# **<u>EXHIBIT 1</u>**

1

```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2   ─────────────────────────────────

 3   IN RE:  VALSARTAN, LOSARTAN,          CIVIL ACTION NUMBER:

 4   and IRBESARTAN PRODUCTS               1:19-md-02875-RMB-SAK

 5   LIABILITY LITIGATION                  Case Management Conference

 6   ─────────────────────────────────

 7   JAN ROBERTS, as personal              CIVIL ACTION NUMBER:
     representative and spouse of
     Gaston J. Roberts, Jr., Deceased,    1:20-cv-00946-RMB-SAK
 8               Plaintiffs,
     v.
 9
     ZHEJIANG HUAHAI PHARMACEUTICAL        Daubert Hearing
10   CO. LTD., et al.
                 Defendants.
11   ─────────────────────────────────

12   Mitchell H. Cohen Building & U.S. Courthouse
     4th and Cooper Streets
13   Camden, New Jersey 08101
     Tuesday, August 26, 2025
14   Commencing at 9:23 a.m.

15   B E F O R E:        THE HONORABLE RENÉE MARIE BUMB, CHIEF
                         UNITED STATES DISTRICT JUDGE, and THE
16                       HONORABLE THOMAS I. VANASKIE (RET.),
                         SPECIAL MASTER
17

18   A P P E A R A N C E S:

19   MAZIE SLATER KATZ & FREEMAN, LLC
     BY:  ADAM M. SLATER, ESQUIRE
20        CHRISTOPHER J. GEDDIS, ESQUIRE
     103 Eisenhower Parkway, Suite 207
21   Roseland, New Jersey 07068
     Counsel for Plaintiffs
22

23            John J. Kurz, Official Court Reporter
                   John_Kurz@njd.uscourts.gov
24                      (856)576-7094

25     Proceedings recorded by mechanical stenography; transcript
            produced by computer-aided transcription.
```

1    **A P P E A R A N C E S:** (Continued)

2    KANNER & WHITELEY, LLC
     BY:  CONLEE S. WHITELEY, ESQUIRE
3         DAVID J. STANOCH, ESQUIRE
     701 Camp Street
4    New Orleans, Louisiana 70130
     Counsel for Plaintiffs
5
     NIGH GOLDENBERG RASO & VAUGHN, PLLC
6    BY:  DANIEL A. NIGH, ESQUIRE
          C. BRETT VAUGHN, ESQUIRE
7    14 Ridge Square NW, Third Floor
     Washington, D.C. 20016
8    Counsel for Plaintiffs

9    HONIK LLC
     BY:  RUBEN HONIK, ESQUIRE
10   1515 Market Street, Suite 1100
     Philadelphia, Pennsylvania 19102
11   Counsel for Plaintiffs

12   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
     BY:  RICHARD BERNARDO, ESQUIRE
13   One Manhattan West, Suites 42-128
     New York, New York 10001
14   Counsel for Defendants Zhejiang Huahai Pharmaceutical Co.,
     Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and
15   Solco Healthcare U.S., LLC (collectively ZHP)

16   KIRKLAND & ELLIS, LLP
     BY:  NINA R. ROSE, ESQUIRE
17   1301 Pennsylvania Avenue, N.W.
     Washington, D.C. 20004
18   Counsel for Defendants Zhejiang Huahai Pharmaceutical Co.,
     Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and
19   Solco Healthcare U.S., LLC (collectively ZHP)

20   KIRKLAND & ELLIS LLP
     BY:  ALLISON M. BROWN, ESQUIRE
21        ANTHONY BALZANO, ESQUIRE
          PAUL A. COTLER, ESQUIRE
22   601 Lexington Avenue
     New York, New York 10022
23   Counsel for Defendants Zhejiang Huahai Pharmaceutical Co.,
     Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and
24   Solco Healthcare U.S., LLC (collectively ZHP)

25              (Appearances continued on next page.)

3

**A P P E A R A N C E S:** (Continued)

KIRKLAND & ELLIS LLP
BY:  PAULA ZAMPIETRO, ESQUIRE
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, Florida 33131
Counsel for Defendants Zhejiang Huahai Pharmaceutical Co.,
Ltd., Huahai U.S., Inc., Prinston Pharmaceutical, Inc., and
Solco Healthcare U.S., LLC (collectively ZHP)

KIRKLAND & ELLIS LLP
BY:  LINDSEY FOSTER, ESQUIRE
601 Lexington Avenue
New York, New York 10022
Counsel for Defendants Torrent Pharma, Inc. and
Torrent Pharmaceuticals Ltd. (collectively Torrent)

CROWELL & MORING LLP
BY:  ANDREW KAPLAN, ESQUIRE
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Counsel for Defendant Cardinal Health

HILL WALLACK, LLP
BY: TERRY M. HENRY, ESQUIRE
21 Roszel Road
Princeton, New Jersey 08540
Counsel for Defendants Hetero Drugs and Hetero Labs

MORGAN, LEWIS & BOCKIUS, LLP
BY: JOHN P. LAVELLE, JR.
502 Carnegie Center
Princeton, New Jersey 08540
Counsel for Defendants Aurolife Pharma LLC
and Aurobindo Pharma USA, Inc.

ARCHER & GREINER, P.C.
BY:  MAUREEN THERESA COGHLAN, ESQUIRE
1025 Laurel Oak Road
Voorhees, NJ 08043
Counsel for the Mylan Defendants

PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI LLP
BY:  FRANK STOY, ESQUIRE
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
Counsel for Defendant Mylan Pharmaceuticals, Inc.

4

**A P P E A R A N C E S:** (Continued)

GREENBERG TRAURIG LLP
BY:  VICTORIA DAVIS LOCKARD, ESQUIRE
     STEVEN HARKINS, ESQUIRE
3333 Piedmont Road, NE, Suite 2500
Atlanta, Georgia 30305
Counsel For Defendants Teva Pharmaceutical Industries Ltd.,
Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma,
Inc. (collectively Teva)

GREENBERG TRAURIG LLP
BY:  GREGORY E. OSTFELD, ESQUIRE
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Counsel For Defendants Teva Pharmaceutical Industries Ltd.,
Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma,
Inc. (collectively Teva)

WALSH PIZZI O'REILLY FALANGA LLP
BY:  LIZA WALSH, ESQUIRE
Three Gateway Center, 100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Counsel for Defendants Teva Pharmaceutical Industries Ltd.,
Teva Pharmaceuticals USA, Inc., Actavis LLC, Actavis Pharma,
Inc. (collectively Teva)

BARNES & THORNBURG, LLP
BY:  KARA KAPKE, ESQUIRE
11 South Meridian Street
Indianapolis, IN 46204
Counsel for Retailer Defendants and CVS Pharmacy, Inc., and
Walmart, Walgreens

ULMER & BERNE LLP
BY: JEFFREY D. GEOPPINGER, ESQUIRE
600 Vine Street
Suite 2800
Cincinnati, Ohio 45202
Counsel for Wholesaler Defendants and AmerisourceBergen

NORTON ROSE FULBRIGHT US LLP
BY:  D'LESLI DAVIS, ESQUIRE
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Counsel for Defendant Mckesson Corp.

5

```
1   A P P E A R A N C E S:  (Continued)

2   FALKENBERG IVES LLP
    BY:  KIRSTIN B. IVES, ESQUIRE
3   230 W Monroe Street, Suite 2220
    Chicago, Illinois 60606
4   Counsel for Defendant Humana

5   BUCHANAN INGERSOLL & ROONEY PC
    BY:  JONATHAN D. JANOW, ESQUIRE
6   1700 K STREET, NW, Suite 300
    Washington, DC 20006
7   Counsel for Albertsons

8   DORSEY & WHITNEY LLP
    BY:  ROXANNA GONZALEZ, ESQUIRE
9   50 South Sixth Street, Suite 1500
    Minneapolis, MN 55402
10  Counsel for OptumRx

11  HUSCH BLACKWELL LLP
    BY:  ABRAHAM JAMES SPUNG, ESQUIRE
12  1801 Wewatta Street, Suite 1000
    Denver, CO 80202
13  Counsel for Defendants Express Scripts, Inc.

14

15  Also present:

16  Arthur Roney, The Courtroom Deputy

17  Clarissa Lintner, Esquire, Career Law Clerk to the Honorable
    Renée Marie Bumb, Chief Judge
18
    Mark Rigney, Paralegal, Kirkland
19
    Roman Bielski, Trial Technology Specialist
20

21

22

23

24

25
```

1                          <u>**INDEX**</u>

2    <u>**WITNESSES**</u>:                                    <u>**PAGE**</u>

3    <u>**FOR THE PLAINTIFFS**</u>:

4    FAREEHA SIDDIQUI, M.D.

5       Direct Examination By Mr. Nigh                 12

6       Cross-Examination By Ms. Brown                 57

7       Redirect Examination By Mr. Nigh              111

8    <u>**WITNESSES**</u>:                                    <u>**PAGE**</u>

9    <u>**FOR THE DEFENDANTS**</u>:

10   NADIM MAHMUD, M.D.

11      Direct Examination By Mr. Balzano            117

12      Cross-Examination By Mr. Vaughn              170

13   ANDREW S. THOMPSON, Ph.D.

14      Direct Examination By Ms. Rose               219

15      Cross-Examination By Mr. Slater              254

16

17

18

19

20

21

22

23

24

25

```
 1              (PROCEEDINGS held in open court before the Honorable
 2    Renée Marie Bumb, Chief United States District Judge, and the
 3    Honorable Thomas I. Vanaskie (Ret.), Special Master, at
 4    9:23 a.m. as follows:)
 5              THE COURTROOM DEPUTY:  All rise.
 6              CHIEF JUDGE BUMB:  Good morning.
 7              MR. SLATER:  Good morning.
 8              MR. NIGH:  Good morning, Your Honor.
 9              MS. ROSE:  Good morning.
10              MS. BROWN:  Good morning, Your Honor.
11              CHIEF JUDGE BUMB:  Good to see you all.  You can all
12    have a seat.  Thank you.
13              Judge Vanaskie is present, the Honorable Judge
14    Vanaskie.  Okay.  Let me get organized.  Okay.  How do you
15    folks -- let's start with appearances, please.  Okay.  We are
16    here in the valsartan matter.  The MDL number is 2875.  So let
17    me start with appearances, please.
18              MR. SLATER:  Good morning, Your Honor.  Adam Slater
19    on behalf of the plaintiffs.
20              CHIEF JUDGE BUMB:  Good morning.
21              MR. VAUGHN:  Good morning, Your Honor.  Brett Vaughn
22    on behalf of the plaintiffs.
23              CHIEF JUDGE BUMB:  Good morning.
24              MR. NIGH:  Good morning, Your Honor.  Daniel Nigh on
25    behalf of plaintiffs.
```

8

```
 1              CHIEF JUDGE BUMB:  Good morning.

 2              MS. BROWN:  Good morning, Your Honor.  Alli Brown on

 3   behalf of ZHP.

 4              CHIEF JUDGE BUMB:  Good morning.

 5              MS. ROSE:  Good morning, Your Honor.  Nina Rose on

 6   behalf of ZHP.

 7              CHIEF JUDGE BUMB:  Good morning.

 8              MR. BALZANO:  Good morning, Your Honor.  Anthony

 9   Balzano on behalf of ZHP.

10              CHIEF JUDGE BUMB:  Good morning.

11              MR. COTLER:  Good morning, Your Honor.  Paul Cotler

12   for ZHP.

13              CHIEF JUDGE BUMB:  Good morning.

14              MR. OSTFELD:  Good morning, Your Honor.  Greg Ostfeld

15   for Teva Pharmaceuticals.

16              CHIEF JUDGE BUMB:  Good morning.

17              MR. BERNARDO:  Good morning, Your Honor.  Richard

18   Bernardo for ZHP.

19              CHIEF JUDGE BUMB:  Good morning.

20              MS. LOCKARD:  Good morning.  Victoria Lockard for

21   Teva.

22              CHIEF JUDGE BUMB:  Good morning.

23              MR. STOY:  Good morning, Your Honor.  Frank Stoy for

24   Mylan.

25              CHIEF JUDGE BUMB:  Good morning.
```

9

```
 1              MS. ZAMPIETRO:  Good morning, Your Honor.  Paula
 2   Zampietro for ZHP.
 3              CHIEF JUDGE BUMB:  Can you say your name louder.
 4              MS. ZAMPIETRO:  Paula Zampietro for ZHP.
 5              CHIEF JUDGE BUMB:  Good morning.
 6              MR. LAVELLE:  Good morning, Your Honor.  John Lavelle
 7   for Aurobindo.
 8              CHIEF JUDGE BUMB:  Good morning.
 9              MS. COGHLAN:  Good morning, Your Honor.  Maureen
10   Coghlan for the Mylan defendants.
11              CHIEF JUDGE BUMB:  Good morning.
12              If any of you want to move some chairs up to sit at
13   counsel table, you're more than welcome to.  Or if you just
14   want to sit back there and stay quiet, you're welcome to, too.
15              (Laughter.)
16              CHIEF JUDGE BUMB:  Okay.  So let me turn, how do you
17   folks want to start?  I am prepared.  I thought we would start
18   right with the Dauberts because I imagine your experts are
19   waiting.  What do you all say?
20              MR. NIGH:  We're fine with starting with the
21   Dauberts, Your Honor.
22              CHIEF JUDGE BUMB:  Okay.  Yes?
23              MS. BROWN:  Sure, Your Honor.
24              CHIEF JUDGE BUMB:  Okay.  So I thought we would start
25   with Dr. Siddiqui.
```

1              MR. NIGH:  Your Honor, I'll go get my witness.

2              CHIEF JUDGE BUMB:  Okay.  While they're doing that,

3    do counsel see the need to go through qualifications?  I

4    don't -- there's no dispute about qualifications under Rule

5    702, and I think that we can skip through that.  If you wanted

6    to introduce the resume as part of the hearing, that might be a

7    way to proceed.  What do you folks think about that?  It's your

8    motion.

9              MR. SLATER:  I guess I'll let Mr. Nigh answer, but I

10   think that sounds reasonable to us, Your Honor.

11             MS. BROWN:  That makes sense to us as well.

12             CHIEF JUDGE BUMB:  Okay.  All right.

13             (Witness took the stand.)

14             CHIEF JUDGE BUMB:  Good morning.  Please step up to

15   the witness stand.

16             THE COURTROOM DEPUTY:  Please place your left hand on

17   the Bible and raise your right hand.

18             Do you solemnly swear the testimony you're about to

19   give in the case now before this Court will be the truth, the

20   whole truth, and nothing but the truth, so help you God?

21             THE WITNESS:  I do.

22             *FAREEHA SIDDIQUI, M.D., called as a witness for the*

23   *Plaintiffs, having been first duly sworn by the Deputy, was*

24   *examined and testified as follows:*

25             THE COURTROOM DEPUTY:  Can you please state and spell

*11*

1    your full name for the record.

2              THE WITNESS:  Fareeha Siddiqui, F-A-R-E-E-H-A,

3    S-I-D-D-I-Q-U-I.

4              THE COURTROOM DEPUTY:  Thank you.

5              CHIEF JUDGE BUMB:  Okay.

6              MR. NIGH:  Your Honor, may I approach?

7              CHIEF JUDGE BUMB:  Yes.  Just one second, Mr. Nigh.

8              So if you could just have a seat.  Can we somehow

9    move the screen because the screen is going to entirely block

10   the witness.

11             THE COURTROOM DEPUTY:  Yes.

12             CHIEF JUDGE BUMB:  So, Doctor, have a seat.  Please

13   keep your voice up, okay, and speak into the microphone.  We're

14   going to have to move this monitor.

15             There we go.  Thank you.  Mr. Nigh, while you were

16   out, we discussed, and there was an agreement, you weren't part

17   of it so I want to make sure you're part of it, that we can --

18   there was an agreement that there's no need to go into her

19   qualifications, et cetera.  And if you wanted to introduce as

20   part of this hearing her CV, that the Court can take notice of

21   that, because there's really no dispute as to her

22   qualifications.  Is that acceptable to you?

23             MR. NIGH:  It is.  We'll hand you the CV at the end,

24   if that's okay.

25             CHIEF JUDGE BUMB:  Okay.  All right.

*Siddiqui, M.D. - Direct - Nigh*                    12

```
 1              MR. NIGH:  Your Honor, may I approach?

 2              CHIEF JUDGE BUMB:  You may, yeah.

 3              MR. NIGH:  These are the presentation slides.

 4              CHIEF JUDGE BUMB:  Thank you.

 5         Okay.  Whenever you're ready.

 6              MR. NIGH:  Thank you, Your Honor.

 7                      PLAINTIFFS' EVIDENCE

 8                      DIRECT EXAMINATION

 9    BY MR. NIGH:

10    Q.   Dr. Siddiqui, can you please introduce yourself.

11    A.   Thank you.  Good morning, Your Honor.  I'm Fareeha

12    Siddiqui.  I'm a board-certified hematologist oncologist.  I've

13    been practicing for more than 20 years as a hematologist

14    oncologist.

15              MR. NIGH:  Your Honor, can we hear the witness?

16              CHIEF JUDGE BUMB:  Okay.  So now we are going to have

17    to make sure that we all hear you.  So can you bring the

18    microphone closer to you.

19              THE WITNESS:  Good morning.

20              CHIEF JUDGE BUMB:  Is it amplified to the highest?

21              THE WITNESS:  Good morning.

22              CHIEF JUDGE BUMB:  Tap it.  So you're very

23    soft-spoken, so if you can just speak into the mic, please, so

24    we can all hear you.  And I do have a hearing issue.

25              THE WITNESS:  Sorry, Your Honor.  Is this better?
```

1    CHIEF JUDGE BUMB:  Much better, yes.

2    THE WITNESS:  Good morning, Your Honor.  I'm Fareeha

3  Siddiqui.  I'm a board-certified hematologist.  I've been

4  practicing as a hematologist oncologist for more than 20 years.

5  BY MR. NIGH:

6  Q.   Dr. Siddiqui, if you could bring the mic just a little bit

7  closer to you and just speak up a little bit more, too.  I'm

8  also hard of hearing so having a little difficulty.

9  A.   Is this better?

10  Q.   That's great.

11    CHIEF JUDGE BUMB:  Yes.  You almost have to just put

12  your mouth right up to the mic.

13    THE WITNESS:  Yes, Your Honor.

14  BY MR. NIGH:

15  Q.   Doctor, can you please explain your methodology that you

16  undertook in reaching your opinions for Mr. Roberts' case.

17  A.   I conducted an extensive differential diagnosis.  I

18  identified risk factors associated with hepatocellular

19  carcinoma, or liver cancer.  I reviewed the literature and the

20  related risk factors.  I reviewed Mr. Roberts' medical and

21  social history, his deposition testimony, and medical records

22  thoroughly, and I determined whether each risk factor was a

23  substantial factor in causing his disease.

24  Q.   And, Doctor, did you prepare an expert report in this

25  case?

*Siddiqui, M.D. - Direct - Nigh*                           14

1    A.   I did.  And I reviewed and relied on the plaintiff's

2    general causation from the other general causation experts.

3    Q.   Okay.

4              CHIEF JUDGE BUMB:  Let me ask you a question.  Were

5    you instructed by legal counsel to use the substantial

6    factor --

7              THE WITNESS:  Uhmm...

8              CHIEF JUDGE BUMB:  -- test.

9              THE WITNESS:  On my -- as a substantial factor?

10             CHIEF JUDGE BUMB:  Yes.

11             THE WITNESS:  My understanding on my reading when

12   writing the legal report was that I should rule in and rule out

13   what seems to be most common.

14             CHIEF JUDGE BUMB:  Uh-huh.

15             THE WITNESS:  And what seems to be a substantial

16   factor, more likely than not, or that I felt was the most

17   reliable.

18             CHIEF JUDGE BUMB:  Okay.

19             MR. NIGH:  And, Your Honor, may I approach with her

20   expert report?

21             CHIEF JUDGE BUMB:  Yes, of course.

22             MS. BROWN:  Thank you.

23             (Counsel approached; documents handed out.)

24   BY MR. NIGH:

25   Q.   And, Doctor, when you were preparing your opinion, did you

1    review Mr. Roberts' medical records?

2    A.    I did.

3    Q.    And you reviewed the scientific literature?

4    A.    Yes, I did.

5    Q.    You didn't do a Bradford Hill analysis.  Why not?

6    A.    The Bradford Hill analysis is usually used for general

7    causation opinions, and I was being asked to do a specific

8    causation opinion.  Also, I reviewed the Bradford Hill analyses

9    that were used in the general causation expert reports.

10   Q.    So you did a differential diagnosis for your specific

11   causation opinion?

12   A.    Yes, I did.

13   Q.    Okay.  Doctor, can you briefly discuss your review of the

14   medical records, just some highlights of Mr. Roberts' timeline.

15   A.    Yes.

16           Your Honor, Mr. Roberts' -- Mr. Roberts had an

17   ultrasound and a CAT scan showing no cancer in April of 2016.

18   In September of 2016, he began ingesting NDMA-contaminated

19   valsartan.  By August of 2018, he was diagnosed with

20   hepatocellular carcinoma.  And unfortunately, in March 2020 he

21   passed away due to liver cancer.

22   Q.    Thank you.

23           And, Doctor, can you briefly describe for the Judge

24   the various stages of liver disease.

25   A.    So usually, Your Honor, the liver goes through a stepwise

1    progression if it's going to be going towards liver disease.

2    It starts off usually with a healthy liver on that far left and

3    ends with end-stage liver disease on the far right.  Over time,

4    over many, many years usually, the healthy liver goes from

5    being healthy to having more inflammation, and then becoming

6    fibrotic in some areas with fibrosis, and then in certain

7    areas, the fibrosis when there is more scar tissue that

8    replaces healthy liver tissue, that becomes cirrhosis, and then

9    a small proportion of people with cirrhosis go on to develop

10   hepatocellular or liver cancer.  And a lot of them end up

11   developing end-stage liver disease.

12   Q.   Thank you.

13         And, Doctor, in April of 2016 when Mr. Roberts had

14   his CT scan and ultrasound, which stage would you have placed

15   Mr. Roberts at that time?

16   A.   I feel, based on the fact that there was no diagnosis made

17   on that CAT scan, he would be between inflammation and possible

18   fibrosis at that time, Your Honor.

19   Q.   And at --

20         CHIEF JUDGE BUMB:  And can you explain that answer to

21   me more thoroughly, please.

22         THE WITNESS:  Yes.  So, Your Honor, on the ultrasound

23   and the CAT scan that were done, they noted -- the radiologist

24   noted that there was -- there were subtle findings, and they

25   said that those -- I'm paraphrasing here -- they said that

```
 1    those findings were consistent with possible inflammation or

 2    nodular formation or fibrosis or cirrhosis, they said.

 3              And so the radiologist usually points towards

 4    something, says that it could be this, but the diagnosis of

 5    cirrhosis is made -- it's a clinical diagnosis, so it's made

 6    based on certain factors, physical findings, such as variceal

 7    bleeding or worsening liver disease.

 8              So in someone who has no symptoms but just subtle

 9    signs and findings on scans that the radiologist says are

10    subtle findings, we assume -- the assumption is that it's not

11    full-blown cirrhosis, but we can say, okay, it's probably

12    inflammation, probably some fibrosis in certain areas.  And if

13    there is anything, maybe -- maybe that fibrosis in certain

14    areas is mild cirrhosis, but we wouldn't diagnose it with

15    cirrhosis.  I wouldn't have diagnosed it with cirrhosis based

16    on those scans.

17              CHIEF JUDGE BUMB:  Have you heard the criticism that

18    there's no such terminology as "mild cirrhosis"?

19              THE WITNESS:  So what I was trying to explain in my

20    report, Your Honor, was they use it -- we use it colloquially

21    where, you know, fibrosis, there are many different stages of

22    fibrosis, and it's used intermixed.  So you can say, okay,

23    there's a little bit of fibrosis, there's, you know, moderate

24    fibrosis and then there's cirrhosis, and even cirrhosis can be

25    extremely fibrosed.  A part of the liver can be fibrosed or
```

1    sometimes, God forbid, the whole liver can be fibrosed, and

2    cirrhosis, where the liver is not being able to regenerate.

3            So I was trying to use -- you know, I was trying to

4    say that he may have had mild fibrosis or mild cirrhosis or a

5    degree of fibrosis, but the exact diagnosis of cirrhosis where

6    he has this -- this physical -- where he has these physical

7    symptoms of cirrhosis, I do not believe he has that.

8            CHIEF JUDGE BUMB:  So let me ask you this question:

9    So I understand your testimony to be that because there was not

10   an actual diagnosis of cirrhosis, that you assumed that he did

11   not have cirrhosis.  Is that right so far?

12           THE WITNESS:  And I'm basing that on, Your Honor, the

13   fact that the CAT scan did not diagnose cirrhosis.  They said

14   that there are possible signs of cirrhosis or fibrosis or

15   inflammation.  And also, he didn't have any physical signs of

16   cirrhosis.  And throughout this time, he was being followed,

17   Your Honor, and no treating physician diagnosed him with

18   cirrhosis.  They questioned --

19           THE COURT:  Right.  So am I correct that you seem to

20   really hang your hat on the fact that he was not diagnosed with

21   cirrhosis, and you do not give any weight to the radiologist

22   finding that he had indicia of factors that were consistent

23   with cirrhosis?  You did not put any weight onto that; am I

24   right?

25           THE WITNESS:  I feel, Your Honor, that I put weight

1    into it in the sense that he pointed towards it and I reviewed

2    that.  It was just that I did not believe that he was diagnosed

3    with cirrhosis because it's a physical finding, diagnosis.

4                 CHIEF JUDGE BUMB:  Right.  My question is --

5                 THE WITNESS:  I'm sorry.

6                 CHIEF JUDGE BUMB:  -- to state it differently is:

7    You put pretty much all of your -- the weight of your opinion

8    into the fact that there was not such a diagnosis, correct?

9                 THE WITNESS:  Correct, Your Honor.

10                CHIEF JUDGE BUMB:  Okay.

11                THE WITNESS:  Yes, Your Honor.

12                MR. NIGH:  Your Honor --

13                CHIEF JUDGE BUMB:  Yes.

14   BY MR. NIGH:

15   Q.   -- in addition to that, you reviewed his medical records,

16   correct?

17   A.   Yes, I did.

18   Q.   And you didn't see any clinical symptoms of him having

19   cirrhosis in 2016, correct?

20   A.   Correct.  And he was -- his treating physicians did not

21   give that diagnosis either.

22   Q.   So when you reviewed his medical records, you also made

23   the statement, based on his symptoms, that you also would not

24   have diagnosed him with cirrhosis, correct?

25   A.   Correct.

*Siddiqui, M.D. - Direct - Nigh*                    20

1    Q.   And why does it need both medical symptoms and imaging

2    findings to diagnose somebody with cirrhosis?

3    A.   Because imaging findings can be subtle and they could

4    point towards either inflammation or fibrosis or cirrhosis when

5    you're looking at a liver like --

6    Q.   So when a radiologist says these findings can be

7    consistent with cirrhosis, that may also be consistent with

8    earlier stages, inflammation or fibrosis, correct?

9    A.   Yes, yes, absolutely.  And the radiologists also do

10   usually end their reports with "clinical correlation is

11   advised."

12   Q.   Thank you.

13            CHIEF JUDGE BUMB:  And I guess what I'm trying to get

14   an answer from is, on what grounds scientifically or did you --

15   you had to choose one or the other, and it's not clear to me

16   why you just assumed that he did not have cirrhosis.

17            THE WITNESS:  I think, Your Honor, because, firstly,

18   when we look at the scans, the liver looks quite hydrogenous,

19   as in it looks clean, it looks --

20            CHIEF JUDGE BUMB:  But you're not a radiologist,

21   right?

22            THE WITNESS:  No, no, just --

23            CHIEF JUDGE BUMB:  And the best -- do you agree with

24   me that the best evidence would be from a radiologist?

25            THE WITNESS:  Yes, absolutely.

```
 1                CHIEF JUDGE BUMB:  Okay.

 2                THE WITNESS:  Yes, absolutely.

 3                CHIEF JUDGE BUMB:  And I should give that greater

 4   weight?

 5                THE WITNESS:  Yes, absolutely.

 6                CHIEF JUDGE BUMB:  Okay.  Go ahead, finish your

 7   answer.

 8                THE WITNESS:  Oh, sorry.

 9           So I was saying that on review, it looked clean.  On

10   the radiologist review, they said there are signs that may be

11   consistent with, but they did not find it to be an absolute

12   indication.  And then he himself, Mr. Roberts, did not have any

13   physical symptoms or signs, and the doctors who were following

14   him at that time did not feel or suspect cirrhosis.

15           So based on those -- on that review, I came up with

16   the fact that he did not have cirrhosis.  And then there were

17   also records reviewed by other doctors who were treating him

18   later on in 2018, and even those records mentioned that he had

19   been worked up for liver disease.  And I'm paraphrasing again,

20   Your Honor.  That he had been worked up for liver disease in

21   the past and had not had any signs of cirrhosis or extensive

22   liver disease in the past.

23   BY MR. NIGH:

24   Q.   Doctor, who makes the diagnosis of cirrhosis?  Is it a

25   radiologist or is it the clinician?
```

Siddiqui, M.D. - Direct - Nigh                    22

1    A.   It's the clinician at the end of the day who makes the

2    diagnosis.

3    Q.   Why is it the clinician and not the radiologist?

4         CHIEF JUDGE BUMB:  Well, the question, to be fair,

5    the question is:  Who was in the best position to review the

6    imaging?  And her answer was the radiologist.  That was a

7    separate question.

8    BY MR. NIGH:

9    Q.   My question is:  In knowing that somebody has cirrhosis,

10   who is in the best position to diagnose or know that a patient

11   has cirrhosis, the radiologist or the clinician?

12   A.   So the clinician makes that final diagnosis, Your Honor,

13   but you are right also, Your Honor, that we base it on the

14   alerts that the radiologist sends us or the guidance that the

15   radiologist sends us, but the radiologist doesn't usually make

16   that diagnosis.  They give us just alerts or they tell us that

17   these are subtle findings, in a case where there are subtle

18   findings.

19        THE COURT:  Right.  And so just -- and then I want to

20   make sure that I understand it.  And so the evidence in this

21   case is that the radiologist made a finding that there were --

22   there was evidence consistent with cirrhosis.  That was the

23   radiologist finding, correct?

24        (Witness nodding head.)

25        CHIEF JUDGE BUMB:  You, however, looked at the images

*Siddiqui, M.D. - Direct - Nigh*                    23

1    yourself and based upon your review determined that it did

2    not -- that those images were not consistent with cirrhosis,

3    correct?

4                    THE WITNESS:  I -- sorry, Your Honor.

5                    CHIEF JUDGE BUMB:  And then you, in addition to the

6    clinical record as well, you then concluded that he did not

7    have cirrhosis?

8                    THE WITNESS:  Yes, Your Honor.  I did not base it on

9    radiological -- I would not base my opinion on a radiological

10   review in the sense that I'm not a radiologist and I would not

11   be able to make a radiological diagnosis.  But I put everything

12   together and what the doctors were saying and what the

13   radiologist was saying.  And my understanding was, and on my

14   review, that he did not have cirrhosis at that time.  He may

15   have had some inflammation or fibrosis at that time, but he was

16   not diagnosed with cirrhosis and did not have cirrhosis at that

17   time.

18   BY MR. NIGH:

19   Q.   What clinical findings do you need to have in order to

20   diagnose somebody with cirrhosis?  What are you looking for?

21   A.   So cirrhosis is basically when there is scar tissue that

22   replaces the liver.  So at that time, the liver is hurting and

23   having issues.  So you can see variceal bleeding because of

24   back pressure in the upper abdominal vasculature.  You can see

25   portal hypertension because of back pressure and the vessels

Siddiqui, M.D. - Direct - Nigh                               24

1   inside the liver or around the liver.  So you can see various

2   degrees of physical symptoms.

3   Q.    And what are those physical symptoms?

4   A.    Abdominal pain that's worsening, ascites, swelling,

5   jaundice, et cetera.

6   Q.    Those physical symptoms, did he have any of those physical

7   symptoms?

8   A.    He did not.

9   Q.    And it's the lack of those physical symptoms also

10  contributed to your opinion that he didn't have cirrhosis in

11  April of 2016, correct?

12  A.    Correct.

13  Q.    Okay.  Doctor, can you describe what is hepatocellular

14  carcinoma?

15  A.    So hepatocellular carcinoma basically means liver cell

16  cancer, and it's the most common form of liver cancer, Your

17  Honor.  It comprises up to 90 percent of liver cancers.

18  Q.    And would you find the liver cancer studies generally to

19  be informative of hepatocellular carcinoma?

20  A.    Yes; because most of them are -- well, most liver cancers

21  are hepatocellular carcinomas.

22  Q.    So you would rely on liver cancer general causation

23  information when you're examining hepatocellular carcinomas?

24  A.    Yes, I would.

25  Q.    Okay.  And let's talk about the risk factors for

1  hepatocellular carcinoma.  How did you put together the risk

2  factors that you would utilize for your differential diagnosis?

3  A.    So, Your Honor, I used a lot of literature and cancer

4  sites that can be found online and medical databases like

5  PubMed.  On the right are the risk factors that I ruled out

6  quite easily and on the left are risk factors that I spoke

7  about in more detail.

8  Q.    Okay.  And where do you pull this list of potential risk

9  factors?

10  A.    From sites like the American Cancer Society, the NIH, and

11  various studies.

12  Q.    Why would you include NDMA as a risk factor if they

13  weren't listed on those sources?

14  A.    Some sites list carcinogens as risk factors, and

15  especially in Mr. Roberts' case, I found that NDMA as a

16  carcinogen was the cause of his liver cancer, and so I put it

17  in as a risk factor to evaluate.

18  Q.    Okay.  And do these sites, do they include every

19  carcinogen that's capable of causing cancers when they list

20  risk factors?

21  A.    Usually not.  They basically put in like, for example, a

22  heading of carcinogens and then you have to go in and look

23  through different types of carcinogens.  For example,

24  aflatoxins are listed and it's like a -- you have to go in and

25  do further research into other carcinogens.

1   Q.    And up to 20 percent of people worldwide that get liver

2   cancer are exposed to aflatoxins, correct?

3   A.    Correct.

4   Q.    So they list the most common risk factors in the websites?

5   A.    Yes, Your Honor.  Yes, they do.

6   Q.    Doctor, let's talk about the risk factors that you were

7   able to rule out easily.

8   A.    So the easy ones were viral hepatitis because he never had

9   hepatitis C or B.  Excessive alcohol consumption, which he did

10  not have.  Tobacco use.  He did smoke till 1983, but he quit in

11  1983.  And studies show that the last cigarette that one smokes

12  it stays in the system for around 15 years and then the risk

13  goes down back to the normal population levels.  So I ruled

14  that out.

15        Aflatoxins, no exposure.  Anabolic steroids, no

16  exposure.  Gender, race and age are basically considered

17  ubiquitous, and they are not the cause of the cancer per se.

18        He did not have iron overload or glycogen storage

19  disease, alpha-1 antitrypsin deficiency, hypercitrullinemia,

20  ALGS, or acute intermittent porphyria.  So I ruled those out.

21  Q.    Doctor, let's talk about the mechanistic, how NDMA causes

22  hepatocellular carcinoma.

23        Did you review the George study as one of the studies

24  you reviewed in this case?

25  A.    I did.

*Siddiqui, M.D. - Direct - Nigh*                     27

```
1                MR. NIGH:  Your Honor, may I approach?

2                CHIEF JUDGE BUMB:  Yes.

3                (Handing out documents.)

4                CHIEF JUDGE BUMB:  Thank you.

5                THE WITNESS:  Thank you.

6    BY MR. NIGH:

7    Q.    And, Doctor, if we turn to page 4, that's the chart that

8    we have here that discusses -- what does this chart discuss?

9    A.    So basically, Your Honor, this chart is giving us a

10   breakdown of what happens on the ingestion of NDMA and all the

11   way to what causes hepatocellular carcinoma.  So NDMA causes

12   oxidative stress, it causes liver cell injury or hepatocyte

13   injury.  It causes inflammation, necrosis, which is cellular

14   breakdown.  It causes mutational changes and DNA changes that

15   cause nodular formation, scarring, mutational changes.  And

16   those can lead to cirrhosis, which is usually the gateway to

17   hepatocellular carcinoma.  And that cirrhosis or the gene

18   aberrations or mutations lead to hepatocellular carcinoma.

19   Q.    And, Doctor, this study also is showing that it can also

20   exacerbate someone's inflammation, fibrosis or cirrhosis they

21   have as well before they get hepatocellular carcinoma, correct?

22   A.    Correct.  Yes.

23   Q.    And when I say "that," that's the NDMA, correct?

24   A.    The NDMA can.  It's known to be a tumor inducer and

25   promoter.
```

Siddiqui, M.D. - Direct - Nigh                                    28

1   Q.    Doctor, is it a surprise that Mr. Roberts had cirrhosis at

2   the time of his HCC diagnosis?

3   A.    I -- it's surprising because mostly when one goes from

4   steps of any sort of early liver disease to cirrhosis, it takes

5   usually many, many years, sometimes seven, ten years or more.

6         And so, for example, from a healthy liver going to

7   fibrosis takes sometimes ten years or more, and then from that

8   fibrosis to cirrhosis usually takes seven to ten years or more,

9   and then cirrhosis to HCC takes another sometimes seven to ten

10  years or ten years or more.

11        And so the fact that in Mr. Roberts' case, he went

12  from what did not look to be a cirrhotic liver or had subtle

13  signs but no obvious aggressive signs of disease in 2016, going

14  from that to something that was -- had a large amount of tumor

15  burden in that liver in 2018 was surprising because it's a --

16  it's a very shortened latency period or time span, and that's

17  why I believe that the NDMA was the cause of that.

18  Q.    Doctor --

19        CHIEF JUDGE BUMB:  Or that he had cirrhosis and the

20  radiologist was correct that he did have cirrhosis back then.

21  That's another option -- alternative; is it not?

22        THE WITNESS:  Yes, Your Honor, that could be an

23  alternative.  The only reason I ruled in NDMA and not the

24  cirrhosis not caused by NDMA is because, say, even if we agree

25  that it was cirrhosis there, the cirrhosis was subtle, but say

Siddiqui, M.D. - Direct - Nigh                          29

1    we agree that there was cirrhosis there, the studies show that
2    cirrhosis to HCC usually takes around seven to ten years.  And
3    we can pull up those studies, and those are in patients who had
4    hepatitis C, so they're more aggressive usually, but --
5              CHIEF JUDGE BUMB:  And diabetes and more obese, all
6    of the factors that Mr. Roberts had, or no?
7              THE WITNESS:  So basically, for example, if you put
8    in diabetes, hyperlipidemia and fatty liver disease or NASH
9    under the umbrella of metabolic syndromes, so those metabolic
10   syndromes from there to fibrosis to cirrhosis takes some time.
11   It usually takes approximately from NASH to cirrhosis sometimes
12   takes up to ten years, sometimes longer, and then from
13   cirrhosis to HCC, again, around ten years or so.
14             So that whole picture, it definitely can happen, but
15   it takes time for it to happen.  It's a chronic sort of issue
16   that takes time to happen.
17             The reason this case was significant for me, Your
18   Honor, was the fact that there was -- if we consider him to
19   have NASH, if we consider him to have fibrosis and cirrhosis in
20   2016, even if he had it then, it wasn't severe enough to make
21   that diagnosis by his treating physicians.  But say we say that
22   he had it in 2016, that would mean that the first signs of
23   decompensated or significant cirrhosis that we would see
24   approximately would be late -- maybe a decade after that,
25   approximately, right?

Siddiqui, M.D. - Direct - Nigh                    30

1          And then approximately a decade or seven to ten years

2     after that cirrhosis we would see HCC.  And not even everyone

3     with cirrhosis gets HCC.  A small proportion of those people

4     do.  So the timeline for me wasn't making sense, Your Honor.

5     The timeline of two years wasn't making sense to me.  And

6     that's why I believe that it was the NDMA that was promoting

7     that cancer and shortening the timeline and making it very,

8     very fast.

9     BY MR. NIGH:

10    Q.   Did you get to review the pharmaceutical records of

11    Mr. Roberts?

12    A.   I did.

13    Q.   And what did those pharmaceutical records show?

14    A.   Basically, Your Honor, they showed that he started

15    ingesting NDMA-contaminated valsartan in 2016, and he continued

16    to refill prescriptions and take contaminated-NDMA valsartan,

17    Your Honor, till June of 2018.  And in fact, his last

18    prescription, Your Honor, was filled just a few days or a

19    little bit after his diagnosis.  And the assumption is that he

20    continued to take that prescription, that last prescription.

21    Q.   Did you review the NDMA test results that the FDA has

22    published?

23    A.   I did.

24         MR. NIGH:  Your Honor, may I approach?

25         CHIEF JUDGE BUMB:  Yes.

1        THE WITNESS:  Thank you.

2   BY MR. NIGH:

3   Q.   And, Dr. Siddiqui, what did the test results show for the

4   pills that Mr. Roberts had consumed?

5   A.   So, Your Honor, Mr. Roberts consumed the pills from

6   Prinston Pharmaceutical, and basically the pills from Prinston

7   Pharmaceutical contained high levels of NDMA in valsartan

8   tablets.

9   Q.   And when you compare the levels of NDMA, what were those

10  levels?

11  A.   So basically there were a few drug companies that were

12  distributing contaminated valsartan, NDMA-contaminated

13  valsartan.  Some companies, Your Honor, like if you look at

14  Hetero Labs, had a smaller contamination level with NDMA.  And

15  there were other companies, like Prinston Pharmaceuticals, that

16  had a much higher level of contamination with NDMA, like a

17  significantly higher level.  And Mr. Roberts was only taking

18  Prinston Pharmaceuticals for nearly two years at a very high

19  contaminated level, Your Honor.

20  Q.   Doctor, did you review epidemiological studies regarding

21  valsartan in this case?

22  A.   Yes, I did, Your Honor.  There are three main ones that

23  have been done looking at contaminated valsartan and the risk

24  of liver cancer -- or cancer.  Sorry.

25  Q.   Did you find the Pottegard study to be helpful in your

```
 1   review of whether or not valsartan can cause cancer?
 2   A.    So the first one that was done, Your Honor, was the
 3   Pottegard study.  It was a Danish study.  Not the one on the
 4   screen.  And the Pottegard study was a very small study.  It
 5   had maybe 5,000 to 6,000 patients.  It didn't find any
 6   incidents of liver cancer, and they even thought that was a
 7   weakness in their study.  They listed the fact that they had
 8   few people and weren't able to find correlation.
 9   Q.    So with having no incidents of liver cancer for both the
10   control or the test group, that study wouldn't be helpful in
11   evaluating your question, correct?
12   A.    Correct, not to me, no.
13   Q.    Let's talk about the Gomm --
14         CHIEF JUDGE BUMB:  Could you explain that answer,
15   please.
16         THE WITNESS:  So I was saying, Your Honor, that I did
17   not find that study useful, the Pottegard study, Your Honor,
18   because it was a small study of 5- to 6,000 people in Denmark.
19   And when they listed -- so they did not find a correlation with
20   NDMA-contaminated valsartan with cancer.  They had no liver
21   cancer patients.  They did not find any liver cancer patients.
22   And in their discussion portion of it, Your Honor, they said
23   that their limitations to the study were that in Denmark they
24   don't use valsartan that much.  So they didn't have a high
25   degree of patients.  And the fact that they only had maybe
```

*Siddiqui, M.D. - Direct - Nigh*                    33

1    5,000 patients, approximately 5,000 to 6,000 patients, sort of

2    limited the amount of information we can get from that study,

3    Your Honor.

4    BY MR. NIGH:

5    Q.    And did you review the Gomm study?

6    A.    Yes.

7          So, Your Honor, the Gomm study was the study that

8    followed that, and this was a large study.  It had

9    approximately nearly 800,000 patients from Germany.  And in

10   that study, Your Honor, they basically divided patients into

11   "ever exposed" and "never exposed."  Never having filled --

12   never exposed being that they never filled an NDMA-contaminated

13   valsartan prescription, and "ever exposed" was that they filled

14   even one prescription.  If someone filled even one prescription

15   or had even one pill of valsartan, Your Honor, they would be in

16   the "ever exposed" group.

17         So you would have people in the "ever exposed" group

18   who had one prescription or multiple prescriptions or two or

19   three years of prescriptions, for example.  And they were all

20   in the ever group.

21   Q.    And the ever exposed, they could be taking -- you know,

22   many of those patients could have been taking significantly

23   less NDMA per pill than what Mr. Roberts was taking, correct?

24   A.    Yes, correct.  Because, Your Honor, they mixed everyone

25   who had ever taken it and they also mixed all the different

Siddiqui, M.D. - Direct - Nigh                           34

1    types of pills that they were getting.  So in that group, for

2    example, they could have had someone who took one prescription,

3    right, as compared to someone who took years of prescriptions.

4              But also, Your Honor, they mixed in someone who took

5    pills from Hetero Labs, for example, that we saw had a less

6    amount of NDMA contamination with someone who also had pills

7    from Prinston labs.  So because we don't know which pill

8    company was giving which drug to which pharmacy, we don't know

9    that, they don't know that.

10             CHIEF JUDGE BUMB:  So talk to me about that.

11             So the study said that there was a very low risk,

12   right?

13             THE WITNESS:  The study showed -- so -- so may I

14   clarify that, Your Honor?

15             CHIEF JUDGE BUMB:  Of course.

16             THE WITNESS:  Thank you.

17             So what the study showed was that when comparing ever

18   and -- sorry, never and ever exposed, there was a higher risk

19   of liver cancer in the ever exposed.  But to me -- so it is

20   statistically significant.  But to me I found it to be even

21   more statistically significant because the study diluted the

22   ever group because you had people who took one prescription and

23   then went to another pharmacy and took another prescription

24   that wasn't contaminated.

25             CHIEF JUDGE BUMB:  And your opinion seems to, and

Siddiqui, M.D. - Direct - Nigh                    35

```
 1   your earlier testimony, you indicated that Mr. Roberts took a

 2   more significant level, right?

 3              THE WITNESS:  Yes, Your Honor.

 4              CHIEF JUDGE BUMB:  Of contaminated drugs, valsartan.

 5              So did you reach a conclusion of, well, what if he

 6   had only taken it for one year?  What if he had only taken it

 7   for six months or just one pill?  I mean, these studies talk

 8   about never and ever.  Did you ever put a definition onto what

 9   "ever" means?

10              THE WITNESS:  So --

11              CHIEF JUDGE BUMB:  Because my question is:  To say

12   that he took significant amounts of NDMA-contaminated valsartan

13   and that is the cause of his cancer, there has to be some --

14   some scientific reliable evidence on which you concluded that

15   studies show that if you take this amount, it's sort of a

16   dose-related issue, which is, the defendants, you say is

17   missing from your report, that there has to be some sort of a

18   correlation, well, this amount of -- the studies show that if

19   you take this amount, it causes... if you take this amount, it

20   doesn't cause cancer.  And it doesn't seem to me as if you

21   drill down on that analysis.  And you say?

22              THE WITNESS:  So, Your Honor, so the first question

23   would be the dose-response question, right?

24              CHIEF JUDGE BUMB:  Yes.

25              THE WITNESS:  So the dose-response question, these
```

Siddiqui, M.D. - Direct - Nigh*                    36

1    studies talk about dose response and how they did not find a

2    dose response.  They did find a statistical significance

3    between taking the "ever" and getting liver cancer.  But the

4    dose response they did not find that.

5           Now, the dose response becomes very interesting, Your

6    Honor, because when you look at dose response, you assume, you

7    make an assumption that if someone takes, for example,

8    40 milligrams of valsartan contaminated, right, as compared to

9    someone who takes 320 milligrams, the more the dose,

10   320 milligrams of a dose, the more the risk of cancer, right,

11   Your Honor?

12          But the problem is that this is not a binary, like,

13   for example, if someone is obese or not obese, that's a binary

14   statistic, right, Your Honor?  In this case, the pills that the

15   people were taking, for example -- oh, thank you.

16          So, for example, the pills that the people were

17   taking, if someone was taking a Hetero pill of 320 milligrams,

18   Your Honor, that actually had less NDMA in it than a

19   40-milligram pill from Prinston, Your Honor, which is what --

20          CHIEF JUDGE BUMB:  But where are the studies that say

21   that someone who has taken a Hetero pill is not going to get

22   cancer and someone who's taking a Prinston pill is?  Where are

23   those dose-reception studies?

24          THE WITNESS:  And so those studies, Your Honor, there

25   are -- so if we don't count the epidemiology studies, there are

*Siddiqui, M.D. – Direct – Nigh*                                        37

1    two other ways to look at that.  Does NDMA cause cancer and how

2    much of NDMA causes cancer, right?

3              CHIEF JUDGE BUMB:  And where are those studies?

4              THE WITNESS:  So firstly, Your Honor, there are lots

5    of animal studies that look at NDMA causing cancer, sometimes,

6    Your Honor, in weeks to months, in animals of course.

7              CHIEF JUDGE BUMB:  Not humans, animals, yes.

8              THE WITNESS:  Not humans.

9              CHIEF JUDGE BUMB:  Okay.

10             THE WITNESS:  They have obviously because of --

11             CHIEF JUDGE BUMB:  I hate to interrupt you.  But I

12   have an emergency call that I have to take.  So hopefully it

13   will only take about five minutes, so just all stay put for a

14   moment, please.  Okay.

15             (Recess was taken at 10:02 a.m. until 10:14 a.m.)

16             CHIEF JUDGE BUMB:  All right.  I apologize.  We're

17   ready to proceed.  Okay.

18             Let me see the last question I had asked.

19             So in a nutshell, the question that I was asking, and

20   we can pick up from there, is it really does deal with the

21   dose-response issue in terms of your conclusion.  But it seems

22   to me, what's not clear to me anyway, is that you -- so looking

23   at what's on the screen here -- that you have concluded,

24   because it seems to sound right, that the more concentration of

25   NDMA, the more likely to cause cancer.

Siddiqui, M.D. - Direct - Nigh                    38

1              But where does that come from, that conclusion come

2    from?  We'll start with that.

3              THE WITNESS:  Yes, Your Honor.

4              So NDMA has been looked at extensively.  Firstly,

5    we'll start with the animal studies.  So there are many animal

6    studies, Your Honor, that look at animals being exposed to NDMA

7    and developing cancers in weeks to months sometimes.  Then,

8    Your Honor, there are case reports in humans because of --

9    sorry, Your Honor.

10             CHIEF JUDGE BUMB:  Go ahead.

11             THE WITNESS:  Sorry.  Because of ethical

12   considerations, they don't do human trials obviously, but there

13   are case reports in humans I think as far back -- I mean a few

14   decades ago by McGhee, et al.  And they mentioned that there

15   were patients exposed or people exposed to NDMA and they

16   developed cirrhosis and possible worsening signs, diseases

17   after that.

18             And then there are exposure studies like, for

19   example, the Hidajat, et al., that look at people who have been

20   exposed, occupational exposures to NDMA and those people

21   exposed to higher concentrations of NDMA had a higher risk of

22   cancer.

23             So it starts off with the animal studies, then it

24   goes to case reports, and then it goes to other studies looking

25   at human exposures and their risk of cancer.  And

1    mechanistically, basically the way NDMA does it is it changes

2    the DNA in the cell.  It makes mutations happen that then cause

3    cancer to happen, and it does it very rapidly, sometimes as

4    early as weeks to months in animals, of course, Your Honor,

5    because we don't have human studies.

6            And then if we look at the epidemiology studies, Your

7    Honor, the ones that we do have from Dr. Gomm and Dr. Mansouri,

8    the ones that we're going to mention here, if we look at those,

9    they had a very short follow-up.  They even say that it was

10   short follow-up.

11           So the fact that they're looking at NDMA exposure and

12   still finding even with dilution effects, Your Honor, because

13   of the "ever, never," even with all of that, they're still

14   finding significant risks because of NDMA exposure.

15           So when we put it all together scientifically, in my

16   mind, I believe that the NDMA exposure, especially at the high

17   levels that Mr. Roberts had for two years consecutively,

18   approximately two years consecutively, really, really caused

19   his liver cancer and caused it very fast.

20           Because if we look at other things, Your Honor, if we

21   look at the other differential diagnoses, and I have a slide

22   for that, too, if we look at that, then we'll see that going

23   from a healthy liver to fatty liver disease, to fibrosis, to

24   cirrhosis, to possibly hepatocellular carcinoma because not

25   everyone with cirrhosis gets hepatocellular carcinoma, that

Siddiqui, M.D. - Direct - Nigh                    40

1    takes time.  And this in Mr. Roberts' case, he didn't have that

2    time.  It was a very shortened period.  And that to me just --

3    is just -- it's so important, that time factor.

4    BY MR. NIGH:

5    Q.   Doctor, in the Mansouri study, Mr. Roberts would have had

6    one of the highest doses of NDMA of people that are in the

7    Mansouri study and the Gomm study, correct?

8    A.   Correct.  They --

9    Q.   And why is that?

10   A.   They used -- can you still hear me?

11          CHIEF JUDGE BUMB:  Yes.

12   BY MR. NIGH:

13   Q.   We can.  If you can get a little bit closer.

14   A.   Sorry.

15          They used all formulations and all companies.

16   Basically they didn't have -- in the Mansouri study, they did

17   not identify who was taking which prescription from which

18   batch, Your Honor.

19          So basically you could have a patient taking a pill

20   from Hetero Labs which had significantly less NDMA in it as

21   compared to a Prinston Pharmaceutical/ZHP company pill that had

22   significantly higher levels of NDMA in it.

23          If you look at the chart that is posted here,

24   sometimes it's 40 times as much NDMA in a Prinston pill.  And,

25   again, that's not related to the dose of valsartan, Your Honor.

Siddiqui, M.D. – Direct – Nigh                    41

1    It could be in any pill, for example.  It could be in a

2    40-milligram pill.  It could be in a 160-milligram pill.  So

3    that's why also the dose response when we think about it

4    doesn't exactly follow through, because a pill coming from

5    Prinston Pharmaceuticals or ZHP, a 40-milligram pill sometimes

6    had 40 times as much as a Hetero Lab pill of the same dose, for

7    example.

8            So I tried to put it here where, for example, a

9    Prinston Lab pill on the right would have 40 times as much NDMA

10   as a 40-milligram pill from Hetero.

11           So if someone was taking a 40-milligram pill of

12   Prinston and we did the math, it would still be five times as

13   much NDMA, Your Honor, as a 320-milligram pill from Hetero.

14   And we -- and those studies didn't do the ID of which batch,

15   which company, what pill, or all of that.  They just put

16   everyone who ever took anything from any of these companies and

17   ever took any prescription in one group.  And that's why I

18   believe, Your Honor, that there was a big dilution effect, a

19   big dilution effect.

20           In Mr. Roberts' case, we know that he had Prinston

21   Pharmaceutical tablets at varying doses for two years

22   consistently.  In the Mansouri study they also talk about being

23   a male having a slightly higher risk, Your Honor, and also

24   being between the ages of 60 and 69 having a higher risk.

25           In that study -- oh, thank you.

```
1          In that study, Your Honor, they did different
2    subgroup analyses, but they never combined those.  They just
3    said, okay, what about this group, what about this group.  And
4    being a male had a higher risk.  Being between 60 and 69 had a
5    higher risk.  And Mr. Roberts was a male between 60 and 69
6    taking the highest contaminated valsartan for a significant
7    amount of time.  So he fell into, in my opinion, into the
8    highest risk group.  And despite the dilution effect in these
9    studies, these studies still showed a significant risk.  I feel
10   that Mr. Roberts' personal risk just extrapolating from the
11   data, Your Honor, would have been much higher because of these
12   factors.
13   Q.   And, Doctor, you're referring to the Mansouri study when
14   you're talking about the male, 60 to 69?
15   A.   Yes, sorry, Your Honor, the Mansouri study.
16            MR. NIGH:  Your Honor, may I approach?
17            CHIEF JUDGE BUMB:  Yes.
18   BY MR. NIGH:
19   Q.   And, Doctor, what you were referring to just now is that
20   males who are taking contaminated valsartan in the Mansouri
21   study had an even higher increased risk than the overall
22   population, correct?
23   A.   Yes, Your Honor.
24            So just to summarize again, the relative risk in the
25   Mansouri study was higher when she subgrouped males and
```

1    females.  For males it was 1.23.

2    Q.    And you can see that in Table S11?

3    A.    Yes.

4    Q.    Okay.  And when you look at that P score, it says .0001.

5    What does that mean?

6    A.    That means, Your Honor, that there is a one-in-10,000

7    chance that this was a chance finding.

8    Q.    Okay.

9    A.    So it's not a -- like it's not a chance finding basically.

10   Q.    So it's very statistically significant?

11   A.    Yes.  Yes, Your Honor.

12   Q.    So the group of males that were exposed, had any exposure

13   to valsartan that was contaminated, they found a 23 percent

14   increased risk that was very statistically significant?

15   A.    Yes.

16   Q.    Okay.  And how about age, what age had the highest

17   increased risk, according to the Mansouri study?

18   A.    Sixty to 69, Your Honor, which is what Mr. Roberts fell

19   into.

20   Q.    And he was 63 at the time he was diagnosed?

21   A.    Yes.

22   Q.    Okay.  And the study doesn't show you the increased risk

23   if somebody is both male and 60 to 69, correct?

24   A.    Correct.  They did not combine that as a risk.

25   Q.    But they would have an even higher increased risk if you

Siddiqui, M.D. - Direct - Nigh                    44

1    combine the two?

2    A.    In my opinion, yes.

3    Q.    Let's talk about latency.  You talked a little bit about

4    this, but I want to talk about a couple issues.

5            First off, when was Mr. Roberts -- his CT scan was in

6    April of 2016, correct?

7    A.    Yes.

8    Q.    And then in -- and you've reviewed the films yourself,

9    correct?

10   A.    Correct.

11   Q.    Did he have cancer in April of 2016?

12   A.    He did not have cancer in April 2016 on my review, and

13   also the radiologist did not diagnose cancer.

14   Q.    And, Doctor --

15           CHIEF JUDGE BUMB:  Wait.  Let me ask you that,

16   because his own treating physicians couldn't rule out the

17   possibility that he had cancer in 2016, how can you?

18           THE WITNESS:  So the treating physicians in 2018,

19   Your Honor, they said -- now, from my recollection of it, Your

20   Honor, in 2018, the treating physician said that he -- I'm

21   paraphrasing -- that he has had an extensive workup done for

22   cirrhosis and liver disease, and nothing was found or something

23   like that; that they really didn't find anything is what the

24   physician said.

25           Dr. Ives, who was one of his gastroenterologists who

Siddiqui, M.D. - Direct - Nigh                    45

1    had been following him from 2016 to 2018, also in his records,

2    Your Honor, had mentioned that he has possible subtle findings

3    and possible NASH, right, or fatty liver disease.  He said

4    fatty liver disease, I think.  But they did not mention cancer.

5    They never -- they never felt that, at least from the notes and

6    the records, Your Honor, in 2016, they did not feel that.  And

7    in 2018 when he went in and was diagnosed with the cancer in

8    2018, when they looked back in their history, in their records,

9    on my understanding of it, Your Honor, they did not -- they

10   were not thinking that there was cancer there.

11          There was -- there was one nodule, Your Honor, in a

12   separate area of the liver that they mentioned that they said,

13   well, could it have possibly been.  But that nodule had

14   disappeared in 2018.

15          Whatever was cancerous in that right liver lobe had

16   not been seen before is my understanding from review of the

17   records.  There was no question of, God forbid, or no question

18   of cancer in 2016, and his doctors did not follow him like that

19   either is my understanding, Your Honor.

20          CHIEF JUDGE BUMB:  Okay.  It does seem that you have

21   followed from an assumption that he had a healthy liver in

22   2016.  You have made that assumption, correct?

23          THE WITNESS:  My assumption, Your Honor, based on my

24   review, so he went in with mildly elevated liver function

25   tests, which he had had for many years.

*Siddiqui, M.D. - Direct - Nigh*                                  46

1              CHIEF JUDGE BUMB:  Uh-huh.

2              THE WITNESS:  He went in with no real symptoms and no

3      signs of any sort of physical symptoms.  His doctor said he

4      probably has fatty liver.  He did have obesity, so the doctor

5      said he probably has fatty liver.  But he had -- so he had no

6      physical signs.  So my assumption is that he probably had an

7      inflamed or possible fatty infiltration of the liver, but he

8      didn't have liver disease in the sense like he didn't have a

9      diseased liver which was not functioning or that was scarred.

10             At most, I would say he may have had a little bit of

11     fibrosis or something possibly, but he didn't have cirrhosis or

12     extensive scarring or extensive scarring that led to disease is

13     my assumption, Your Honor.

14     BY MR. NIGH:

15     Q.   Doctor, can you please discuss the expected tumor growth

16     if somebody had cirrhosis due to NASH versus if somebody had

17     ingested carcinogens with promoter capabilities?

18     A.   So the usual timeline is a very stepwise approach, Your

19     Honor.  It goes from fatty liver infiltration to

20     steatohepatitis, which is a more serious, you know, deposition

21     of fatty -- fat cells.  That causes more fibrosis and scarring.

22             All of that, Your Honor, takes around approximately,

23     say, ten years, approximately.  Then from fibrosis leading on

24     to cirrhosis over time, it's a slow process, and it can go this

25     way, too.  It can -- you know, it can change sometimes.  It

1    doesn't happen with everybody.  It's not a -- it's not that you

2    have to have -- one has to have it this way.

3            So it goes over time or maybe ten years or so from

4    fibrosis to cirrhosis, Your Honor, and then maybe another ten

5    years or so if in those patients who are going to get liver

6    cancer, it takes maybe another seven to ten years to get to

7    that.  A lot of people don't even get there, Your Honor.  They

8    go just furthering into the cirrhosis or decompensated liver

9    disease.  So it's a more slow-growing or slow stepwise

10   progression.

11           In carcinogens, especially with NDMA, when we look at

12   the literature and the data, we are seeing changes in months.

13   So it's much faster.  When you look at it, it's much faster.

14   So looking at the mechanistic data, looking at even the

15   epidemiology studies that were short-term follow-up, it's a

16   much faster process.

17           And so if we have someone who, Your Honor, say, had

18   subtle signs or signs of even something like NASH, right, Your

19   Honor, in 2016, and then, all of a sudden in 2018 they have

20   aggressive cancer or extensive cancer, that timeline to me,

21   that fast growth timeline of two years just doesn't make sense,

22   Your Honor.  And that's why I -- I keep bringing up the

23   timeline.

24   BY MR. NIGH:

25   Q.   And, Doctor, would that be carcinogens with promoter

Siddiqui, M.D. - Direct - Nigh                    48

1    capabilities that have more aggressive growth?

2    A.    Yes, promoter and inducer capabilities, yes.

3    Q.    Why would it be carcinogens with promoter capabilities

4    have more aggressive growth?

5    A.    Because what they do is they cause mutational changes that

6    promote the growth of cancer.  So the cancer just continues to

7    grow, and there's less cell death and there's less, there's --

8    there's less of an option for the cancer to be controlled

9    basically because of the mutations.

10   Q.    Did you review Dr. Panigrahy's report?

11   A.    I did.

12   Q.    And did you review information that shows promoter

13   capabilities of NDMA?

14   A.    Yes.

15   Q.    And can you explain this?

16   A.    So basically Dr. Panigrahy did a general causation report,

17   and he basically said that based on multiple studies that he

18   quoted in his report, that at the cellular level NDMA can be a

19   cancer promoter and a cancer inducer because of these

20   mutational changes and fibrotic changes and et cetera, and DNA

21   changes basically.

22   Q.    Doctor, can you explain -- you have some criticisms that

23   you didn't do to tumor volume doubling time.  What is your

24   reaction to that?

25   A.    Your Honor, I did not do a tumor volume doubling time

Siddiqui, M.D. - Direct - Nigh                    49

1    because it's a research metric.  So it's used for research

2    purposes, not clinical purposes.

3            Also, it's used mostly for spherical cancers, not

4    like web-like cancers such as hepatocellular carcinoma.  And

5    his other treating physicians who were clinically following him

6    did not do tumor volume doubling times most likely because it

7    is a research metric and therefore I didn't do one either.

8    Q.   Was Mr. Roberts' tumor spherical?

9    A.   It was not.

10   Q.   When you reviewed the films in 2018, was it spherical?

11   A.   It did not look spherical to me, no.

12   Q.   Doctor, after reviewing all the material regarding NDMA

13   that you've discussed here, did you rule in NDMA as a cause of

14   Mr. Roberts' cancer?

15   A.   I did.

16   Q.   Doctor, let's talk about these other factors, the

17   preexisting cirrhosis, NAFLD, NASH, obesity, diabetes, or

18   hyperlipidemia.

19   A.   Thank you.

20           So, Your Honor --

21   Q.   So first off --

22   A.   Sorry.

23   Q.   -- the time frame from -- when was Mr. Roberts diagnosed

24   with cirrhosis?

25   A.   His actual diagnosis of cirrhosis, Your Honor, the actual

1    clinical diagnosis was given in 2018, according to the records,

2    in August 2018 approximately.

3    Q.   And if -- what do you know about the typical progression

4    from when someone is diagnosed with cirrhosis until they

5    develop HCC, if they're going to develop HCC?

6    A.   So in the small proportion of patients who develop HCC

7    from cirrhosis, it usually is a time frame of seven to ten

8    years.  The study I quoted here, Your Honor, Johnson, et al.,

9    was looking at hepatitis C patients, and those are the most

10   aggressive actually.  So these are conservative numbers, seven

11   to ten years.

12          A lot of the time patients, for example, as I

13   mentioned, NASH, et cetera, who aren't as aggressive as

14   hepatitis C patients, even treated hepatitis C patients, there

15   were some in the study, so this study what I was trying to say

16   is a conservative number, seven to ten years.

17          In real time, in real life patients who have a

18   slow-growing process like NASH would have most likely an even

19   slower -- slower average time frame from cirrhosis to the

20   diagnosis of HCC in those proportion of patients who did

21   develop -- who would develop HCC.

22   Q.   And, Doctor, even if you utilize seven years from the time

23   that he was diagnosed with cirrhosis, and assuming he went on

24   to get HCC from that time of the diagnosis, when would he have

25   been -- when would you have expected him to get hepatocellular

1  carcinoma?

2  A.    So if we used that aggressive type time frame of seven

3  years from diagnosis in August 2018, we would probably see, if

4  he was to get it from NASH or cirrhosis or something, non-NDMA

5  cirrhosis, Your Honor, we would probably see maybe in August of

6  2025 we would see some signs of HCC if he was going to get it.

7  Q.    And that would be in the absence of NDMA?

8  A.    Yes, correct.

9  Q.    And Your Honor -- or if you can explain, well, even if he

10  did have or he was diagnosed with cirrhosis in 2016, if he had

11  it two years earlier, when would the expected time frame have

12  been if he were to then go on to develop HCC?

13  A.    So say we made the assumption, Your Honor, that he had

14  cirrhosis, a clinical diagnosis of cirrhosis in 2016, which at

15  that time wasn't a clinical one, but say based on radiology

16  they gave him a clinical diagnosis, if at that time in April of

17  2016 he had cirrhosis, non-NDMA cirrhosis, a cirrhosis due to

18  anything else, HCC, this study looks at HCC, we were looking at

19  seven to ten years.  So seven years being the quickest time

20  frame, he would probably be diagnosed with it like in 2023, if

21  we were doing non-NDMA cirrhosis or noncarcinogen cirrhosis.

22  Q.    Okay.  And would this be one of the reasons you would rule

23  out that any potential preexisting cirrhosis would not have led

24  to the HCC that he was diagnosed with?

25  A.    And so that to me is very important, Your Honor, because

```
 1    cirrhosis can be a gateway to HCC, right, because of the
 2    fibrosis, fibrosis, cirrhosis and then hepatocellular carcinoma
 3    in the area where there's cirrhosis, so it can be a gateway to
 4    HCC.  There are some cancers that don't need cirrhosis, but in
 5    Mr. Roberts' case, he had cirrhosis and HCC, so we're talking
 6    about cirrhosis to HCC.  So cirrhosis can be a gateway, and --
 7    sorry.  I forgot what I was saying about it.
 8          Basically I feel that his cirrhosis to HCC was
 9    shortened significantly, whether it's two years or less,
10    because of the NDMA.
11    Q.   Now, Doctor, let's talk about the metabolic syndrome.  Can
12    you explain that, please.
13    A.   Yes.
14          So, Your Honor, there's a lot of interest these days
15    in metabolic syndrome, and basically it's an umbrella --
16    they're trying to put it under the umbrella of metabolic
17    syndrome.  It includes being, you know, having obesity, having
18    hyperlipidemia, even hypercholesteremia sometimes, diabetes.
19          NASH and NAFLD, so nonalcoholic fatty liver disease,
20    or nonalcoholic steatohepatitis, was used before.  Now they've
21    changed the nomenclature to MAFLD and MASH, which is metabolic
22    syndrome associated fatty liver disease, or metabolic syndrome
23    associated steatohepatitis.  So all of these are sort of not
24    lumped but considered under one umbrella.  And that's what we
25    were talking about, Your Honor, about how it's a slow, usually
```

*Siddiqui, M.D. - Direct - Nigh*                    53

1    stepwise progression.

2           If someone is going to get cirrhosis, it's a slow

3    stepwise progression from this metabolic syndrome, any of those

4    things under the metabolic syndrome to cirrhosis.  And if

5    they're going to develop HCC, then a slow stepwise progression

6    from cirrhosis to HCC.  And with this metabolic syndrome,

7    there's time, and not everyone gets cirrhosis, because if you

8    look at the images and the data, people can get better

9    sometimes.  People don't always get cirrhosis.

10   Q.   And, Doctor, there are few cases where people can go from

11   metabolic syndrome to HCC.  Why did you rule that scenario out?

12   A.   Well, two reasons.  Firstly, metabolic syndrome to HCC is

13   rare.  It does happen, Your Honor.  It can happen because of

14   fatty cell insertion, and that causes inflammation, so it can

15   happen, but it's rare, rarer than this pathway.

16          And secondly, for Mr. Roberts, Mr. Roberts didn't

17   have -- he had cirrhosis at some point, right?  He had

18   cirrhosis in 2018.  So I didn't want to take out the cirrhosis

19   part of it, because that data wasn't making sense in

20   Mr. Roberts' case, the direct NASH to HCC, because he did have

21   cirrhosis in there and I wanted to give that the weight that it

22   deserved.

23   Q.   So that scenario wouldn't be applicable to Mr. Roberts'

24   case, correct?

25   A.   Correct.

1    Q.    And, Doctor, looking at all that evidence, what was your

2    opinions in regards to preexisting cirrhosis, NAFLD, NASH,

3    obesity, diabetes, and hyperlipidemia?

4    A.    I felt that those reasons, the metabolic syndrome reasons,

5    were not the cause for Mr. Roberts' HCC given the timeline,

6    given the fact that he had such high doses of NDMA, and the

7    fact that he developed some -- he developed significant changes

8    within two years.  I felt that the timeline was not making

9    sense at all.  So that's why I ruled them out.

10   Q.    And you also ruled out preexisting cirrhosis?

11   A.    Preexisting cirrhosis, yes.

12   Q.    And so to go from metabolic to preexisting cirrhosis, that

13   same time frame would apply that we showed earlier, correct?

14   A.    Yes.  So it's a slow stepwise progression from metabolic

15   syndrome, whether that's diabetes, obesity, all of them

16   separately have been looked at, too, not just lumped together,

17   they've all been looked at separately and they all can cause

18   cirrhosis that sometimes can go to HCC; they all can.  But it's

19   a stepwise, slow progression usually.  It's not an active,

20   aggressive progression usually.

21   Q.    Doctor, what was your ultimate opinion in this case?

22   A.    My ultimate opinion, Your Honor, reviewing everything,

23   reviewing Mr. Roberts' case, was basically that his high doses,

24   ingested doses of contaminated -- NDMA-contaminated valsartan

25   caused his liver cancer in the short time frame that we saw it

Siddiqui, M.D. - Direct - Nigh                    55

1    in.  And if he had not taken the NDMA, I do not believe -- I

2    don't know if he would have gotten the liver cancer, Your

3    Honor, based on everything.

4              CHIEF JUDGE BUMB:  But you can't answer the question

5    as to what dose is in response.  In other words, to get back to

6    the question that I asked you, if he had taken NDMA -- if he

7    had taken valsartan for three months or if he had taken it for

8    a year or in this case he took it longer, you can't answer that

9    question because there are no studies?

10             THE WITNESS:  There is some data, Your Honor, for

11   example, the FDA has a limit that they put in.  It's like about

12   .1, like .96 or something, that is considered carc -- they

13   consider it carcinogenic, Your Honor, so smaller doses.  So

14   there is some literature that quotes smaller doses, Your Honor.

15             His doses were significantly more than that.  So if

16   we look at the dose, the concentration, the FDA lists a small

17   concentration that can become problematic or cause cancers.

18             And then, Your Honor, the animal studies and then the

19   exposure studies talk about sort of like the latency of weeks

20   to months, sort of the rapidity of it.

21             CHIEF JUDGE BUMB:  What about the studies that show

22   that valsartan was associated with a reduced risk of HCC?

23             THE WITNESS:  So those studies, Your Honor, the

24   valsartan with the reduced risk of HCC, we have to consider,

25   firstly -- so when we are looking at the epidemiology study,

1    we're not talking about valsartan, right?  We're talking about

2    NDMA in the valsartan.  The studies that talk about valsartan

3    reducing the risk of HCC, valsartan in and on its own, when not

4    contaminated with NDMA, the valsartan is -- is a good drug.  It

5    helps protect the heart.  It's cardio protective.  It decreases

6    any of these syndromes.  Like, it can help with the umbrella of

7    metabolic syndrome, in which case it would help with this

8    chronic, slow progression to liver disease and HCC.  So that

9    makes sense to me.

10          The thing is that my -- my understanding -- what I'm

11    trying to say is not about valsartan.  I'm not saying that the

12    valsartan causes the cancer.  What I'm saying is that the toxic

13    product found in these valsartan prescriptions was what caused

14    his cancer, which is the NDMA.

15    BY MR. NIGH:

16    Q.   And, Doctor, just one more point on Gomm and Mansouri,

17    Mr. Roberts would have had one of the highest exposures

18    compared to those subjects in that study, correct?

19    A.   Correct.

20    Q.   So his risk would be even higher than the overall average

21    to the people in that study, correct?

22    A.   Yes.  That's my opinion, yes.

23    Q.   Okay.  Doctor, were all of your opinions given here today

24    and your expert report given to a reasonable degree of medical

25    certainty?

```
 1    A.    Yes, sir.

 2              MR. NIGH:  Thank you, Your Honor.

 3              CHIEF JUDGE BUMB:  Okay.  Cross.

 4              MS. BROWN:  Your Honor, would it be possible for me

 5    to use the ELMO, please?  Thank you.

 6              Your Honor, may I proceed?

 7              CHIEF JUDGE BUMB:  Yes.

 8              MS. BROWN:  Thank you.

 9                      CROSS-EXAMINATION

10    BY MS. BROWN:

11    Q.    Good morning, Dr. Siddiqui.  How are you?

12    A.    Good morning.  Thank you.  Good.  Thank you.

13    Q.    My name is Alli Brown, and I have some questions for you

14    on behalf of ZHP, okay?

15    A.    Yes.  Thank you.

16    Q.    I understood your presentation this morning to include

17    testimony that you are now not of the view that Mr. Roberts had

18    cirrhosis in April of 2016.  Did I hear you correctly?

19    A.    So what I was saying was that in my report I said he may

20    have had mild cirrhosis or fibrosis, and I'm trying to -- I was

21    trying to explain that we use mild cirrhosis or fibrosis or

22    inflammation together colloquially to describe some degree of

23    fibrosis.

24    Q.    And what you actually told us in your report,

25    Dr. Siddiqui, is that you were of the view that he did in fact
```

Siddiqui, M.D. - Cross - Brown                    58

1    have cirrhosis in April of 2016, correct?

2    A.   In my report, would you please be able to --

3    Q.   Absolutely.  And I have a copy.  I'm not sure if you have

4    it.

5    A.   I have a copy, too.

6    Q.   Okay.  Let's take a look.  I want to direct you to page 30

7    of your report.

8         And there's two portions in that paragraph there --

9    A.   Oh, thank you.

10   Q.   -- that I want to talk to you about.

11   A.   Yes.

12   Q.   All right.  In your report, you offered the opinion that

13   Mr. Roberts indeed had mild -- incredibly mild, the earliest

14   stages of cirrhosis prior to being exposed to valsartan

15   contaminated with NDMA, correct?

16   A.   In my report, I put that in because the radiology findings

17   found possible suggestions of cirrhosis or fibrosis.

18   Q.   And what you went on to say in your report was that

19   Mr. Roberts' cirrhosis was so mild at such an early stage that

20   you would not have given the diagnosis, correct?

21   A.   Correct.  And what I was trying to explain in that

22   sentence was that if we assume that the radiologist is finding

23   cirrhosis there, I do not want to discount that.  So I want to

24   say, Your Honor, that, okay, there might have been fibrosis,

25   there might have been mild cirrhosis or early signs of

Siddiqui, M.D. - Cross - Brown                           59

1    cirrhosis, but I would not have diagnosed Mr. Roberts with

2    cirrhosis clinically at that time.

3    Q.   And what you go on to say is that Mr. Roberts would have

4    had a very minor increased risk of liver cancer because of the

5    cirrhosis that you say he had in 2016, right?

6    A.   So what I was trying to say here was, if we look at the

7    progression of fibrosis to cirrhosis to -- so fibrosis to

8    cirrhosis to hepatocellular carcinoma in those patients we're

9    considering cirrhosis without NDMA, then, yes, there is a risk.

10   We can't discount the risk of cirrhosis without NDMA.

11        The report, however, went on to explain that the

12   timeline did not make sense, and the exposure to NDMA was the

13   reason that he developed this aggressive hepatocellular

14   carcinoma.

15   Q.   And as it relates to the statements here in your report

16   about the increased risk of liver cancer that you opined

17   Mr. Roberts was at in 2016, that's not something that you

18   quantified, correct?

19   A.   Sorry, please, could you -- sorry.

20   Q.   Sure.

21        I want to -- I'm looking at this sentence where you

22   acknowledge you believed he had a minor increased risk of liver

23   cancer because of his cirrhosis in 2016.  Are you with me on

24   that?

25   A.   Yes.

Siddiqui, M.D. - Cross - Brown                    60

1   Q.   Okay.  And in terms of how much, the quantification of

2   that increased risk, that's not something you did for your work

3   in this case, correct?

4   A.   Correct.  And the reason being that I felt that the

5   cirrhosis was -- if we are going to consider the radiologist

6   diagnosis of cirrhosis, I felt that it was minor.  It had to be

7   mentioned.  It should be mentioned.  But it would have been

8   very low risk fibrosis/cirrhosis.  But I wanted to mention

9   that.

10  Q.   And as it relates to this slide that you showed during

11  your questioning, you say here in April of 2016 that the

12  ultrasound and CT scans showed no cancer, correct?

13  A.   Correct.

14  Q.   Okay.  And you are not a radiologist, correct?

15  A.   Correct.

16  Q.   And, in fact, what the treating radiologist noted at that

17  time was that there were -- there was a lesion, correct?

18  A.   Please, could you show me that?

19  Q.   Sure.  If we --

20  A.   Because I do not recall there ever being a diagnosis of

21  cancer in 2016.

22  Q.   A lesion.

23          CHIEF JUDGE BUMB:  Do you recall the CT scan showing

24  lesions in 2016?

25          THE WITNESS:  Yes.

*Siddiqui, M.D. - Cross - Brown*                                61

1                MS. BROWN:  Okay.  Thank you, Your Honor.

2    BY MS. BROWN:

3    Q.   And that CT scan, the treating radiologist said that

4    lesion couldn't be characterized, correct?

5    A.   I don't recall that.

6    Q.   Okay.

7                MS. BROWN:  Why don't we take a quick look -- if we

8    could bring it up, please, tab A.  And it's 944, please.

9                There it is.  Thank you.

10   BY MS. BROWN:

11   Q.   And you recall reviewing this radiology report, correct,

12   from April of 2016, correct?

13   A.   Correct.

14   Q.   All right.

15               MS. BROWN:  And if you wouldn't mind just scrolling

16   so we could see the bottom of it there under "impressions."

17   BY MS. BROWN:

18   Q.   This of course is Impression No. 1, "although nonspecific,

19   findings above may be evidence of liver cirrhosis," correct?

20   A.   Correct.

21   Q.   Okay.  And Finding No. 2 shows a lesion in the right lobe

22   of the liver too small to definitively characterize, correct?

23   A.   Correct.  And this was followed up by a CAT scan in 2016

24   and another CAT scan in 2018, and I don't recall the 2016 CAT

25   scan, but the 2018 scan, any of the lesions that they found in

*Siddiqui, M.D. - Cross - Brown*                                    62

1    those areas were not seen in the 2018 scan.

2    Q.    And what the treating radiologist said at the time in 2016

3    was that benign or malignant etiologies could have that

4    appearance, correct?

5    A.    Correct.

6    Q.    And that means that the treating radiologist couldn't make

7    a determination of whether this lesion was benign or cancerous,

8    correct?

9    A.    I think what they're saying is that there's an

10   indeterminate, so he can't -- he or she, sorry, I couldn't

11   remember the name, that they can't identify exactly what this

12   lesion is.  And they said, well, it could be benign, it could

13   be malignant, it could be either of those things.  And that's

14   what they're saying.

15          And they said that the relationship of this nodule to

16   the findings are unknown, and a follow-up scan liver protocol

17   is what we should look at.

18   Q.    And one of -- if we go back to the ELMO, please, thank

19   you -- one of the things that we know from this timeline that's

20   not here is that Mr. Roberts had an ultrasound in 2009,

21   correct?

22   A.    I think so.  I'd have to go back and check.

23   Q.    And you know that that ultrasound showed NASH, correct?

24   A.    Let me just -- sorry.  I put that in my report as well.

25   Q.    Uh-huh.

*Siddiqui, M.D. - Cross - Brown*                    63

1   A.    Do you have a copy of that ultrasound?

2   Q.    Yeah.  We can take a look at it.

3         Do you recall Mr. Roberts being diagnosed with NASH

4   in 2009, Dr. Siddiqui?

5   A.    There was a question -- Dr. Ives questioned that as well.

6   He said -- I think he -- I'm paraphrasing, Your Honor -- I

7   think he has NASH or he may have fatty liver disease.

8   Q.    And you were in agreement, Doctor, that back in 2009

9   Mr. Roberts had NASH, correct?

10  A.    To be honest, I'm not sure when the NASH was diagnosed,

11  because he was not given an official diagnosis of NASH.  There

12  was some -- some notes that said possible fatty liver disease.

13  There were some notes that said consistent with NASH.  But

14  there was no official diagnosis of NASH.  But I did consider

15  that in my report.

16  Q.    And one of the things you know is that NASH is a risk

17  factor for liver cancer, correct?

18  A.    Correct.

19  Q.    NASH could be in the progression of liver disease that

20  leads to HCC, correct?

21  A.    So what NASH does is, it's under the umbrella -- or NASH

22  or MASH, which is metabolic syndrome associated

23  steatohepatitis, what they do is they can cause over time, over

24  a decade or so, cause fibrosis, well, inflammation, then

25  fibrosis, then cirrhosis over maybe another decade or so, and

1    then a small proportion of them go into hepatocellular

2    carcinoma over another seven to ten years.

3    Q.    And so what you -- to be clear, Dr. Siddiqui, you cannot

4    give this Court the opinion that had Mr. Roberts never taken

5    valsartan contaminated with NDMA, he would never have gotten

6    HCC, correct?

7    A.    No, I don't think that's correct.  I think that if he had

8    not taken NDMA-contaminated valsartan, if he had not taken

9    NDMA-contaminated valsartan, I believe he would most likely

10   have not gotten hepatocellular carcinoma.

11   Q.    Ever?

12   A.    I can't -- I can't say "ever."  But it's my opinion that

13   he wouldn't have -- Mr. Roberts, with his timeline, with the

14   way he presented, would not have more -- most likely would not

15   have had HCC.

16   Q.    Okay.  Because when we asked you in --

17            CHIEF JUDGE BUMB:  Excuse me.  Ever?  I thought you

18   said that he would have -- it seemed to me, as I was

19   understanding your testimony, that if he had cirrhosis in 2016

20   and all of the other issues that he faced, the likelihood of

21   him developing HCC was there.  Your testimony, as I understood

22   it, was that his taking NDMA expedited it.

23            THE WITNESS:  Yes, Your Honor.  I think what I said

24   was I can't say "ever."  I think -- I think what I understood

25   from the counsel's question was would he have -- maybe I need

1   to repeat it, but my understanding was she said would he have

2   ever gotten it, and I said I can't say "ever."

3             CHIEF JUDGE BUMB:  Well, I thought your testimony was

4   that there was this timeline with someone with cirrhosis, and

5   you showed a timeline, that he quite likely would have gotten

6   it.  Do we need to go through that timeline again?  I thought

7   that's what you were saying.

8             So I'm surprised to hear that you seem to be saying

9   that he would not have -- he probably would never have gotten

10  liver cancer.  I'm surprised to hear that.

11            MR. NIGH:  Your Honor, I would object.  Her testimony

12  was that if --

13            CHIEF JUDGE BUMB:  Counsel, if I am misstating it,

14  she will correct me.

15            MR. NIGH:  Okay.  My objection is mischaracterizing

16  testimony.

17            CHIEF JUDGE BUMB:  Did I mischaracterize your

18  testimony?

19            THE WITNESS:  Sorry, Your Honor, I think if we could

20  ask the question again.  What I was saying, Your Honor --

21            CHIEF JUDGE BUMB:  Yeah.

22            THE WITNESS:  -- was that I can't say ever or never

23  to something.

24            CHIEF JUDGE BUMB:  Yeah, of course.

25            THE WITNESS:  That's what I was trying to say.  But

Siddiqui, M.D. - Cross - Brown                                    66

1    what I was saying, Your Honor, was that in Mr. Roberts' case,

2    if he did not take the NDMA, he may still have had the

3    progression from NASH to cirrhosis and then from cirrhosis to

4    HCC.  However, most patients with cirrhosis don't get HCC.

5    Most patients continue with cirrhosis and go into decompensated

6    liver disease.  So I can't say ever or never.  She said "ever,"

7    and I said I can't say "ever."

8             CHIEF JUDGE BUMB:  Okay.

9             MS. BROWN:  May I proceed, Your Honor?

10            CHIEF JUDGE BUMB:  Yes.

11   BY MS. BROWN:

12   Q.   And just to make sure I'm clear, Dr. Siddiqui, you can't

13   say that if Mr. Roberts had never taken any contaminated

14   valsartan, he would never have gotten HCC, correct?

15   A.   I don't -- so sorry, I'll just repeat the question because

16   there is two nevers in there.  You're asking me if he had never

17   taken the contaminated valsartan, he would never have gotten

18   HCC?

19   Q.   Right.

20            CHIEF JUDGE BUMB:  Can you say that?

21            THE WITNESS:  No, I cannot say that, Your Honor.

22   BY MS. BROWN:

23   Q.   And one of the reasons that is, Doctor, is because

24   Mr. Roberts had a number of different risk factors for HCC, and

25   you identified them, correct?

Siddiqui, M.D. - Cross - Brown                    67

1    A.   The reason I can't say "never" is because you can never be

2    sure that someone is going to get cancer or not.  You can never

3    be sure.

4              CHIEF JUDGE BUMB:  And that's why I questioned you,

5    because as I was listening to your testimony, I understood that

6    you laid it out that this is someone who would have or could

7    have developed HCC, but your testimony is the NDMA expedited

8    that.

9              THE WITNESS:  I believe so, Your Honor.

10             CHIEF JUDGE BUMB:  Yes.

11             THE WITNESS:  Could he have?  Yes, he could have,

12   Your Honor, if we went down that NASH/metabolic syndrome

13   pathway, yes, he could have.  But the NDMA was what changed the

14   picture and what I believe caused his liver cancer at this

15   time.

16   BY MS. BROWN:

17   Q.   And the crux of your opinion, Dr. Siddiqui, as I

18   understand it, as to why you believe this had to be NDMA and

19   not cirrhosis or obesity or diabetes or metabolic syndrome is

20   the timeline, correct?

21   A.   That is the major part of it.

22   Q.   Okay.  And one of the studies that you cite on that score

23   for your timeline opinion is the Johnson study, correct?

24   A.   Correct.

25             CHIEF JUDGE BUMB:  That really is the crux of your

Siddiqui, M.D. - Cross - Brown                    68

1    opinion, again, just to put a -- you know, look, I have an

2    obligation.  I'm sure your lawyers have explained this to you,

3    the lawyers have explained it to you.  I have to be satisfied

4    that the testimony that a jury hears is reliable; that there's

5    a reliable application of the methods and the principles.  So I

6    have a gatekeeping function.

7            So it's important that if I'm not following your

8    testimony, you tell me.  It's important that I ask these

9    questions, because that's the role that I'm being called upon

10   to do.

11           And so it seems to me that you really have put much

12   of the emphasis of your opinion on the timeline.  It is the

13   timeline from when he started taking the contaminated valsartan

14   to his diagnosis that you find to be, I would say, the crux of

15   your opinion.  Would you disagree with that statement?

16           THE WITNESS:  Thank you, Your Honor, for asking the

17   questions and trying to understand my point of view.

18           CHIEF JUDGE BUMB:  Yeah.  Uh-huh.

19           THE WITNESS:  My -- my take on this, Your Honor, is

20   that the timeline doesn't make sense.  But the timeline doesn't

21   make sense because of NDMA is a carcinogen.  And we know from

22   multiple data, studies, literature, that NDMA does cause

23   mutation changes, does cause cancer.  So we have someone who

24   came in with this ultrasound, CAT scan, showing whatever we

25   want to call it, right, Your Honor.  Whatever you feel is

Siddiqui, M.D. - Cross - Brown                                    69

1    appropriate, fibrosis, mild cirrhosis.  We have someone who

2    would have maybe had nothing.  Maybe they would have gone on to

3    cirrhosis in ten years or so.  Maybe they would have gone on to

4    hepatocellular, maybe.

5           But Mr. Roberts has this timeline where he comes in

6    and within two years he has aggressive cancer.  And we know

7    that -- and I'm basing it on the fact that we have all this

8    data proving to us that NDMA is a potent carcinogen.

9           CHIEF JUDGE BUMB:  Okay.  So just one last question

10   and then I'll let cross continue.  Yes or no, your opinion

11   really does hinge on the timeline?

12          THE WITNESS:  It's one of the major factors, yes,

13   Your Honor.

14          CHIEF JUDGE BUMB:  Go ahead.

15   BY MS. BROWN:

16   Q.   And it really is the major factor, right, Dr. Siddiqui?

17   That what doesn't make sense to you, as you evaluated this case

18   and offered us your opinion, is the timeline between cirrhosis

19   or mild cirrhosis, as you term it, and the diagnosis of HCC in

20   2018, right?

21   A.   I would just like to say that, yes, the timeline is

22   important.  However, the timeline of what?  And we're looking

23   at a potent carcinogen.  We're looking -- we're talking about

24   NDMA, which is known to be a tumor or cancer-inducer and

25   promoter.  So that's why those two together, the fact that NDMA

Siddiqui, M.D. - Cross - Brown                    70

1   is such a potent carcinogen, the fact that Mr. Roberts took

2   such high levels of NDMA for approximately two years and the

3   fact that then he got this cancer in an extremely short amount

4   of time, those three together are what I'm basing my opinion

5   on, Your Honor.

6   Q.    And --

7            MS. BROWN:  May I proceed, Your Honor?

8            CHIEF JUDGE BUMB:  Yes.

9   BY MS. BROWN:

10  Q.    And we asked you quite a bit, you'll probably remember,

11  Doctor, in your deposition to give us the study that you were

12  relying on for the timeline between HCC, cirrhosis and HCC, and

13  you identified Johnson, correct?

14  A.    I -- I don't remember the deposition.

15  Q.    Okay.  And Johnson, in fact, is what you identified here

16  on the timeline slide you just showed us, correct?

17  A.    Correct.

18  Q.    And based on your testimony, Johnson stands for the

19  proposition that on average there is a seven- to ten-year

20  latency between a diagnosis of cirrhosis and a diagnosis of

21  HCC, correct?

22  A.    Correct, on average, yes.

23  Q.    Right.

24            And just by simple common sense, average means some

25  people are going to be shorter, some people are going to be

1    longer, right?

2    A.   Right.  Just -- just to clarify, Your Honor, in the

3    Johnson study, the patients were hepatitis C and hepatitis B

4    patients.  And those patients more often than not have the

5    most -- most commonly they go on to HCC because they cause a

6    very high degree of -- the viruses, the hep-B and hep-C cause a

7    high degree of cirrhosis that can lead to HCC, and also because

8    of fibrosis, et cetera, and also they change the DNA in the

9    liver, or in the cells, and that itself can be a direct

10   cancer-promoter.

11   Q.   And the one thing, though, that you left out about that

12   description of Johnson, Dr. Siddiqui, is that the patients in

13   Johnson were actually cured of their hepatitis C, right, ma'am?

14   A.   I -- I didn't leave that out.  That's not exactly what the

15   study was about.

16        Your Honor, firstly, this study was looking at

17   hepatitis C and hepatitis B patients.  There is no such thing

18   as a -- well, we have new antiretrovirals that quote-unquote

19   can cure hepatitis C, but what they do is they decrease the

20   amount of viral load in the system, hopefully then getting rid

21   of the hepatitis C.  We're talking about hepatitis C now.

22        And what this study showed was that there were

23   certain patients in this study that were given the

24   antiretroviral.  So there were certain patients in the study

25   who had had hepatitis C and then didn't have hepatitis C and

1    still developed seven to ten -- after seven to ten years, they

2    developed cirrhosis.

3            So what counsel was saying was that they were cured.

4    The thing is that when someone has hepatitis C and they use an

5    antiretroviral to decrease the viral load to minimal levels or

6    zero levels, they may be cured of the virus, but they're not

7    cured of what's happening in the liver, the DNA changes that

8    may have happened, the fibrotic changes that may have happened.

9    That process doesn't go away, the one that started.

10           And also this study, Your Honor, was very interesting

11   in the sense that, yes, they did include people who were on

12   antiretrovirals and cured, Your Honor, quote-unquote, but they

13   also looked at -- they didn't -- they didn't tell -- I think

14   they mentioned in one table, Your Honor, that some of them had

15   the antiretrovirals just close to the diagnosis of cirrhosis,

16   or they didn't exactly tell you the time frame all the time for

17   every patient.

18   Q.   Mr. Roberts never had hepatitis C, right?

19   A.   Correct.  He didn't have hepatitis C, which is the most

20   aggressive liver disease that leads to HCC.

21   Q.   And because he didn't have hepatitis C, he was never one

22   of the Johnson type patients who was cured or in some type of

23   remission from hepatitis C, correct?

24   A.   But -- but, Your Honor, that's why I wanted to bring this

25   study up because he didn't have hepatitis C.  And if hepatitis

1    C, if we make the assumption, the correct assumption, I feel,

2    Your Honor, that hepatitis C patients are the most aggressive

3    patients going on to hepatocellular carcinoma, right, even if

4    they get the antiretrovirals, they still can get HCC.

5            So I used this study to show that even in the most

6    aggressive patients, Your Honor, even in the ones that at

7    high -- more likely than not will get HCC, even then their

8    progress, the time frame from cirrhosis to HCC in the most

9    aggressive patients is seven to ten years.  And that's what I

10   was trying to prove by this study.

11           So the fact that he didn't have hepatitis C, the fact

12   that he didn't need antiretrovirals for hepatitis C actually

13   puts him in a lower risk group and actually again puts him

14   in -- his time frame would be longer than the seven to ten

15   years because he didn't have hepatitis C, because he didn't

16   have that risk of HCC that hepatitis C confers.

17   Q.   And at least, Dr. Siddiqui, when we asked you in your

18   deposition for a cite on the latency period, you pointed to the

19   Johnson study, which is the one you have cited on your chart,

20   correct, Doctor?

21   A.   Yes, correct.

22   Q.   All right.  And as it relates to this slide where you

23   indicate slow growth and fast growth, this carcinogen with

24   promoter capabilities being equal to fast growth, you base that

25   on animal studies, correct, Doctor?

1    A.    So I was -- I based it on a lot of research and literature

2    research that I did myself on animal studies and the case

3    reports and the epi studies, and also I read the general

4    causation experts, Your Honor.  Dr. Panigrahy has like a

5    20-page sort of writeup on carcinogens and NDMA being the

6    promoter and inducer.

7    Q.    The epidemiology studies that you're referring to, that's

8    Gomm and Mansouri, correct, Doctor?

9    A.    Correct.

10   Q.    And there's absolutely no information in either of those

11   papers about the time in which those cancers developed,

12   correct?

13   A.    Well, so what they talk about in the Gomm and Mansouri

14   studies, Your Honor, are the time frames that the studies were

15   done.  So they were done, if -- I could pull them up to tell

16   you exactly, but they were basically done in a short-term time

17   frame, and even the studies say that these were short-term

18   follow-up studies.  So the time frame is not ten years, 20

19   years, et cetera.  It's approximately five years or so.  And

20   that includes getting someone into the study, getting those

21   patients the time frame of when they start the valsartan and

22   then following them up to see whether they got any events.  So

23   that whole time frame of five years gets shortened down.  If

24   you look at the study methods, it gets shortened down to three

25   or four years anyways.

Siddiqui, M.D. - Cross - Brown                    75

1              So if we were to use that data of three to four years

2     of follow-up for cancer, if we were to use that data, that

3     would still be a shorter latency than the one that we're

4     talking about of decades or so from metabolic syndrome.

5     Q.   Doctor, there's absolutely no analysis in either of those

6     studies of the size of any of those tumors, the doubling rates

7     of the cancer, how long it would have taken for the individual

8     cancer that was found in those studies to have formed and

9     developed?  That is not part of those studies, correct?

10    A.   Those studies did not do tumor volume doubling times.

11    They did not look at latency periods.  What they did was --

12    what we can infer from those studies basically, Your Honor, is

13    that they quoted the time that the person started and the time

14    that the person stopped being followed up and with some lag

15    periods that they added.  And some people were followed for the

16    full five to six years.  Other people were followed for much

17    less than that.  And all of those people were calculated in the

18    statistics.

19             And even with all of that, even with that, and they

20    list themselves as a short-term follow-up study, even with that

21    they found a statistically significant risk of liver cancer in

22    those two studies, Your Honor.

23    Q.   And as it relates to whether or not -- neither of those

24    studies found a dose response, correct?

25    A.   Correct, Your Honor.  We were talking about the dose

Siddiqui, M.D. - Cross - Brown                    76

1    response before basically.  So they were looking at valsartan

2    doses.  But as we -- as we discussed, Your Honor, the valsartan

3    dose isn't what we would look for for a dose response.

4           If we were looking for a dose response of NDMA

5    concentration as you were asking me, Your Honor, to the cancer,

6    this would not be -- this would not -- they wouldn't be able to

7    come up with a dose response, a proper dose response, because

8    if you take a 300 -- and as I mentioned, a 320-milligram pill,

9    for example, from one of the other companies like Hetero Labs

10   that had a smaller amount of NDMA in that pill, and then you

11   compare it to a 40-milligram pill from Prinston Labs, which is

12   a larger amount of NDMA, you would think in dose-response

13   studies, you would think that the 320 would lead to more cancer

14   and the 40 would lead to less cancer, right, Your Honor.  But

15   we're not looking at the valsartan dosages, the 320, the 40.

16   What we're looking at is the concentration of NDMA

17   contamination, and they didn't do that.  They didn't look at

18   NDMA contamination levels.  So we can't come up with a dose

19   response of NDMA contamination, this much NDMA caused this much

20   cancer.

21          CHIEF JUDGE BUMB:  No.  And I think that's the

22   criticism that the defendants have, which is because there are

23   no studies that do that, the contamination, the dose response,

24   what the contamination level is to the risk of cancer.

25          And so while -- I think their argument is, is that

United States District Court
District of New Jersey

1    while intuitively it makes sense that if you give more poison

2    to a person, they're more likely to die.  So you give a little

3    bit, they might survive.  You give a lot more, they'll die.

4    Intuitively that all sounds right, that the more carcinogen you

5    take... there just are simply no studies to support that.  And

6    I think that is where this line of questioning is focusing.

7    That's how I'm understanding this question.  And that's the

8    question that I have posited before, which is it does seem that

9    you're focused on the increased concentration and the very

10   shortened timeline.

11          Let me ask you this:  If Mr. Roberts had developed

12   HCC seven years later, would your opinion be different?

13          THE WITNESS:  I think, Your Honor, depending on what

14   the clinicals were at that time, of course we would have to

15   relook at everything again, and of course the opinion might

16   have been different.  I don't know at that time how much NDMA

17   contamination he would have had or what other issues he may

18   have had that may have made his HCC more likely.

19          But I think that if the information in the case

20   changes, you absolutely have to look at everything again and

21   come up with a new, more updated opinion, right?  But based on

22   what we have here, that's what made sense.

23          And, Your Honor, just one thing I wanted to add, as

24   far as the concentration and causing the cancer, again, I would

25   say that we -- because NDMA is such a potent carcinogen, we

 1    don't have good human studies because of ethical concerns.  But

 2    the animal studies and the Hidajat study, Your Honor, looked at

 3    a large amount of exposure or a large amount of people exposed

 4    to NDMA.

 5              CHIEF JUDGE BUMB:  The Hidajat study, that was in a

 6    different context, right?  Remind me of that.

 7              THE WITNESS:  Yes.  That was an occupational study in

 8    I think rubber workers, Your Honor.  And they were exposed to

 9    NDMA.  They weren't ingesting it.  I think it was what they

10    were inhaling, but it was still the concentration, if you look

11    at it.  And if you look at the concentration amounts, those

12    people who are exposed to more concentrations of NDMA for

13    longer had more of a risk, Your Honor.

14              CHIEF JUDGE BUMB:  But there's a difference between

15    longer and levels, right?

16              THE WITNESS:  Yeah.  And --

17              CHIEF JUDGE BUMB:  I mean, there's not a correlation

18    there?

19              THE WITNESS:  There is no -- other than these -- so

20    you have to assume -- we're making the assumption that the

21    exposure, so we're basically talking about exposure --

22              CHIEF JUDGE BUMB:  Right.

23              THE WITNESS:  -- whether it's inhalation or

24    ingestion.

25              CHIEF JUDGE BUMB:  Right.

```
 1              THE WITNESS:  So we're sort of making up --
 2              CHIEF JUDGE BUMB:  Yeah.  And your opinion is not, as
 3    I hear it, does not -- your opinion really focuses on the
 4    concentration and the timeline and not necessarily the exposure
 5    over a longer period of time.  You really are focusing on the
 6    fact that it was a short amount of time and that the
 7    concentration levels were higher.  Higher than what, I'm not
 8    sure.  But higher than Hetero's, for example, right?
 9              THE WITNESS:  Yes, Your Honor.  And the fact that the
10    general causation experts like the toxicologist and the
11    excellent molecular diagnosticians, they had -- they have a lot
12    of data proving -- showing that the NDMA at these
13    concentrations -- so I am certainly not a toxicologist, but
14    they have the data, and I'm relying on that data, that the high
15    doses of NDMA caused this rapidity of cancer.
16              CHIEF JUDGE BUMB:  Go ahead.
17              MS. BROWN:  Thank you, Your Honor.
18    BY MS. BROWN:
19    Q.   And you referenced in some of that testimony there,
20    Dr. Siddiqui, this slide that you showed earlier this
21    morning --
22    A.   Yes.
23    Q.   -- correct?
24              And if I understood your testimony, we shouldn't be
25    concerned that Gomm and Mansouri don't have a dose response
```

Siddiqui, M.D. - Cross - Brown                    80

1   because we're not considering the individual pills and the

2   concentration of a potential contaminate that they might have

3   had; is that fair?

4   A.    I don't think I said we shouldn't be concerned.  We should

5   always look at everything with a critical eye, a scientific

6   eye.  So it all concerns me.  We discussed the issues with why

7   they could not come up with a dose response.

8   Q.    And one of the issues you pointed out is that, well, some

9   folks might have been taking a pill that was made by Hetero

10  that had less NDMA, correct?

11  A.    Some people might have, yes.  That was an example I was

12  giving, yes.

13  Q.    Sure.

14         And the fact of the matter is, you have no idea if

15  that's true because we don't have that data, correct?

16  A.    We don't -- we don't have that data or the study?

17  Q.    The study does not have data on whether people were taking

18  Hetero pills or Prinston pills or Solco pills or somebody

19  else's pills.  That is unknown, correct?

20  A.    Yes, correct.  And that's why I feel that, Your Honor, the

21  fact that we have so many different pill formations in the

22  market and these studies in Germany and France, the fact that

23  we have so many different concentrations really diluted that

24  patient population, the "ever" patient population because it

25  included many, many people who may have just had, as I

1   mentioned, Your Honor, who may have just filled one

2   prescription as compared to those people like Mr. Roberts who

3   may have filled multiple prescriptions.  So I feel that the

4   data was diluted, Your Honor.  They tried to be true to the

5   statistics.  They tried to be fair of course in the study.  It

6   was a very good study, I believe.  But ultimately, in an effort

7   to be fair and calculating those numbers, especially in the

8   Mansouri study, you know, Your Honor, what they did was, say,

9   for example, in the Mansouri study, say, for example, someone

10  took a year's worth of noncontaminated valsartan and then they

11  started taking a year's worth of contaminated valsartan.  In

12  the Mansouri study, Your Honor, they would take that patient

13  and put them into both groups, into the "ever" and the "never"

14  groups, diluting the patient population even more.

15         So despite all these dilution effects, we still had,

16  Your Honor, a statistical significance, despite all of these

17  different things that they did to statistically sort of unbias

18  themselves, and we still had a statistical significant

19  response.  And that's why I feel that it was important.

20  Q.   In order for your dilution theory to hold true, Doctor,

21  what needs to be true is that some people were taking a pill of

22  valsartan with less contamination than others, that's really

23  your point with this graph, correct?

24  A.   Yes.  My point was that there were people who were taking

25  less contaminated -- like a pill with less contaminated NDMA in

*Siddiqui, M.D. - Cross - Brown*                        82

1    it, right.

2    Q.    And the fact is, we don't have the data to know if that's

3    true either way.   That data is not contained in either of the

4    studies that you're relying on that informs this graphic,

5    correct?

6    A.    They did not include that data, correct.   But we have the

7    data, or the FDA.

8    Q.    And you haven't, Doctor, you have not analyzed, for

9    example, the market share of these different companies in the

10   areas from whom these study -- from where these study

11   participants were pooled, correct?

12   A.    Correct.   And, Your Honor, I'd just like to add here, if I

13   may, the market share is really important as far as when we

14   talk about sending these pills out.

15          So how do we know, Your Honor, that the market share

16   wasn't all Hetero?   So I don't know what the major pharmacy in

17   France is, right?   Or say, for example, the French equivalent

18   of CVS, say all they bought was Hetero, which has a 40th of

19   Prinston, which remained in Alabama or wherever Mr. Roberts

20   was, so say, for example, France got 80 percent of the market

21   share from Hetero pills, and now we have a study showing that

22   80 percent of the market share from Hetero pills, for example,

23   we could make that assumption, still showed a statistical

24   significance to liver cancer.

25          So, yes, market share is important.   But we don't

1    have access to that, nor did the study people.  We don't have

2    access to the market share.

3              But if we assume -- if we talk about market share and

4    the dynamics of how prescriptions are filled, then there is so

5    much randomness in it, Your Honor, and even with all that

6    randomness, even with the dilution theory, we still find a

7    statistically significant response.

8    Q.   Ma'am, the point is, it could go the other way.  Because

9    we don't have the data, all these folks could have been taking

10   more contaminated pills than Mr. Roberts was, right?

11   A.   It could go any way, that's the thing.

12   Q.   Absolutely.

13             You've made an assumption here that this dilution

14   theory means people were taking lower contaminated pills, but

15   because we don't have the data, they could have been taking a

16   ton more than Mr. Roberts was, right?

17   A.   But the thing is what we're trying to do with --

18             CHIEF JUDGE BUMB:  Can you answer that question?

19             THE WITNESS:  Sorry.

20             Yes, that is possible.  That is a possibility.

21   BY MS. BROWN:

22   Q.   All right.  Let's keep moving.  I'm almost done.

23             So as it comes to this chart where you have

24   information about what Mr. Roberts ingested, we know prior to

25   the very first pill of valsartan that he took, we have the

1    April '16 scan with cirrhosis, correct?

2    A.    So, again, I feel it's either -- based on the radiology

3    reads, it's either inflammation or fibrosis or mild cirrhosis.

4    Q.    We already did it.  Your report says "mild cirrhosis,"

5    right?

6    A.    Right.

7    Q.    Okay.  So we got that in April of 2016.  And we know in

8    2009 we have a treating radiologist diagnosing NASH, correct?

9    A.    Well, again, I just want to repeat that the NASH wasn't a

10   solid diagnosis.  They were talking about questionable fatty

11   liver disease, questionable NASH.  And a treating doctor in

12   2018 said that they had done a full review in the past and had

13   not found liver disease.  I'm paraphrasing, Your Honor, but

14   that's basically what they had said.

15   Q.    And when it comes to the information about the pills that

16   Mr. Roberts ingested, you have not formed an opinion as to how

17   many of these pills contaminated with NDMA were necessary for

18   Mr. Roberts to develop HCC, correct?

19   A.    So as a specific causation expert, I was not asked to give

20   a toxicological review, Your Honor, or, you know, like the dose

21   concentration.  My understanding as just as a clinician, Your

22   Honor, was that based on his dose, based on how he filled the

23   prescriptions, based on the information we have from his

24   contaminated batches, he was continuously taking a high level

25   for those approximately two years.

*Siddiqui, M.D. - Cross - Brown*                    85

1          CHIEF JUDGE BUMB:  And what -- I mean, are you able

2     to say, well, if he had taken a lower dose, he would not have

3     gotten HCC?

4          THE WITNESS:  The -- my -- for me --

5          CHIEF JUDGE BUMB:  I mean, where do you draw the

6     line?  And on what studies do you rely?  I think that's really

7     what the heart of the cross-examination is at this point.

8          What are you relying on that says, well, these levels

9     were so high?

10         Again, I sort of -- maybe I'm repeating myself.

11    Intuitively it makes sense, but where is the scientific data

12    that says that at these levels he developed HCC, whereas if it

13    had been in lower levels, let's call them the Hetero levels, he

14    would not have?  Where is that data?

15         THE WITNESS:  So firstly, I would go with the FDA

16    number, Your Honor, which is like .96, or .1 approximately,

17    .096 or .1, Your Honor, micrograms.  They gave us a cutoff.

18    They said anything, you know, more than this can lead to

19    toxigenic effects.  So firstly, we would start with that,

20    right?

21         CHIEF JUDGE BUMB:  Uh-huh.

22         THE WITNESS:  Secondly, we would say that animal

23    studies and the exposure studies that we discussed show that

24    those animals or people exposed to an increased concentration

25    can get risk of increased cancer.  And then we have the human

1    epidemiology studies that we were just discussing, again,

2    showing a statistical significant increase.

3           The crux of it is, we know from the FDA, we know that

4    it is a -- it's a toxic substance.  And the FDA has given us

5    this sort of marker of .1.  And anything above that, if we

6    assume based on what the FDA is telling us, that anything above

7    that is toxic, and then we read our general causation reports

8    that go into great detail about the toxicity and the amount of

9    cancer promotion that NDMA does, we put that all together and

10   the levels together and then we look at Mr. Roberts himself and

11   how much he took, that's how we come up with our diagnosis

12   basically or our cause, specific causation of why we believe

13   that this dose of NDMA for this many years in Mr. Roberts

14   caused his HCC.

15          MS. BROWN:  May I proceed, Your Honor?

16   BY MS. BROWN:

17   Q.   I'm not sure I followed that, so let me ask a couple of

18   questions in follow-up here.

19          Based on your own theory, Doctor, can we agree by

20   June 13, 2018, Mr. Roberts would have had HCC?

21   A.   Yeah.  I think he was diagnosed -- I don't remember the

22   exact date, but he was diagnosed in August.

23   Q.   Yes, ma'am.

24   A.   Yeah.  So -- he was diagnosed in August, so I --

25   Q.   Well, so cancer doesn't just appear, right?  I mean, he

Siddiqui, M.D. - Cross - Brown                    87

1    had it in June if he was diagnosed in August; would you agree?

2    A.   So I don't want to -- I would like to be specific, and so

3    specifically, my specific answer is he was diagnosed in

4    August --

5    Q.   Right.  But what I'm trying to understand --

6    A.   -- 2020.

7    Q.   -- is how much of this valsartan contaminated with NDMA

8    was necessary to cause the cancer.  And the truth is you don't

9    know.

10   A.   I believe that -- well, I can't -- let's see, how should I

11   answer it?  I believe that the amount that he had caused his

12   cancer.  As far as the exact amount or a cutoff amount, that

13   would be the general causation experts who would discuss that.

14   Q.   But if he had cancer in January of 2017, he would have --

15   the dose of valsartan needed to cause it would have been

16   significantly less than all the other pills you have listed on

17   the chart after that.  Do you see what I'm saying?

18            MR. NIGH:  Objection; speculative.

19            CHIEF JUDGE BUMB:  I don't understand the question.

20            MS. BROWN:  I'll rephrase.

21   BY MS. BROWN:

22   Q.   What I'm trying to understand is when is the point,

23   according to your theory, that he had consumed enough

24   contaminated valsartan such that he developed cancer?  Does

25   that make sense?

Siddiqui, M.D. - Cross - Brown                            88

1   A.   So my understanding based on my reading is this, that NDMA

2   is such a potent cancer-inducer that even a few doses, even a

3   few, even weeks to months can cause cancer.

4            Now, again, Your Honor, of course this is in animal

5   studies, but if we extrapolate the weeks to months, if we

6   extrapolate it to a year, for example, the fact that NDMA is

7   such a strong cancer-inducer and promoter -- I don't know at

8   which point he got the cancer.  I believe it was somewhere

9   maybe in around 2018, but this is pure speculation.  The reason

10  being that it was so aggressive that he started having

11  symptoms.  So I would assume, my assumption is that it would

12  have been a fast-growing cancer, and he would have sought help

13  as soon as it started to grow.

14            CHIEF JUDGE BUMB:  Okay.  Now I'm really confused.

15            THE WITNESS:  Okay.  Shall I re --

16            CHIEF JUDGE BUMB:  Let's take a five-minute break.

17  We'll take a morning break.  I'll have some questions when I

18  get back.

19            MS. BROWN:  Thank you, Your Honor.

20            THE COURTROOM DEPUTY:  All rise.

21            CHIEF JUDGE BUMB:  You could step down, Doctor.

22            THE WITNESS:  Oh, thank you.

23            (Recess was taken at 11:28 a.m. until 11:35 a.m.)

24            THE COURTROOM DEPUTY:  All rise.

25            CHIEF JUDGE BUMB:  Okay.  Where is Dr. Siddiqui?  Oh,

*Siddiqui, M.D. - Cross - Brown*                           *89*

```
 1   there you are.  Okay.
 2              Okay.  Have a seat.  Thank you.  Continue on.
 3              All right.  We'll continue with cross.  I feel like
 4   I've asked too many questions and we'll just keep moving along,
 5   okay.
 6              MS. BROWN:  May I proceed, Your Honor?
 7              CHIEF JUDGE BUMB:  Yes.
 8   BY MS. BROWN:
 9   Q.   Dr. Siddiqui, when we left off we were looking at this
10   slide that you showed earlier this morning in talking about
11   it's true, is it not, that you were unable to tell us at what
12   point on this chart, in your view, Mr. Roberts had consumed
13   enough contaminated valsartan to cause his HCC; true?
14   A.   So what I was trying to say was that based on the data
15   that I reviewed, it can be -- NDMA can sometimes be as quick as
16   weeks to months.  So it could be at any point.  And then I was
17   trying to -- I think I went into this explanation of how with
18   the carcinomas you can't always tell when they arise, so we
19   assume, we make the assumption that they, depending on the type
20   of cancer, that they really started growing when the patient
21   first starts having symptoms.  So I was just sort of talking
22   about that.
23   Q.   And so in your view, it could have been just a few weeks
24   of taking contaminated valsartan that Mr. Roberts had consumed
25   enough in your opinion to cause his HCC, correct?
```

Siddiqui, M.D. - Cross - Brown                    90

1    A.    My opinion is that although there are animal studies, Your

2    Honor, that talk about a few weeks to a few months, I think for

3    Mr. Roberts, it must have been -- again, this is pure

4    speculation, Your Honor, because we don't know, we don't know

5    that, but I think what we do know is it came up somewhere

6    between 2016 and 2018, right, most likely, I think.  But,

7    again, it's pure speculation, I think it was somewhere probably

8    late 2017, maybe early 2018.  And the reason I think that is

9    because he -- he went in when he started having symptoms.  And

10   he started having symptoms when his cancer must have, you know,

11   grown to a point that it was causing him issues.  And that's

12   why I'm speculating that it may have been somewhere in late

13   2017, 2018.  And he continued to take the contaminated

14   valsartan throughout that.

15   Q.    And what that means, Dr. Siddiqui, just to round out this

16   questioning on this slide, is you can't give us a particular

17   dose of contaminated valsartan that is necessary in order to

18   induce HCC, correct?

19   A.    So there are no studies that I can think of that look at

20   that.  There are, you know, the toxicological studies, Your

21   Honor, that, again, the FDA on the numbers, they look at those

22   numbers.  So I, standing here, don't know at which point for

23   Mr. Roberts that turned into -- that dose for Mr. Roberts that

24   turned into cancer.  I don't know that.  But I do believe it

25   was somewhere within --

*Siddiqui, M.D. - Cross - Brown*                                          91

1    Q.    And -- I apologize.

2    A.    Sorry.  Sorry.

3    Q.    And in terms of a document you showed earlier this

4    morning, this is a FDA document about the laboratory analysis

5    of valsartan products.  Do you recall showing that earlier this

6    morning?

7    A.    Yes.

8    Q.    And what the FDA said here as it relates to NDMA estimated

9    risk is that the FDA estimated that if 8,000 people took the

10   highest dose containing NDMA from the recalled batches daily

11   for four years, there might be one additional case of cancer

12   over the lifetime of 8,000 people; is that right?

13   A.    That's what it says, yes.  Although, again, as we

14   mentioned before, the 300 -- they're talking about the

15   valsartan dose, which does not always correlate with the --

16   mostly does not correlate with the dose of contaminated NDMA in

17   that valsartan.  So they're --

18             CHIEF JUDGE BUMB:  What do you mean?  Because it does

19   say "containing NDMA."  What are you saying?

20             THE WITNESS:  So I was saying, Your Honor, that it

21   says the highest valsartan dose, so that means the highest

22   valsartan dose, the pill of valsartan that's made is

23   320 milligrams.  It's also 160, 80 and 40, right, Your Honor.

24             We saw in our FDA table that some valsartan like the

25   Hetero, for example, I keep coming back to that, this

*Siddiqui, M.D. - Cross - Brown* 92

1   320-milligram valsartan pill of Hetero has less NDMA than a

2   40-milligram pill -- valsartan 40 milligrams from Prinston.  So

3   this dose they're talking about, so the FDA has a -- you know,

4   wants to alert us to this, but it's not -- also here not

5   talking about a dose response, because the 320-milligram pills

6   could be from any of those manufacturers.  And depending on

7   which manufacturer you -- the prescription that the patient

8   took, the amount of NDMA in each pill could be exorbitantly

9   different.  They're just talking about the valsartan dose.

10  BY MS. BROWN:

11  Q.   And you know that the FDA knew that because they tested

12  it, right?

13  A.   Right.

14  Q.   So when -- this whole thing is talking about laboratory

15  analysis, right?  So the point that you're making is that the

16  FDA wasn't in the dark about the different levels of

17  contamination in the different pills, right, Doctor?

18  A.   Right, I hope so.

19  Q.   So when they make this statement, they know full well the

20  point you're making; that there were differing levels of

21  contamination in different products, correct?

22  A.   I think -- yes, correct.

23  Q.   All right.  Let's talk a little bit about quickly your

24  differential diagnosis.

25          As I understand it, Doctor, you rule in what you

Siddiqui, M.D. - Cross - Brown                    93

1    believe to be the most likely possible causes and then you rule

2    out those that you do not believe are the only substantial

3    factor, correct?

4    A.    Correct.

5    Q.    And you have come to the conclusion in this case that

6    Mr. Roberts' use of valsartan contaminated with NDMA was the

7    only substantial factor in causing his HCC, correct?

8    A.    Yes, for Mr. Roberts specifically, correct.

9    Q.    Mr. Roberts had a number of risk factors for HCC; true?

10   A.    True.

11   Q.    Okay.  He had cirrhosis, correct?

12   A.    Again, if we -- if we talk about what the radiologist

13   said, mild fibrosis versus cirrhosis, we can make that

14   assumption that he had quote-unquote mild cirrhosis in the 2016

15   scan.

16   Q.    And certainly at the time he was diagnosed with HCC, he

17   had very aggressive cirrhosis, correct?

18   A.    I believe so, yes.

19   Q.    And cirrhosis, in your words, is one of the most

20   significant risk factors for liver cancer, correct?

21   A.    Correct, yes.

22   Q.    You mentioned earlier the American Cancer Society, the

23   NCI, the NIH, they put together risk factors for HCC, correct?

24   A.    Correct.

25   Q.    And those lists include, way up at the top, cirrhosis,

*Siddiqui, M.D. - Cross - Brown*                    94

1    correct?

2    A.    Correct.

3    Q.    Widely regarded as the most potent risk factor for this

4    type of liver cancer, HCC, correct?

5    A.    Correct.

6    Q.    And even though you haven't looked at the quantification,

7    you're aware of the body of scientific literature that attempts

8    to quantify the magnitude of that increased risk, correct?

9    A.    Correct.

10    Q.    And you know that it is enormous, correct?

11    A.    It's large, yes.

12    Q.    Sure.

13          When you're talking about the relative risk of having

14    cirrhosis and being at risk for HCC, we are talking about an

15    increase of thousands of percent, correct?

16    A.    Depending on how you calculate it.

17    Q.    You've seen those studies --

18    A.    Correct.

19    Q.    -- right, Doctor?

20    A.    Yes.

21    Q.    And you pointed out the relative risks in two studies that

22    were done on folks taking contaminated valsartan, correct?

23    A.    Correct.

24    Q.    And those relative risks were not enormous, right, Doctor?

25    A.    To me, they were significant.

Siddiqui, M.D. - Cross - Brown                    95

1    Q.   They were approximately -- to get a thousand percent

2    increased risk, we're talking about a relative risk that is in

3    the hundreds or a hundred, correct?

4    A.   Okay.

5    Q.   Is that -- do you agree with me?

6    A.   Yes.

7    Q.   Okay.  And when we looked at these relative risks earlier

8    in the Gomm and Mansouri studies, we're looking at relative

9    risks of like 1.18, correct?

10   A.   Correct.

11   Q.   1.23, correct?

12   A.   Correct.

13   Q.   Those are small relative risks compared to the relative

14   risks of cirrhosis; would you agree?

15   A.   Agreed.

16   Q.   The relative risk or the increased risk of cirrhosis and

17   HCC is exponentially larger than the two studies you cited to

18   us, Gomm and Mansouri, correct?

19   A.   Correct.

20        But let me just, if I may, just explain something.

21   So cirrhosis causes HCC, and we know that it's the major -- one

22   of the major risk factors for HCC.  But what I'm saying is that

23   Mr. Roberts had cirrhosis.  There's no doubt about that.  When

24   he was diagnosed with HCC, he was also diagnosed with

25   cirrhosis.  We're not -- we're saying that he had the cirrhosis

Siddiqui, M.D. - Cross - Brown                    96

1    in 2018.

2              So when we look at studies that show that people with

3    cirrhosis, you know, 4,000 percent increase in HCC, yes, we

4    know.  We know that.  We all know that.  What I'm saying is,

5    how did he get to that cirrhosis?  Did he get to that cirrhosis

6    in two years or three years or however you want to think of it,

7    Your Honor?  Did he get to that cirrhosis through NASH, fatty

8    liver inclusions, or did he get to that cirrhosis within two

9    years through a high concentration, high dose, a high amount of

10   contaminated NDMA?  So --

11             CHIEF JUDGE BUMB:  So are you now saying that the

12   NDMA caused the cirrhosis that caused the liver cancer?

13   What -- are you saying -- it sounds like you're saying the NDMA

14   caused cirrhosis.

15             THE WITNESS:  So what happens, Your Honor, in that

16   George study that we pulled out, so the NDMA can cause many

17   things, fibrosis, cirrhosis, HCC.  Cirrhosis is a gateway to

18   HCC.  So the NDMA can cause HCC by fibrosis, cirrhosis, HCC,

19   but it can also cause HCC.  It can also cause HCC by mutational

20   changes.  It can also cause HCC by inflammation and DNA

21   changes.  So there's many ways that NDMA causes the HCC.

22             But one of the ways, so what -- what -- I'm sorry,

23   Your Honor, I'll just say it, what is HCC?  HCC is where the

24   cells, the liver cells are not able to regenerate themselves,

25   and that cycle of cell growth and death stops at cell growth.

Siddiqui, M.D. - Cross - Brown                    97

```
 1    It just keeps growing, growing, growing, right?  So that's HCC.
 2            What I'm saying is that cirrhosis is seen in patients
 3    with HCC.  So Mr. Roberts most likely had inflammation,
 4    fibrosis, and cirrhosis, and a part of that cirrhosis was HCC.
 5            Now, that HCC that was growing in that cirrhotic part
 6    could have been because of the cirrhosis, and that cirrhosis
 7    came from that fibrosis and inflammation coming from NDMA, in
 8    my opinion.  It could also have been a direct mutational change
 9    in the liver cells from the NDMA, because NDMA can follow that
10    stepwise progression.  It's just in my opinion quicker because
11    it's a carcinogen.  So progression from inflammation, fibrosis,
12    cirrhosis, HCC.  Or it can directly affect the cells causing
13    mutations and additions and DNA changes.  And that's what I'm
14    saying; that yes, we know that he had cirrhosis.  For me,
15    that's not a surprise.
16            And so looking at the data, looking at the
17    literature, showing that cirrhosis causes HCC, we know that.
18    That's -- we know that cirrhosis is associated with HCC.  We
19    just want to understand how he got to that point, that 2018
20    scan.  How did he get to that point with a 2016 scan, Your
21    Honor, that didn't show any of these things?  Didn't show these
22    things.  It showed some things, but not these things, and that
23    was my point.
24    BY MS. BROWN:
25    Q.   At the time -- we looked at your report earlier about your
```

1    view that he had cirrhosis in 2016.  At this time, just so

2    we're crystal clear, Mr. Roberts had not taken a single pill of

3    contaminated valsartan; true?

4    A.    True.

5    Q.    All right.  And you mentioned just a moment ago that one

6    way cirrhosis can form is it can be a progression.  If we look

7    at kind of your stages of liver disease, it can be a

8    progression from a healthy liver to an inflamed liver or

9    fibrotic liver and then you get to cirrhosis, correct?

10   A.    Correct.

11   Q.    And you know -- and I know we've gone back and forth on it

12   a little bit today so I want to show you.  In September of

13   2009, Mr. Roberts was diagnosed with NASH or nonalcoholic

14   steatohepatitis, correct?

15   A.    So there was in the records from my recollection, Your

16   Honor, there was a questionable diagnosis of NASH.  But the

17   proper full diagnosis of NASH was not made, even when Dr. Ives,

18   I have it in my report, when Dr. Ives saw him, he said, again,

19   sorry, Your Honor, I'm paraphrasing, he said possible fatty

20   liver disease, possible fatty inclusions.  So they did discuss

21   NASH, but the proper diagnosis was not made.  But, yes, they

22   were talking about NASH in 2009.

23   Q.    And I put the record up here so we can make sure we're all

24   on the same page.

25   A.    Oh, thank you.

Siddiqui, M.D. - Cross - Brown                    99

```
 1   Q.   This is a treating physician, a follow-up visit for

 2   Mr. Roberts in September of 2009.  Correct?

 3   A.   Correct.

 4   Q.   Okay.  And what is noted under the impression is NASH,

 5   correct?

 6   A.   Correct.  It says nonalcoholic steatohepatitis with no

 7   evidence of decompensation at least biochemically, and physical

 8   exam showed no evidence of portal hypertension.

 9   Q.   And no evidence of decompensation, that means he wasn't

10   experiencing any symptoms from the NASH, correct?

11   A.   Symptoms, sorry.  Decompensation would mean where the

12   liver is decompensated, not working as well as it should, is

13   extremely scarred, so it could be portal hypertension, ascites,

14   et cetera.

15   Q.   And one of his things his treaters at the time recommended

16   or at least discussed with him was the possibility of doing a

17   liver biopsy, correct?

18   A.   What they said was -- sorry, I was just reading this.

19   What they said was he's really not too interested in having a

20   liver biopsy, which is understandable and not completely

21   necessary.

22   Q.   That was the discussion that they had with him back in

23   2009 --

24   A.   Yes.

25   Q.   -- correct?
```

1    A.    I'm just reading this.

2    Q.    Sure.

3          And in addition to cirrhosis being a risk factor for

4    developing HCC, NASH itself, independent of cirrhosis or

5    anything else, is a risk factor for developing HCC, correct?

6    A.    NASH can, in a small proportion of patients, develop HCC

7    without cirrhosis, which of course is not the case for

8    Mr. Roberts because he did have cirrhosis.

9    Q.    And, in fact, his treating physicians, when he was

10   diagnosed with HCC, determined or termed it HCC arising out of

11   NASH cirrhosis, correct?

12   A.    There was one doctor who said that, but there were also

13   other doctors who said -- and, again, I'm paraphrasing, they

14   said that a complete workup was done, and no -- sorry.  I'd

15   have to read that again.  But no -- a full workup for liver

16   disease was done and basically they didn't find anything.

17   Q.    Let's take a look at tab L if we could, please.  I want to

18   point you to what I just quoted from and make sure that's

19   something you saw.

20         And we're looking at page 85, please, Bates ending in

21   85.

22         All right.  And if we take a look at this image here,

23   this is something that you reviewed in connection with your

24   opinions, correct?

25   A.    Correct.

1    Q.    All right.  And if we scroll down a little bit to

2    "impression and plan," you see, "63-year-old Caucasian male

3    with HCC arising out of NASH cirrhosis," correct?

4    A.    That's what's written there, yes.

5    Q.    Okay.  And this was read by a treating radiologist,

6    correct?

7    A.    No.  I think this was written by a radiation oncology

8    resident, so that's not a radiologist.  That's someone who

9    gives radiation.

10           And, Your Honor, I just wanted to clarify one thing

11   here.  So when someone -- this resident who is not the

12   attending who made the decision, but of course they did a good

13   job, this radiation oncology resident is reading, he has half

14   an hour to quickly make the history, so he's reading, he's

15   not -- he doesn't have everything we have on Mr. Roberts.  He

16   doesn't know what he was exposed to, what he wasn't exposed to.

17   He is seeing a questionable history of NASH and he's seeing

18   cirrhosis and he's saying HCC arising out of NASH cirrhosis,

19   and that's what he presents to his attending, who then makes

20   the decision following this to give him radiation, localized

21   radiation.

22   Q.    And when this says that this was electronically signed on,

23   that's the supervising doctor right there?

24   A.    Most likely, yes.

25   Q.    And so the supervising doctor read the report of the

*Siddiqui, M.D. - Cross - Brown*                                   *102*

1    resident who you never spoke to, right?

2    A.    Correct.

3    Q.    You have no idea what he was thinking when he wrote down

4    HCC arising out of NASH cirrhosis, correct?

5    A.    No, I have no idea.  But I can tell you that he was never

6    diagnosed with NASH cirrhosis.  These are all things that this

7    doctor or any of the -- because we have other treating

8    physicians who said he had a completely normal liver workup.

9    So, you know, these are records, people writing their own

10   opinions.  I don't know what else to say about this line.

11   Q.    Let's keep moving, okay.

12          We talked about cirrhosis, independent risk factor

13   for HCC.  NASH, too, you will agree is an independent risk

14   factor for HCC, correct?

15   A.    Correct.

16   Q.    And you haven't looked specifically at the relative risks,

17   but you know that there are studies that have attempted to

18   quantify the increased risk of having NASH and developing HCC,

19   correct?

20   A.    Correct.

21   Q.    And you know that those studies show increased risk higher

22   than the Gomm and Mansouri articles you cited for us this

23   morning, correct?

24   A.    Correct.  It's just that I'd go back, I'd just do a subtle

25   reminder that these studies, Your Honor, are binary studies in

1    the sense "diagnose NASH versus not diagnose NASH" going to

2    cirrhosis.

3              In the Gomm and Mansouri study, as I mentioned,

4    there's a lot of dilution, and it's not binary, they could have

5    been on multiple prescriptions or minimal prescriptions, so

6    it's not the same.

7    Q.    Let's talk about obesity.  Obesity is an independent risk

8    factor for developing HCC, correct?

9    A.    Correct.

10   Q.    Mr. Roberts was clinically obese for as far back as we

11   have records, correct?

12   A.    I remember 2012 being the earliest one.

13   Q.    Okay.  Did you see any records prior to 2012 that showed

14   Mr. Roberts also being obese?

15   A.    I don't recall.

16   Q.    Okay.  And you would agree that there are studies that,

17   just like cirrhosis and just like NASH, have attempted to

18   quantify the increased risk of being obese and developing HCC,

19   correct?

20   A.    Correct, through cirrhosis usually though.

21   Q.    And you know there are studies that control for that, and

22   they look at whether folks who are obese who do not have

23   cirrhosis are at an increased risk of getting HCC, correct?

24   A.    They have looked at all these risk factors, yes.

25   Q.    And you know and you wouldn't be surprised to learn that

*Siddiqui, M.D. - Cross - Brown*                    *104*

1    those studies show a higher increased risk of being obese

2    without cirrhosis and developing HCC than the Gomm and Mansouri

3    studies you pointed to us this morning, correct?

4    A.    Yes.  But most of those studies are looking at being obese

5    and having cirrhosis versus being obese and not having

6    cirrhosis.  So the percentage is -- the relative risks that

7    they're talking about in those studies are if you are obese and

8    you get cirrhosis, what is the percentage increase as compared

9    to if one is obese and doesn't get cirrhosis.  It's just

10   cirrhosis -- sorry, obesity, cirrhosis.  Obesity, no cirrhosis.

11   And they're doing the relative risks on that.

12          And we know that obesity can cause liver changes and

13   cirrhosis.  We also know that diabetes does the exact same

14   thing.  The studies looked at that, diabetes, cirrhosis.

15   Diabetes, no cirrhosis.  So we know also that those numbers are

16   high.

17          They also looked at hyperlipidemia, and they also --

18   so they looked at everything under the metabolic syndrome, and

19   NASH of course as well.  But in our case, we put all of those

20   things under the umbrella of metabolic syndrome.  We considered

21   all of those things under the umbrella of metabolic syndrome.

22   Q.    Yes, ma'am.  I understand you did that.  I'm talking about

23   what the scientific literature does.  And even though you

24   grouped them all together because you think they're subsumed by

25   the risk of cirrhosis, the literature actually looks at the

1    risk independent of cirrhosis.  You know that there are studies

2    that look at whether just being obese without cirrhosis,

3    putting that to the side, puts you at an increased risk for

4    HCC.  You know that to be true, right?

5    A.    Yes.  But those -- that data, those studies are mostly

6    looking at binary events, so obesity, no obesity.  They're

7    comparing -- so the relative risk that you're talking about is

8    basically the disease with something versus the disease without

9    that thing, or having the disease and not having the disease.

10          So if you take, for example, there was a study that

11   you had quoted about NASH.  If you take someone with NASH who

12   gets cirrhosis and then you look at someone with NASH who

13   doesn't get cirrhosis, and then you take a hundred people with

14   NASH who got cirrhosis and 50 people with NASH who didn't get

15   cirrhosis and you divide that, that gives you a factor of two.

16   It's double the risk.  But that's not the question for us.  We

17   know that it's a risk factor.  We know that it's a risk factor.

18   We're not questioning that, yes, having NASH causes cirrhosis.

19   So that's what I'm trying to explain that these studies don't

20   answer the question.

21          So when you're saying to me that, you know, having

22   NASH doubles the risk whereas you, Dr. Siddiqui, are saying

23   1.18 on the Mansouri study, we're looking at completely

24   different things.  We cannot use that method of calculation or

25   the hazard ratio or the relative risk to talk about the hazard

*Siddiqui, M.D. - Cross - Brown*                     106

1    ratio in the Mansouri study, which is looking at multitudes of

2    different patients with multitudes of different prescriptions

3    that still came up with a significant -- statistical

4    significant risk.

5    Q.    Obesity is an independent cause of HCC; would you agree,

6    Doctor?

7    A.    Yes.

8    Q.    Diabetes is an independent cause of HCC; would you agree?

9    A.    Yes.

10   Q.    And when you look at studies that evaluated that question,

11   the magnitude of the independent risk of diabetes, NASH and

12   obesity, they all conclude the magnitude of that risk is far

13   greater than the magnitude of the risk that was identified in

14   Gomm and Mansouri, correct?

15   A.    And again, sorry, I just want to simplify that.  When

16   we're looking at the magnitude of the risk, we can't take that

17   magnitude of risk from whether this person has -- for example,

18   a male or a female.  Being a male doubles the risk of liver

19   cancer.  We can't take that risk and say, wow, it's double the

20   risk, 200 percent, et cetera, however you want to calculate it.

21   We can't take that risk and compare it to the risk in the

22   Mansouri study which is not looking at male or female.  It's

23   looking at all the prescriptions ever filled, ever or never, at

24   which dose, what dose, we don't know, right?  It's not the

25   same.

1    So if you look at the male or female, it's a binary.

2    You can say, okay, you divide this by this and you get double

3    the score.  But in this study, the fact that it's still diluted

4    as all-comers, all different prescriptions and we still see a

5    statistically significant risk, it's a different study,

6    different calculation, different subjects, not binary, random,

7    we're still seeing a significant risk.  So we can't compare --

8    we can't say that if someone has hepatitis C they will

9    4,000 percent get cirrhosis and compare that number to this

10    number.  It --

11    CHIEF JUDGE BUMB:  I think the question is designed

12    to get you to answer the following question:  How is it that

13    you can rule out obesity and not have obesity as part of your

14    consideration, okay?  Because you have acknowledged that there

15    are studies that show obesity can lead to HCC.  Diabetes can

16    lead to HCC.  You seem to have concluded that those did not

17    cause Mr. Roberts' cancer here.  And you seem to ignore the

18    literature that says that they can.

19    And so I think the questioning is:  Well, how did you

20    rule them out so categorically?  Were they not part of the

21    equation?  And could it not be a combination of factors that

22    led to his HCC?

23    But your testimony and your report seems to say

24    definitively you've ruled that factor out when all of the

25    studies seem to say that obesity can lead to HCC or diabetes

*Siddiqui, M.D. - Cross - Brown*                                        108

 1   can, et cetera.  And your answer to that is?

 2           THE WITNESS:  My answer, Your Honor, is that I would

 3   never wish to ignore that.  It's a very important cause.  The

 4   thing is that I firstly looked at each one separately, obesity,

 5   diabetes, and fatty liver disease or NASH at that time.  I

 6   looked at them separately and I commented on them in my report.

 7   But what I said was that if we group them like we do usually

 8   now under the metabolic syndromes, if we group them under the

 9   metabolic syndromes, so each of them separately do cause -- can

10   cause HCC and they can cause cirrhosis, but then if we look at

11   those studies in context, so, yes, now we know that we've

12   established a causation, so now we're going to talk about that

13   causation, right, Your Honor?

14           So then if we have these risk factors, how do they

15   cause the HCC?  They cause the HCC by, in ten years or so,

16   causing inflammation.  The way they cause inflammation is

17   there's insulin resistance.  So they all up-regulate insulin

18   resistance.  That insulin resistance causes fatty deposition.

19   That fatty deposition causes inflammation.  That inflammation

20   causes fibrosis that can still be changed around sometimes.

21   That fibrosis causes cirrhosis, and that cirrhosis in some

22   people causes HCC.

23           That whole timeline, Your Honor, takes time, because

24   it's inherent genetic -- not genetic, sorry, inherent cellular

25   changes that are happening, not genetic changes, cellular

```
 1    changes that are happening.
 2               CHIEF JUDGE BUMB:  Right.  And you focused much of
 3    your testimony on the timeline.  I guess my question is and
 4    where I don't have clarity is, it seems to me that you are
 5    saying that all of these factors caused his liver cancer, but
 6    the fact that he had taken the NDMA, the valsartan contaminated
 7    with NDMA exacerbated it, expedited it, et cetera.  And that
 8    you're really not ruling out these other factors, but the
 9    timeline is what led to his early demise.  That's how I'm
10    hearing it.
11               THE WITNESS:  I feel, Your Honor, that obesity -- I
12    mentioned obesity, NASH and cirrhosis, and I think I mentioned
13    hyperlipidemia in my report, I think that they were there, but
14    I do not think that they caused his cancer.  The reason I do
15    not think they caused his cancer is because in 2016, when they
16    were there, those causes were there, he didn't have a diagnosis
17    of obvious cirrhosis or a clinical diagnosis of cirrhosis,
18    number one.
19               Number two, he had no diagnosis of cancer in 2016.
20               CHIEF JUDGE BUMB:  Did they contribute to the cause
21    of his cancer?
22               THE WITNESS:  They may have, Your Honor.  But I'm not
23    sure because -- the reason I'm not sure is because in 2016, he
24    didn't have any -- he didn't have any of those signs, and then
25    in 2018, he did.  But just in 2018, his diabetes was
```

1    controlled.  He did have a high HbA1c.  So he did have

2    diabetes, but he was trying to control it, and his fatty liver

3    was never diagnosed officially, but they spoke about it.  And

4    his cirrhosis again was the same thing, was it fibrosis?  Was

5    it mild cirrhosis?  It was never officially diagnosed.  So we

6    have these possible things that he had.  They may have

7    contributed to the overall liver health, but they wouldn't, in

8    my opinion, have caused such rapidity, and I do not think they

9    caused his liver cancer, Your Honor.

10          CHIEF JUDGE BUMB:  All right.  Let me ask the

11   following question:  If -- if -- assume hypothetically that

12   Mr. Roberts was a healthy individual, was not obese, was not

13   diabetic, et cetera, assume that, assume he ingested the

14   contaminated valsartan as he did, would he have died of liver

15   cancer?

16          THE WITNESS:  Yes, I think so, based on everything

17   I've read, Your Honor.

18          CHIEF JUDGE BUMB:  Okay.

19   BY MS. BROWN:

20   Q.   And if you assume, Dr. Siddiqui, that he was not diagnosed

21   in 2018 but he was diagnosed in 2025, you would have a

22   different opinion on the risk factors that may have contributed

23   to his cancer, correct?

24   A.   That would have been a completely different case with

25   completely different -- completely different medical scenarios.

*Siddiqui, M.D. - Redirect - Nigh*                    111

1    So, yes, I would have to look at everything again and come up

2    with a --

3    Q.   Because at bottom, Doctor, your opinion is based on the

4    fact that you view the time between what you term mild

5    cirrhosis in April of 2016 to a diagnosis of HCC in July of

6    2018, you believe that is a short latency period, correct?

7    A.   I believe so, yes.

8    Q.   And for that point, you pointed us to the Johnson study,

9    correct?

10   A.   Yes.  But there are other studies, too.

11   Q.   Well, we asked you about that in your dep and you pointed

12   us to Johnson, correct?

13   A.   Correct.

14   Q.   All right.  And your slide making that point here in court

15   cited Johnson, correct?

16   A.   Correct.

17   Q.   All right.

18           MS. BROWN:  Thank you, Your Honor.  I have no further

19   questions.

20           CHIEF JUDGE BUMB:  Any redirect?

21           MR. NIGH:  I only have a few questions, Your Honor.

22                      REDIRECT EXAMINATION

23   BY MR. NIGH:

24   Q.   First were the questions that you were asked that if

25   Mr. Roberts had been diagnosed or if he had gone on in the

*Siddiqui, M.D. - Redirect - Nigh*                    *112*

1    absence of NDMA, would he have gotten cancer in 2025.  Do you

2    remember those questions?

3    A.   Yes.

4    Q.   Or 2023, seven years plus, 2016, or seven years plus,

5    2025.

6    A.   Yes.

7    Q.   Plus 2018.

8         Okay.  Do most people with cirrhosis go on to get

9    HCC?

10   A.   So cirrhosis is a risk factor for HCC, but most people do

11   not get HCC with cirrhosis.  Most people with cirrhosis go on

12   to decompensated liver failure or something else.

13   Q.   And, in fact, the vast majority of people who are

14   diagnosed with cirrhosis never go on to be diagnosed with HCC,

15   correct?

16   A.   Correct.

17   Q.   Okay.  So in the absence of NDMA, if Mr. Roberts had never

18   had NDMA, it would be less likely that he would have ever gone

19   on to be diagnosed with HCC, correct?

20   A.   Yes, in my opinion, yes.

21   Q.   Okay.  In fact, the vast majority don't go on to get HCC,

22   correct?

23   A.   Correct.

24   Q.   Okay.  Doctor, you were asked questions about you don't

25   know the test levels of ZHP or the other manufacturers in the

*Siddiqui, M.D. - Redirect - Nigh*                    113

1    Mansouri study and the Gomm study, correct?

2    A.    Correct.

3    Q.    But we looked at those FDA test levels, and ZHP's pills

4    were dramatically higher than all the other manufacturers,

5    correct?

6    A.    Correct.

7    Q.    So ZHP has the highest levels of contamination in the

8    world, right?

9    A.    Right.

10   Q.    Okay.  That was a cohort study, both Gomm and Mansouri,

11   correct?

12   A.    Correct.  They were retrospective cohort studies.

13   Q.    And that was a large -- that was using a large patient

14   population, correct?

15   A.    Correct.

16   Q.    Both of those?

17   A.    Nearly -- yes, 800,000 nearly, and more than a million.

18   Q.    What we know about cohort studies is they're going to

19   reflect what the people are using and that that cohort study is

20   coming out, correct?

21   A.    Correct.

22   Q.    And we know that people in these countries would be using

23   all these different manufacturers that had these varying levels

24   of contamination, correct?

25   A.    Correct.

*Siddiqui, M.D. – Redirect – Nigh*                                114

1   Q.    And NDMA in ZHP is the highest level of any of the other

2   manufacturers, correct?

3   A.    Correct.

4   Q.    It's not even close, right?

5   A.    Correct.

6   Q.    Okay.  Doctor, you had also reviewed, as part of your

7   opinions, you had reviewed lifetime cumulative thresholds that

8   were calculated by Dr. Panigrahy and by Dr. Madigan and by

9   Dr. Sawyer, correct?

10  A.    Correct.

11  Q.    And in reviewing those, your opinions are consistent with

12  the opinions of what they had calculated that would be needed

13  to reach lifetime cumulative exposures, correct?

14  A.    Yes, correct.

15  Q.    Okay.  Doctor, I want to ask you about again NASH,

16  obesity, diabetes, and hyperlipidemia.  You were just asked

17  questions about those conditions, correct?

18  A.    Yes.

19  Q.    If Mr. Roberts had gotten cancer from NASH, obesity,

20  diabetes, I want to talk about that for a second.

21  A.    Yes.

22  Q.    If I understand your testimony correctly, he would have --

23  generally you need to get cirrhosis, the vast majority of cases

24  say you get cirrhosis and then you go from cirrhosis to getting

25  HCC, correct?

```
1   A.   Yes.

2   Q.   So if you're ruling out his preexisting cirrhosis wasn't

3   long enough, then those conditions that would have to lead to

4   cirrhosis would also not be long enough, correct?

5   A.   Correct.

6              MR. NIGH:  Okay.  Thank you.  That's all I have.

7              CHIEF JUDGE BUMB:  Okay.  You're excused.

8              THE WITNESS:  Thank you so much, Your Honor.

9              CHIEF JUDGE BUMB:  You may step down.  Nice to meet

10  you.  Thank you.

11             THE WITNESS:  You, too, Your Honor.  Thank you.

12             (Witness excused.)

13             CHIEF JUDGE BUMB:  So normally I would take lunch

14  around 12:30, so maybe it makes sense to take lunch now and

15  come back at 1:00.  Can we do that?

16             MS. BROWN:  Yes, Your Honor.

17             CHIEF JUDGE BUMB:  And who will we pick up with then?

18  Probably be good to hear from Dr. Mahmud; no?

19             MS. ROSE:  Yes.

20             MR. BALZANO:  Dr. Mahmud.

21             CHIEF JUDGE BUMB:  Yeah.  Okay.  We'll hear from

22  Dr. Mahmud then.  Okay.  We'll see you at 1:00.

23             MS. BROWN:  Thank you, Your Honor.

24             MR. NIGH:  Thank you, Your Honor.

25             THE COURTROOM DEPUTY:  All rise.
```

116

```
 1              (Recess was taken at 12:13 p.m. until 1:09 p.m.)

 2              THE COURTROOM DEPUTY:  All rise.

 3              CHIEF JUDGE BUMB:  Okay.  Good lunch?  Okay.  You can

 4  have a seat.  Thank you.

 5              All set to go with Dr. Mahmud?

 6              MR. BALZANO:  Yes, Your Honor.

 7              CHIEF JUDGE BUMB:  Okay.

 8              MR. BALZANO:  Good afternoon, Your Honor.  I call

 9  Dr. Nadim Mahmud to the stand.

10              CHIEF JUDGE BUMB:  Okay.

11              THE COURTROOM DEPUTY:  Good afternoon.

12              (Witness took the stand.)

13              THE COURTROOM DEPUTY:  Please step in the witness

14  stand; place your left hand on the Bible and raise your right

15  hand.

16         Do you solemnly swear the testimony you're about to

17  give in the case now before this Court will be the truth, the

18  whole truth, and nothing but the truth, so help you God?

19              THE WITNESS:  I do.

20         *NADIM MAHMUD, M.D., called as a witness for the*

21  *Defendants, having been first duly sworn by the Deputy, was*

22  *examined and testified as follows:*

23              THE COURTROOM DEPUTY:  Can you please state and spell

24  your full name for the record.

25              THE WITNESS:  Nadim Mahmud.  First name is N-A-D-I-M.
```

*Mahmud, M.D. - Direct - Balzano*                    117

1   Last name is M-A-H-M-U-D.

2                THE COURTROOM DEPUTY:  Thank you.

3                THE WITNESS:  Thank you.

4                CHIEF JUDGE BUMB:  Okay.  Have a seat.  Make yourself

5   comfortable.

6                THE WITNESS:  Thank you.  Good afternoon.

7                CHIEF JUDGE BUMB:  Afternoon.  Please keep your voice

8   up into the microphone, okay?

9                THE WITNESS:  Sure.

10               CHIEF JUDGE BUMB:  And there's water in the pitcher

11  if you should need it.

12               THE WITNESS:  Thanks so much.

13               CHIEF JUDGE BUMB:  Okay.

14               MR. BALZANO:  May I proceed, Your Honor?

15               CHIEF JUDGE BUMB:  You may.

16                       DEFENDANTS' EVIDENCE

17                       DIRECT EXAMINATION

18  BY MR. BALZANO:

19  Q.   Good afternoon, Dr. Mahmud.  How are you today?

20  A.   Good afternoon.  I'm doing well.  How are you?

21  Q.   And so you gave some opinions in this case about the

22  likely cause of Mr. Roberts' HCC; is that right?

23  A.   I did.

24  Q.   And I just want to first before we start in your opinions,

25  I just want to briefly, can you tell the Court a little bit

*Mahmud, M.D. - Direct - Balzano*                    118

1    about yourself and your experience, your education and clinical

2    background.

3    A.    Sure.  I'll be brief.

4          So I'm currently a triple board-certified physician.

5    I'm certified in transplant hepatology, gastroenterology, and

6    internal medicine.  My current practice is primarily as a

7    transplant hepatologist, which means that I take care of

8    patients with liver disease across the whole range of liver

9    disease spectrums, so patients with chronic liver disease

10   before they develop cirrhosis, patients who develop cirrhosis,

11   patients who develop liver cancer, and then shepherding

12   patients through liver transplant.  So that's the core of my

13   practice is to care for these types of patients.  And in doing

14   so, I routinely diagnose cirrhosis.  I routinely diagnose and

15   manage liver cancer.

16         And educational background:  Undergraduate at Yale,

17   Stanford Medical School, Harvard system for medical residency,

18   then I've been at University of Pennsylvania for

19   gastroenterology, transplant hepatology, and now on faculty.

20   Q.   And, Doctor, just briefly, can you -- you told us a little

21   bit about your clinical.  You currently treat patients with

22   cirrhosis and/or HCC; is that right?

23   A.   That's right, yes.

24   Q.   And do you also -- you are also a clinical researcher,

25   too?

*Mahmud, M.D. – Direct – Balzano*                    119

```
 1   A.   That's right, yes.

 2   Q.   Tell us a little bit about that.

 3   A.   Yes, I should mention that.  So I'm also a clinician

 4   scientist.  So I am a data scientist and a clinical

 5   epidemiologist, and I have formal training in both those

 6   avenues.

 7            So a part of my position, in addition to seeing

 8   patients, is also to conduct research.  So I conduct a wide

 9   variety of different types of clinical epidemiology studies

10   that are related to patients with liver disease and cirrhosis,

11   and liver cancer, of course.

12   Q.   Thank you, Doctor.

13            And so we'll jump right into your opinion.  Doctor,

14   did you perform a differential diagnosis in this case?

15   A.   Yes.

16   Q.   And as part of your review, did you also take a look at

17   Dr. Siddiqui's report and the differential diagnosis that

18   Dr. Siddiqui performed?

19   A.   Yes, I did.

20   Q.   And so you have opinions about Dr. Siddiqui's differential

21   diagnosis as well as your own independent differential

22   diagnosis?

23   A.   That's correct.

24   Q.   And, Doctor, if we could just -- if you could just briefly

25   walk through how you conducted your differential diagnosis and
```

Mahmud, M.D. - Direct - Balzano                    120

1    what you found significant in Mr. Roberts' medical record.

2    A.    Sure.

3          So of course Mr. Roberts was diagnosed with

4    hepatocellular carcinoma, HCC.  So when constructing a

5    differential diagnosis for HCC, we consider what things are

6    most common that are associated with developing this.  And in

7    reviewing Mr. Roberts' medical history, the top of the list

8    really every time is cirrhosis.  It is far and away the

9    strongest, best established risk factor for developing HCC.

10   It's not controversial.  You know, it's somewhere in the

11   ballpark of a 35- to 40fold increased risk of developing HCC in

12   patients who have cirrhosis.

13         In addition to this, I identified other -- several

14   other important independent risk factors that Mr. Roberts had.

15   He had MASLD, formerly called NAFLD, nonalcoholic fatty liver

16   disease.  He had longstanding diabetes, sorry, diabetes and

17   obesity, which are strong independent risk factors.  So those

18   were the foremost salient points that I drew out from his

19   medical record history.

20         Of course I cast a broad differential, some of the

21   things that were mentioned by Dr. Siddiqui.  There are other

22   causes of hepatocellular carcinoma such as hepatitis B

23   infection, hepatitis C virus infection.  There are less common

24   causes that are genetic, hereditary hemochromatosis, Wilson's

25   disease, Alpha 1...

*Mahmud, M.D. – Direct – Balzano*                                    121

```
 1              (Court reporter clarification.)

 2              THE WITNESS:  Sorry.  Sure.  I can go back as well if

 3       you need me to repeat some of that.

 4              So there are several things that Dr. Siddiqui also

 5       ruled out that I would agree with, things like viral hepatitis

 6       infections, autoimmune liver disease, hereditary

 7       hemochromatosis, Wilson's disease.  These were things that

 8       Mr. Roberts had been tested for during the course of his

 9       medical history and were ruled out.

10              I also ruled out alcohol-related liver disease as a

11       primary cause of his hepatocellular carcinoma.  There is one

12       mention in the note where he had had some alcohol intake, but

13       it was not a consistent finding in his record.

14              And then at kind of the bottom of the list there are

15       different toxic causes of HCC, but the ones that are best

16       established and present in our national society guidelines do

17       not include NDMA.  They include things like vinyl chloride or

18       kind of aflatoxin.  It's a small list of toxins that have

19       sufficient data to be causally linked to HCC in humans.

20              So of course I entertained NDMA in this case as a

21       potential cause of HCC, but I did not find sufficient evidence

22       in the literature to substantiate a causal inference between

23       NDMA exposures and HCC in humans, so I did not rule that in.

24       BY MR. BALZANO:

25       Q.   Thank you, Doctor.
```

*Mahmud, M.D. - Direct - Balzano*                    122

```
 1            And we're going -- we'll go through and break those
 2    down, but I just want to stick with cirrhosis for now, okay?
 3    A.    Sure.
 4    Q.    And, Doctor, can you tell me a little bit more about just
 5    how significant cirrhosis is as a risk factor for HCC.
 6    A.    Sure.  So you're summarizing some of what I said.  As I
 7    mentioned, it is the best established and strongest risk factor
 8    for developing HCC.  If you look at, you know, patients who
 9    have MASLD who are diagnosed with HCC, 80 to 90 percent of them
10    will have cirrhosis.  And in contrast, I think what we heard
11    earlier this morning, this is not a rare outcome in cirrhosis.
12    So over the lifetime of a patient having cirrhosis, 30 percent
13    of those patients will develop an HCC.  So one in three
14    patients will develop an HCC.  It's extremely common.
15            So two of the estimates from major kind of population
16    level studies you have shown there estimate between a 30- to
17    45fold increased risk of HCC in patients who have cirrhosis,
18    and some would argue those are actually conservative estimates.
19    There are other studies that report as high as 150- or 200fold
20    increased risk.  So this is sort of on the conservative side of
21    those estimates.
22            And if you look at really any national or
23    international major society guideline dealing with hepatology,
24    they will all list cirrhosis as the most prominent risk factor
25    for developing HCC.
```

*Mahmud, M.D. - Direct - Balzano*                    *123*

1    Q.    And, Doctor, to break that down even further, when you say

2    30fold increased risk of HCC, you're saying 3,000 percent

3    increased risk of HCC?

4    A.    Yes.

5    Q.    And you also said that these studies are conservative.

6    Can you elaborate a little bit more on why you -- why you think

7    these studies are actually on the conservative side of the

8    risks?

9    A.    Yeah.  As I mentioned, if you look in the literature,

10   there are studies that identify the risk of HCC and cirrhosis

11   that approach 150- to 200fold.  There is variability depending

12   on the cause of liver disease, admittedly.  So some of these

13   studies have a higher proportion of patients who have hepatitis

14   B virus related liver disease which does, I think, also

15   independently increase the risk of liver cancer.  So some of

16   these more dramatic estimates come from populations that are a

17   little bit more comprised of patients with viral -- virus

18   infection-related hepatitis and cirrhosis.  But on balance, you

19   know, these are on the lower end of these estimates in

20   cirrhosis.

21   Q.    And, Doctor, are these on the lower end because of the

22   populations that they were looking at in these studies?

23   A.    No, I wouldn't say so.  So, you know, the study you have

24   at the very bottom is actually isolating patients who

25   specifically have MASLD and MASH, which is perhaps the most

*Mahmud, M.D. - Direct - Balzano*                    124

1    relevant to this case, as I believe Mr. Roberts had MASLD and

2    MASH for pretty much the duration of his observable medical

3    history.

4         So, you know, if we were to pick an estimate, I think

5    the 45fold increased risk of HCC is most applicable to this

6    case.  But, again, if you look at the entire body of literature

7    trying to estimate the risk of HCC and cirrhosis, it will range

8    from 30- to 200fold increased risk.

9    Q.    And, Doctor, I want to ask you about when someone is first

10   diagnosed with cirrhosis, is there any type of medical

11   treatment or some type of plan that you put them on?

12   A.    Yeah.

13        So when someone is diagnosed with cirrhosis, there

14   are -- there's a variety of things that we try to do.  So one

15   important thing is we try to control the underlying cause of

16   their liver disease.  So if they have, for instance, MASLD or

17   MASH, the principal recommendation is to try to facilitate

18   weight loss, to try to get fat out of the liver to prevent

19   ongoing injury.  That's important for any type of liver

20   disease.  But cirrhosis-specific management, one of the

21   cardinal recommendations is we always immediately initiate a

22   cancer screening protocol because the risk of developing a

23   liver cancer when there's cirrhosis of kind of any degree is

24   extremely high.

25        So if I diagnose a patient with cirrhosis in my

1    practice, I immediately enroll them in a cancer screening

2    protocol where every six months they will get an ultrasound,

3    they will get blood work including something called an

4    alpha-fetoprotein, which is a tumor marker that is sometimes

5    produced by these liver cancers, and it's non-negotiable.  We

6    do this every six months for all patients with cirrhosis

7    because the risk of liver cancer is so high.

8    Q.    And, Doctor, is this a consensus -- is this a

9    recommendation across all medical guidelines that once

10   cirrhosis is identified in a patient, that they should be

11   surveilled for six months, every six months?

12   A.    Yes.  If you look at the -- so there's three very large

13   guideline producing societies.  There's the American

14   Association for the Study of Liver Disease, also called AASLD.

15   There's a European Association for the Study of Liver Disease,

16   EASL.  Then there's the Asian-Pacific Association for the Study

17   of Liver Disease, APASL.  All of them agree that every patient

18   with cirrhosis needs to be screened for cancer every six

19   months.

20         The one nuance is that the Asian-Pacific Society,

21   they identify certain higher risk patients that they would

22   optionally allow for every three to four months surveillance.

23   So if anything, a little bit more frequent in the Asian-Pacific

24   Society, and that's because they have more hepatitis B-related

25   liver disease in those countries.

Mahmud, M.D. – Direct – Balzano                    126

1    Q.    And, Doctor, I want to ask you, we heard a lot this

2    morning from Dr. Siddiqui about something called "mild

3    cirrhosis."

4              In your opinion, what is mild cirrhosis, or does that

5    exist?

6    A.    So, you know, as a hepatologist, we don't use that

7    terminology.  We think of cirrhosis broadly in two buckets.

8    One is compensated cirrhosis where cirrhosis is present, but

9    there's an absence of major symptoms related to cirrhosis.  And

10   then there's decompensated cirrhosis, which is cirrhosis that

11   has become more advanced, that now has manifestations of major

12   symptoms that basically classify this as decompensated

13   cirrhosis.  So that's things like fluid in the abdomen, which

14   is called "ascites," which Mr. Roberts had later in his course,

15   confusion related to liver disease called encephalopathy, and

16   then major bleeding in the gastrointestinal tract called

17   variceal bleeding.  Those are the three symptoms that define

18   decompensated cirrhosis.  So there's not really a, you know,

19   semantics of mild cirrhosis in the hepatology world.

20   Q.    So, Doctor, to stick with this distinction between

21   compensated and decompensated, you can have cirrhosis but not

22   have symptoms, not be decompensated?

23   A.    Absolutely.  It's very common to have compensated

24   cirrhosis and the patient would not otherwise know it, but for

25   the fact that we've identified concerning findings on

1    laboratory findings and/or imaging, and then make the

2    diagnosis.  So most patients with compensated cirrhosis will

3    not have any symptoms.  It's extremely common to just --

4    they'll be walking around, they would not ever know they had

5    cirrhosis except that a doctor told them they had this.  It's

6    really once they become decompensated, when they have these

7    overt symptoms that sometimes bring them to care if they

8    weren't already diagnosed.

9    Q.    And, Doctor, does surveillance period of every six months

10   scanning, does that change between a compensated cirrhosis and

11   decompensated cirrhosis?

12   A.    No, it does not.  It's applied uniformly across

13   compensated and decompensated cirrhosis.  The only caveat is in

14   patients who have an expected life expectancy of less than six

15   months, where cancer screening would not really be expected to

16   modify their kind of clinical course, we sometimes will stop

17   surveillance in those patients.  So those are the most

18   end-stage liver disease patients who are expected to die very

19   soon.

20   Q.    And so, Doctor, to now ask you about Mr. Roberts, you saw

21   evidence in the medical record that Mr. Roberts had cirrhosis?

22   A.    I did, yes.

23   Q.    And so Mr. Roberts was diagnosed with cirrhosis in

24   August 2018?

25   A.    That's in the medical record when he was formally

*Mahmud, M.D. – Direct – Balzano*                    128

1   diagnosed with cirrhosis by his providers, yes.

2   Q.   And so, Doctor, is it typical or is it atypical for a

3   patient to get diagnosed with cirrhosis and HCC at the same

4   time?

5   A.   No, it's not unusual.  Patients who did not previously

6   have a diagnosis of cirrhosis or if they're not regularly seen

7   by a provider to make that diagnosis oftentimes will copresent

8   with both.  They'll have symptoms that might be attributable to

9   either the cirrhosis or the liver cancer.  They'll seek care

10  and then they can get diagnosed concomitantly with both of

11  them, so that does happen with some regularity.

12  Q.   And we'll come back to talk more about your opinions on

13  Mr. Roberts' cirrhosis.

14  A.   Okay.

15  Q.   But I just want to move along to your opinions on NDMA --

16  A.   Sure.

17  Q.   -- and HCC.

18            CHIEF JUDGE BUMB:  Do you have copies of the slides?

19            MR. BALZANO:  I do.

20            May I approach, Your Honor?

21            CHIEF JUDGE BUMB:  Yes.  Okay.  Thank you.

22            MR. BALZANO:  May I proceed, Your Honor?

23            CHIEF JUDGE BUMB:  Yes.

24  BY MR. BALZANO:

25  Q.   Dr. Mahmud, can you just tell me -- tell the Court briefly

*Mahmud, M.D. - Direct - Balzano*                    129

1    your opinion about NDMA and its possible association with HCC.

2    A.    Sure.

3          So, you know, I reviewed in the course of this

4    case -- there's, you know, quite a few animal studies that have

5    studied this in kind of more controlled settings, and I think

6    there is -- there's good animal evidence that exposure to very,

7    very high doses of NDMA, there's an association with different

8    types of cancers, and primarily rodent studies.

9          In evaluating the human literature, you have two of

10   the studies shown here, these are retrospective cohort studies

11   that they're really not -- you cannot make a causal inference

12   in my review of these studies.  They're subject to many

13   different types of biases, which I laid out in my expert

14   report, that identify very weak potential associations, but

15   nothing that I would say rises to the level of being a causal

16   association.  And I think the authors say as much.

17         And so in the conclusions you have highlighted here,

18   the authors very explicitly say that, you know, causality

19   cannot be inferred from this study.

20         So while I acknowledge that there are human studies

21   where this question has been evaluated, the strength of the

22   data does not rise to the level where I think it's been

23   causally linked to HCC specifically in humans.

24   Q.    And, Doctor, just to compare the state of the NDMA

25   epidemiology to the state of cirrhosis epidemiology in HCC, how

Mahmud, M.D. - Direct - Balzano                 130

1    many more, you know, studies show that cirrhosis has an

2    increased risk of causing liver cancer?

3    A.    I mean, I can't give you a precise number, but it's --

4    there is a tremendous amount of literature demonstrating the

5    strength of the association between cirrhosis and HCC.  And

6    many of the studies are kind of population level studies where

7    we're able to identify precisely when patients develop

8    cirrhosis and then follow their natural history to identify

9    when they develop HCC.

10        So the studies that tend to be performed that

11   demonstrate that, one, they're very consistent.  If you look at

12   these large population level studies, you could probably find a

13   dozen very quickly just by searching.  They all have very

14   consistent findings of the increased risk, so it's very

15   consistent.  The magnitude of the effect is also generally

16   consistent.  It's certainly consistent with respect to showing

17   that it is the single most important factor.  And this is

18   consistent across different researchers, across different

19   populations, across different time points of these studies

20   being conducted.  And I think a good reflection of that is this

21   conclusion is featured very prominently in all of our major

22   hepatology society guidelines.

23        Like, it's very unequivocal that the American

24   Association, the European Association, the Asian-Pacific

25   Association, they all agree that cirrhosis is the most

Mahmud, M.D. – Direct – Balzano                    131

1    important and significant risk factor, and that's because of
2    the wealth of literature supporting that conclusion.
3    Q.    And, Doctor, just to briefly ask you, both of these
4    studies -- we talked about this earlier today with
5    Dr. Siddiqui -- didn't find a dose-response relationship
6    between NDMA and HCC?
7    A.    That's correct.
8    Q.    And we heard a little bit from Dr. Siddiqui about animal
9    studies.  Are you familiar with those animal studies that
10   Dr. Siddiqui was referencing that showed a dose response?
11   A.    Yes.
12   Q.    And what is your opinion of those studies and how they
13   apply in this case?
14   A.    So I think generally speaking, there's -- I think as
15   clinicians, you know, we're always cautious to try to translate
16   findings from an animal study directly to humans because
17   inherently humans are different from mice.  In these animal
18   studies that Dr. Siddiqui had cited in her report, many of
19   these are mouse or rat studies.  Those studies, the animals are
20   exposed to orders of magnitude more NDMA than humans are
21   exposed to, in studies like Gomm and Mansouri, on the order of
22   milligrams per kilogram per day, whereas human exposure is on
23   the order of nanograms to micrograms per day, at most.  And the
24   time scales are also very different.
25         So we heard this morning that in the animal studies

*Mahmud, M.D. - Direct - Balzano*                                132

1    when rats or mice are exposed to extraordinarily high doses of

2    NDMA, cancers of various types, including liver cancers and

3    bile duct cancers, can be observed over the course of let's say

4    weeks or months, but you have to scale the life cycle of a

5    mouse or a rat to a human.  So a mouse lives for like two or

6    three years.  Humans live, you know, 70 to 80 years.  So those

7    types of findings, you cannot just directly extrapolate that to

8    say that in a human you'd see the same thing.

9            One, because of the dose issue being orders of

10   magnitude higher and then, two, you know, eight weeks for a

11   mouse is equivalent to about, you know, eight years for a

12   human.  So that tends to be the way that these things translate

13   from exposure studies, from animal studies to humans when

14   something is substantiated.

15           But sorry, to your question about the dose response,

16   yes, there was a dose response observed in these animal studies

17   where they gave them higher doses, they saw a greater rate of

18   adverse effects.

19           So if the claim is that these animal studies should

20   apply to humans, you would expect to see a dose response in the

21   human studies as well.  And that was not seen.

22   Q.   And, Doctor, to your knowledge, have you reviewed any

23   human epidemiology studies that have reliably shown a dose

24   response between NDMA and HCC?

25   A.   No, I have not.

*Mahmud, M.D. - Direct - Balzano*                    133

```
 1              CHIEF JUDGE BUMB:  So let me ask this question:
 2     Focusing on animal studies, and in particular, the dose
 3     response analysis --
 4              THE WITNESS:  Uh-huh.
 5              CHIEF JUDGE BUMB:  -- are they ever valuable unless
 6     you've had a human study done?
 7              THE WITNESS:  I think they can be valuable, you know,
 8     they're oftentimes used as sort of -- again, I'm not a basic
 9     scientist so I'll qualify that, but they're oftentimes used as
10     sort of hypothesis generating studies where we identify a
11     potential link between something that could be harmful to
12     humans and that then serves as a foundation for high quality
13     studies to be performed in humans to the extent possible to
14     identify if there's substantiated risk that we need to change
15     medical practice or policy for.
16              CHIEF JUDGE BUMB:  So just generally -- so I want to
17     make sure I'm understanding you.  It sounds like what you're
18     saying is, generally speaking, rat studies are not reliable
19     in -- all right.  Let me say it differently.
20              It's your opinion -- well, you tell me, is it your
21     opinion that relying on rat studies per se to translate to
22     conclusions for humans is not reliable, is erroneous, but sort
23     of those studies are more to provide a gateway for further
24     research to perform more reliable studies?
25              THE WITNESS:  That's perfectly said, yeah.
```

*Mahmud, M.D. - Direct - Balzano*                    134

1              CHIEF JUDGE BUMB:  Okay.

2              THE WITNESS:  I would agree with that.

3              CHIEF JUDGE BUMB:  You agree with that?

4              THE WITNESS:  Yes, I do.

5              CHIEF JUDGE BUMB:  Okay.

6              MR. BALZANO:  May I proceed, Your Honor?

7              CHIEF JUDGE BUMB:  Yes.

8    BY MR. BALZANO:

9    Q.   And so I think, you know, to move on, and so just to sum

10   this up, in conducting your differential diagnosis, what was

11   your opinion as it relates to NDMA?

12   A.   Yeah.  So after reviewing these studies in detail, as I

13   mentioned, I didn't think that this evidence in humans rose to

14   the standard to be able to say that NDMA is causally linked

15   specifically to HCC in humans.  And so I couldn't rule it in.

16   Q.   And, Doctor, I just want to move along to we're going to

17   take the other risk factors together.

18   A.   Okay.

19   Q.   And --

20             CHIEF JUDGE BUMB:  I'm sorry, one more question.

21             Do you know of any studies where it is accepted

22   practice for someone such as in your field to rely upon rodent

23   studies to form these types of conclusions?

24             THE WITNESS:  Not in and of themselves.  The reason

25   why I say is there are like very famous examples where we have

*Mahmud, M.D. - Direct - Balzano*                    135

```
1   falsely relied on animal studies and made an assumption that
2   we'd see the same thing in humans that were famously incorrect.
3   And so now we're very guarded against this so-called
4   translation gap, which is we have to be very cautious to
5   translate a finding from a rodent study or an animal study and
6   assume that we have the same thing in humans.
7            CHIEF JUDGE BUMB:  So that's what you call it in the
8   industry, in the medical field, a translation gap?
9            THE WITNESS:  Yeah.  That's a commonly used term
10  about when we -- about the reason why -- there are many reasons
11  why you might see something in rodents or animals and you don't
12  see the same thing in humans.  That's referred to as the
13  translation gap.  And so it's a sort of a cautionary tale that
14  we shouldn't just blindly extrapolate something you see in an
15  animal study and assume that the same thing will be observed in
16  humans.
17           CHIEF JUDGE BUMB:  Did Dr. Siddiqui consider that
18  translation gap?
19           THE WITNESS:  I did not see that mentioned, certainly
20  not that terminology in her expert report.  And I don't think
21  she gave it sufficient consideration either.  I think she --
22  and we heard this morning, she was very willing to try to
23  extrapolate certain findings from animal studies to humans.
24  And I think a great example is the time course she was willing
25  to ascribe to NDMA as being potentially causal for the liver
```

*Mahmud, M.D. - Direct - Balzano*                    *136*

```
 1   cancer in this case.  She was willing to say it could happen on
 2   the order of weeks to months, which I think, from my opinion,
 3   it's very absurd with my knowledge of the risks of translating
 4   a finding from rodent studies to human studies.  It's just
 5   implausible.
 6            You know, the best studied human carcinogens that we
 7   know of, like things like smoking, you could -- you could
 8   smoke, you know, four packs a day and you will not develop a
 9   lung cancer in the course of weeks to months.  It still takes
10   20 to 30 years, so --
11            CHIEF JUDGE BUMB:  Okay.  So follow that through.
12            THE WITNESS:  Yeah.
13            CHIEF JUDGE BUMB:  Her testimony -- and she did say
14   that, that's my recollection -- was based on the rodent
15   studies.
16            THE WITNESS:  Yes.
17            CHIEF JUDGE BUMB:  Okay.  And therefore did not
18   consider this translation gap, which you tell me is well
19   accepted in the industry.
20            THE WITNESS:  Yes.
21            CHIEF JUDGE BUMB:  Okay.  Go ahead.
22            MR. BALZANO:  Thank you, Your Honor.
23   BY MR. BALZANO:
24   Q.  And so Dr. Siddiqui, if we can briefly talk about this
25   slide shows -- well, let me back up.
```

*Mahmud, M.D. - Direct - Balzano*                    *137*

1          In reviewing the medical record, did Mr. Roberts have

2    other risk factors for HCC besides cirrhosis?

3    A.    Yes.  He had MASLD and MASH.  He had diabetes.  He had

4    obesity.  Those were the other primary risk factors.

5    Q.    And so can you unpack a little bit the epidemiology study

6    or the literature on these risk factors and how they increase

7    the risk for HCC?

8    A.    Sure.

9          So you summarized in this figure some of the

10   literature that I cited in my expert report that demonstrates

11   that each of these risk factors independently increases the

12   risk of HCC in humans.  I think it's important to kind of maybe

13   explain what independent risk factor means.  It was a bit

14   confusing this morning I think from some of the discussion.  It

15   means that if you were to take the cirrhosis variable out of

16   the equation, you would still observe an increased risk of

17   liver cancer in patients who had these conditions.

18         And what you've presented there are a range of

19   different estimates from large studies that are published in

20   major journals to demonstrate the magnitude of increased risk.

21         So, for instance, the diabetes studies, you know,

22   patients with diabetes relative to those who don't have

23   diabetes among patients with cirrhosis, the diabetes patients

24   have up to a fourfold increased risk of developing liver

25   cancer.  So in that specific type of study, cirrhosis is sort

*Mahmud, M.D. - Direct - Balzano*                    138

1    of taken out of the equation because all of the patients have

2    cirrhosis.  And you can find similar such studies for MASLD and

3    MASH and for obesity.

4          I will just briefly highlight I guess that in the

5    obesity studies, by the way, we do see a very clear

6    dose-response effect.  It's not a binary variable as was

7    suggested this morning.  There are studies that look at Class 1

8    obesity versus Class 2 obesity versus Class 3 obesity, which is

9    the highest category, and there is a progressive rise in the

10   risk of liver cancer the more obese a patient is.

11         So those types of things are consistently observed

12   for these well-established independent risk factors.  But it's

13   important to list them as separate because they do confer risk

14   even outside the context of cirrhosis.

15   Q.   And, Doctor, I want to stick with what you said about

16   obesity and the dose response of that.

17         What is class 3 obesity?  Like could you give a

18   little bit more detail on what that means in terms of BMI or --

19   A.   Sure.  So Body Mass Index is based on height and weight.

20   Basically overweight is a classification between 25 and 30 for

21   Body Mass Index.  Class 1 obesity is above 30 but less than 35.

22   Class 2 is above 35 but less than 40.  Class 3 obesity is above

23   40.

24   Q.   And in your review of Mr. Roberts' medical records, where

25   did he fall within this scale of obesity?

1    A.    My recollection is for the majority of his medical

2    history, he was in the range of Class 2 obesity.  I remember

3    pretty early in his record he had a BMI around 38, somewhere in

4    that ballpark, and he was consistently in that range for much

5    of his medical history.

6             I think later once he had a cancer diagnosis that was

7    progressing, I think he did lose some weight which is expected

8    in advanced cancer.

9    Q.    And, Doctor, I just want to ask you briefly about how

10   Dr. Siddiqui ruled out these other risk factors.

11            Do you have any thoughts or critiques about how in

12   her differential diagnosis she ruled out these other risk

13   factors?

14   A.    Yes.  My understanding from what she was saying is that

15   she tried to pool all of these risk factors together under one

16   umbrella of a metabolic syndrome, which I'm critical of because

17   these are studied independently.  These are studied as

18   independent risk factors in these studies.  So you can isolate

19   the effect of diabetes alone, you know, kind of holding

20   constant obesity and MASLD, and you can do the same thing for

21   each one of these risk factors.  There's no justification for

22   lumping them together kind of in the literature, so I don't

23   know why she chose to do that.

24            And then she also, I think, argued that the only

25   relevant way that these risk factors contribute to cancer risk

Mahmud, M.D. – Direct – Balzano                    140

1    is through cirrhosis, kind of mediated through cirrhosis

2    itself, which then in turn increases the risk of liver cancer.

3    But what I'm saying is that the studies, you know, they very

4    specifically study these independent pathways.

5              I agree that part of the risk that's attributable to

6    these conditions is mediated through development of cirrhosis

7    which increases the risk of liver cancer.  But there's another

8    pathway where they independently increase the risk.  And that's

9    why it is observed that many patients with MASLD and MASH can

10   still develop a liver cancer even in the absence of cirrhosis.

11   I think that kind of crystallizes that point very clearly.

12             CHIEF JUDGE BUMB:  Okay.  Try this all again, please.

13             THE WITNESS:  Sure.

14             So what I'm saying is --

15             CHIEF JUDGE BUMB:  And let me ask you, maybe I can

16   just ask the question.

17             THE WITNESS:  Sure.

18             CHIEF JUDGE BUMB:  This is what -- this is kind of

19   what's going on in my head.

20             THE WITNESS:  Okay.

21             CHIEF JUDGE BUMB:  How is it that a physician can,

22   with all of these risk factors that we've been talking about,

23   and assuming all of these risk factors apply to the patient,

24   okay, so Mr. Roberts was diabetic, Mr. Roberts was obese, okay,

25   you know the record.

Mahmud, M.D. - Direct - Balzano                    141

1              THE WITNESS:  Right.

2              CHIEF JUDGE BUMB:  How is it that a physician can say

3    with confidence which one of those caused the liver cancer?

4              THE WITNESS:  Hmm, I see.

5              CHIEF JUDGE BUMB:  Isn't it -- because they all are

6    risk factors, isn't it the combination of factors?  That's an

7    intuitive position I'm taking.

8              THE WITNESS:  Yeah, yeah.

9              CHIEF JUDGE BUMB:  And you say what?

10             THE WITNESS:  Yeah.  That's a good question.  I

11   agree, it is a combination of factors.  And to some degree,

12   there is synergistic risk of this in the literature.  So if you

13   have multiple of these risk factors, that each independently

14   increase the risk, there is kind of an additive effect where if

15   you have all of these factors, your risk is even higher.  So

16   that's absolutely true.

17             I segregated them out just to highlight that in the

18   literature.  There's been a lot of effort made to try to

19   isolate what is the magnitude of risk attributable to each one

20   of these things.

21             CHIEF JUDGE BUMB:  Sure.  And so maybe we're saying

22   the same thing.

23             THE WITNESS:  Yeah.

24             CHIEF JUDGE BUMB:  So obesity is a risk factor.

25             THE WITNESS:  Yes.

*Mahmud, M.D. – Direct – Balzano*                    142

1          CHIEF JUDGE BUMB:  Okay.  And the literature says

2   that obesity is a risk factor.  But the literature doesn't say

3   and if the other factors are present ignore them, right?  Or do

4   they say "ignore them"?

5          THE WITNESS:  No, they don't say that, no, no.  We do

6   consider them all together in clinical practice.  It's just

7   from like a research standpoint, when we're trying to isolate

8   the effect of one specific condition on the risk of liver

9   cancer, they try to hold everything else constant in their

10  statistical analyses to help try to figure out how much of the

11  risk is really because of the obesity itself versus the other

12  things.  But you're absolutely right that in the real world

13  clinical practice, we look at all these things together and

14  they comprise, you know, together elevations in risk of liver

15  cancer.

16         CHIEF JUDGE BUMB:  Go ahead.

17         MR. BALZANO:  Thanks, Your Honor.

18  BY MR. BALZANO:

19  Q.   And so to just wrap this up, Dr. Mahmud, when you look at

20  Mr. Roberts' record, medical record, and you look at his risk

21  factors, what is your opinion of what likely caused his HCC?

22  A.   Yeah.  So I think the most likely cause of his HCC, you

23  can just really go by the numbers, it's cirrhosis on a

24  background of diabetes, obesity, and MASLD.  Those are clearly

25  far and away the strongest kind of risk factors for this.  If

*Mahmud, M.D. - Direct - Balzano*                        143

1    you put cirrhosis on this chart, it would be really, you know,

2    out of scale as well.  And I think it's important the way

3    you've shown this because it shows you how small the potential

4    associations are with NDMA with respect to HCC in humans even

5    if we accepted that that was a causal association.  The

6    magnitude of increased risk is completely dwarfed by all of

7    these other very well-established risk factors.

8                CHIEF JUDGE BUMB:  And where do these numbers come

9    from?

10               THE WITNESS:  These come from --

11               CHIEF JUDGE BUMB:  Mansouri?

12               THE WITNESS:  No.  So the NDMA numbers, yes, those

13   come from Mansouri and Gomm.

14               CHIEF JUDGE BUMB:  And Gomm.  Right.  Okay.  Thank

15   you.

16               THE WITNESS:  Yes.  The other numbers come from a

17   range of different population level studies.

18               CHIEF JUDGE BUMB:  Okay.

19   BY MR. BALZANO:

20   Q.   And so, Dr. Mahmud, I want to move on now.  You have

21   additional opinions that you gave in this case about

22   Mr. Roberts' cirrhosis and medical condition.

23   A.   Yes, I did.

24   Q.   And so I just want to talk a little bit about -- we talked

25   a lot this morning with Dr. Siddiqui about the timing of

*Mahmud, M.D. - Direct - Balzano*                    144

1    Mr. Roberts' cirrhosis.  Do you recall that?

2    A.    Yes.

3    Q.    And so in your opinion, Dr. Mahmud, when you were

4    reviewing Mr. Roberts' medical records, did you see evidence

5    that he was diagnosed with NASH?

6    A.    I did.

7    Q.    And what was that evidence?

8    A.    Well, part of the evidence you have shown here, this is a

9    record from 2009 from his gastroenterologist at the time who

10   very clearly in his impression, which is part of the assessment

11   and plan of the note, Problem No. 1 was NASH, nonalcoholic

12   steatohepatitis.  So he's unequivocally ascribing that

13   diagnosis to Mr. Roberts, and there's the adequate support in

14   the note as well.

15         So there had been a note, from what I recall,

16   slightly prior to this where this doctor ordered an ultrasound

17   because he suspected fatty liver disease.  And here at this

18   visit in September he has the results of the ultrasound that

19   demonstrates that there was fat in the liver.  Ultrasound is a

20   very common, very simple way to see fat in the liver.  And if I

21   was his treating physician, I would have given him the same

22   diagnosis, given I know that he had elevated liver tests for

23   many years.  He had an elevated ALT and an AST since he was a

24   teenager according to the records, very longstanding.  When

25   those numbers are elevated, it indicates that something is

Mahmud, M.D. – Direct – Balzano                    145

1    causing injury to the liver.  It doesn't tell you what is

2    causing injury to the liver, just that something is hurting the

3    liver and causing inflammation, and then those enzymes leak out

4    of liver cells into the blood.  We take a blood measurement and

5    we see the ALT and AST are elevated.

6              It's the job of the clinician to try to figure out

7    what is the cause of the injury to the liver.

8              When you see fat in the liver on ultrasound, you have

9    a very narrow differential.  There is in common practice really

10   only two things that do this.  It's either heavy regular

11   alcohol use that drives fat into the liver, or it is MASLD,

12   which is this metabolic dysfunction-associated steatotic liver

13   disease that is typically co-associated with obesity, diabetes,

14   high blood pressure, high cholesterol, et cetera.

15             Mr. Roberts did not have any history of substantial

16   regular alcohol use.  So you rule out the alcohol-related liver

17   disease.  He did have the classic phenotype for somebody who

18   has MASLD, Class 2 obesity, coronary artery disease, high blood

19   pressure, et cetera.

20             So process of elimination, you diagnose him with

21   MASH.  So I would have made the same diagnosis.

22   Q.   Doctor, you just mentioned that's based on a differential

23   diagnosis.  That is something -- that's how you routinely

24   diagnose conditions in your care and treatment of patients?

25   A.   Yes.  You can apply a differential diagnosis to a lot of

*Mahmud, M.D. - Direct - Balzano*                                146

1    different findings.  So fat in the liver has a differential

2    diagnosis.  A low platelet count has a differential diagnosis.

3    A liver cancer has a differential diagnosis.  So, yes, in the

4    course of my routine practice, that's the way I think of

5    things.

6    Q.    And, Doctor, if you look at the note, I think you were

7    mentioning the AST and the ALT numbers.  And is that -- what's

8    your opinion of what those numbers mean in the context of this

9    note?

10   A.    Yeah.  So the AST and the ALT, as I mentioned, these are

11   enzymes or proteins that are produced inside liver cells.  For

12   a male, a normal ALT is less than 30.  So these are elevated.

13   Both of these values are elevated.  And they have been noted to

14   be elevated pretty much throughout his entire medical history,

15   as early as his teenage years, according to some notes.  So, as

16   I mentioned, they're just indicative of something causing

17   inflammation and injury in the liver.  And it's up to the

18   clinician to figure out why that's happening.  So you typically

19   would rule out things like hepatitis B or hepatitis C

20   infection.  You rule out genetic conditions, autoimmune

21   conditions, and then of course you look at the very common

22   things like alcohol and MASLD.

23          In the course of his medical history, he had these

24   other things we ruled out.  He was later tested for hepatitis

25   B, hepatitis C, et cetera, and he didn't have any of those

1    things.  So it's not a particular challenging case, I'd say,

2    from a hepatology perspective to make this diagnosis.

3    Q.   So, Doctor, in your opinion, Mr. Roberts had NASH in

4    September of 2009?

5    A.   Yes, that's my opinion.

6    Q.   And so, Doctor, now I want to ask you a little bit about

7    something called FIB-4 score.  Can you just briefly explain to

8    the Court what this is?

9    A.   Sure.

10        So the FIB-4 score is a risk stratification tool that

11   we use in clinical practice in patients who have different

12   types of chronic liver disease to help us put patients into

13   different bins for who is likely to have significant scarring

14   in the liver and cirrhosis and to help rule out which patients

15   don't have significant scarring in the liver or cirrhosis.

16        We apply this as part of our routine care.  It's

17   featured in our major guidelines as a best practice tool to

18   apply specifically in patients who have MASLD, to identify

19   patients who are highly likely to have cirrhosis.  If we

20   identify such a patient based on this score, they would

21   typically see a liver physician or hepatologist or

22   gastroenterologist to try to evaluate if they need to be

23   formally diagnosed with cirrhosis based on additional testing.

24   Q.   And, Doctor, what is the actual -- like what goes into the

25   FIB-4 score?  What are they measuring here?

*Mahmud, M.D. - Direct - Balzano*                    148

```
 1    A.    Sure.
 2          So there is four parameters.  There's age, there's
 3    AST, there's ALT, those two liver parameters I mentioned, and
 4    then the platelet count.  So only four inputs go into this
 5    score.
 6    Q.    And, Doctor, in your routine care and practice of treating
 7    patients, do you routinely use a FIB-4 score when treating your
 8    patients?
 9    A.    I use it probably every single clinic, yes.
10    Q.    And how do you use it?
11    A.    So I'll keep it most applicable to this case.  So if I
12    have a patient who has MASLD and MASH and/or MASH I should say,
13    I will at least on an annual basis, I will calculate a FIB-4
14    score from those parameters that I mentioned.  If it's high,
15    which is high being defined as greater than 2.67 is the value,
16    then they are very likely to have significant scarring in the
17    liver, called advanced fibrosis, or cirrhosis.  I would then do
18    additional testing in this patient.
19          In the modern practice we would do a special type of
20    ultrasound to measure scar tissue in the liver to very
21    concretely stage how much scar tissue there is to confirm a
22    diagnosis of cirrhosis.  There's also a special type of MRI
23    that can do something similar.  Or if the patient has had high
24    quality imaging such as a CT scan, if you see features of
25    cirrhosis on that type of cross-sectional imaging, that's
```

*Mahmud, M.D. - Direct - Balzano*                    149

1    sufficient to actually make the diagnosis of cirrhosis.

2         So the FIB-4 is part of a multi-step process to make

3    a diagnosis of cirrhosis.  You don't diagnose cirrhosis purely

4    based on the FIB-4.  It helps you identify the patients that

5    need further testing and evaluation to help confirm the

6    diagnosis of cirrhosis.

7    Q.    And, Doctor, you mentioned something, "MDCalc."  Can you

8    tell me a little bit more about what that is and how you use it

9    during your practice.

10   A.    Sure.

11        Yes.  That came up in the deposition from what I

12   remember.  So MDCalc is a very widely trusted and heavily used

13   website that is a repository of clinical risk prediction tools

14   across all ranges of medicine, not just hepatology.  I've been

15   using it since I was a resident in training, you know, more

16   than a decade ago.

17        And it's a -- they basically, they house prediction

18   tools that are well validated, published in high quality

19   peer-reviewed literature, where they will basically program in

20   the formulas for a risk prediction tool in collaboration with

21   the inventor, as they call it, of the score.  It's usually the

22   first or the senior author on the initial study.  And then

23   physicians will go there to facilitate the calculations.

24        Basically nobody in the real world will hand

25   calculate the FIB-4 score.  There's no need to do that.  We

Mahmud, M.D. - Direct - Balzano                    150

1   will just go to a site like MDCalc, put in the inputs, the age,

2   the AST, the platelet count, et cetera, and it will give us the

3   calculation.  It's up to us to then interpret it and use that

4   in clinical practice.

5   Q.   And so, Doctor, in your routine care and practice of

6   patients, you find MDCalc to be a reliable tool?

7   A.   Yes, absolutely.  It's a simple calculation, but MDCalc

8   does it accurately, yes.

9   Q.   And then, Doctor, I want to move on to -- we talked a lot

10  about this this morning with Dr. Siddiqui, are you familiar

11  with an April 2016 CT scan of Mr. Roberts' liver?

12  A.   Very familiar, yes.

13  Q.   And what are your impressions of this medical record,

14  Dr. Mahmud?

15  A.   So I think the things that stand out to me, they comment

16  on the surface appearance of the liver, which is really

17  important to a hepatologist.  A normal liver is smooth, like

18  smooth like a table.  A liver that has cirrhosis, the scarring

19  will cause small retractions along the surface and it looks

20  bumpy or lobulated or nodular.  There's different language

21  that's used.  So they comment on the margin of the liver as

22  being lobulated.  That is basically a semantic term that

23  indicates concern for cirrhosis.

24          My -- I looked at this scan myself, as I do in my

25  routine practice for my patients.  Any time I order a CT scan

*Mahmud, M.D. - Direct - Balzano*                    151

1    or an MRI, I will also look at it myself, and so I feel

2    comfortable looking at some of these particular findings for

3    cirrhosis.  And there's really no question that the left side

4    of his liver, his left lobe is extremely nodular.  It's very,

5    very bumpy.  I could probably teach everybody in the room to

6    identify it relative to a normal liver.

7              But there are other features that were consistent

8    with cirrhosis on this imaging study as well.  And, you know,

9    some of those were noted by the radiology experts on both the

10   plaintiff and the defense side.  For instance, there's a

11   finding called -- it's called a recanalized umbilical vein.

12   There's a vein that's usually closed in adults, but in

13   cirrhosis there is elevated pressure behind the liver and that

14   vein can reopen.  So it's a very strong signal if you see this

15   that cirrhosis is likely present.  That finding is present on

16   this imaging.

17             And then --

18             CHIEF JUDGE BUMB:  Is there a mention of it in the

19   report?

20             THE WITNESS:  It's not mentioned on this report.  My

21   recollection is that the plaintiff expert witness report does

22   mention this.  And I believe the defense expert radiologist

23   also mentions this, yeah.

24             And then finally, there is -- I guess there's two

25   other findings to highlight.  The spleen size, which I don't

*Mahmud, M.D. - Direct - Balzano*                              152

1    think is noted as being enlarged in the report, in the record,

2    is noted as being enlarged from the plaintiff expert

3    radiologist, Dr. Mele.  I think he measured it as

4    16 centimeters over 12 centimeters is typically considered to

5    be enlarged.  That's also consistent with cirrhosis.  So

6    there's -- I highlight this just because there's not just one

7    finding, there's multiple findings that are consistent with

8    cirrhosis just on this imaging alone.

9           CHIEF JUDGE BUMB:  Did Dr. Siddiqui consider those

10   additional facts that are not listed here on the radiologist

11   report?

12          THE WITNESS:  She does not mention them.  So I assume

13   they were not considered in great detail.  I'm not sure to what

14   extent she reviewed these images in detail herself.

15          That being said, in her expert report she does say

16   that she agreed there was mild cirrhosis.  So perhaps she did

17   look at these things and factor that into her decision-making

18   but did not note it down in her report.  That's possible.

19          Sorry.  And then the last finding of course which

20   they do mention here is that there is an abnormality.  There's

21   a lesion in the liver that they measure as 8 millimeters here.

22   I believe the defense expert radiologist measured it as

23   5 millimeters.  You can get some variability from radiologist

24   to radiologist.  But they both agree there's an abnormality

25   there.  There's a spot that needs to be watched.  We don't know

*Mahmud, M.D. - Direct - Balzano*                                153

1    what it is.  It could be benign.  It could be malignant, but

2    it's an abnormality.

3    BY MR. BALZANO:

4    Q.   And so, Doctor, to put this all together in a timeline,

5    when you're looking at the entirety of Mr. Roberts' medical

6    records, when would you say that he -- when would you have

7    diagnosed him with cirrhosis, based on all the medical records

8    that you reviewed?

9    A.   So I think, without question, I would have diagnosed him

10   with cirrhosis in April of 2016.  He likely had cirrhosis quite

11   sometime prior to that.  The reason I say that is I was careful

12   to calculate his FIB-4 score whenever I was able in his medical

13   history, whenever he had the appropriate labs checked.  Even

14   dating back to September of 2009, he had a FIB-4 score of 1.99.

15   That's not in the range of being high.  That's in the range of

16   being indeterminate.  So if it's less than 1.3, that's low

17   risk.  It rules out cirrhosis essentially.  But if it's between

18   1.3 and 2.67, it's indeterminate, and that requires further

19   evaluation.

20          So typically if he had been my patient at that time,

21   I would have done these additional assessments to measure scar

22   tissue in the liver or perform some cross-sectional imaging

23   like a CT scan to further evaluate.  He may have had cirrhosis

24   as far back as 2009.  So sometime between those periods, you

25   know, 2009 and April 2016, he likely developed cirrhosis.  I

Mahmud, M.D. - Direct - Balzano                    154

1    can't pinpoint exactly when in that timeline he developed

2    cirrhosis, but it's clearly present in April of 2016, at the

3    very latest.

4    Q.   And, Doctor, NASH develops into cirrhosis?

5    A.   Yes.

6    Q.   Doctor, are you familiar with a study Kanwal 2023?

7    A.   Dr. Kanwal is very prolific, and you have to be more

8    specific.  She publishes a lot.

9    Q.   Sure.  Well, I'll just --

10            MR. BALZANO:  Your Honor, may I approach?

11            CHIEF JUDGE BUMB:  Yes.

12            Mr. Nigh, you have a copy?  Yes.

13            THE WITNESS:  Yes.  I am familiar with this paper.

14   BY MR. BALZANO:

15   Q.   And, Dr. Mahmud, can you describe a little bit what this

16   paper is saying and why it's relevant to your opinion.

17   A.   Sure.

18            So this paper is updated practice guidance from the

19   American Association for the Study of Liver Disease, which is

20   our national hepatology society that helps to set the standard

21   of care that provides guidance on how to diagnose cirrhosis in

22   patients who have MASLD.  So, yes, you're bringing up the

23   figure that I would go to as well.

24            So Figure 3 in this paper, which you're showing, is

25   essentially the algorithm that we follow in clinical practice,

*Mahmud, M.D. - Direct - Balzano*                    155

1    which is concordant with guideline care.  So you have a patient

2    with MASLD, you apply the FIB-4 score, just trying to walk

3    through this algorithm.  If the FIB-4 score is over 1.3, you

4    then see is it over 2.67.  If it's over 2.67, that indicates a

5    high risk of potential cirrhosis.  And typically those patients

6    are referred to see a liver specialist at that point.  That's

7    oftentimes how patients are referred to me in my practice.

8    They have a high FIB-4 score.

9           Then if you kind of go down the algorithm from the GI

10   hepatology care side, this patient is classified as

11   intermediate to high -- he's classified as high risk based on

12   the FIB-4 score.  You then have the option of doing a liver

13   biopsy or suspecting cirrhosis based on other findings that may

14   be available, so either clinical findings or imaging findings

15   in particular.

16          So in this case, the reason why I would have, you

17   know, diagnosed Mr. Roberts with cirrhosis in April of 2016

18   without question, at that time point he had a high FIB-4 score.

19   So I'm already on that side of the algorithm.  And he already

20   had imaging that had multiple features that were consistent

21   with cirrhosis.  So if you follow that line on the very right,

22   you then just move to cirrhosis-based management.  You make the

23   diagnosis of cirrhosis.  You don't need any further testing.

24   You initiate cancer screening and you do the other cirrhosis

25   related best practice management elements of care that we don't

*Mahmud, M.D. – Direct – Balzano*                    156

1    necessarily need to talk about that.

2            But the most relevant one is that I would have

3    initiated him on a cancer screening protocol absolutely in

4    April of 2016.  And it's a shame that that didn't happen

5    because his cancer would have been detected much earlier and

6    would have been potentially curable.  So it's very unfortunate.

7    Q.   And, Doctor, this -- you were mentioning before that the

8    author of this paper is very reputable.  Is this the standard

9    of care when diagnosing a patient with cirrhosis?

10   A.   Yes, in the setting of MASLD, yes.

11   Q.   Understood.

12           So the three factors that this is talking about is if

13   a patient has NASH, if a patient has an elevated FIB-4 score,

14   and if a patient has some sort of clinical imaging --

15   A.   Yeah.

16   Q.   -- suggesting cirrhosis?

17   A.   Absolutely, yeah.  It's one of the -- there's multiple

18   ways to diagnose cirrhosis as you can see here, but that is a

19   standard of care best practice way of diagnosing it.  High

20   FIB-4 score, plus imaging evidence consistent with cirrhosis,

21   that's all you need to make the diagnosis and manage the

22   patient as a patient with cirrhosis.

23   Q.   And, Doctor, we heard from Dr. Siddiqui a little bit this

24   morning about how there weren't any symptoms from

25   Mr. Roberts' --

1    A.    Right.

2    Q.    -- cirrhosis.  How does whether or not someone is

3    symptomatic of cirrhosis, how does that play into a diagnosis,

4    if at all?

5    A.    Yeah.  I remember that statement, because I disagree with

6    it.  It's, as I mentioned previously, patients who have

7    compensated cirrhosis are typically asymptomatic.  They

8    typically don't have any symptoms attributable to the

9    cirrhosis.  And that's part of the reason why patients will

10   oftentimes copresent with a liver cancer and cirrhosis because

11   they didn't feel unwell, they didn't seek care, no one ever

12   diagnosed their cirrhosis until it was, you know, too late

13   where they developed complications from the cirrhosis.

14          So, yeah, most of the diagnoses I make in my practice

15   are in patients who don't have systems and I give them the

16   diagnosis of cirrhosis because they were getting routine care

17   with their primary, they had lab work that showed some

18   abnormalities, they had a FIB-4 score that was concerning, they

19   saw me, I did more testing, diagnosed cirrhosis.

20   Q.    And, Doctor, in your opinion, can compensated cirrhosis go

21   undetected for a period of time or years?

22   A.    Absolutely.  It's very common for it to not be diagnosed

23   in that state.

24   Q.    And so, Doctor, I just want to wrap up this timeline to

25   when applying the diagnostic standard that we were just looking

Mahmud, M.D. - Direct - Balzano          158

1    at, how would you -- how did you apply it to Mr. Roberts?

2    A.    So you've summarized it well for me here.  So in November

3    of 2015, as you've shown in the middle, the FIB-4 score was

4    elevated.  It was 3.22.  So then I'm just looking for any

5    corroborating evidence on imaging to confirm the diagnosis of

6    cirrhosis.  That is present on his CT scan in April 26 -- I'm

7    sorry, 2016 rather.  So, yes, that's why I would have formally

8    diagnosed him with cirrhosis then.  But as I said, if he had

9    been my patient, I would have pursued additional imaging much

10   earlier in his timeline to try to confirm or deny cirrhosis

11   much earlier.

12   Q.    And, Doctor, does the 2009 NASH diagnosis at all play into

13   your opinion here?

14   A.    It just helps me understand why he developed cirrhosis.

15   NASH is -- the two most common causes of cirrhosis in the

16   United States right now are NASH, or MASH, and alcohol.  And

17   one in three people in the country have fatty liver disease.

18   They have MASLD.  So it's extraordinarily common.

19          And as we talked about before, we ruled out

20   alternative potential causes of cirrhosis that are well

21   established.  So the fact that he had NASH in 2009 that was not

22   adequately managed, he was unfortunately never able to lose

23   significant weight to get fat to leave the liver to stop the

24   inflammation, so, you know, it's not surprising whatsoever that

25   this progressed to cirrhosis.  It's what you would expect for

Mahmud, M.D. - Direct - Balzano          159

1    someone who has longstanding NASH, eventually there will be

2    enough scar to get to the point where it's cirrhosis.

3    Q.   And so, Doctor, I think this morning Dr. Siddiqui, we

4    talked a lot about the timeline and about Dr. Siddiqui's

5    opinion that the cirrhosis couldn't advance from 2016 to HCC in

6    2018.  You were present in the courtroom when you heard that

7    testimony, right?

8    A.   Yes.

9    Q.   And, Doctor, can you give me your thoughts or impressions

10   of that opinion and what you think of that?

11   A.   Yeah.  I just -- I, frankly, I just disagree with

12   Dr. Siddiqui's opinion on the timeline piece of this.  It

13   appeared to me that her opinion was that once you had

14   cirrhosis, seven years essentially had to elapse before liver

15   cancer could develop, which is just frankly incorrect.  There's

16   a reason why all of our major societies recommend initiating

17   cancer surveillance immediately upon diagnosing cirrhosis.  We

18   don't wait for seven years and then start looking for liver

19   cancer.

20           Even in Dr. Siddiqui's report, she cites some of the

21   relevant literature that reports the annual incidence rates of

22   HCC in cirrhosis, which she cites as being between 2 to

23   4 percent.  I generally agree with those numbers.  Some studies

24   report up to 8 percent.

25           What that means is if you follow 100 patients who

Mahmud, M.D. - Direct - Balzano                    160

1    have cirrhosis for one year, somewhere between two and eight of

2    them will develop a liver cancer.  That's why we screen so

3    aggressively for liver cancer as soon as we identify cirrhosis.

4            So, I mean, I'm happy to also talk about the Johnson

5    study that she cited, if you want, but I think her

6    interpretation of that is flawed fundamentally and a

7    misrepresentation of the general natural history of liver

8    cancers and what's plausible.

9            The reality is that patients can develop a liver

10   cancer, you know, commonly within a year of being diagnosed

11   with cirrhosis.  It happens all the time.  There's nothing

12   that's unusual about Mr. Roberts' case from my perspective as a

13   hepatologist.

14           Unfortunately, on paper, you know, he looks like many

15   patients that I diagnose with liver cancer in my practice.

16   It's not unusual.  It's very typical in some ways.

17   Q.  And so, Doctor, you mentioned the Johnson study.  What are

18   your -- how -- what you saw that Dr. Siddiqui relied on the

19   Johnson study, what are your opinions as it relates to that

20   study?

21   A.  Yeah.  Yes.  I think it's worth going into since it

22   featured very prominently in her presentation.  She uses the

23   Johnson study to make this claim that to go from cirrhosis to

24   liver cancer, generally seven years need to elapse.  That

25   number in that study is reported among patients who had

1    hepatitis C virus infections who were then treated and cured of

2    the hepatitis C.

3            Just to like correct one small thing from

4    Dr. Siddiqui, the medications we have for hepatitis C virus

5    now, they don't give you a quote-unquote cure.  They give you a

6    literal cure.  The hepatitis C virus is gone from the body.

7    They're 98 to 99 percent effective, which is why we have so

8    much less hepatitis C in this country now.  But regardless, the

9    reason why that's relevant, patients -- we know that patients

10   who have hepatitis C virus and cirrhosis, if you treat them and

11   cure their hepatitis C and remove the cause of liver disease,

12   you actually see regression of the scar.  So those patients

13   actually can revert from having cirrhosis to then having stage

14   2 or stage 3 scarring in the liver.  Stage 4 is cirrhosis.  So

15   those patients can go from having cirrhosis to not having

16   cirrhosis.

17           In the Johnson study, as well as many other studies,

18   were part of a body of literature when we were trying to

19   identify what do we do with respect to cancer screening for

20   these hepatitis C patients that we have now cured.  Because we

21   recognize that a lot of their numbers would improve, the

22   scarring would get better.  We didn't know do they still have

23   any risk of liver cancer or not.

24           And so the fact that in that population where, you

25   know, 70 percent of these patients have regression to not have

*Mahmud, M.D. – Direct – Balzano*                    162

1   cirrhosis at all, those patients still develop liver cancer,

2   just with a longer latency period.  So I highlight that because

3   it's not the same population whatsoever to Mr. Roberts.

4   Obviously he didn't have hepatitis C.  He had MASLD.  He had

5   cirrhosis.  The cirrhosis never went away.  He never -- you

6   know, his underlying liver disease was never removed.  He never

7   had the opportunity to have regression of his liver disease.

8           So the data just don't apply to this case at all, and

9   they're a misunderstanding of what the data are really telling

10  us.  And, again, it's all sort of just overwhelmed by all the

11  evidence we've talked about already that demonstrates these

12  very high annual incidence rates of developing liver cancer in

13  anybody who has cirrhosis.

14          So I'll just kind of underscore the point again that

15  we don't wait seven years from the time of a cirrhosis

16  diagnosis to begin cancer screening, which is what the logical

17  implication would be from Dr. Siddiqui's argument.  We screen

18  patients immediately, and we keep screening them because the

19  risk is extremely high.

20  BY MR. BALZANO:

21  Q.   And so, Doctor --

22          CHIEF JUDGE BUMB:  Well, I don't know that -- well,

23  let me just test you on this.  I don't know that she was

24  talking about screening.  I thought her testimony was that once

25  you have cirrhosis, you don't develop liver cancer until seven

*Mahmud, M.D. - Direct - Balzano*                    163

```
 1   years later, right?

 2              THE WITNESS:  Right, yes.

 3              CHIEF JUDGE BUMB:  So I don't think it was in the

 4   context of screening.

 5              So other than the Johnson report, which you have said

 6   is misplaced --

 7              THE WITNESS:  Yes.

 8              CHIEF JUDGE BUMB:  -- her reliance is misplaced --

 9              THE WITNESS:  Yes.

10              CHIEF JUDGE BUMB:  -- for the reasons you've

11   articulated, what else -- is there any other literature that

12   you are aware of in the medical field that says that?

13              THE WITNESS:  Yeah.  There's tremendous amounts of

14   literature on this.  And this is all -- much of it is cited in

15   my report.  And it's also cited in our society guidelines.  The

16   reason why I brought up the screening is because it's an

17   illustration of our field's recognition that the risk begins

18   immediately.  We screen for the cancer because we know it

19   doesn't take seven years to develop a liver cancer from the

20   time of incident cirrhosis diagnosis --

21              THE COURT:  And just to be clear, that's the

22   literature I'm referring to.

23              THE WITNESS:  Sure.

24              THE COURT:  Her testimony was, is that the

25   literature, generally speaking, shows that a cancer doesn't
```

Mahmud, M.D. - Direct - Balzano                    164

```
 1   develop until seven years later.  You're saying that the
 2   literature doesn't show that?
 3            THE WITNESS:  No, it does not.  And her support for
 4   that is only the Johnson study.
 5            CHIEF JUDGE BUMB:  That's my question.  Her support
 6   for that is only the Johnson study?
 7            THE WITNESS:  Correct, it's only the Johnson study.
 8   There's nothing else that's cited in her expert report.  I
 9   responded specifically to that critique, because I was very
10   dubious when I first read it.  So I read the study in detail to
11   understand where that estimate would come from, because it's
12   completely contradictory to an immense body of literature that
13   demonstrates very clearly what the real risk of liver cancer is
14   and cirrhosis.
15            CHIEF JUDGE BUMB:  And do you cite that body of
16   literature in your report?
17            THE WITNESS:  Oh, yeah, absolutely, yes, yes, yes.
18            CHIEF JUDGE BUMB:  Okay.  Go ahead.
19   BY MR. BALZANO:
20   Q.   And so, Dr. Mahmud, just to finish up on this, it is your
21   opinion that Mr. Roberts should have been diagnosed with
22   cirrhosis in April 2016?
23   A.   Yes.
24   Q.   And what is your opinion as to whether or not Mr. Roberts
25   had cirrhosis in November 2015 or earlier?
```

*Mahmud, M.D. - Direct - Balzano*                              165

1   A.   It's likely that he did.  So based on the FIB-4 score,

2   that gives you something called a positive predictive value,

3   which means that among people who have the FIB-4 score that

4   high, 80 percent will have advanced fibrosis or cirrhosis.  So

5   he was more likely than not at that time to have cirrhosis.

6   But I can't confirm it without more imaging, yeah.

7   Q.   And so, Doctor, I'm just going to switch gears now and

8   we're going to talk about your opinion as it relates to the

9   tumor volume doubling time calculation that you performed.

10  A.   Sure.  So --

11  Q.   Can you tell me -- yeah, can you tell me a little bit

12  about this analysis, Doctor?

13  A.   Yeah.  I'll try to walk you through this.

14        So the basic argument here or the idea of this I

15  think is pretty straightforward.  When Mr. Roberts was

16  diagnosed with his liver cancer in August of 2018, he was not

17  diagnosed with early-stage cancer.  He was -- he already had

18  incurable liver cancer.  He had large tumors.  He had -- the

19  largest tumor was 5.8 centimeters.

20        Obviously a 5.8-centimeter tumor does not grow

21  overnight from, you know, zero to 5.8.  It takes time to do

22  that.  And so I looked extensively in the literature to try to

23  understand what is the plausible range of growth of an HCC

24  tumor that can be expected for the majority of patients.  And

25  so I found a really excellent study that was the basis for this

1   analysis, that was a meta-analysis.  So it basically pooled

2   estimates of HCC growth rates from 20 different studies to

3   provide our best understanding of what is the average tumor

4   volume doubling time.

5          So tumor volume doubling time is the metric that's

6   typically used to track growth rates of HCC tumors in these

7   research studies.  So they'll make an estimate of what the

8   volume is and see how long it takes for that volume of cancer

9   to double essentially.  And so in this meta-analysis, they

10  report what the average tumor volume doubling time was, which

11  was 4.6 months.  That's the kind of column shown in the very

12  middle.

13         And they also report the 95 percent confidence

14  interval, so that's essentially -- there's obviously a

15  distribution of growth rates, and they basically take estimates

16  from, you know, the 2.5 percentile all the way to the 97.5

17  percentile to encapsulate what they consider to be plausible.

18  And that's a very standard statistical principle to use a

19  95 percent confidence interval.

20         So I took the average and I took either extreme from

21  the 95 percent confidence interval and basically calculated,

22  back calculated what the tumor volume and tumor diameter would

23  have been at different time points prior to when he was

24  actually diagnosed with liver cancer to try to understand was

25  he more likely than not or less likely than not to have already

1    had a liver cancer when he was first exposed to

2    NDMA-contaminated valsartan.

3              And under all of those assumptions, which, again,

4    they're coming from the study, I'm not just making up these

5    numbers, these come directly from the paper.  They're in the

6    abstract, each of these numbers.  Under all of these ranges of

7    plausible growth rates, he would have been expected to have

8    already had some degree of small HCC tumor in the liver before

9    he was even exposed to NDMA.

10             So that really casts a lot of doubt, in my view, on

11   any kind of temporal claim that NDMA, you know, either predated

12   the liver cancer or that there was sufficient latency between

13   the NDMA to develop a liver cancer.  So that was the essence of

14   what this analysis shows.

15   Q.   And so, Doctor, when you looked at this paper and applied

16   this analysis, you found this paper and this analysis to be

17   reliable?

18   A.   Absolutely.  This paper, I forget the exact year, 2021 it

19   was published, yeah.  And so it's published in one of the

20   highest tier gastroenterology journals called Gut.  It's

21   probably one of the top two journals in gastroenterology and

22   hepatology.  And the author list is like basically, you know,

23   if there were celebrities in hepatology and HCC, it's like a

24   star-studded cast of the most reputed international experts in

25   HCC.

1          So, yes, I trust this.  I trust the authors.  It was
2    peer reviewed in a very rigorous journal, and it's a
3    meta-analysis.  It's pooling.  It's not a single-centered study
4    which can be biased for various reasons.  It is pooling data
5    from many different studies to give us the best possible
6    estimates of what plausible growth rates could be expected for
7    a typical HCC in an average patient.
8    Q.   And, Doctor, this calculation, is this separate from your
9    differential diagnosis?  Is this in addition to it?
10   A.   This is just an additional point.  I mean, this doesn't
11   really, in my view, doesn't really kind of cut to the core
12   arguments in the case.  Like, it doesn't take away the fact
13   that he had cirrhosis, that he had MASLD and diabetes and
14   obesity.  This is just, you know, trying to dig deeper on how
15   plausible is it even to think that NDMA could have been related
16   to this even if I were to accept the very weak human literature
17   on that.  And even when I look at this type of analysis, I'm
18   extremely dubious.
19   Q.   And so, Doctor, just to sum it up, I just want to, you
20   know, summarize, you performed a differential diagnosis in this
21   case, and you also looked at Dr. Siddiqui's differential
22   diagnosis, and if you could just give a summary of your
23   opinions.
24   A.   Sure.
25          So, in my view, as a hepatologist who takes care of

*Mahmud, M.D. - Direct - Balzano*                    169

```
1    these patients in my routine course of regular care, my opinion
2    is that Mr. Roberts' HCC was developed, related to his history
3    of NASH cirrhosis with contributing risk factors of his obesity
4    and diabetes.  I did not find any substantiated evidence that
5    there will be a casual link between NDMA and HCC specifically
6    in humans, nor do I think that even if I were to accept that
7    there was such an association there was sufficient exposure and
8    time to develop a liver cancer in this particular case.
9              And I think that Dr. Siddiqui's differential, she was
10   very quick to exclude the most relevant and best established
11   risk factors which, in my view, is just completely
12   scientifically invalid and inconsistent with the standard of
13   care.
14             MR. BALZANO:  Thank you, Doctor.  I think those are
15   all the questions I have.
16             CHIEF JUDGE BUMB:  Okay.  Five-minute break, and
17   we'll turn to cross.  Okay.
18             THE COURTROOM DEPUTY:  All rise.
19             (Recess was taken at 2:18 p.m. until 2:28 p.m.)
20             THE COURTROOM DEPUTY:  All rise.
21             CHIEF JUDGE BUMB:  Okay.  You can be seated.  Thank
22   you.
23             Cross-examination.
24             MR. VAUGHN:  May it please the Court.
25             CHIEF JUDGE BUMB:  Yes.
```

```
 1                 MR. VAUGHN:  Thank you.

 2                     CROSS-EXAMINATION

 3    BY MR. VAUGHN:

 4    Q.   Hello again, Dr. Mahmud.

 5    A.   Hello, Counselor.  Nice to see you again.

 6    Q.   Good to see you again as well.

 7             I'd like to start with the April 2016 CT scan that

 8    you guys were looking at.

 9    A.   Sure.

10    Q.   And this 8-millimeter focal hypodensity seen in the right

11    lobe --

12    A.   Yes.

13    Q.   -- was that in the same location that he eventually got

14    cancer?

15    A.   So I -- I don't recall specifically.  I recalled from

16    Dr. Chernyak's review of this that she identified a lesion in

17    the right lobe that did correspond on this imaging to one of

18    his eventual locations on his subsequent MRI that was

19    consistent with HCC.

20    Q.   Was it this 8-millimeter lesion?

21    A.   I couldn't say.  I mean, I -- I wouldn't be able to state

22    that specifically because I don't know which specific lesion

23    the diagnostic radiologist is referring to.

24    Q.   And did you review the 2016 CT scan yourself?

25    A.   I did.
```

1    Q.   And did you look to see if there was a corresponding

2    lesion where he eventually developed cancer?

3    A.   So when I review a CT scan, I'm fairly adept at looking at

4    certain things and I'm a little bit less qualified at looking

5    at other things.  So looking for features of cirrhosis, I do

6    that routinely for my patients.  So if I'm looking for a

7    nodular liver border, enlarged spleen size, recanalized

8    umbilical vein --

9             (Court reporter clarification.)

10            THE WITNESS:  Sorry.  I'm looking for a nodular

11   liver, enlarged spleen, or a recanalized umbilical vein.

12   Sorry, it's a lot of words.  I feel comfortable looking for

13   those things.

14            Looking for a very subtle liver lesion is really

15   outside kind of the realm of my comfort zone not being a

16   diagnostic radiologist.  So for those specific questions, I'm

17   usually very deferential to a diagnostic radiologist who's very

18   experienced in looking at these very subtle lesions and trying

19   to characterize them.

20   BY MR. VAUGHN:

21   Q.   And so you yourself did not observe any lesion in the same

22   location that Mr. Roberts eventually developed liver cancer,

23   correct?

24   A.   Yeah.  I couldn't confidently say that -- I would not be

25   able to confidently say that I would be able to identify that

Mahmud, M.D. - Cross - Vaughn                    172

```
 1   myself.
 2   Q.   And did you review Dr. Chernyak's deposition transcript?
 3   A.   I did review the deposition transcript, yes.
 4   Q.   And are you aware if she testified that that is not in the
 5   same location as where he developed hepatocellular carcinoma?
 6   A.   I don't immediately recall, honestly.  I remember she did
 7   specify that there was a lesion, I think she may have said a
 8   5-millimeter lesion that did correspond to an eventual location
 9   of liver cancer on the MRI.
10   Q.   Right.  But you did not see that yourself, correct?
11   A.   Correct.
12   Q.   And it's your opinion that Mr. Roberts' liver cancer was
13   caused by NASH, correct?
14   A.   I think there were multi-factorial contributors to his
15   HCC.  I think cirrhosis is the top of that with, I think,
16   additional contributors from NASH or MASH and obesity and
17   diabetes.
18   Q.   In your expert report, you said it was the direct result
19   of longstanding MASH that resulted in cirrhosis?
20   A.   I may have phrased it that way, yes.  I mean, commonly in
21   liver -- in our practice, we'll say that liver cancer resulted
22   from a background of NASH cirrhosis.  That's a very common way
23   that we'll phrase it.  That's the way that his physicians at
24   UAB phrased it.  So, okay, yeah.  I can't see the left side.
25              Yes.  Sure.  Yes.  Yeah, yeah.
```

Mahmud, M.D. - Cross - Vaughn                    173

1    Q.    Okay.

2    A.    I'm okay with that.

3    Q.    And you didn't consider NDMA in your differential,

4    correct?

5    A.    I considered it in the differential.  It didn't rise to

6    the point where I would kind of list it as a probable -- as a

7    possible cause really.

8    Q.    And you testified that it didn't matter how much NDMA

9    Mr. Roberts was exposed to because, in your opinion,

10   Mr. Roberts likely already had hepatocellular carcinoma when he

11   was first exposed to NDMA, correct?

12   A.    I think there's more to it, to my opinion, than just that.

13   I think there's really just insufficient data in humans to

14   really establish that there's any potential causal link.

15   That's one point I'd make.

16          I think an additional point that I raised that's come

17   up a couple of times is this issue of the tumor volume doubling

18   time, which gives me added concern separate or perhaps in

19   addition to my concerns about the lack of literature to form

20   the causal inference.

21   Q.    And in your deposition we discussed that NASH is typically

22   associated with indolent growth if it does result in liver

23   cancer, correct?

24   A.    You'll have to remind me of the context.  What do you mean

25   by that exactly?

United States District Court
District of New Jersey

*Mahmud, M.D. - Cross - Vaughn*                    174

```
 1    Q.    What does "indolent" mean?

 2    A.    Indolent would mean kind of slow growing, yes.

 3    Q.    Okay.  And is NASH typically a slow-growing cancer?  If

 4    NASH results in liver cancer, is that liver cancer typically

 5    slow growing?

 6    A.    It depends on what you mean by "slow growing."  I think

 7    you can make statements about relative rates of growth on

 8    average relative to other causes of liver disease.  So, for

 9    instance, you could say -- I mean, there are data to

10    demonstrate that patients who have hepatitis B virus as a cause

11    of liver disease on average tend to have more aggressive tumors

12    than patients who have NASH or MASH.  That's true.

13          But you can't universally say that all patients with

14    NASH or MASH have slow-growing tumors because there's a

15    distribution.  Some of them have slower growing tumors.  Some

16    of them have faster growing tumors.

17    Q.    On average, are they usually slower growing tumors?

18    A.    I would say on average they're slower growing as compared

19    to hepatitis B-related cancers.  There has to be a reference.

20          MR. VAUGHN:  Can we pull his expert report up and go

21    to page 34.

22          And if we could zoom in on that chart and the

23    paragraph below it.

24    BY MR. VAUGHN:

25    Q.    This was the chart that you were going over with your
```

1    counsel earlier, correct?

2    A.    Yes.

3    Q.    And your opinion was under all scenarios from the study

4    that you've made this chart, he would have already had cancer,

5    correct?

6    A.    Yes.

7    Q.    And in your deposition we went over that there were some

8    other scenarios that you didn't actually map out, correct?

9    A.    That's correct.

10   Q.    Okay.  This chart is based off a study, Nathani.  Is that

11   the author's name?  Do you recall?

12   A.    The senior author was Singal, Amit Singal.  The first

13   author is escaping me.  I can think of like multiple authors on

14   the paper.  Nicole Rich was on the paper.  But I forget who the

15   first author was.  Singal is definitely the senior author.

16              MR. VAUGHN:  May I approach?

17              CHIEF JUDGE BUMB:  Yes.  Thank you.

18              THE WITNESS:  Thanks.  Yes, this is the one.

19   BY MR. VAUGHN:

20   Q.    And this is Nathani?

21   A.    Yes.

22              MR. VAUGHN:  And can we pull Nathani up now?

23              And if we go to page 7.

24   BY MR. VAUGHN:

25   Q.    And, Doctor, you see in the study where it says, "more

Mahmud, M.D. - Cross - Vaughn                    176

1    indolent growth among patients with nonviral liver disease."

2    A.    Yes.   That's consistent with what I think I just said.

3    Q.    Okay.   And then later on it talks about NASH being one of

4    those that would be a non -- it would be indolent, correct?

5    A.    Yes.   As I said though, it's important to have the

6    reference, the more indolent as compared to viral-related liver

7    disease, which is what I said.

8    Q.    And if we go to page 1 now of this study.

9          MR. VAUGHN:   And zoom in on the highlighted spot.

10   BY MR. VAUGHN:

11   Q.    And so for rapid growth here, they define it as less than

12   three months on the tumor volume doubling time, correct?

13   A.    Sure.

14   Q.    And the quickest that you modeled out was 3.9 months,

15   correct?

16   A.    That's right.

17   Q.    Okay.   And then also on this first page, it notes that the

18   indolent growth is greater than 9 months, correct?

19   A.    That's the way they classified indolent in this study.

20   Q.    And you didn't model out the greater than 9 months, did

21   you?

22   A.    I didn't, because I -- you know, if you look at the

23   results which is just below this, I took their estimates --

24   they report this in the abstract -- of the average and then the

25   95 percent confidence interval which represents, you know, the

*Mahmud, M.D. - Cross - Vaughn*                     177

```
1    plausible range of what would be expected for patients with

2    HCC.  That would capture 95 percent of patients with HCC.

3    Q.   But you believed his HCC was caused by NASH cirrhosis,

4    correct?

5    A.   I do believe that his HCC was most likely related to NASH

6    cirrhosis, yes.

7    Q.   All right.  If we go to the tumor volume doubling time one

8    now.

9          And this is your chart I put on, correct?

10   A.   Yes.

11   Q.   And then can we go to the second page where I've extended

12   it.

13         And I've now done -- the nine months is actually in

14   the Nathani study.  And did I do this right?  You just add nine

15   months to each line?

16   A.   Okay.  I see.

17   Q.   Okay.  And Mr. Roberts, his initial CT was in April of

18   2016, correct?

19   A.   Yes.

20   Q.   And then a subsequent CT in August of 2018?

21   A.   To get an MRI.  Well, yeah, a CT and an MRI, yes, yes.

22   Q.   So approximately 28 months later?

23   A.   Sure.

24   Q.   Okay.  And so if we model out based on the actual study

25   you cited, at 27, 28 months, you would expect an almost
```

1    3-centimeter tumor at the time of his 2016 CT, correct?

2    A.    Yeah; I think if you model it that way.  But I think the

3    caveat is they may have classified indolent as that, but they

4    report the actual findings of what the ranges were that were

5    observed in the majority of patients, which is the 95 percent

6    confidence interval.  So this nine-month doubling time is not a

7    common scenario.  It's a very uncommon scenario in this study.

8           But, yes, I would agree with you, sure.  Based on

9    this, that way of modeling it, you would expect the cancer

10   would be already present and perhaps it would be larger than it

11   would be in these other projections.

12   Q.    And the study is talking about all types of liver cancer

13   when it's lumping them all together.

14   A.    That's right.

15   Q.    But when it's talking about NASH, it's indolent and it's a

16   9-month tumor volume doubling time, correct?

17   A.    I mean, that's one projection.  I mean, it's not like an

18   incontrovertible fact that every patient with NASH will have a

19   9-month doubling time.  There's a range to this.  Some patients

20   will be faster, some will be slower.

21          But, sure, if you were to model it this way, then,

22   yes, you would expect the cancer was already present and maybe

23   it would have been a little bit larger than in the other

24   projections.

25   Q.    And even in your 5.3-month projection, it would have been

Mahmud, M.D. - Cross - Vaughn                    179

```
 1   nearly 2 centimeters in size, correct?
 2   A.   So if you're going by this chart, yes.  But these are not
 3   really designed to give you perfect millimeter-by-millimeter
 4   predictions of what the exact size of a tumor will be for a
 5   particular patient.  You know, error does get introduced into
 6   these things even though these are reasonable assumptions to
 7   make about rates of growth.  So I wouldn't necessarily expect
 8   him to have exactly a measurement that's shown on this table.
 9   It's really just trying to answer the question is it more
10   plausible than not that he already had cancer.
11   Q.   But did you observe any lesion at all in the location of
12   his cancer in 2016?
13   A.   Right.  So as I've stated, I am not well qualified as a
14   non-diagnostic radiologist to resolve extremely small liver
15   lesions on imaging.  I don't feel confident doing that.  But
16   the radiologist did resolve something.  And Dr. Chernyak, an
17   expert radiologist, resolved something.  And one of those
18   lesions was in the location that ultimately turned out to be a
19   cancer.
20   Q.   And so you're relying on Dr. Chernyak, correct?
21   A.   Sure, yes.  She's a well-reputed diagnostic abdominal
22   radiologist who does this routinely as part of her job.
23   Q.   Can we go back to the Nathani study, and page 16.
24        And you said it cited a whole bunch of different
25   studies in that, right?
```

*Mahmud, M.D. - Cross - Vaughn*                    *180*

1    A.   Yes.

2    Q.   If we zoom in, one of those is -- what's it, Matsuhashi,

3    1996.  And you looked at these underlying studies as well,

4    correct?

5    A.   Yes, I did.

6    Q.   And then can we go ahead and pull up that study, the

7    Matsuhashi, or however you say it.

8         All right.  If we go to page 3, it would be page 445

9    of the study.  And it gives the tumor volume doubling times.

10   And the quickest ones it actually gives is 22 days, correct?

11   A.   Yeah.  I mean, I'd have to review this study in detail to

12   remind myself of their methodology, but, yes, based on this

13   table, that does seem to be what they're reporting.

14             MR. VAUGHN:  May I approach, Your Honor?

15             CHIEF JUDGE BUMB:  Sure.

16             THE WITNESS:  Thanks.

17   BY MR. VAUGHN:

18   Q.   If you need time to review, let me know when you're ready.

19   A.   Sure.  You can ask questions, I can try to identify things

20   in realtime if you'd like.

21   Q.   Okay.  And so this study reports multiple people with a

22   tumor volume doubling time less than one month that are

23   drinking alcohol, correct?

24   A.   Yes.  I think that does seem to be the case.

25             Yeah.  They report a range from 22 to 171 days.

1    Q.   But it shows that the tumor volume doubling time in the

2    liver cancer can be as quick as 22 days is what the study is

3    saying, correct?

4    A.   Yes.  And they report an average of 78 days.

5    Q.   Can we go back now to the tumor volume doubling time and

6    go to the third page where we model out the 22 days now.

7             And so with a 22-day tumor volume doubling time,

8    we're just looking at 159 days as opposed to years, correct?

9    A.   Sure.  The thing is you're -- you're trying to pick like

10   the most extreme outlying value for a tumor volume doubling

11   time, which the whole purpose of the meta-analysis is to get

12   away from the outlying noise and try to identify for the

13   majority of patients what is the most plausible scenario.

14            Sure, if I pick an extreme value, which this may be

15   the shortest tumor volume doubling time in any of these

16   studies, then, yes, I mean, you're right that you'd have a very

17   aggressively growing tumor that would match those

18   specifications.

19   Q.   So it's plausible for a tumor to grow that quickly?

20   A.   It is possible.  It is not more likely than not though.

21   Q.   In your expert report you said all scenarios he would have

22   had it beforehand.  It's not all scenarios, correct?

23   A.   What I'm referring to there is all scenarios that I

24   modeled in this table.

25   Q.   Oh, that you modeled, not that's possible?

Mahmud, M.D. - Cross - Vaughn                    182

1    A.    Yeah.

2    Q.    Okay.

3    A.    But what I modeled is what I viewed to be the plausible

4    range of growth scenarios from the meta-analysis, which is the

5    best available data that we have.

6              CHIEF JUDGE BUMB:  And not the outliers?

7              THE WITNESS:  And not the outliers.

8              What you're asking me to do is to pick an extreme

9    outlier and represent that as if it is the most plausible

10   scenario, which I think would be irresponsible.

11   BY MR. VAUGHN:

12   Q.    Is not one of these outliers NASH, which is what you think

13   caused his cancer?

14   A.    NASH is not an outlier.  As I said before, one in three

15   people in the country have MASLD.  MASH is extraordinarily

16   common.  And it's actually fairly well represented in some of

17   these studies.  Some of these studies are, as this one, has

18   zero NASH patients.  This study you showed me is all hepatitis

19   C and alcohol patients, which are known to have, you know, more

20   aggressive rates of growth.  So I really don't know why I would

21   pick this particular study and take the most extreme outlier

22   from this one to represent Mr. Roberts' likely growth scenario.

23   That makes absolutely no sense to me.

24   Q.    You're saying NASH is not an outlier in general, but is

25   NASH an outlier in this, in the study, the nine months?

Mahmud, M.D. - Cross - Vaughn                183

1   They're saying NASH takes nine months for the tumor volume to
2   double.  Are you disagreeing with the study that you cited?
3   A.   I mean, I'm not agreeing with the way you're
4   characterizing it.  I'm not -- I don't agree that NASH means
5   that you have to have a tumor volume doubling time of nine
6   months.
7   Q.   But it's typically going to be on the slower end, correct?
8   A.   Relative to things like hepatitis C and hepatitis B, so
9   yes, it's going to be slower than the projection you're giving
10  me from this Japanese study.
11  Q.   And every single one that you modeled out would have
12  expected him to have a tumor in that location, but you didn't
13  see a tumor in that location?
14  A.   This doesn't say anything about location.  This just says
15  would he have had cancer in the liver, yes or no.  And all
16  these scenarios tell me that he likely had an incipient cancer
17  somewhere in the liver at that time.  It doesn't tell me that
18  you expect to see a cancer in the right lobe or the left lobe
19  or, you know, there's going to be even a specific measurement.
20  I'm not claiming that he would have a tumor exactly that size.
21  There are reasons why these are not perfect predictions, and
22  some of those you actually brought up.
23         But it just tells us that based on reasonable rates
24  of growth of HCC, as best as we can determine based on
25  aggregating data from many studies to give us, you know,

1    broader averages for populations of patients with liver cancer,

2    these are the expectations.  And all these expectations from a

3    reasonable range of what's plausible tell us that he would be

4    expected to have already had a small cancer at the time of his

5    first exposure to NDMA.

6    Q.   Cancer can't -- doesn't move around in the liver, right?

7    If it's in one location, it grows in that location?

8    A.   If you have cancer in one location, yes, it will typically

9    replicate in that location and get bigger.  However, especially

10   in cirrhosis, when you develop HCC, oftentimes it can be

11   microscopically present in multiple locations.  And that's why

12   when you observe a patient long enough, you'll see tumors grow

13   in multiple occasions, which is exactly what was observed for

14   Mr. Roberts.  He had more than one tumor.  So he had HCC

15   present in more than one location.  That's extremely common.

16           So whether or not -- I wouldn't even have been

17   shocked if we saw no lesion on his CT scan in April 2016.  Part

18   of the reason for that is, as I think you had stated in your

19   motion to dismiss my testimony, he had suboptimal imaging.  He

20   never had an MRI, which is the best way to characterize these

21   lesions.  The CT scan did not have optimal phasing, which I

22   think was also mentioned.  So it's possible that he could have

23   had a lesion that was missed because he didn't have the proper

24   imaging to diagnose it.

25   Q.   All right.  So you did read the briefing, correct?

*Mahmud, M.D. - Cross - Vaughn*                        185

1    A.    Yes, your briefing to dismiss my testimony, yes.

2    Q.    And did you read your counsel's response?

3    A.    My counsel's response?

4    Q.    Uh-huh.

5    A.    I don't believe so.

6    Q.    Okay.  They cited a study called Chansik An to support

7    your tumor volume doubling time opinions titled:  Growth Rate

8    of Early Stage Hepatocellular Carcinoma in Patients with

9    Chronic Liver Disease.

10          Have you seen that study before?

11   A.    You'd have to show it to me.  I don't immediately recall.

12   Q.    Can you pull it up.

13   A.    Okay.  Thanks.

14   Q.    Uh-huh.  And if we just zoom in on the results section.

15          And, Doctor, do you see here in this study, they're

16   talking about tumor volume doubling times for liver cancer as

17   short as eleven days?

18   A.    Okay.  Yes, I see that.

19   Q.    And can we go to the fourth page now.

20          And again, it's saying the range was as low as eleven

21   days for doubling.  And that was with HBV patients.  What is

22   HBV?

23   A.    HBV is hepatitis B virus.

24   Q.    And so with hepatitis B virus, they're seeing the liver

25   tumors or cancer doubling as quickly as every eleven days,

1    correct?

2    A.   Yeah.  And hepatitis B is the most aggressive phenotype of

3    HCC we would see.  So this would be like on the extreme high

4    end of growth rates.

5    Q.   Why is it that it's the most aggressive?  What's it doing

6    mechanistically?

7    A.   So hepatitis B virus is inherently oncogenic, which means

8    cancer-causing to liver cells.  It actually integrates with the

9    DNA of liver cells, which is why we can't cure hepatitis B in

10   contrast to hepatitis C which does not do that.  We can cure

11   hepatitis C.  So hepatitis B has inherent properties that

12   promote very kind of more rapid DNA mutations that are

13   precursors to cancer.

14   Q.   Because it's causing DNA mutations, correct?

15   A.   Yes, yeah, essentially.

16   Q.   And that is the theory of how NDMA causes liver cancer as

17   well, correct, DNA mutations?

18   A.   That is a common model for how cancer forms generally,

19   yes, accumulation of DNA mutations that lead to unregulated

20   cell growth and replication.

21   Q.   All right.  So can we go back now to the tumor volume

22   doubling time, fourth page, where we model out the eleven days.

23           And so now with an eleven-day, we're looking just 77

24   days earlier now, not years and years earlier, correct?

25   A.   Sure.  Yes.

*Mahmud, M.D. - Cross - Vaughn*                    187

1    Q.    Okay.  And NASH would be the slowest of them all?

2    A.    Okay.  If I accept the numbers that you're presenting,

3    sure.

4    Q.    Okay.  And so even though your modeling predicts that

5    Mr. Roberts would have had liver cancer that was caused by NASH

6    and he would have had between a 1- and 3-centimeter tumor at

7    the location where he later developed cancer, there were no

8    such tumors, you still believe that NASH is the most likely

9    cause of his cancer?

10   A.    Again, I think it's multi-factorial, but I think the most

11   predominant causes were his cirrhosis which was caused by his

12   NASH, yes.

13   Q.    And you reviewed his medical records, correct?

14   A.    Yes.

15   Q.    Including from his treating physician, Dr. White?

16   A.    Yes.

17   Q.    And what was his profession; do you recall?

18   A.    I believe he was a -- I want to say he was a hepatologist,

19   if I remember correctly, yeah.

20   Q.    And what is a hepatologist?

21   A.    Yeah.

22   Q.    What is that?

23   A.    Oh, what is a hepatologist?  That is what I am.  It's a

24   specialist who treats liver disease and manages liver disease.

25   Q.    So Mr. White was Mr. Roberts' treating liver doctor?

*Mahmud, M.D. - Cross - Vaughn*                   188

```
 1   A.   That's right.
 2   Q.   And he wasn't a resident or anything, it was his actual
 3   treating physician?
 4   A.   I mean, a resident can be a treating physician for
 5   patients, but I believe he was an attending physician, if I
 6   remember correctly.
 7           MR. VAUGHN:  Can we go ahead and pull up that
 8   August 2018 medical record from Dr. White.
 9           Can we go ahead and pull up that.
10           Okay.  Yes.  Zoom on the highlights.
11   BY MR. VAUGHN:
12   Q.   So this was in 2018 at the time he was actually diagnosed
13   with cancer, correct?
14   A.   Yes, that seems right.
15   Q.   And do you see where his liver doctor says that the
16   patient has undergone extensive workup for cirrhosis?
17   A.   I do see that.
18   Q.   And do you agree with that?
19   A.   Yes, I do agree he's undergone -- at this point in time in
20   his record, he had had a pretty detailed evaluation for chronic
21   liver disease and cirrhosis, yeah, sure.
22   Q.   And then do you see lower where his treating liver doctor
23   says that the workup for cirrhosis is essentially negative?
24   A.   I do see that.
25   Q.   Okay.  And that's consistent with Dr. Siddiqui's opinion
```

1    that you sat in here and listened to, correct?

2    A.   I think that Dr. Siddiqui's opinion is a misinterpretation

3    of what Dr. White is saying in that sentence.  And I think my

4    point is actually very clearly made if you look at the rest of

5    the note.  If you look at page 4, where they get to the

6    impression, the assessment and plan, he summarizes the case as

7    "Mr. Roberts is a 62-year-old male NASH cirrhosis with two

8    hepatic lesions with total tumor diameter 10.8 centimeters in

9    the setting of cirrhosis and elevated AFP, concerning for HCC."

10         So it's very clear that Dr. White knows he has

11   cirrhosis from NASH.  I can explain what this means.  As a

12   hepatologist, this type of language is commonly used.

13         CHIEF JUDGE BUMB:  All right.  Go ahead, explain it.

14         THE WITNESS:  Sure, yeah.

15         CHIEF JUDGE BUMB:  Because it does look like he's

16   saying on this page -- it's on the screen -- he doesn't have it

17   and on the last page he clearly has it.

18         THE WITNESS:  Yeah.

19         CHIEF JUDGE BUMB:  So, yes, help me understand that.

20   And then I'm going to ask you, did Dr. Siddiqui inaccurately

21   rely upon in a vacuum this one sentence that's on the screen,

22   "workup for cirrhosis is essentially negative."

23         THE WITNESS:  Sure.

24         So to answer the first question, so what I -- what I

25   interpret this to mean as a hepatologist, we typically do a

1   quote-unquote cirrhosis workup, which means we send serologic

2   or a blood-based evaluation to identify potential causes of

3   cirrhosis, things like hepatitis B virus, hepatitis C virus,

4   antibodies to look for different types of autoimmune liver

5   disease, certain types of testing to look for genetic causes of

6   liver disease.

7          When all of that returns negative, which means to say

8   that we don't identify any evidence of hepatitis B, hepatitis

9   C, autoimmune liver disease, et cetera, we refer to that as a

10  negative cirrhosis workup.  There is no blood test for MASH or

11  MASLD, so that's never really kind of referred to as being a

12  positive element of this cirrhosis workup.

13         It's very common to use this language in hepatology

14  notes.  I agree it's imprecise.  But if you read through the

15  rest of his note, there is no question that he understands the

16  patient has cirrhosis.  Even in the opening sentence of what

17  you have on the screen he says, "Mr. Roberts is a 62-year-old

18  male who presents today for a new visit for evaluation and

19  treatment of a liver mass in the setting of NASH cirrhosis."

20         CHIEF JUDGE BUMB:  So --

21         THE WITNESS:  The MRI showed cirrhosis.

22         MR. VAUGHN:  No, no.

23         CHIEF JUDGE BUMB:  So --

24         MR. VAUGHN:  Sorry, Your Honor.

25         CHIEF JUDGE BUMB:  So -- so I don't recall

*Mahmud, M.D. - Cross - Vaughn*                    191

```
 1   Dr. Siddiqui's testimony.  Is she relying on the sentence right
 2   here that says "workup for cirrhosis is essentially negative"?
 3   Does she conclude from that sentence that this means he did not
 4   have cirrhosis?
 5             THE WITNESS:  I -- well, so, admittedly, her
 6   testimony is confusing, because in some parts she says that she
 7   agrees there's mild cirrhosis in 2016.  She says that very
 8   clearly in her report, but then later in her expert testimony
 9   she does reference this specific sentence to indicate -- or to
10   suggest that his providers did not think he had cirrhosis.
11             CHIEF JUDGE BUMB:  Is that true?  What he just said,
12   is that true?
13             MR. VAUGHN:  She does cite it in her expert report.
14             CHIEF JUDGE BUMB:  Does she say that -- does she rely
15   upon this sentence that is highlighted:  "Workup for cirrhosis
16   is essentially negative"?
17             MR. VAUGHN:  Yes.
18             CHIEF JUDGE BUMB:  Does she cite to that and then
19   conclude, as a matter of opinion, that his own providers say he
20   did not have cirrhosis?
21             MR. NIGH:  No, Your Honor.  It's not only that
22   sentence.  That's one piece as a part of everything else that
23   we presented this morning.  There are numerous other things
24   that she said.
25             CHIEF JUDGE BUMB:  Okay.  So I want some assurance;
```

```
1     I'm going to hold the parties to it.  I'm going to turn to both
2     of them.  I want to know if Dr. Siddiqui relied upon that
3     sentence right there, in whole or in part, to conclude that he
4     did not have cirrhosis at that time.  Because that is a gross
5     mischaracterization of this document.
6              MR. VAUGHN:  What is a gross mischaracterization?
7     I'm sorry.
8              CHIEF JUDGE BUMB:  To conclude from that sentence
9     that Mr. Roberts did not have cirrhosis.
10             MR. NIGH:  Your Honor, her testimony was that
11    sentence is referring to what happened in the past.
12             CHIEF JUDGE BUMB:  Don't know.  I want to know.
13             MR. NIGH:  That's her testimony.
14             CHIEF JUDGE BUMB:  I want to know, because it would
15    be a gross mischaracterization, because I don't have to be a
16    physician to know that when I read the first sentence, this
17    provider clearly says that he has a liver mass in the setting
18    of NASH cirrhosis.
19             MR. VAUGHN:  Give me one second on that, Judge.
20    BY MR. VAUGHN:
21    Q.   In 2018 -- you were here for Dr. Siddiqui's testimony.
22    She was not disputing that he had cirrhosis in 2018, was she?
23    A.   I think what she's -- so I don't think she was disputing
24    that based on her testimony at that time.  She --
25    Q.   She even said that he had --
```

```
1            CHIEF JUDGE BUMB:  Wait.  Let him finish.
2            THE WITNESS:  Like I said, she -- I've gotten very
3    mixed messages from Dr. Siddiqui at different times.  We heard
4    kind of both opinions given about the 2016 time point where she
5    did say there was cirrhosis and then she said she wouldn't have
6    diagnosed cirrhosis.  And then, you're right, at some point in
7    her testimony this morning she did say that he was diagnosed
8    with cirrhosis in August of 2018.  I think she agreed with that
9    as a matter of fact from the record.
10   BY MR. VAUGHN:
11   Q.   So she agrees that it was liver cancer in the setting of
12   cirrhosis just like this says at the beginning?
13   A.   I -- I don't know if she agreed with the specific phrasing
14   you gave it.  I think she agreed with the diagnosis of
15   cirrhosis when asked about that.  But at the same time in her
16   report, she absolutely references this note to make -- to give
17   the appearance that the providers thought that he did not have
18   cirrhosis.
19   Q.   Well, the provider is saying that the previous --
20   A.   So I don't know what her opinion is.
21            MR. BALZANO:  Your Honor --
22            CHIEF JUDGE BUMB:  Yes.  I'm listening.
23            MR. BALZANO:  I have a copy of Dr. Siddiqui's report
24   where this is referenced if it would be --
25            CHIEF JUDGE BUMB:  I want to see that section.  Just
```

Mahmud, M.D. - Cross - Vaughn                    194

```
 1    highlight it to me, because I really -- I want to know -- it's
 2    a very straightforward question.  Is she relying on that
 3    sentence to say that he didn't have it?  Let me see.
 4              MR. BALZANO:  It's the sentence after the
 5    highlighted, Your Honor.
 6              CHIEF JUDGE BUMB:  Okay.  This is what her report
 7    says:  "Mr. Roberts' cirrhosis was so mild and at such an early
 8    stage in 2016 that I would not have expected him to receive an
 9    actual diagnosis of cirrhosis.  I would not have given him an
10    actual diagnosis of cirrhosis at this time.  This is further
11    supported by Dr. White's, Mr. Roberts' hepatologist, note on
12    August 22, 2018, contemporaneous with Mr. Roberts' liver cancer
13    diagnosis, that Mr. Roberts had, quote, undergone extensive
14    workup for cirrhosis and that the workup for cirrhosis is
15    essentially negative."
16              MR. SLATER:  Your Honor, can I address this?
17              CHIEF JUDGE BUMB:  No.
18              MR. SLATER:  Because it's not what she said.  She
19    said very clearly in the testimony that she was referring to
20    the past workup in the past.  She testified unequivocally --
21              CHIEF JUDGE BUMB:  She just --
22              MR. SLATER:  -- that he had cirrhosis and liver
23    cancer in August of 2018.  He was -- it was absolutely
24    straightforward testimony, Your Honor.  And this is -- this is
25    not a real -- this is not what she said.  She never said he
```

Mahmud, M.D. - Cross - Vaughn                195

```
 1    didn't have cirrhosis when he was diagnosed.  She said it was

 2    absolutely cirrhotic at that time.  And she said the NDMA she

 3    believes either promoted or caused the cirrhosis that he had

 4    when he was diagnosed.  She never suggested he didn't have

 5    cirrhosis at the time of diagnosis.

 6              CHIEF JUDGE BUMB:  She just -- I just read it to you.

 7              MR. NIGH:  No.

 8              MR. SLATER:  That's not what -- Your Honor, that's

 9    not what the words on the page --

10              MR. NIGH:  It's 2016.

11              MR. VAUGHN:  It's talking about prior workup.

12              MR. SLATER:  She's talking about 2016.

13              CHIEF JUDGE BUMB:  Wait.

14              MR. SLATER:  Hang on.  She said that the workup in

15    the past had been negative for cirrhosis.

16              CHIEF JUDGE BUMB:  Wait.  Mr. Slater, let me read it

17    again.

18              MR. SLATER:  Thank you.

19              (Simultaneous speaking.)

20              CHIEF JUDGE BUMB:  I -- can we put this on the

21    screen.  I want to ask this witness a question.

22              MR. BALZANO:  May I approach, Your Honor?

23              CHIEF JUDGE BUMB:  You don't have to put it on the

24    screen.  I just need him to see this.

25              MR. SLATER:  Can I also make a suggestion?  We have a
```

*Mahmud, M.D. - Cross - Vaughn*                    196

1    realtime transcript.  Can we word search in it and find her

2    testimony for what she actually said?

3              CHIEF JUDGE BUMB:  I can assure you, Mr. Slater, I

4    will be looking for it.

5              MR. SLATER:  I appreciate it.

6              (Counsel conferring.)

7              MR. BALZANO:  Your Honor, it's up on the screen.

8              CHIEF JUDGE BUMB:  Okay.  Do you see what's on the

9    screen?  Here's -- I would like you to highlight as follows, I

10   would like you to highlight the sentence that says, "this is

11   further supported."  I'd like you to highlight that sentence.

12             You passed it.  It's about the seventh or eighth line

13   down.  All right.  Can you read that?  Doctor, read that

14   sentence.

15             THE WITNESS:  Sure.

16             CHIEF JUDGE BUMB:  And then tell me what she is

17   saying.

18             THE WITNESS:  "This is further supported by

19   Dr. White's, Mr. Roberts' hepatologist, note on August 22,

20   2018, contemporaneous with Mr. Roberts' liver cancer diagnosis,

21   that Mr. Roberts had, quote, undergone extensive workup for

22   cirrhosis, and that the workup for cirrhosis is essentially

23   negative."

24             I mean, she's using -- my plain reading of this is

25   that she's using this as support that he was not thought to

```
 1    have cirrhosis.
 2            CHIEF JUDGE BUMB:  The way I interpret it, you tell
 3    me, is this is apples and oranges.
 4            THE WITNESS:  Sorry.  Explain again.  Sorry.
 5            CHIEF JUDGE BUMB:  Yeah.  She makes an opinion that
 6    he had -- that the earliest stages he had cirrhosis in 2016.
 7            THE WITNESS:  Ah.
 8            CHIEF JUDGE BUMB:  Okay.
 9            THE WITNESS:  Right, yes.
10            CHIEF JUDGE BUMB:  And to support that conclusion --
11            THE WITNESS:  Yeah.
12            CHIEF JUDGE BUMB:  -- that's the apple --
13            THE WITNESS:  Right.
14            CHIEF JUDGE BUMB:  -- she relies upon an orange that
15    has nothing to do with 2016 but has to do with he's gotten
16    worked up for his liver diagnosis.
17            MR. SLATER:  Objection.
18            CHIEF JUDGE BUMB:  No.
19            MR. SLATER:  It's a leading question.  It's
20    inappropriate under the circumstances of this hearing, Your
21    Honor.
22            CHIEF JUDGE BUMB:  We're going to take a break, five
23    minutes.
24            THE COURTROOM DEPUTY:  All rise.
25            (Recess was taken at 3:04 p.m. until 3:08 p.m.)
```

*Mahmud, M.D. - Cross - Vaughn*                                    198

```
 1                THE COURTROOM DEPUTY:  All rise.

 2                CHIEF JUDGE BUMB:  Okay.  Dr. Mahmud, is he here?

 3     Okay.  You can be seated.  Thank you.

 4                All right.  So there's an objection by Mr. Slater.

 5     So we're going to move on.  This Court is perfectly capable of

 6     reviewing the report and determining whether or not the opinion

 7     that the expert relied upon is supported by the document that

 8     he or she cites.

 9                It is pretty clear to me that it is not supported by

10     that document, which is what I call an apples-oranges problem,

11     and I can make my own findings.

12                Okay.  Next question.

13                MR. VAUGHN:  All right.

14     BY MR. VAUGHN:

15     Q.   And, Doctor, in that sentence they're talking about his

16     medical history, correct, that he has a history of diabetes, a

17     history of hypertension, a history of central obesity, but his

18     workup previously for cirrhosis was negative.  Could it be read

19     that way?

20     A.   I think if you read the whole sentence in view of what I

21     was saying, it's pretty clear to me what he was saying.  He

22     says, the workup for cirrhosis is essentially negative.

23     However, he has a history of diabetes, hypertension and central

24     obesity.

25                What that means to me as a hepatologist is the blood
```

Mahmud, M.D. - Cross - Vaughn                    199

1    testing looking for other causes of liver disease like

2    hepatitis B, hepatitis C, et cetera, is unremarkable.  However,

3    he has all of these risk factors for MASLD.  What that tells me

4    is he understands this patient has MASH or NASH and that's the

5    reason why there's cirrhosis.

6    Q.   But it's talking about his medical history in this

7    section, correct?

8    A.   Yes.  Well, with respect to the diabetes, hypertension,

9    and obesity, yes.

10   Q.   So you think part of this sentence is about his history

11   but part of it is not?

12   A.   Oh, I see what you're saying.  Yeah, I think he's

13   referring to historic testing and established medical history,

14   yes.

15   Q.   So he's saying historically he was tested for cirrhosis?

16   A.   Yes.

17   Q.   Historically he did not have cirrhosis, but when they

18   looked at the imaging and saw HCC, he did have cirrhosis?

19   A.   That is not how I interpret this.  What I interpret this

20   to mean is historically he has had testing for different types

21   of chronic liver diseases that could help explain why there is

22   cirrhosis.  That is what this means.  And that was

23   unremarkable.

24           However, he has all of these well-established risk

25   factors for NASH.  And the coded language here is basically

1    saying he has NASH cirrhosis.  The rest of the workup for why

2    he would have cirrhosis is unrevealing.

3    Q.   Okay.  Let's go to page 5.

4              CHIEF JUDGE BUMB:  Am I permitted to ask a question?

5              MR. VAUGHN:  Of course, Your Honor.

6              CHIEF JUDGE BUMB:  Okay.  It would seem to me that

7    the word "is" would be "was," under the plaintiffs'

8    interpretation.

9              MR. VAUGHN:  Correct.

10             CHIEF JUDGE BUMB:  Okay.

11             MR. VAUGHN:  Can we go to page 5.  And zoom in on the

12   highlighted as well.

13   BY MR. VAUGHN:

14   Q.   And, again, this is in 2018, his treating liver doctor is

15   saying that the patient is without significant history of liver

16   disease.  Do you disagree with that?

17   A.   If you read the full sentence, it says other than risk

18   factors for NASH cirrhosis.

19   Q.   And risk factors for NASH cirrhosis aren't the same as a

20   diagnosis of NASH cirrhosis, is it?

21   A.   So risk factors for -- as I said, there's no blood test

22   for NASH cirrhosis.  So we make the diagnosis on the basis of

23   compatible risk factors and history.  So this is the way we

24   would basically make a diagnosis of NASH cirrhosis, and that's

25   the reason why it's framed this way.

*Mahmud, M.D. - Cross - Vaughn*                    *201*

1    Q.    And his treating liver doctor says he does not have a

2    significant history of liver disease, correct?

3    A.    Other than the risk factors for NASH cirrhosis, which

4    means he understands the patient has a history of NASH.

5    Q.    Wouldn't he just say that he has NASH cirrhosis, not that

6    he has risk factors for NASH cirrhosis?

7    A.    Well, he does say he has NASH cirrhosis multiple times in

8    the document.  He says very clearly he has NASH cirrhosis.

9    Q.    And Dr. Siddiqui is relying on the parts where he is

10   saying that he only has risk factors, and that's consistent

11   with what she saw as well?

12   A.    My understanding -- so after having reread that portion of

13   her expert statement, I do think she just mischaracterizes what

14   Dr. White understands.  Dr. White clearly understands that this

15   patient has NASH cirrhosis.  It's not really a question to me.

16   It's obvious that he understands this.

17          Dr. Siddiqui using this somehow as a support to imply

18   that the diagnosis of cirrhosis was in question either at this

19   time point or prior is a mischaracterization of what Dr. White

20   is trying to communicate with this phrasing.

21   Q.    In your opinion?

22   A.    Yes, in my opinion, yes, absolutely.  This is -- as I

23   said, as a hepatologist, I might phrase things similarly

24   because I understand that you do a workup for cirrhosis to try

25   to understand why this cirrhosis is there.  When I say that

Mahmud, M.D. - Cross - Vaughn                    202

1    workup is negative, it means that the blood-related testing for

2    other causes is unremarkable.  It doesn't give us an answer.

3    And so you then have to look at what are the other causes of

4    cirrhosis that we don't have a blood test for, including things

5    like NASH.  You then look at the risk factors for NASH, and he

6    clearly outlined the history that Mr. Roberts had, the

7    diabetes, the obesity, the hypertension, to justify this

8    diagnosis of NASH cirrhosis, which he makes very plainly in the

9    assessment.

10   Q.   In 2018.  But he's saying --

11   A.   Yes.

12   Q.   -- his prior workup was negative, and I was trying to

13   figure out why he had cirrhosis in a two-year period, correct?

14   A.   What I'm trying to communicate to you is that I think

15   you're misunderstanding what this phrase of "workup for

16   cirrhosis" means.  It doesn't mean a workup to determine if

17   cirrhosis is present or not.  It's a workup to understand why

18   cirrhosis is there.

19           He doesn't seem to state concretely when he thinks

20   the cirrhosis was diagnosed in this -- in this clinic note,

21   only that it's clearly present at the time of this visit.

22   Q.   And did you review Dr. White's testimony?

23   A.   I don't -- I don't recall his testimony.

24   Q.   And so you don't recall if he actually thought he had

25   cirrhosis in 2016?

1    A.    It's possible I reviewed it.  I don't recall it in detail.

2    Q.    You also performed a FIB-4 calculation you talked about

3    earlier?

4    A.    Yes.

5    Q.    And none of Mr. Roberts' physicians performed a FIB-4

6    calculation, correct?

7    A.    I wouldn't -- I'm not surprised they didn't because it

8    didn't become standard of care really until much later.

9    Q.    And in your deposition I was trying to figure out exactly

10   what this formula is to calculate it.

11   A.    Sure.

12   Q.    And you told me that you thought it was multiplied and

13   then there was a square root in the formula somewhere.  Do you

14   know the actual formula now?

15   A.    I do.  It's clear that it was very important to you that I

16   memorize the formula so I did in advance of today.  It's age

17   times AST all divided by ALT times the square root of the

18   platelet count.

19   Q.    And so as he gets older, the FIB-4 score is automatically

20   going to go up, correct?

21   A.    Yes, the FIB-4 score will go up as someone gets older.

22   It's an enumerator.

23   Q.    And then you used MDCalc.com to do this calculation?

24   A.    For this case, yes.

25            MR. VAUGHN:  Can we go ahead and pull up the MDCalc

*Mahmud, M.D. - Cross - Vaughn*                    *204*

1    website that we have PDFed.  And if we could zoom in on the

2    highlight for "pitfalls and perils of using the FIB-4."

3    BY MR. VAUGHN:

4    Q.    It notes that the FIB-4 was developed in patients with HIV

5    and HCV coinfection.  What is a coinfection?

6    A.    That means the patient has both infections.  They have

7    both hepatitis C and HIV.

8    Q.    And HIV is the precursor to AIDS?

9    A.    It's human immunodeficiency virus, yeah, which can lead to

10   AIDS.

11   Q.    And Mr. Roberts did not have either of those two, HIV or

12   HCV, correct?

13   A.    Correct.

14   Q.    All right.  In your practice, have you ever ran into a

15   radiologist that might use the word "cirrhosis" as opposed to

16   "fibrosis"?

17   A.    Sorry, say it again.

18   Q.    When you're getting a -- a radiologist looks at imaging

19   and you get their report, do radiologists frequently term

20   things as cirrhosis as opposed to fibrosis?

21   A.    I would say if they're commenting on possible cirrhosis,

22   they're more likely to say cirrhosis than the word "advanced

23   fibrosis," yeah.

24   Q.    And so just because a radiologist says cirrhosis in their

25   imaging finding doesn't mean that they actually have cirrhosis,

Mahmud, M.D. - Cross - Vaughn                    205

```
 1   it could also be fibrosis, correct?
 2   A.   Correct.
 3   Q.   And that is consistent with Dr. Siddiqui's opinion,
 4   correct?
 5   A.   I -- my opinion is that Dr. Siddiqui's interpretation was
 6   a little bit overly simplistic because when you're making the
 7   diagnosis of cirrhosis you have to look at not just the imaging
 8   but other clinical features and scores, such as the FIB-4
 9   score, to help interpret the imaging properly.
10   Q.   As far as that 2016 imaging, you didn't speak to that
11   radiologist, the treating radiologist, correct?
12   A.   Did I speak to the treating radiologist?
13   Q.   Correct.
14   A.   Like personally?
15   Q.   Yeah.
16   A.   No.
17   Q.   And his deposition wasn't taken in this either, was it?
18   A.   I don't -- I don't believe so.  I believe Dr. Lockhart, I
19   think, had a deposition taken, but he was from UAB.  So as far
20   as I recall, I don't think that treating radiologist was
21   deposed.
22   Q.   And you testified earlier dose response for NDMA is
23   expected in all the animal studies that have been done,
24   correct?
25   A.   Yes.  I believe it's been demonstrated in a lot of the
```

1    animal studies.

2    Q.    And that means as you give them more NDMA, they have a

3    higher risk of getting cancer, correct?

4    A.    Yes, generally.

5    Q.    And the same is observed in the human studies where it

6    might be with food, when they're getting more NDMA through

7    their food, they have a higher risk of cancer, correct?

8    A.    I mean, I think the nutrition and kind of environmental

9    exposure, food exposure literature, they're biased in a whole

10   host of other ways, you know, separate from the

11   pharmacoepidemiology studies on NDMA and valsartan in humans.

12   So I think you have to be very cautious in making a concrete

13   statement that there is a dose-response effect in that.

14   Q.    But they do show a dose response, right?

15   A.    Yes, I believe some of them did show dose response.

16   Q.    And that's in humans?

17   A.    Yeah.

18   Q.    And in the study Hidajat where they're also exposed to

19   NDMA this time through the air --

20   A.    Yeah.

21   Q.    -- you also see a dose response in humans, correct?  More

22   NDMA, higher levels of cancer, correct?

23   A.    Again, I think you have to really be -- you have to caveat

24   these a little bit because, like, in the Hidajat study, for

25   example, these are workers in rubber factories, they're not

1    exposed only to NDMA.  They're exposed to a whole host of

2    different toxins and rubber fumes and things like this.  So you

3    can't just make a blanket statement that there is a

4    dose-response effect with NDMA because the exposure is not well

5    classified.

6    Q.   But there was a dose response observed there as well?

7    A.   Sure.  There is a dose response in the very imperfect way

8    that exposure was classified.

9    Q.   A dose response has been exhibited with NDMA in every

10   organism it's been studied in, correct?

11   A.   If -- if you are -- yeah.  I guess if you're saying that

12   those studies constitute sufficient evidence of dose response

13   in humans, then, sure, but I would argue that point.

14         CHIEF JUDGE BUMB:  What part?  The sufficient

15   evidence?

16         THE WITNESS:  Yeah, in humans, yeah.  I would argue

17   that I don't think those studies are really specific enough or

18   with the exposure of NDMA, I don't think it's classified well

19   enough to really demonstrate conclusively that there is a dose

20   response.

21         But I agree, in those studies they report, you know,

22   odds ratios that move in a dose response type of way with the

23   way that they claim NDMA was classified.

24   BY MR. VAUGHN:

25   Q.   And no one can actually do a study on humans giving them

1   NDMA to see if there's a dose response, correct?

2   A.   It would probably be unethical to do a randomized

3   controlled trial on that, yes.

4   Q.   And why is that?

5   A.   Because it is -- it -- you know, it's regarded to be a

6   potential carcinogen.  It's something that may potentially

7   carry risk.

8   Q.   A probable carcinogen?

9   A.   Probable carcinogen, sure.

10  Q.   Can you name any organism -- they can do these studies in

11  animals or organisms that aren't humans, correct?

12  A.   Yeah, in animals, yes.

13  Q.   Can you name any organism they've done an NDMA study on

14  and there was not a dose response?

15  A.   Not that I can think of.

16  Q.   Okay.  And then you criticize the Gomm and Mansouri

17  studies that find an increased risk of liver cancer because

18  there is no dose response, correct?

19  A.   I have more criticisms than just that, but that is -- that

20  is a criticism, yes.

21  Q.   Based on how they designed that study, would you expect it

22  to be able to observe a dose response?

23  A.   I mean, I think these studies have many sources of

24  potential bias.  Based on the way they designed the study, they

25  could have observed a dose response potentially.  I mean, if

*Mahmud, M.D. - Cross - Vaughn*                    *209*

1    the claim is that they adequately classified the exposure of

2    NDMA and that patients stayed exposed to NDMA throughout

3    follow-up, then, sure, I mean, you would have expected that

4    there would be a dose response if there was truly a causal

5    relationship between NDMA and liver and HCC in humans.

6              So they could have, I think, but they didn't, which

7    casts doubt on the study.

8    Q.   Were they measuring the amount of NDMA that people were

9    exposed to?

10   A.   They did not precisely measure the amount of NDMA.

11   Q.   Then how could you have a dose response if they're not

12   measuring the dose?

13   A.   But they -- they measure the dose of the drug, right, so

14   like the valsartan itself.  So --

15   Q.   We're not alleging valsartan is causing cancer, correct?

16   A.   Yeah, I understand.  I understand.

17             And this point was extremely convoluted with, I

18   think, Dr. Siddiqui this morning as well.  But honestly, this

19   whole line of questioning, in my view, just kind of speaks to

20   the major limitation of the study is that we don't really know

21   how much patients were really exposed to in terms of the NDMA

22   itself.  It was impossible to characterize that in these

23   studies.  We don't know.  And they really only classified it at

24   an initial time point.

25             So during the course of follow-up, some patients who

Mahmud, M.D. - Cross - Vaughn                    210

1    might have received a contaminated version of valsartan, they

2    might have later stopped taking it, they might have switched to

3    a different medication that was not contaminated and vice versa

4    for the unexposed group.  There is a huge problem of exposure

5    misclassification in this study.

6             What I'm saying is that theoretically if they had

7    captured exposure well, you would expect to see a dose-response

8    effect if there was a causal link between NDMA and HCC in

9    humans, and they didn't see it.

10   Q.   If they were able to capture how much people were exposed

11   to, but they weren't able to actually capture that, correct?

12   A.   Yes.  But my point is the fact that they can't accurately

13   capture it is a major flaw in the study.  It's a huge weakness

14   in the study.

15   Q.   There's still a statistically significant increased risk

16   of cancer even though they're not doing it by dose, correct?

17   A.   That, yes, they report that, yes.

18   Q.   And so if there would be a dose response as you would

19   expect with every organism, whoever was taking the highest

20   levels of NDMA, you would expect to be at the highest risk,

21   correct?

22   A.   Yeah, in animal studies, sure.  In animal studies it's

23   been quite clearly demonstrated there's likely a dose response.

24   So, yes, if you give an animal extraordinarily the highest tier

25   dosing of NDMA, then, yeah, you expect more adverse event

Mahmud, M.D. - Cross - Vaughn                     211

1    rates.

2    Q.    Do you believe that all the pills have the same amount of

3    NDMA in it by the different manufacturers?

4    A.    No, I don't believe so.

5    Q.    Do you agree that a ZHP or Prinston 40-milligram pill

6    could have more NDMA in it than another manufacturer's

7    320-milligram pill?

8    A.    Yeah, I think in theory that's possible, yeah.

9    Q.    And so if they were only measuring the milligram of

10   valsartan, that's not going to adequately capture how much NDMA

11   they are exposed to, correct?

12   A.    Yeah, I agree.  I agree that can't accurately capture it.

13   But I don't think that's an explanation for why you don't

14   observe a dose response, because that would imply that some --

15   because patients in the higher dosing tier were systematically

16   exposed to less NDMA, which doesn't make any sense.  You would

17   expect that these things would, to some extent, be a little bit

18   randomly allocated.  And so you'd still see that on average

19   patients exposed to a higher dose category, you still might

20   expect that there would be more exposure to NDMA overall.  So I

21   don't really find that compelling.

22          And I think the way Dr. Siddiqui talks about this

23   study in particular with this dilution effect, the fact some

24   patients may have switched off the medication, it really just

25   exposes her bias in interpreting this study; because if

1    patients were perfectly exposed, we don't know which way the

2    association would have gone.  She has this assumption that it

3    would have been a higher risk.  She says this over and over

4    again that this dilution effect underestimated the

5    statistically significant association, which really is an

6    extraordinarily biased way to look at a study.  So I take a

7    huge issue with that as a clinical epidemiologist.

8         So I have to like put that point in there because

9    it's directly related to this, but I think I'm looking at this

10   in an unbiased way as a data scientist and a clinical

11   epidemiologist, and I really don't think that the plaintiff

12   position is doing so.

13   Q.   You earlier testified you're not a basic scientist,

14   correct?

15   A.   Correct.

16   Q.   And this peer-reviewed study did find a statistically

17   significant increased risk of liver cancer for people that were

18   ever exposed to contaminated valsartan regardless of the amount

19   of NDMA, correct?

20   A.   Correct.

21   Q.   And with any other organism, you would expect more NDMA,

22   more cancer?

23   A.   Sure, yeah.  Outside humans, yes.

24   Q.   Okay.  And as far as the levels of NDMA in the pills, do

25   you know which company had the highest level of NDMA in their

 1    pills?

 2    A.    I would imagine it may have been ZHP, Prinston.

 3    Q.    And do you know what pills Mr. Roberts took exclusively?

 4    A.    I believe it was those pills.

 5    Q.    And so he took the highest levels the entire time, right?

 6    A.    Yes.

 7    Q.    Okay.  You were talking about obesity being a risk factor

 8    for liver cancer without it needing to go through cirrhosis,

 9    correct?  Can you explain the mechanism of action of how

10    obesity is going to cause liver cancer without causing

11    cirrhosis?

12    A.    So I can give you -- so a general principle -- so I can't

13    give you like an explanation down to the level of what a cancer

14    biologist might be able to provide, but I can give you a

15    general understanding.

16            Things that cause inflammation in general tend to be

17    associated with an increased risk of cancer.  Inflammation is

18    associated with an increased risk of DNA damage as cells

19    replicate.  As you accumulate these DNA mutations, there's an

20    increased risk of ultimately developing the right constellation

21    of mutations that accumulate and then turn into cancerous cells

22    that will replicate basically without any checks.  They'll keep

23    replicating without end, essentially, which is what cancer is.

24    Cancer is inability to stop cell replication.  So things that

25    cause inflammation are associated with this process.

1          And so in patients who have, let's say, Class 1

2    obesity, we know very well that patients who have -- the more

3    obesity you have or the higher the BMI you have, the more fat

4    goes into liver.  Your liver doesn't like there to be fat

5    there.  That causes inflammation in the liver, and it's very

6    consistent in literature and in clinical practice where if you

7    have someone that gains weight, more fat goes into the liver

8    and we see more evidence of inflammation and damage in the

9    liver.  Their ALT and their AST will go up if they gain weight.

10   Likewise, if they lose a lot of weight, the fat will leave the

11   liver, the ALT and AST will go down, inflammation goes down, so

12   it tracks extremely closely with this.

13         So it's very logical that when going from Class 1

14   obesity to Class 2 obesity to Class 3 obesity, more fat is

15   entering into the liver with each one of those progressive

16   phases, that causes more inflammation, thus increasing the risk

17   of DNA mutations and eventual development of cancer.  That's

18   the basic principle.

19   Q.   Does that inflammation not also cause cirrhosis?

20   A.   Inflammation leads to scarring as well which ultimately

21   can lead to cirrhosis, absolutely, yeah.

22   Q.   Earlier you testified that cirrhosis has an annual

23   incidence rate of 1 to 2 percent for HCC, correct?

24   A.   I believe I said 1 to 8 percent in my expert testimony,

25   and in Dr. Siddiqui's testimony she says 2 to 4 percent.

 1   Q.   And that's an annual incidence, correct?

 2   A.   Correct.

 3   Q.   That doesn't mean that you can get cancer one year after

 4   being diagnosed with cirrhosis.  That's just saying out of

 5   everybody that has cirrhosis, a couple -- a percentage will get

 6   cancer a year, correct?

 7   A.   What it means is if you follow 100 people with cirrhosis

 8   for one year, between 1 and 8 of them will develop a cancer.

 9   Q.   But that's not saying that someone's getting cancer a year

10   after being diagnosed with cirrhosis?

11   A.   It's saying exactly what I said.  It's saying that if you

12   have -- if you take 100 people that are newly diagnosed with

13   cirrhosis and you followed them for a year, between 1 and 8 of

14   them will develop a liver cancer.  So you can absolutely -- and

15   patients do all the time develop a liver cancer in the course

16   of one year.  That's why I keep coming back to emphasize the

17   screening guidance.  That's the whole reason why we start

18   cancer screening the moment we identify cirrhosis, because

19   there's a sufficiently high risk that liver cancer can develop

20   even over the time course of six months.

21   Q.   But an annual incidence rate does not tell you how quickly

22   someone can go from cirrhosis to liver cancer, correct?

23   A.   An annual incidence rate is giving you -- I'm not -- I

24   think we're crossing paths here on this a little bit.  It is

25   communicating to you the aggregate risk of developing a liver

1    cancer.  It's not telling you precisely, you know, what is the

2    time that one patient is going to go from cirrhosis to

3    developing a liver cancer.  It's telling you on average, if you

4    look at 100 patients in a year, 1 to 8 of them will get a liver

5    cancer.  I don't know precisely when during that year that

6    cancer may have, you know, actually developed or been

7    identified, but that's the general progression.

8              And so if you follow, you know, the remaining, you

9    know, 92 percent -- 92 patients for another year, another 1 to

10   8 percent of them are going to develop a liver cancer and so on

11   and so forth.  That's the way that these statistics work.

12   Q.   But the annual incidence rate is not looking at just newly

13   diagnosed cirrhosis, correct?

14   A.   It's -- you're right.  It's looking -- it depends on the

15   study, I'll say.  There are some studies that look at incidence

16   cirrhosis.  But, yes, there are other studies that look at just

17   aggregate patients who carry a diagnosis of cirrhosis and you

18   follow them for a period of time and then you compute what is

19   the incidence rate and then you report that and scale it to one

20   year.

21             MR. VAUGHN:  No further questions.

22             CHIEF JUDGE BUMB:  Do you have any redirect?

23             MR. BALZANO:  No further questions.

24             CHIEF JUDGE BUMB:  Before the witness leaves,

25   Mr. Vaughn, please tell me -- hang on one second.

*Mahmud, M.D. - Cross - Vaughn*                    *217*

```
 1              THE WITNESS:  Oh, I'm sorry.
 2              CHIEF JUDGE BUMB:  Because I may have a question for
 3    you.
 4              Tell me how in your brief you can say that
 5    Mr. Roberts was never diagnosed with NASH.
 6              MR. VAUGHN:  Excuse me?
 7              CHIEF JUDGE BUMB:  In your brief, you state that
 8    Mr. Roberts was never diagnosed with NASH.  Can you explain
 9    that?
10              MR. VAUGHN:  Yeah.  It was our understanding talking
11    to Dr. Siddiqui that he had not had a formal diagnosis of NASH.
12              CHIEF JUDGE BUMB:  Well, I'm looking at the report,
13    which has caused somewhat of a commotion.
14              MR. VAUGHN:  Understood.  When I had talked to
15    Dr. Siddiqui, she had --
16              CHIEF JUDGE BUMB:  Well, can I finish my question?
17              The diagnosis, again, I'm not a physician, but I
18    certainly can read it, "Mr. Roberts is a 62-year-old male NASH
19    cirrhosis, and two hepatic lesions with total tumor diameter
20    10.8 centimeters in the setting of cirrhosis and elevated AFP,
21    concerning for HCC."
22              Now, unless there's an objection, I'll ask the
23    following question:  If someone is diagnosed as a male NASH
24    cirrhosis, is that someone being diagnosed with NASH?
25              THE WITNESS:  Yes.
```

```
 1                MR. VAUGHN:  My understanding is that that is

 2    tracking what is in prior medical records and it's carrying

 3    over for what they see, and he does not have a formal diagnosis

 4    of NASH.  And that's why in 2018 they're saying that he has

 5    risk factors for NASH.

 6                CHIEF JUDGE BUMB:  You could step down.

 7                THE WITNESS:  Sure.  Thank you.

 8                CHIEF JUDGE BUMB:  Thank you.  You're excused.

 9                (Witness excused.)

10                CHIEF JUDGE BUMB:  Okay.  Our next witness.

11                In case it's not clear to the parties, I am very

12    troubled, so we're going to have a conversation when we finish

13    with the testimony today.

14                (Witness took the stand.)

15                CHIEF JUDGE BUMB:  Okay.  Afternoon.

16                THE WITNESS:  Afternoon.

17                MS. ROSE:  Your Honor, I'd like to call Dr. Andrew

18    Thompson.

19                CHIEF JUDGE BUMB:  Okay.

20                THE COURTROOM DEPUTY:  Doctor, can you please place

21    your left land on the Bible and raise your right hand.

22                Do you solemnly swear the testimony you're about to

23    give in the case now before this Court will be the truth, the

24    whole truth, and nothing but the truth, so help you God?

25                THE WITNESS:  Yes, I do.
```

*Thompson, Ph.D. - Direct - Rose*                    219

```
 1          ANDREW S. THOMPSON, Ph.D., called as a witness for the

 2     Defendants, having been first duly sworn by the Deputy, was

 3     examined and testified as follows:

 4               THE COURTROOM DEPUTY:  Can you please state and spell

 5     your full name for the record.

 6               THE WITNESS:  Andrew S. Thompson.  A-N-D-R-E-W, S.

 7     T-H-O-M-P-S-O-N.

 8               THE COURTROOM DEPUTY:  Thank you.

 9               CHIEF JUDGE BUMB:  Okay.  Have a seat; make yourself

10     comfortable.  Please keep your voice up.  There's water in the

11     pitcher if you should need it.

12               THE WITNESS:  Okay.

13               MS. ROSE:  Your Honor, may I approach with the

14     slides?

15               CHIEF JUDGE BUMB:  Yes.

16               MS. ROSE:  Thank you.

17                         DIRECT EXAMINATION

18     BY MS. ROSE:

19     Q.   Good afternoon, Dr. Thompson.  How are you?

20     A.   Good.  Good afternoon.

21     Q.   Could you please introduce yourself to the Court.

22     A.   Yeah.  I'm Andrew S. Thompson.  My expertise in this case

23     will be organic chemistry.  I have a Ph.D. in organic chemistry

24     and 38 years' experience in the pharmaceutical industry and API

25     synthesis.
```

*Thompson, Ph.D. - Direct - Rose*                    220

1    Q.   And I'm just going to run very, very quickly through your

2    educational background because you've said most of it, but

3    could you just let us know your academic background.

4    A.   Yeah.  So pretty briefly, I mean, I went to the State

5    University of New York at Buffalo where I obtained a bachelor's

6    degree.  My major was org chemistry.  I have a Ph.D. from

7    University of Pennsylvania right here in Philadelphia.  That's

8    also in organic chemistry, organic synthesis.  I obtained that

9    Ph.D in 1985.  And then I was an NIH postdoctoral fellow from

10   1985 to 1987 at the University of California Irvine.

11   Q.   Dr. Thompson, after you completed your postdoctoral

12   fellowship, where did you begin working?

13   A.   So I started my professional career at Merck Research

14   Laboratories in Rahway, New Jersey.  I was a process chemist.

15   Q.   And how long did you work at Merck?

16   A.   So I was there -- I worked there for nine years as a

17   process -- in the process group, in the department of process

18   research.  I was there for nine years.

19   Q.   And what were your responsibilities at Merck?

20   A.   So our responsibility in that group was to define and

21   implement the optimum route of synthesis for Merck's APIs,

22   active pharmaceutical ingredients, and we also defined the

23   impurity profiles.

24   Q.   And for all of our benefit, we're not chemists, what is a

25   route of synthesis?

*Thompson, Ph.D. - Direct - Rose*                    221

1    A.   So the route of synthesis is the actual steps you take

2    synthetically to put a molecule together.  You start with

3    building blocks, you do the chemistry to make the chemical

4    bonds, you come up with a final API.  Those steps you use to

5    make the bonds, build a structure, that's the route of

6    synthesis.

7    Q.   And why did you leave Merck?

8    A.   I wanted to start my own company.

9    Q.   And did you start your own company?

10   A.   Yes, I did.

11   Q.   What was it called?

12   A.   J-STAR Research, Inc.

13   Q.   And where is J-STAR located?

14   A.   So J-STAR, initially I was located in an incubator at NJIT

15   campus in Newark, then we moved to South Plainfield, and then

16   when I was acquired in 2017, we moved the headquarters to

17   Cranbury, New Jersey.  But we have two sites now.  One's in

18   South Plainfield and one's in Cranbury, New Jersey.

19   Q.   And what was your title at J-STAR?

20   A.   I was the president and CEO.

21   Q.   And was that your title throughout your time at J-STAR?

22   A.   Yes, it was.  I never got promoted.

23   Q.   What was J-STAR's mission?

24   A.   So the mission for J-STAR was modeled after my experience

25   at Merck.  So we were going to do the same exact work, we were

*Thompson, Ph.D. – Direct – Rose*                    222

1   going to define the optimum route of synthesis for customers,

2   usually small companies, we were going to define their optimum

3   route of synthesis.  We were going to define the impurity

4   profile.  We would develop the analytical methods, and we would

5   prepare an API.

6   Q.   And what was your role in particular at J-STAR?

7   A.   So since I was the president and founder, I was the person

8   who decided what the mission statement of the company would be,

9   what people would see when they looked at J-STAR, what do we --

10  what services do we offer?  What is our -- what do we do?  So I

11  defined that, and then I hired the people and put the groups

12  together to become what the mission statement was.  So I ran

13  the company.

14  Q.   And what were the two main process groups at J-STAR?

15  A.   So there was -- we needed a group to prepare the active,

16  well, a process group to develop the route of synthesis and

17  then prepare the material.  That was the material synthesis

18  group.  And then we had an analytical group to develop and

19  validate the analytical methods and do release testing, and in

20  that analytical group we had a subgroup, which I call the

21  impurity isolation and identification group.

22  Q.   And did you oversee both of those groups --

23  A.   Yes, I did.

24  Q.   -- at J-STAR?

25       And how many employees worked for you at J-STAR?

1    A.    So at the time of my retirement in 2023, there was about

2    150 employees there, and about 70 of them were process

3    chemists.

4    Q.    And you oversaw those process chemists?

5    A.    Yes, I did.  It was either me directly or people that

6    reported to me, but ultimately they all reported in to me.

7    Q.    And I won't go over all of your many publications, but I

8    just want to talk about over the course of your almost 40 years

9    working in pharmaceutical process -- as a pharmaceutical

10   process research chemist, how many API products did you help

11   develop?

12   A.    So I would say at least 250 active pharmaceuticals.  We

13   developed the route of synthesis and defined the impurity

14   profile for at least 250 APIs.  I honestly lost count, but it's

15   at least 250.

16   Q.    And do you have any patents related to API?

17   A.    Yes, I do.  There's 30 -- at least 33 U.S. patents because

18   I'm named as an inventor on those patents.

19   Q.    Dr. Thompson, do you know what nitrosodimethylamine is?

20   A.    Yes, I do.

21   Q.    And that's also known as NDMA, correct?

22   A.    Correct.

23   Q.    Can you tell me what NDMA is?

24   A.    So briefly, it's a small molecule.  It's got a nitrogen

25   atom at its center.  Bonded to that nitrogen atom are two

Thompson, Ph.D. - Direct - Rose                        224

1    methyl groups.  That is the dimethyl part of the name.  And

2    then also bonded to that nitrogen is a nitroso group, N double

3    bond O.  So it's got one nitrogen in the center, two methyl

4    groups and a nitroso group.  That's the chemical structure of

5    NDMA.

6    Q.   Dr. Thompson, were you aware of NDMA before you became

7    involved in this litigation?

8    A.   Yes.  I became aware of it as a result of the valsartan

9    recall.  That's when I first -- in 2018.  That's when I first

10   became aware of NDMA.

11   Q.   Prior to the valsartan recall while either at Merck or

12   J-STAR, did you ever evaluate API for the presence of

13   nitrosamines?

14   A.   No, I did not.  And I didn't know anybody else who did.

15   Q.   And prior to the valsartan recall while at either Merck or

16   J-STAR, did you evaluate API for NDMA specifically?

17   A.   No, I did not.

18   Q.   After the valsartan recall, did your job require you to be

19   knowledgeable about NDMA and how it forms?

20   A.   Yes, it did.

21   Q.   And why?

22   A.   So I was a contract lab and I had to go out and talk to

23   people about their projects and I had to understand their needs

24   and make sure we could address them.  At the time of the

25   valsartan recall, the issue of nitrosamines and NDMA dominated

*Thompson, Ph.D. - Direct - Rose*                    225

1    what people were interested in in the industry.  In order for

2    me to be competitive when I talked to customers, in order for

3    me to convince them that we were a viable company to send their

4    project to, I had to be knowledgeable about this -- the whole

5    NDMA issue, how they formed, what our risk mitigation

6    strategies would be.  I had to be very knowledgeable in that

7    area because I was getting grilled by customers every time I

8    went out on the road.

9    Q.   And what did you do to educate yourself regarding NDMA and

10   nitrosamines?

11   A.   So I read the literature.  I talked with people about it.

12   I read the press releases from the FDA.  We had meetings

13   internally about it.  I talked with my analytical people about

14   what we were going to do.  I learned as much as I could.

15   Q.   Dr. Thompson, I want to talk a little bit about your role

16   in this specific case.  What was your assignment in this case?

17   A.   So I was -- my role in this case is to respond to the

18   expert testimony of Drs. Hecht and Najafi regarding the state

19   of knowledge around nitrosamine impurities in active

20   pharmaceutical ingredients prior to 2018.  And also, I'm also

21   tasked with providing some knowledge about the API synthesis in

22   the pharmaceutical industry with regard to nitrosamine

23   impurities prior to 2018.

24   Q.   And did you review the expert reports and deposition

25   testimony of Drs. Hecht and Najafi?

1    A.    Yes, I did.

2    Q.    And did you form any opinions in response to what they

3    said?

4    A.    Yes.  I mean, do you want to talk about the methodology at

5    all?

6    Q.    Yeah.  Well, sure.  We'll get there.

7    A.    Yeah.  Just briefly, on the methodology, so I reviewed

8    their reports.  I reviewed their deposition testimony.  I

9    reviewed the literature they cited.  I used my experience in

10   the industry.  I then looked at what they wrote.  I decided if

11   it was -- I would evaluate it if it was scientifically sound

12   what they were saying, if they were following a timeline

13   logically, if what they were saying jibed with my experience in

14   the industry.  So that was the methodology I used.

15            And, you know, in particular what I was looking for,

16   since I had not encountered a nitrosamine impurity in an API

17   prior to 2018, what I was looking for is some scientifically

18   sound reason why the plaintiffs' experts expected ZHP to be

19   looking for nitrosamine impurity in API when nobody that I knew

20   had ever encountered one, yet the experts were saying they

21   really should be looking for that, everybody was looking.  So I

22   was looking for some scientifically sound rationale for why

23   they expected ZHP to be looking for nitrosamines prior to 2018.

24   Q.    And after reviewing Drs. Hecht and Najafi's reports and

25   deposition testimony, did you disagree with any of the opinions

*Thompson, Ph.D. - Direct - Rose*    227

1    that they offered?

2    A.    Yes, I disagreed with almost every opinion that they

3    offered.

4    Q.    All right.  Well, let's just talk about the key opinions

5    that Drs. Hecht and Najafi offered that you have a disagreement

6    with.

7    A.    Okay.  So this will be a high level and then we'll go into

8    it in more detail further on.

9        So they stated in black and white that chemists in

10    the pharmaceutical industry were -- should expect nitrosamines

11    to be present.  They're well known.  You should expect them to

12    be present.  You're required to test for them prior to 2018.

13    They said that in black and white.

14        They said that ZHP should have used GC-MS, which is

15    not the standard.  Residual solvent test, they should have been

16    using that.  They never explained why they didn't use that

17    method.  There was existing methods, and ZHP should have been

18    using that.  So I didn't agree with that.

19        They said that the use of DMF solvent would have

20    alerted any reasonable chemist to the possibility of NDMA

21    formation.  And I disagreed with their conclusions of the

22    July 27, 2017 email.

23    Q.    All right.  Well, as you said, we're going to go in some

24    more depth through each of those opinions.

25        I want to talk first about Drs. Hecht and Najafi's

*Thompson, Ph.D. - Direct - Rose*                    228

1   opinions that NDMA was not unexpected in API prior to 2018.

2   A.    Yeah.  So that's the wording, "it was not unexpected."

3   That's what the wording in Najafi's testimony was.

4   Q.    And do you disagree with that statement?

5   A.    I disagree with that.

6          So they never -- they never provided a literature

7   example of a nitrosamine or NDMA being found in an API prior to

8   2018.  They never provided one example like that.

9          All the guidance that they cited that was

10  specifically around nitrosamines, all of that guidance came out

11  after ZHP had stopped working on the project and submitted the

12  amendment and it was approved.  So there was no guidance that

13  was cited -- no FDA guidance from the 2012-2013 time frame.  It

14  was all post 2018.  That was the guidance.

15         Their statements were, you know, inconsistent with

16  what I knew about the industry, really.  So when I read what

17  they wrote, when I evaluated it, what appeared to me, what it

18  seemed to me was they took the answer, right, this is the

19  answer we got after the recall, there's NDMA in the batch,

20  right?  And that changed how the industry operated, right?

21  Everybody knew about NDMA at that point.  Everybody was looking

22  for -- you were required to look for it after the recall.  So

23  they took that industry knowledge and standard operating

24  procedures and they applied it retroactively to ZHP.  So in

25  their opinion, ZHP should have operated in 2012-2013 time frame

Thompson, Ph.D. - Direct - Rose                    229

1    under conditions that came out in post 2018.

2           So it was not logical from a time frame that somebody

3    would be expected to operate in 2012 on guidance that came out

4    after 2018.  That was not logical to me.

5    Q.   And did you consider FDA statements --

6    A.   Oh, yeah.

7    Q.   -- when you were --

8    A.   So now -- so it was -- these are the -- these are in

9    addition to my experience of never having encountered NDMA or

10   nitrosamine contamination prior to 2018, there were statements

11   coming out from the FDA, it's not just me saying it, right,

12   it's statements coming out from the FDA.  And here's a typical

13   one.  This is July 13, 2018.  This is about a month after they

14   first found out about it.  "The presence of NDMA was

15   unexpected."

16          This is a black -- this is not a subtle disagreement.

17   This is not, you know, slight.  This is a black and white, you

18   know, contradiction to what Najafi and Hecht were saying.  This

19   is a black and white contradiction, okay.  Here's another one.

20   Q.   And did the FDA say anything else that you believe

21   contradicted Hecht and Najafi?

22   A.   Yeah.  So the FDA -- I'll read this because we'll come

23   back to it later, but here's another press release.  So this is

24   not guidance, these are press releases, things for the public

25   to consume, not that an expert would need to -- you wouldn't

Thompson, Ph.D. - Direct - Rose                    230

1    need an expert, this is for the public.  And this is the FDA's

2    statement now.  Chemists, this is from chemists at the FDA.

3    "Before we undertook this analysis, neither regulators nor

4    industry fully understood how NDMA or NDEA could form during

5    this particular manufacturing process."

6              And they mentioned that it was not easy to detect.

7    So this is the FDA again saying they didn't understand -- this

8    is -- now they've had months.  This is January 2019.  They've

9    had six or seven months to look at the process and they're

10   saying, you know, they really still don't quite understand how

11   it could happen.

12             So these, you know, these statements that chemists

13   should have been looking, they should have known, this is,

14   again, it's directly contradicted by this statement.  Nobody

15   was aware of nitrosamine contamination in API prior to 2018.

16   Q.   And, Dr. Thompson, are these statements that NDMA was

17   unexpected within the industry prior to 2018, is that

18   consistent with your experiences working in the development of

19   API during that time?

20   A.   No, that's not consistent with my experience at all.  In

21   my experience, and this is at Merck and this is at J-STAR and

22   this is all the customers that I talked to, no one was

23   mentioning nitrosamine impurities prior to 2018, not a single

24   person.

25   Q.   And I think maybe we got our wires crossed.  My question

Thompson, Ph.D. - Direct - Rose                    231

1    was actually about the FDA's statements, whether the FDA

2    statements that neither regulators nor industry understood or

3    expected the formation of NDMA prior to 2018.  Is that

4    consistent with your experience as a process chemist working in

5    the industry?

6    A.   Yes, it is.

7    Q.   And to clarify, Dr. Thompson, are you offering any

8    opinions as a regulatory expert?

9    A.   No, I'm not.

10   Q.   What is your expertise in the area of?

11   A.   So my expertise is organic chemistry.

12   Q.   And in what manner are you responding to Drs. Hecht and

13   Najafi?

14   A.   I'm responding as an expert on organic chemistry.  I'm

15   responding to their opinions about the state of knowledge of

16   nitrosamine impurities in API prior to 2018.

17   Q.   Well, let's talk about another opinion offered by Hecht

18   and Najafi, Drs. Hecht and Najafi, that you said you disagreed

19   with.  And that was the opinion that there was a validated

20   method to identify NDMA in drug substance prior to 2018.

21   A.   Yes.  Actually, it was a little more than that.  Because

22   in the testimonies of both Hecht and Najafi, they said

23   repeatedly, in repeated sections, ZHP should have been using

24   GC-MS.  Are we going to the next slide?

25   Q.   Oh.

1    A.    Yeah.  Okay.

2    Q.    They're your slides, so I'll keep up with you.

3    A.    So they said repeatedly:  ZHP should have been using

4    GC-MS.  You know, there was a GC-MS method in the literature,

5    they were in the literature, they should have been using it.

6    They never explained why they didn't use GC-MS.  They said that

7    repeatedly throughout their testimony.

8          Now, GC-MS is not the method that anybody uses or

9    that very few people use for residual solvents release testing.

10   Nobody uses GC-MS.  So they never really provided -- there was

11   another case where they never provided a scientifically sound

12   reason why they expected ZHP to be using GC-MS for residual

13   solvents analysis.  Not really being used.  It wasn't the

14   standard test.  It wasn't in the USP monograph.  And there was,

15   contrary to what they said, there was no validated GC-MS method

16   for detecting nitrosamines in API prior to the valsartan

17   recall.

18   Q.    And, Dr. Thompson, just to take it back a second for

19   myself and the other nonchemists, what is GC-MS testing?

20   A.    So GC-MS, that's an acronym, right, so GC slash -- it's

21   gas chromatography/mass spec.  And so gas chromatography is a

22   separation technique.  You inject a mixture of compounds onto a

23   column.  You push with an inert gas.  Those compounds move

24   through the column at a different rate based on their molecular

25   weight, so they separate.  It separates the mixture of

1    compounds into the individual compounds.  And then you detect

2    them.  At the other end of the column there's a detection

3    method.  In this case it would be detection by the mass spec,

4    by molecular weight.

5            FID detects by burning.

6    Q.   So just sticking on GC-mass for a second, at some point

7    was there a GC-MS test method developed to specifically test

8    for NDMA?

9    A.   Yeah.  And so you could see in this, this is an August 30,

10   2018 press release from the FDA, and this is -- they had the --

11   this was done at the best research center in St. Louis, the

12   best FDA research center in St. Louis.  They say they have now

13   developed a GC-MS headspace method for testing for

14   nitrosamines.

15           So contrary to the testimony of Hecht and Najafi that

16   there was methods out there readily available, off the shelf,

17   take them and use them, there was no method.  It was only at

18   this point in 2018 -- really if there was a method, considering

19   the severity of this problem, the FDA would have told everybody

20   use such and such a method we found in the literature, but

21   there was no method.  The FDA had to develop it.  And when they

22   developed it, they put out a press release that it's now

23   available.  That was when it became available, not prior to

24   that.

25   Q.   Just to clarify, Dr. Thompson, in your experience as a

1    process chemist working in the industry, are you aware of a

2    validated method to test for NDMA that was available prior to

3    2018?

4    A.    No, I am not.

5    Q.    Okay.  And then you mentioned GC-FID.  Can you tell us

6    what that is?

7    A.    Yeah.  GC-FID is the standard bearer test method for

8    residual solvent analysis release testing in API, standard

9    bearer method.  It's the USP method.  So in this, the USP, it

10   lists the impurity profiles and the tests and test methods you

11   would use to release test in API.  So in this case it's a

12   standard method.  It's called USP No. 467.  It's a GC-FID

13   method.  It's the standard residual solvents method that

14   everybody uses, 99 percent of the people, 99.9 percent of the

15   compounds in the USP monograph use for release tests, for

16   residual solvents testing for release testing of an API.  It's

17   the method.

18          To expect somebody to use a different method other

19   than what's in the USP for their compound, for valsartan, is

20   unreasonable.

21   Q.    And you mentioned the term "residual solvent testing."

22   What is that?

23   A.    It's residual solvent.  So these APIs are always a powder,

24   right, a solid, powder, but they come out of a solvent, they

25   come from a liquid.  They're dissolved in a liquid.  You boil

*Thompson, Ph.D. - Direct - Rose*                    235

1    off the liquid or you crystallize out from the liquid and you

2    isolate a solid and dry it.  But you never get the solvents off

3    completely.  There's always some residual solvent, and there

4    are specs on that.  So you have to test.  And you really want

5    to test for all the solvents that you used probably for the

6    last four steps of the synthesis to see how many have carried

7    over, to make sure they're within the right specifications.

8    Otherwise you can't release the API.  So you need to test.

9    Those are the residual solvents that don't fully evaporate

10   away.  They're usually below a half a percent.

11   Q.    And so in order to test API, you need to perform residual

12   solvent testing; is that what you're saying?

13   A.    Yeah.  That's one of the release tests.  Yeah, there are

14   about 10 or 15 release tests they have to do.  Residual

15   solvents is one, critical one.

16   Q.    And prior to the 2018 recall, how was ZHP testing its

17   valsartan API?

18   A.    For residual solvents, they were using GC-FID, the USP 467

19   method.

20   Q.    Was that consistent with the valsartan monograph at the

21   time?

22   A.    Yes, it was.

23   Q.    I want to move on to the opinions offered by Drs. Hecht

24   and Najafi that the use of DMF solvent in a reaction with

25   sodium nitrite quenching would have alerted a reasonable

*Thompson, Ph.D. - Direct - Rose*                    *236*

1   chemist to NDMA formation prior to 2018.  Are you familiar with

2   that opinion?

3   A.   Yes, I am.

4   Q.   Just to start, I want to talk about DMF solvent.  What is

5   that?

6   A.   So DMF is a reaction solvent.  So that's one of the -- you

7   dissolve your solvent in a solvent.  So you could do a

8   reaction.  It has to be dissolved.  So DMF is one of the

9   solvents in the repertoire of solvents that organic chemists

10  use.

11          CHIEF JUDGE BUMB:  Ms. Rose, I'm sorry to interrupt

12  you, is this witness available tomorrow?

13          MS. ROSE:  I can consult with him.

14          CHIEF JUDGE BUMB:  Are you available tomorrow?

15          THE WITNESS:  Yeah.

16          MR. SLATER:  Judge, I'm on an airplane tomorrow out

17  of town.

18          THE COURT:  Well, we won't finish today.

19          MR. SLATER:  Well, my cross will be less than 30

20  minutes.

21          CHIEF JUDGE BUMB:  Well, then Judge Vanaskie needs to

22  meet with you all.  I thought we had set two days aside.

23          MR. SLATER:  We were told today.

24          CHIEF JUDGE BUMB:  Well, I had reserved two days if

25  we didn't finish today.

*Thompson, Ph.D. - Direct - Rose*                    237

1           I was hoping to go through the summary judgment

2    motion.  I was hoping to go through the motions in limine.  I

3    was hoping to go through questions regarding the 2017 email.  I

4    was hoping to accomplish a lot more.  I didn't realize you were

5    on a plane.

6           I don't know what to do.  I've made myself available

7    to get this trial prepped and ready.

8           Let's skip through some of this.  Some of this I'm

9    not sure why expert testimony is needed.  The FDA documents

10   seem to speak for itself.  I have a very -- I think a very

11   significant question regarding the 2017 email.  It is not clear

12   to me how both sides can interpret a document that they are not

13   the author of.  That seems to be pretty, to me, rank hearsay

14   and speculation.  The author wasn't deposed.  Is he going to

15   testify?

16           MS. ROSE:  Your Honor, the author of the email is no

17   longer with ZHP, and he is in China and unavailable to testify.

18           CHIEF JUDGE BUMB:  So how is it that -- this doesn't

19   involve you for one second, well, we're getting to it -- how is

20   it that this Court can permit speculation on the side of each

21   party as to what that email says?

22           MR. SLATER:  Well, from the plaintiffs' standpoint,

23   we don't have speculation.  What I did is I deposed a 30(b)(6)

24   representative named Min Li who was Jinsheng Lin, the author of

25   the email's boss, who was on the email, and I asked him to go

238

1    through the email, tell us what it said and explain what it

2    meant.  So we have sworn testimony from the company, ZHP, since

3    he was speaking for ZHP, as to what it said and what it meant.

4              CHIEF JUDGE BUMB:  Okay.  You agree with that?

5              MS. ROSE:  I don't.  Your Honor, Min Li --

6              CHIEF JUDGE BUMB:  Shocking.

7              MS. ROSE:  I know.  Min Li was deposed, was shown

8    this email.  He was asked to read the words on the page.  I

9    believe it was shown to him in Mandarin and he was asked to

10   read the words on the page.  He was asked if it said what it

11   said.  He said yes.  He also said numerous times, one, that he

12   didn't remember getting the email, and he said numerous times

13   that he did not have knowledge of anything that plaintiffs are

14   representing that the email said.

15             CHIEF JUDGE BUMB:  Can you step down, Doctor.  We're

16   not going to finish you today.  Can you step down.  Thank you.

17             THE WITNESS:  Go back to my seat?

18             CHIEF JUDGE BUMB:  Yes; for now.

19             MS. ROSE:  Sorry, Your Honor.

20             (Witness left the stand.)

21             MR. SLATER:  Your Honor, they're not even objecting

22   to our use of the email.  They've never objected to our use of

23   the email ever.  The defense has never even objected to it.

24             CHIEF JUDGE BUMB:  No.  The question is -- there are

25   motions to preclude testimony about the email.  This is one

```
 1    such; is it not?  Is he not about to interpret this email?
 2              MR. SLATER:  Well, actually, Your Honor, I have his
 3    deposition testimony ready to go.  He actually agrees that the
 4    words on the page say there's NDMA in valsartan, and it's
 5    caused by the sodium nitrite quenching, which is the actual
 6    root cause.  He doesn't dispute what it says.  What he says is,
 7    well, I don't understand why that information was in this email
 8    about something they were testing separately and it seems
 9    ignorant for him to have put it in that email.  He doesn't
10    dispute what it says.  He doesn't dispute that it's accurate.
11              He just has some weird criticism of I don't know why
12    he put it in this email, which is not a subject of expert
13    testimony, and that's why he should be precluded from talking
14    about the email because he has nothing to add to it because he
15    doesn't dispute what it says.
16              CHIEF JUDGE BUMB:  I know.  So that's why I'm
17    addressing -- you just stood up and said why are we talking
18    about the email?  Because you've moved to preclude him from
19    talking about the email.
20              MR. SLATER:  No; I understand that.  I thought you
21    were questioning our use of the email.
22              CHIEF JUDGE BUMB:  Mr. Slater, I'm going to say it,
23    I've said it several times, the plaintiffs continue to distort
24    this record.
25              MR. SLATER:  I have not distorted anything, Your
```

240

1    Honor.

2              CHIEF JUDGE BUMB:  Mr. Slater, Mr. Slater, I'll say

3    it again, it has been a challenge for me to keep this record

4    straight.  I am still thinking about Dr. Siddiqui saying that

5    he was never diagnosed with NASH, and the record on its face

6    says he was.  We'll get to that.

7              It has been difficult for this Court, which is why in

8    the past several months I have said to the plaintiffs, point to

9    the record to back up what you have said.  Point specifically

10   to citations to back up what has been represented.  It has been

11   a challenge.  I raised the issue of the 2017 email because it's

12   the subject of a motion to preclude by the plaintiffs.

13             I don't know what to do with it.  I mean, I am not

14   prepared to rule on this expert.  I'm not prepared to rule.  I

15   need more briefing on Siddiqui.  You folks have a trial in

16   about eight days, or whatever the math is.  I've got a summary

17   judgment motion pending I wanted to hear oral argument on.

18   I've got motions in limine, although it appears that you filed

19   a stipulation this morning.

20             What else have you folks asked me to work on that I

21   have worked on the entire weekend?  Let's see, is Russo -- is

22   Russo out of the picture now with the amended report?

23             MS. ROSE:  Your Honor, we've reached an agreement on

24   Dr. Russo.

25             CHIEF JUDGE BUMB:  Okay.  Russo is out.

1    Who else?  A summary judgment motion, I have

2    questions.  There were claims in.  Now I guess there's claims

3    out.  I'd like to know what's in.  New Jersey law doesn't

4    apply.  We haven't even had that conversation.  Plaintiffs seem

5    to think New Jersey law applies.  It does not apply.  Alabama

6    law applies.

7        MR. NIGH:  Your Honor, we agree that Alabama

8    substantive law applies.

9        CHIEF JUDGE BUMB:  Well, but in your briefing you

10   didn't.

11       MR. NIGH:  I understand.

12       CHIEF JUDGE BUMB:  You -- now you agree after I have

13   read your briefs where you tell me that New Jersey law applies.

14       I would just like a little bit of grace.

15       MR. NIGH:  New Jersey procedural law, Your Honor.

16       MR. SLATER:  Federal.

17       MR. NIGH:  Or federal.

18       CHIEF JUDGE BUMB:  The fact that I -- I don't know

19   what to do.  I feel like the plaintiffs' case is a moving

20   target.  It is difficult to keep up with it.  When I first

21   inherited this case, the defendants complained of that, and I

22   pooh-poohed it, because it had been long going.  I now

23   understand where they are coming from.  It has been a

24   challenge.

25       So I am not going to begin this trial unless I am

```
 1    confident of my rulings, and I don't know what to do.  I don't
 2    know what to do.  You folks can propose a solution.  This
 3    witness hasn't finished.  I want additional briefing on
 4    Siddiqui, because I am quite inclined to preclude her
 5    testimony.  But I want to give the plaintiffs another
 6    opportunity to persuade me why I shouldn't.
 7              But I don't believe that she satisfies Rule 702, as I
 8    sit here right now, but I want to review her transcript.
 9              So I'm here.  Suggestions?  Judge Vanaskie is here.
10    He was ready to give you his rulings on designations.
11              I'm here.  How can I be of help?
12              MS. ROSE:  We are also here, Your Honor.  We're happy
13    to proceed as ever you'd like.
14              CHIEF JUDGE BUMB:  I was prepared to continue
15    tomorrow.
16              MS. ROSE:  We don't have an issue with that.
17              CHIEF JUDGE BUMB:  Well, apparently the plaintiffs
18    do.  So I don't know what to do about it.
19              I'm not sure where the miscommunication came from.
20              MS. ROSE:  Your Honor --
21              CHIEF JUDGE BUMB:  But I would think that you folks
22    recognize that this Court has a fulsome calendar and a fulsome
23    caseload, and scheduling issues is not always the easiest.
24              Yes.
25              MS. ROSE:  Given that Your Honor would like briefing
```

243

1    on Dr. Siddiqui, would it make sense to set a briefing schedule

2    on that and we can -- the parties can work on that if you

3    wanted.

4             CHIEF JUDGE BUMB:  I'm only going to give the parties

5    five pages.  And the question is why she shouldn't be precluded

6    in light of today's testimony.  And that's the question that

7    should be answered.

8             And I only want -- I want record citations.  I want

9    what her testimony was and why.  I'll tell you where I -- so

10   that we can shortcut it.

11            I think that the issue for the Court is 702(c) and

12   (d), whether or not her testimony is the product of reliable

13   principles and methods and her opinion reflects a reliable

14   application of the principles and methods to the facts of the

15   case.  And that's the question to be answered.

16            But I only want five pages, because I intend to read

17   the transcript myself, probably a couple of times.

18            MS. ROSE:  Your Honor, would you like simultaneous

19   briefing from the parties?

20            CHIEF JUDGE BUMB:  Yes.

21            But I don't know what to do with the -- with -- how

22   are we to begin picking a jury on the 8th?

23            I had hoped to use these two days to tell you how I

24   select a jury, to figure it all out, to talk about voir dire,

25   to give you my rulings.

```
 1            So I don't know.  So I guess we'll start with the
 2     plaintiffs, are you prepared to go forward tomorrow with
 3     additional work that has to be done or no?
 4            MR. SLATER:  Can I talk to our team?  Because I'm
 5     supposed to leave tomorrow on an airplane to go somewhere.
 6            CHIEF JUDGE BUMB:  You'll have --
 7            MR. SLATER:  Nobody understood, Your Honor, that this
 8     was going to be a two-day hearing.  So I've asked around,
 9     nobody knew.  Everyone thought it was one day.  You told us 30
10     minutes a side with each witness, and we thought that Your
11     Honor was going to just blow through this stuff, and we were
12     ready to talk through every issue.
13            But can I talk for five minutes with my colleagues?
14     Maybe they'll be fine without me.
15            CHIEF JUDGE BUMB:  Well, let me look at another date
16     you all folks can come back.
17            Well, how else do you -- Mr. Slater.
18            MR. SLATER:  No; I understand.
19            CHIEF JUDGE BUMB:  How else do you expect to be ready
20     to open on September 8th?
21            MR. SLATER:  I -- I don't know, Judge.
22            (Court conferring with the courtroom deputy.)
23            MR. SLATER:  I mean, I could certainly do
24     Dr. Thompson by Zoom, but if Your Honor prefer it in court,
25     then that's not going to work.  I'd much prefer to do him live.
```

```
 1    I'm ready.  I have less than 30 minutes.
 2              CHIEF JUDGE BUMB:  No.  And there are parts of
 3    Dr. Thompson's testimony that I think that the plaintiffs make
 4    a good point on.  I would like to flesh that out.
 5              (Counsel conferring.)
 6              (Court conferring with the courtroom deputy.)
 7              CHIEF JUDGE BUMB:  Judge Vanaskie, how long do you
 8    need?
 9              JUDGE VANASKIE:  Today?  Not long.  Five, ten
10    minutes.
11              CHIEF JUDGE BUMB:  All right.  We're going to finish
12    Judge Vanaskie.  Where's Dr. Thompson?  Let's wrap it up.
13              (Witness returned to the witness stand.)
14              CHIEF JUDGE BUMB:  Okay.
15              THE WITNESS:  What was the decision?
16              CHIEF JUDGE BUMB:  We're going to try to wrap up your
17    testimony in a matter of 20 minutes.
18              THE WITNESS:  Okay.
19    BY MS. ROSE:
20    Q.   Dr. Thompson, I'll try to go very quickly through your
21    slides.  We were just talking about the DMF solvent, and I'll
22    really get to the heart of your opinion, is that you've said
23    that Drs. Hecht and Najafi have offered the opinion that the
24    use of DMF solvent in the valsartan manufacturing process
25    should have put a reasonable chemist on notice for the
```

Thompson, Ph.D. - Direct - Rose                    246

1    potential formation of NDMA.  Is that your understanding of

2    their testimony?

3    A.    That's my understanding of their testimony, yes.

4    Q.    And do you disagree with that?

5    A.    I disagree with that.

6    Q.    Why?

7    A.    So if you look at this slide, this doesn't show chemical

8    equations.  This just has written words what has to happen.  To

9    get from DMF -- let's go back.  To get from DMF to NDMA, this

10   is the chemistry that has to happen.  The solvent -- and Hecht

11   says repeatedly this is obvious, any reasonable chemist should

12   know this right or instantaneously as soon as they see it.  But

13   these are not reactions on the page, right, these are reactions

14   people have to visualize in their imagination.  The DMF solvent

15   has to decompose.  That is a reaction not too many people know;

16   some people do.  So that's one thing that has to happen.

17         Sodium nitrite has to be converted into nitrous acid,

18   okay.  The use of sodium nitrite in API synthesis, no one uses

19   sodium nitrite, no one's familiar with the chemistry.  So

20   there's a reaction that no one knows.  It's complicated

21   actually.  They say it's simple.  It's complicated.

22         Then the sodium nitrite -- the nitrous acid has to

23   then react with the DMA, the minor decomposition product to

24   form NDMA.  And that's also a reaction chemists in the

25   pharmaceutical industry are not very well versed in, okay.  So

Thompson, Ph.D. - Direct - Rose                    247

1    these three reactions are not written on a page.  They don't

2    show up in a balanced equation that you do in a PowerPoint

3    setting.  Nowhere do they show up.

4            Could we go back?

5    Q.   Oh, sure.

6    A.   So you have to visualize this in your head.

7            When I read Hecht's deposition testimony on this, it

8    seemed like he was using circular reasons.  So he's saying they

9    should have known this would happen.  And why should they have

10   known?  Because if they had tested for it, they would have

11   detected it.  Why should they have tested?  Because they should

12   have known.  So his logic that this was obvious to everybody

13   was actually circular logic was what he was using.

14           So I disagree that this is something that chemists

15   should just instantly know and visualize in their head the

16   second they see the reaction.  That's not true.  It's true to

17   somebody who spent their entire career studying NDMA, but it's

18   not true to pharmaceutical chemists who never work with it.

19           So that's my opinion.  It's not straightforward.

20   That's -- that's unreasonable to expect chemists to think -- to

21   see in their head and say this is straightforward.

22   Q.   Dr. Thompson, did you have your deposition taken in this

23   case?

24   A.   I did.

25   Q.   And did plaintiffs' counsel ask you for your opinions

*Thompson, Ph.D. – Direct – Rose*                    248

1    about DMF solvent?

2    A.    Yes, they did.

3    Q.    And did plaintiffs' counsel ask you about certificates of

4    analysis that came with DMF solvent that ZHP used in its

5    manufacturing processes?

6    A.    Yes.

7    Q.    And just to clarify, what are certificates of analysis?

8    A.    So a certificate of analysis is something that the

9    manufacturer provides.  It has the expected -- the

10   specifications required for that grade, and it has the actual

11   test results.  So you can compare the specifications against

12   the actual test results.  It's the certificate of analysis for

13   that particular product that you bought.

14   Q.    And who creates the certificate of analysis?

15   A.    The manufacturer does.

16   Q.    The manufacturer of what?

17   A.    The manufacturer of DMF would have created that.

18   Q.    And did you review any certificates of analysis for the

19   DMF solvent that was sold to ZHP?

20   A.    Yes, I did.

21   Q.    And did you review any other documents related to the COAs

22   that were -- that accompanied the DMF that was sold to ZHP?

23   A.    Yes.  So I reviewed the Chinese national standard for DMF.

24   It was the -- it was in English -- it was an English

25   translation of the Chinese national standard.  It's about a

Thompson, Ph.D. - Direct - Rose                    249

1    30-page document.  It showed a -- and it was in English so I

2    could read it, because I don't read Mandarin.  It showed a

3    certificate of analysis, a typical certificate of analysis, and

4    it showed all the test methods and how those tests were run and

5    how the results were calculated.  So I was able to use -- so I

6    had the English -- that's the English version.  I had that.

7              So then when I was shown the certificate of analysis

8    in Chinese, I could understand what each column was by working

9    back through this, so I knew what each column was.

10   Q.   And, Dr. Thompson, is there a reference to dimethylamine,

11   the secondary amine that we were talking about earlier, in the

12   Chinese national standard?

13   A.   Yes.

14   Q.   And is that what's highlighted on this slide here?

15   A.   Yes.

16   Q.   And that language in the COA says "alkalinity calculated

17   as dimethylamine."  Do you see that?

18   A.   Yes.

19   Q.   What do you interpret that to mean?

20   A.   So I couldn't interpret that.  That's why the English

21   translation -- I couldn't really figure out what that meant, so

22   I needed that method, the way they ran that method and how they

23   did the calculation.  I needed to see what it was so I could

24   see what -- I could figure out what that term meant.  And so

25   here, you want to go through it.

Thompson, Ph.D. – Direct – Rose                    *250*

1    Q.    Sure.

2          So on the screen now is the calculation in the

3    Chinese national standard for the calculation of alkalinity in

4    dimethylformamide, correct?

5    A.    Right.  So the titration as you run it gives you the

6    number of molecules of base.  It doesn't give you a weight.  It

7    gives you like an Avogadro's number, how many molecules of

8    base.  In order to convert that number of molecules into a

9    weight, because you're putting weight percent in, and that's --

10   you need to multiply by a number.  So they used the molecular

11   weight of dimethylamine in the formula to convert from number

12   of molecules to an actual mass.

13   Q.   So where there's a test for alkalinity calculated as

14   dimethylamine, do you interpret that as calculating the amount

15   of dimethylamine in the DMF solvent?

16   A.   No.  When I read the formula, what that means is that's

17   the total base content in the DMF.  It's not necessarily

18   only -- it's the total base content in DMF.  It's not one

19   particular base.

20   Q.   And you reviewed the actual COAs, correct, that provided

21   the alkalinity numbers?

22   A.   Yes, I did.

23   Q.   And so if you were to assume that the alkalinity

24   calculated as dimethylamine, if all of that alkalinity was

25   dimethylamine, would that, in your opinion, put a reasonable

*Thompson, Ph.D. - Direct - Rose*                    251

1    chemist on notice that there's a potential for NDMA formation

2    by using DMF solvent in a reaction with sodium nitrite?

3    A.   No, it would not.

4    Q.   Why not?

5    A.   Because the amount, that's -- that .001, okay, that's 10

6    parts per million.  That's the top limit for that grade,

7    superior grade, which is the best grade you can buy.  The top

8    limit is 10ppm.  In the certificate of analysis I saw, there

9    were 1ppm, there were 2ppm.  They were so low, everybody would

10   just move onto something else.  It was too low a number to

11   worry -- to concern anybody and you just wouldn't put together

12   the pieces that this is going to be NDMA in my batch.  It's

13   just -- it's just too low a number for anybody to concern

14   themself about.

15   Q.   And, Dr. Thompson, I want to talk to you about the

16   July 27, 2017 email that the Court raised earlier.

17   A.   Okay.

18   Q.   You reviewed the July 27, 2017 email, correct?

19   A.   I did.

20   Q.   And Drs. Hecht and Najafi talked about this email in their

21   reports, right?

22   A.   Yes, they did.

23   Q.   What do Drs. Hecht and Najafi say that this email means?

24   A.   They say -- they say this means that people at ZHP knew

25   there was NDMA in valsartan.

*Thompson, Ph.D. - Direct - Rose*                    252

1    Q.    And what do they base that on?

2    A.    They base that off -- I think that's speculation actually.

3    I think they're speculating that because this sentence appears

4    in this email, that everybody at ZHP knew there was NDMA in the

5    batch.   They're speculating.   I don't think they're -- I don't

6    know what they're basing it on.

7    Q.    And do you disagree with their interpretation of this

8    email?

9    A.    I mean, the bulk of this email is about irbesartan, an

10   impurity in irbesartan, deacylated valsartan, a way to avoid,

11   you know, this impurity in irbesartan.   There was one sentence

12   that says that.   You know, it's similar to the NDMA in

13   valsartan.

14           But to speculate that that one sentence proves that

15   everybody at ZHP knew there was NDMA in valsartan, I think

16   that's speculation, and there's nothing to support that.

17   Q.    Dr. Thompson, you talked about this email being about

18   irbesartan, correct?

19   A.    I did.

20   Q.    And is this the language you were referring to from the

21   email saying -- with Dr. Lin reporting that he's identified an

22   impurity in the irbesartan crude product?

23   A.    Yes.  And this gets to another point I want to bring up.

24   So this is how impurities manifest themselves.   You're a

25   process chemist, you're working on a project, how does an

*Thompson, Ph.D. - Direct - Rose*                    253

1    impurity make itself known to you that it's there?  And the way

2    that it happens in a large majority of the cases is you see

3    something in the data.  You see a peak in a chromatogram.  That

4    alerts you to the fact that there's an impurity.  And that's

5    exactly what happened here.

6              They saw a peak.  They said this is an impurity I

7    have to worry about.  They isolated and they identified it, as

8    opposed to NDMA which never gave -- which never manifested

9    itself as a peak in any of the data.  So there was nothing to

10   flag anybody at ZHP that there was an impurity they needed to

11   worry about.  And that's what I want to say about this slide.

12   Q.   But going back, this email was about an impurity in

13   irbesartan.  Is irbesartan a different molecule from valsartan?

14   A.   Yes, it is.

15   Q.   Okay.  And Dr. Lin, in the course of his description of

16   this impurity, he made a comparison to another impurity; is

17   that correct?

18   A.   Yes.  He made -- he said it's -- in comparison to Impurity

19   K.

20   Q.   And what is Impurity K?

21   A.   Impurity K is a N -- it's an N-nitroso derivative of

22   deacylated valsartan.

23   Q.   And what is deacylated valsartan?

24   A.   So deacylated valsartan is actually an intermediate in the

25   synthesis.  There's a side chain, a five-carbon side chain with

*Thompson, Ph.D. - Cross - Slater*                    254

```
 1    a carbonyl and a nitrogen, and that comes off.  It either comes
 2    off or it's incomplete.  It doesn't go on completely.  So
 3    there's deacylated valsartan present.  And if that's present
 4    when you're using a sodium nitrite quench, that will form an
 5    N-nitroso compound.
 6    Q.   Is deacylated valsartan the same as valsartan API?
 7    A.   No.  It's a different molecule.
 8              CHIEF JUDGE BUMB:  Okay.  Wrap it up, please.
 9              MS. ROSE:  Okay.  I think we can end there.  I know
10    the Court is rushed for time.
11              CHIEF JUDGE BUMB:  Okay.  Cross.
12              MR. SLATER:  May I proceed, Your Honor?
13              CHIEF JUDGE BUMB:  Yeah.
14              THE WITNESS:  Oh, I thought it was over.  Sorry.
15              MR. SLATER:  Let's go to slide 1.
16              Your Honor, would you like the slides I'm going to
17    use?
18              CHIEF JUDGE BUMB:  Yes.
19              MR. SLATER:  May I approach?
20              CHIEF JUDGE BUMB:  Yes.
21              MR. SLATER:  It's not stapled.
22              Here you go.
23                         CROSS-EXAMINATION
24    BY MR. SLATER:
25    Q.   Okay.  Dr. Thompson, we can agree you're not holding
```

*Thompson, Ph.D. - Cross - Slater*                    *255*

1   yourself out as a regulatory expert, you're not holding

2   yourself out as an expert in cGMPs, or the risk assessment

3   process for drugs.  You agreed with me on that when I deposed

4   you, right?

5   A.   Yes.  I'm knowledgeable, but I'm not an expert.

6   Q.   Let's go to slide 2.

7        As you said before, you had never done any research

8   into nitrosamines, and you actually learned of the existence of

9   nitrosamines only after the recall, correct?

10  A.   I never did any research into nitrosamines prior to 2018,

11  that's a miss --

12  Q.   And you first learned of the existence of nitrosamines

13  after the recall, right?

14  A.   Yes.

15  Q.   And that's when you first learned of the existence of

16  NDMA, correct?

17  A.   Yes.

18  Q.   Let's go to slide 3.

19       You agreed with me that the following things were

20  outside the scope of your opinions:  What ZHP's process

21  chemists were supposed to do to evaluate the potential

22  reactions in the process.

23       Outside the scope of what you were opining on.

24  That's what you told me under oath, right?

25  A.   I was opining on the opinions of Hecht and Najafi.

Thompson, Ph.D. - Cross - Slater                    256

1    Q.    You agreed with me as to each of these points, and you can

2    see I actually have in the slides actual citations to your

3    deposition for every single thing I said here.  So if you want

4    to question it, I can get your transcript for you and I can

5    show it to you, but to move through it, let's go through this.

6              Outside the scope of your opinions, what the ZHP

7    process chemists needed to look for in evaluating potential

8    impurities in the valsartan; not something that you opined on,

9    correct?

10   A.    Correct.

11   Q.    Whether ZHP was responsible to identify the potential for

12   these impurities even if not obvious and easy to catch.  That's

13   outside the scope of your opinions, right?

14   A.    They're not required to identify things they don't know

15   are there.

16   Q.    You -- did you agree with me in the deposition that it's

17   outside the scope of your opinions whether ZHP was responsible

18   to identify the potential for these impurities even if not

19   obvious and easy to catch?

20   A.    So I don't remember exactly what I agreed -- every single

21   thing that I agreed to in the deposition you gave me several

22   months ago, but they're not required to identify something they

23   have no reason to suspect is there.

24   Q.    We'll get to that.

25              Whether or how ZHP should have used the available

Thompson, Ph.D. - Cross - Slater                    257

1    technology to identify impurities.  Outside the scope of your

2    opinions, correct?

3    A.    If they -- they used the technology for release testing

4    that you would use for release testing.  They wouldn't use

5    technology for something that they don't know is there.

6              MR. SLATER:  Can I approach, Your Honor, and hand him

7    his transcript?

8              CHIEF JUDGE BUMB:  Well, I think he's agreeing with

9    you.

10             MR. SLATER:  Oh, as long as he's agreeing, I --

11             CHIEF JUDGE BUMB:  I think the issues are being

12   conflated.  He is responding to the experts' opinions, the two

13   experts' opinions, that it was not known -- that NDMA was not

14   known.  There was no expectation that it would be known.  He is

15   not commenting upon -- opining because it's beyond his

16   expertise as to what ZHP chemists should have done or shouldn't

17   have done.  That's beyond his expertise.  He is opining that in

18   the industry it was not -- no one even heard of NDMA, they

19   didn't know.

20             So I think you're digging -- your questions to him

21   when you say you're not opining on this, you're not opining on

22   that, that's true.  Why don't we focus on what he is opining

23   on.

24             MR. SLATER:  Okay.

25   BY MR. SLATER:

*Thompson, Ph.D. - Cross - Slater*                    258

1    Q.    You understood that what Dr. Hecht and Najafi were talking

2    about is what the ZHP chemists should have done.  You

3    understood that was their opinion, right?

4    A.    Yes.

5    Q.    Okay.  And you're not opining on that.  You said that's

6    outside the scope of your opinions, because you actually don't

7    know what the ZHP chemists even did --

8    A.    No.  I'm --

9    Q.    -- correct?

10   A.    I'm opining on the opinions of Hecht and Najafi and their

11   opinions as to what ZHP chemists should have done.  That's what

12   I'm opining on.  And their opinions of what ZHP chemists should

13   have done I disagree with, every single one.

14   Q.    Okay.  Let's go to slide 4.

15          The basis of your opinions is what you are familiar

16   with from your own work in your own lab.  That's what you told

17   me.  Sir, I'm going to hand you your transcript.

18          MR. SLATER:  If it's okay, Your Honor, to approach,

19   because I need to be able to show him the page.  There's your

20   transcript, sir.

21          Your Honor, do you need this or is it okay if I

22   proceed?

23          CHIEF JUDGE BUMB:  Just proceed.

24          THE WITNESS:  So that really --

25          MR. SLATER:  Am I correct --

*Thompson, Ph.D. - Cross - Slater*                259

1              CHIEF JUDGE BUMB:  I think the two of you are talking

2    past each other, but --

3    BY MR. SLATER:

4    Q.   Do you agree that you based your opinions on what you are

5    familiar with from your own work?

6    A.   Yeah.  And I just want to elaborate, my own work

7    encompasses hundreds of people at different companies talking

8    to them about their needs.  My own work is not limited to the

9    people in my laboratory.  It incorporates hundreds of chemists

10   across the country on what they expect.  My own work is very

11   broad.  It has a very broad and diverse input from many people.

12   Q.   You did no independent literature search as part of your

13   work in this case, correct?

14   A.   I was a rebuttal witness.  I wasn't coming --

15   Q.   Sir, did you do an independent literature search or not?

16   A.   I was --

17   Q.   You didn't, right?

18   A.   I was a rebuttal witness.  No, I didn't.  I answered your

19   question.

20   Q.   You did no independent study or analysis of what subjects

21   were in the literature at any particular time, correct?

22   A.   No.  I used the testimony that was -- I used all the

23   literature that Hecht and Najafi cited that was adequate.

24   Q.   Am I correct?

25   A.   Yes.

1          CHIEF JUDGE BUMB:  You responded to the literature

2    that they used?

3          THE WITNESS:  Yes.

4    BY MR. SLATER:

5    Q.    Let's go to slide 5.  You've talked about industry

6    practice.  You testified that in terms of industry practice,

7    your understanding is based on your own experience and what you

8    did in your lab, correct?  That's what you told me, right?

9    A.    Yes.

10   Q.    And you did no study or analysis of what other people were

11   doing across the industry, correct?

12   A.    I used the -- I used the references cited by Najafi.  I

13   used the public press releases from the FDA.  I didn't have to

14   do an analysis.  I wasn't coming up with -- I was doing

15   rebuttal.

16   Q.    Am I correct that you did no study or analysis of what

17   other people were doing across the industry?  That's correct,

18   right?  That's what you told me in your deposition, correct?

19          We can go to it, page 86, line 25 to page 87, line

20   11.  Do you want to look at it?

21   A.    Uhmm, I knew what people were talking to me about, so I

22   did do an analysis because I thought -- I went through my

23   memory banks to see if anybody had talked to me about

24   nitrosamines.  That's an analysis of what other people were

25   doing.

*Thompson, Ph.D. - Cross - Slater*                261

```
 1    Q.   Do you remember on the deposition, page 87, line 7, I
 2    asked you:  "You didn't do a study or analysis of what other
 3    people were doing or what was being done across the industry?
 4    You based it on your own experience and your own work,
 5    correct?"
 6              And your answer was:  "Yes."
 7              Correct?
 8    A.   So I --
 9    Q.   Sir, is that correct that that was your testimony?
10    A.   I might have misunderstood what you meant by "analysis,"
11    but what I -- when I think back on what people were telling me,
12    that's an analysis to me.
13              MR. SLATER:  Number 6.  We don't have time.
14    BY MR. SLATER:
15    Q.   Dr. Thompson, you told me you do not know what standards
16    applied to the process chemists at ZHP and what they were
17    supposed to do to evaluate potential formation of genotoxic
18    impurities, correct?
19    A.   Yes.
20    Q.   You don't know what was expected or what standards
21    applied.  You don't know the regulatory requirements or the
22    internal protocols that spoke to what the chemists were
23    supposed to do to try to find impurities, correct?
24    A.   My job was to opine on the --
25    Q.   Am I correct?
```

*Thompson, Ph.D. - Cross - Slater*                    *262*

1          CHIEF JUDGE BUMB:  Can you just let him answer the

2     question.  What's your answer?

3          THE WITNESS:  My job was to opine on the opinions of

4     Hecht and Najafi, so the answer to this question is correct.

5     BY MR. SLATER:

6     Q.   You did not apply any standard in evaluating what the

7     process chemists at ZHP could or should have known with regard

8     to potential genotoxic impurities, correct?

9          CHIEF JUDGE BUMB:  If he's a rebuttal expert, he

10    doesn't have to produce his own independent competing analysis.

11         MR. SLATER:  Your Honor, he still has to comply with

12    *Daubert* and actually apply an objective standard to give an

13    opinion in this courtroom.

14         CHIEF JUDGE BUMB:  Sure.  But he doesn't have to --

15         MR. SLATER:  And he's admitted that he did not do so.

16         CHIEF JUDGE BUMB:  So as a rebuttal expert, he must

17    comply with *Daubert*, but the standard is different from an

18    affirmative expert.  And the questions that you are asking him

19    go to an affirmative expert.

20         MR. SLATER:  Your Honor, if he's not --

21         CHIEF JUDGE BUMB:  Of course he has to comply with

22    *Daubert*.

23         MR. SLATER:  If he doesn't apply an objective

24    standard, he should not be allowed to testify to this jury.  He

25    can't just go on what I think.  That's -- Your Honor has

*Thompson, Ph.D. - Cross - Slater*                    263

```
 1   written on that.
 2            CHIEF JUDGE BUMB:  No, he -- yes.  He's -- I'm --
 3   your questions seem to be going to whether or not he's done an
 4   independent analysis and come up with his own affirmative
 5   expert opinion.  He has taken the opinions, and this is what
 6   he's saying, of the other two experts and he's criticizing what
 7   they're relying on.  Isn't that --
 8            MR. SLATER:  No.  What I'm doing is I'm saying to him
 9   in criticizing the plaintiffs' experts, he applied no objective
10   standard.  He's basically just saying, "I disagree, I disagree
11   based on what I know."
12            CHIEF JUDGE BUMB:  I see your point.  Okay.  Go
13   ahead.
14   BY MR. SLATER:
15   Q.   So you did not apply any standard in evaluating what the
16   process chemists at ZHP could or should have known with regard
17   to potential genotoxic impurities, correct?
18   A.   I applied the standard of logic and whether it met what I
19   was familiar with.  I did apply some standard to it, of course.
20   Q.   In the deposition you agreed you didn't apply any
21   standard, correct?
22   A.   So --
23   Q.   Let's go to the next one.
24   A.   Okay.
25   Q.   You do not know the level of scientific analysis ZHP was
```

*Thompson, Ph.D. - Cross - Slater*                    264

1    required to perform to anticipate potential impurities.  You

2    don't know what level of scientific analysis those process

3    chemists were supposed to apply, correct?

4    A.    I mean, again, I was opining on Hecht and Najafi.  I --

5    I -- and --

6    Q.    Is that correct, sir?

7    A.    That's correct, yes.

8    Q.    And, in fact, let's go to slide 7.  This is part of an

9    internal standard operating procedure at ZHP, which you never

10   saw and did not consider, that required all intermediates and

11   APIs produced under GMP conditions to be identified for

12   genotoxic impurities.

13            You were not aware that ZHP had an internal standard

14   operating procedure that they were required to identify

15   genotoxic impurities; you didn't know that, correct?

16            You did not know that, correct, sir?

17   A.    I did not, but --

18   Q.    Let's go to the next slide, number 8, please.

19   A.    If --

20            CHIEF JUDGE BUMB:  Can you let him finish his answer.

21            THE WITNESS:  If there was a genotoxic impurity in

22   the batch and they knew about it, they would test for it.

23   BY MR. SLATER:

24   Q.    As you've told me, you don't know the standards that

25   applied to those chemists in identifying genotoxic impurities

*Thompson, Ph.D. - Cross - Slater*                    265

1    that they may not know about from moment one but to figure out

2    that they're there.  You don't know what standards applied,

3    correct?

4    A.   No, I don't know what standards they --

5    Q.   Let's go to the next slide, number 9 -- or number 8.

6    Sorry.

7              This is from the 2008 FDA guidance titled:

8    "Genotoxic and Carcinogenic Impurities in Drug Substances and

9    Products:  Recommended Approaches."

10             That's not something that you applied.  You didn't

11   apply that regulatory standard, correct?  You did not apply

12   that guidance standard, correct?

13   A.   I did.  If they -- if they knew there was a genotoxic

14   impurity in there, they were required to identify it.

15   Q.   You didn't apply this standard, though, that says -- and

16   this is the FDA guidance on this subject which includes

17   nitrosamines -- that ZHP was required to make every feasible

18   technical effort to prevent the formation of genotoxic or

19   carcinogenic compounds during the manufacture of valsartan.

20   You were not aware of that standard, correct?

21   A.   I don't see the word "nitrosamines" in this sentence.

22   Q.   Were you aware of that standard?

23   A.   No.  But I don't see the word -- I don't see this --

24             MR. SLATER:  Can I approach, Your Honor?

25             CHIEF JUDGE BUMB:  Okay.

*Thompson, Ph.D. - Cross - Slater*                266

```
 1              MR. SLATER:  Lightning round here.

 2              I have this for counsel as well and for the Court,

 3    Your Honor.

 4              There's no slide for this.

 5              THE WITNESS:  This says genotoxic and carcinogenic

 6    compounds.

 7    BY MR. SLATER:

 8    Q.   Right.  Go to page 8 of that document, please, which is

 9    the FDA guidance.

10    A.   Okay.

11    Q.   And you can see at the very top of that page where they're

12    talking about the assessment of genotoxic impurities:

13    "However, there are some compounds containing certain

14    structural groups, aflatoxin like, N-nitroso."

15              N-nitroso compounds are nitrosamines, correct?

16    A.   Correct.

17    Q.   "And azoxy structures that have extremely high

18    carcinogenic potency and are excluded from the threshold

19    approach."

20              Do you see that the guidance actually is talking

21    about the carcinogenicity of nitrosamines as being part of this

22    evaluation?  Do you see that now that I'm showing it?

23    A.   Yeah.  And my interpretation is if they know they have a

24    GTI, they have to identify it.

25    Q.   So you defined --
```

*Thompson, Ph.D. - Cross - Slater*                    *267*

```
 1    A.    They can't apply the threshold --
 2    Q.    -- applying every feasible --
 3              CHIEF JUDGE BUMB:  Wait.  Wait.  You have to let him
 4    finish, Mr. Slater.
 5              THE WITNESS:  They cannot apply the threshold
 6    approach to a GTI.  That's what this says.  They have to
 7    identify it even though it's below a threshold approach.
 8    BY MR. SLATER:
 9    Q.    They have to --
10    A.    But it doesn't say they have to identify things they don't
11    know are there or they're not aware of.  That's not what this
12    guidance says.  You're misinterpreting the guidance.
13    Q.    So every feasible technical effort to prevent the
14    formation of genotoxic or carcinogenic compounds in your
15    estimation means if you know about it, you control it.  If you
16    don't know about it, you're okay?
17    A.    No.  It means --
18    Q.    That's your interpretation of this standard --
19    A.    It means you --
20    Q.    -- which you've never seen before?
21    A.    It means you make every feasible effort.  But if you don't
22    know it's there and you don't suspect it's there, it's not
23    logical to expect you to be testing for it.
24    Q.    Number 9.
25              And, by the way, I never said anything about testing.
```

Thompson, Ph.D. - Cross - Slater                    268

1    I'm talking about being aware of the potential formation and

2    then taking steps to avoid it.  You do understand the

3    difference, right?  Testing comes later after you realize

4    there's the potential formation.

5    A.    Right.  You have to realize.  You just said it.  You have

6    to realize you have it.

7    Q.    You have to realize -- no.  You have to realize potential

8    formation, correct?

9    A.    You have to realize you have it.

10   Q.    Okay.  So we disagree.

11   A.    We disagree.

12   Q.    Let's go to 9.  You only need to be concerned if you know

13   you put it there, you know it's there, and you can think of it.

14   That's it?  That's all you think the process chemists need to

15   try to figure out is if they know it going in, that's it.  If

16   they don't know it going in, they don't have to study it or

17   analyze it at all to figure out what they didn't realize.

18   That's your standard, right?

19   A.    Not true.  The guidance says if you know it's there, you

20   have to -- you can't use a threshold, you have to test for it.

21   The guidance doesn't say test for everything to make sure it's

22   not a GTI.  That's the way you're interpreting the guidance.

23   Q.    Where -- what do you -- I don't know what you're referring

24   to.

25   A.    What you're saying is they must test for everything to

*Thompson, Ph.D. - Cross - Slater*                    *269*

```
1    make sure it's not a GTI.
2    Q.   What guidance are you referring to that says you only have
3    to test for things that you -- well, what guidance are you
4    talking about or referring to that you think means you don't
5    have to figure out the potential formation and then test for
6    it?
7    A.   You have to do all those things.
8    Q.   Okay.  Exactly.
9    A.   But if you don't think of it --
10   Q.   You have to figure out a potential formation.
11   A.   If you don't think of it --
12             MS. ROSE:  Objection.
13             CHIEF JUDGE BUMB:  Can he finish his answer, please.
14             MS. ROSE:  Thank you, Your Honor.
15             THE WITNESS:  You have to do --
16             CHIEF JUDGE BUMB:  These things all have to be
17   done -- if you don't know about them, then how do you know to
18   do these things?  That's your testimony, correct?
19             THE WITNESS:  That is.
20             CHIEF JUDGE BUMB:  Okay.  You can step down.  We're
21   going to adjourn for the day.  Thank you.
22             (Witness stepped off the stand.)
23             MR. SLATER:  I have about five more minutes, Your
24   Honor.
25             CHIEF JUDGE BUMB:  Okay.  I don't.
```

*270*

```
 1              MR. SLATER:  Okay.

 2              CHIEF JUDGE BUMB:  Let's go through some other

 3    things.

 4              I'm going to reserve on the last witness.  What's not

 5    clear to me is why all of this couldn't be covered in

 6    cross-examination.  Because as I understand the witness's

 7    testimony, and I just summed it up, the criticism is, is that

 8    they should have tested for it.  But if there's no one in the

 9    industry, including the FDA, who didn't know about this NDMA,

10    hindsight doesn't enter into the equation.

11              It seems to me that all of that can be covered by the

12    defendant on cross-examination through FDA documents and an

13    expert witness is not necessary.  I'm not ruling.  I'm

14    reserving because I really want to see why this would not be

15    cumulative.

16              MR. SLATER:  And for the record, Your Honor, I had

17    more to go through to show that his methodology is completely

18    devoid of any objectivity at all and that he admitted most of

19    the things that he now on the witness stand is saying he would

20    not need to -- they would not have had to figure out, like the

21    availability of the information about the chemical processes.

22    My next slide shows that he admitted all of this information

23    was in the literature.  All of it was available.  And the

24    applicable standards required them, by their own admission, to

25    do a scientific analysis of the literature as part of the risk
```

1    assessment and find those things out.

2            And he admitted it's in the literature, but he

3    doesn't have a standard that he applies.  And with all -- his

4    standard is not objective and it should not be allowed.  He has

5    no objective methodology.

6            CHIEF JUDGE BUMB:  But he -- do you agree that much

7    of this can be accomplished on cross-examination?  That much of

8    this -- you wouldn't agree with "it can be accomplished."  Do

9    you agree that much of this is fodder for cross-examination of

10    your two experts?  Well --

11            MR. SLATER:  Can they ask my --

12            CHIEF JUDGE BUMB:  -- he's shaking his head yes.

13    You're shaking your head no.

14            MR. SLATER:  Can my experts be asked these questions?

15            CHIEF JUDGE BUMB:  So you two want to confer.

16            MR. SLATER:  Judge, I didn't have a chance to answer

17    you yet.

18            CHIEF JUDGE BUMB:  I'm saying, I'm asking the

19    questions and you're saying no and he's saying yes.

20            MR. SLATER:  I didn't say no.  I didn't answer you

21    yet.

22            Yes, my experts can be asked questions about the

23    literature because they actually addressed it, and they can be

24    asked questions about the standard that applied because they

25    actually addressed it.

```
 1              CHIEF JUDGE BUMB:  Right.
 2              MR. SLATER:  But this witness should not be allowed
 3    to testify because he has no standard other than:  "I only know
 4    what I know and based on what I know, they didn't have to think
 5    of this."  And that is not a reliable methodological standard
 6    to be allowed to testify.  As much as I'd like to cross him in
 7    front of the jury, I shouldn't have to, and this witness should
 8    not be permitted to testify.
 9              If I go through the rest of it, I'm sure that I can
10    establish that, but I haven't -- I only got a little bit
11    through my cross, halfway or so.
12              MS. ROSE:  Your Honor, may I respond very, very
13    briefly?
14              Dr. Thompson, as he said, he is a very limited
15    witness.  Drs. Hecht and Najafi have made statements that
16    reasonable chemists in the industry prior to 2018 would have
17    known about this reaction; these are textbook reactions; this
18    is what everyone knew.
19              CHIEF JUDGE BUMB:  And the FDA disagrees with that.
20              MS. ROSE:  And in addition, Dr. Thompson, who was
21    working at Merck Laboratories, who was working at his own
22    laboratory making API during this period, was talking to
23    hundreds of chemists, was overseeing dozens of chemists, he
24    knew what was being discussed in the industry at the time.  And
25    he is offering a very, very narrow opinion to counter -- just
```

273

1    to counter Hecht and Najafi saying this was obvious to any

2    reasonable chemist.  I think Dr. Thompson is a reasonable

3    chemist and he can say I disagree with that from the

4    perspective of a chemist.

5              CHIEF JUDGE BUMB:  And so why I am reserving is

6    because I need to hear their testimony.  I need to then hear

7    what the cross-examination is, because much of what I

8    anticipate the cross-examination will be is much of what this

9    witness would say.

10             So it seems duplicative to me because it's all in FDA

11   documents.  To the extent that the witness might say, well, I

12   work in the industry and no one ever heard of NDMA, that might

13   survive, but I don't know that you need an expert to say that.

14   That sounds like fact testimony to me.

15             So I'm going to reserve on the motion.  I think the

16   arguments that the plaintiffs make are persuasive, but for the

17   wrong reasons.  I think it can be somewhat cumulative after I

18   hear the cross.

19             Do you understand what I'm saying?

20             MS. ROSE:  I understand, Your Honor.

21             MR. SLATER:  Can I say one last thing, Your Honor?

22             Slide 12, which Your Honor has all our slides, so you

23   have basically the core of what the cross would be, because I

24   heard about FDA said it was no big deal.  I just want to point

25   out that what I would have done with my next slide is showed

274

1    that the FDA, when they actually addressed ZHP in one of their

2    statements, one of the ones he used in his slide 12 actually

3    said that they placed ZHP's facility on import alert, issued a

4    warning letter, and found multiple manufacturing violations

5    specific to this issue.

6         So the FDA never absolved ZHP the way that they tried

7    to twist these statements, and methodologically he didn't take

8    that into account because he couldn't even tell me what

9    statements he saw, and then there's the warning letter which he

10   never read, and he had never seen any of the language there

11   where the FDA criticized ZHP's conduct and found multiple cGMP

12   violations on this exact issue -- failing to learn the chemical

13   reactions with the solvents they were injecting into the

14   process.  Basically the standard is you can't just use a

15   solvent without researching it to see, well, what might this

16   cause.

17        His testimony is, well, if you don't know it, you

18   don't have to worry about it.  That's not the law.  The

19   regulations say you have to actually do the research when

20   you're going to use a solvent or change your process, as they

21   did.  And that's why they got the warning letter.  That's why

22   they got the import ban.  That's why their factory was shut

23   down from sending products into the U.S. for about four years.

24        CHIEF JUDGE BUMB:  Mr. Slater, I don't really think

25   you've listened to me.

```
 1              I have said for the last five minutes, I am
 2    disinclined to allow the testimony, but I want to reserve and
 3    wait and see what the cross looks like, because much of what
 4    he's testified to, it seems to me, would come out on
 5    cross-examination of your two experts.
 6              MR. SLATER:  Okay.  I understand.
 7              In terms of going forward, we were going to suggest
 8    perhaps September 3 and 4.
 9              CHIEF JUDGE BUMB:  I'll have you folks back on the
10    3rd.  I had a *Markman* hearing that day which I have now
11    rescheduled, which I had rescheduled.  So I am free that day.
12    I want to talk about a few things and then I'm going to let
13    Judge Vanaskie take over.
14              The certificates, the COAs, if the plaintiffs have a
15    good-faith basis that those COAs that were not preserved would
16    be any different than what they already have, I'll hold a
17    hearing.  But it has to be a good-faith basis.  I understand
18    why the plaintiffs feel aggrieved.  I understand why the
19    plaintiffs are upset because these documents were not
20    preserved.
21              When I read the defendants' papers, there's some sort
22    of misunderstanding about whether they should come -- whether
23    these were documents that come from the suppliers or not.  It
24    seems to me to be neither here nor there if at the end of the
25    day there's no prejudice and these COAs are, in essence, the
```

1    same -- would have been the same as the many, many that the

2    plaintiffs have.

3           If the plaintiffs have a good-faith basis to show me

4    that those documents would have been different, I'll hold a

5    hearing.  If at the end of the day I find that the COAs would

6    have been all the same, I'm not going to award fees for the

7    hearing.  If at the end of the day they're different, then I'll

8    figure out what the sanction should be.  But from when I read

9    the papers, I don't even think the plaintiffs are telling me

10   they would have been different, right?

11          MR. SLATER:  Your Honor -- well, first of all, we

12   don't have the documents.  But we do have a good-faith basis

13   because we do have a document that predated these documents

14   from the years that were destroyed.  And mind you, the

15   destruction documents for 2010 and 2011 have not been produced.

16   So they don't even have documentation for when they destroyed

17   those documents.  They just ask us to take their word for it,

18   number one.

19          CHIEF JUDGE BUMB:  Well, that's why I'll hold a

20   hearing and see who's credible and who's not.  I mean, so they

21   say that they were done in the ordinary course of their

22   protocols.  They say that they were the same.  They say that

23   they followed the Chinese protocol.  So there would be --

24   there's no evidence why they would have been different.  So

25   there are a whole number of facts that they lay out that say to

1    me, you know, why are we -- why are we fighting over this?

2         MR. SLATER:  The second thing is, it's not just the

3    certificates of analysis.  They came with the internal

4    inspection reports.  What did the people at ZHP when they

5    received each batch of DMF do in response?  What did they

6    notate about it?  What did they test?  We don't have those.

7    That would have been the critical time, 2010, 2011, when they

8    were initially evaluating the DMF solvent for use in this new

9    process, that that would have been the likely time for them to

10   actually evaluate the DMF and see what was in it.

11        And the other thing is, as we've briefed to Your

12   Honor, I think what you're getting at is the concept of

13   prejudice, but because this is not ESI and these are hard copy

14   documents, I think it's black letter law, we don't have to

15   prove prejudice to get an adverse inference or to have other

16   sanctions assessed.

17        CHIEF JUDGE BUMB:  Well, no, I'm not giving you an

18   adverse inference until I'm satisfied that there was prejudice,

19   because I have to hold a hearing on it.  So, again, here we

20   are.  September 8th is the day.  I guess I'm going to just

21   delay the trial.

22        MR. SLATER:  What day do you have in mind, Judge?

23        CHIEF JUDGE BUMB:  I don't know.  November.

24        I mean, you folks just keep bringing up all of these

25   issues.  You file a 40-page motion for sanctions.  They want to

1    respond to it.  I never authorized the motion for sanctions.

2            MR. SLATER:  I -- we thought we were responding when

3    they -- they said there's no prejudice, there should be no

4    sanctions, and Your Honor told us to give you a fulsome record.

5            CHIEF JUDGE BUMB:  Answer three questions.  I didn't

6    say file a motion for sanctions.  I said answer three

7    questions.

8            MR. SLATER:  Well, we were just responding to their

9    argument, and they only responded to two of them, because they

10   didn't answer to the one about did they destroy the documents

11   in violation of the lit hold, which they did, after telling the

12   Court they didn't.

13           CHIEF JUDGE BUMB:  Well, I'll have to just hold a

14   hearing.  I'll just have to hold a hearing.

15           MR. SLATER:  That's fine.  Or Your Honor could charge

16   the jury on it just as you did in the other case that we cited

17   to.

18           CHIEF JUDGE BUMB:  What do you mean, "charge the jury

19   on it"?

20           MR. SLATER:  You charged the jury in another case

21   that the jury will determine whether these documents -- in a

22   case where prejudice was required, you charged the jury to

23   determine whether there was intent.  And then you said you'll

24   address it after the case.  I'm just throwing it out.  We don't

25   think we have to show prejudice because these are not ESI

1    documents.

2            CHIEF JUDGE BUMB:  Well, why would I create error

3    without holding a hearing?

4            MR. SLATER:  I'm not fighting against the hearing.

5    I'm just making suggestions.

6            Because I've never had this ever happen in my career

7    where I actually was able to prove destruction of relevant,

8    central documents in violation of a lit hold, a preservation

9    order, and an order compelling production.  I've never had this

10   before.

11           MS. ROSE:  Your Honor --

12           MR. BERNARDO:  Your Honor --

13           CHIEF JUDGE BUMB:  And I'm not saying that there

14   shouldn't be some consequence to it.  But at the end of the

15   day, if I find that it was done in good faith, if I find that

16   it's no harm, no foul because the certificates of analysis are

17   the same as the many, many hundreds that the plaintiff already

18   has and that there's no prejudice, then the punishment has to

19   fit the crime, okay?

20           A court shouldn't just give an adverse inference

21   without fact-finding.  That seems to me to be a dereliction of

22   my duties.  So I have to figure out why did this happen.  I

23   mean, I guess I could refer to Judge Vanaskie, but in the

24   interest of moving this along, because I doubt that you folks

25   will agree with anything that Judge Vanaskie rules.  So I'll

1    have to hold a hearing and resolve it.

2            MR. BERNARDO:  Your Honor, if I may, very briefly.  I

3    understand it's late in the day.  If there is going to be a

4    hearing, which we would appreciate, we also feel like there

5    needs to be some kind of pleading that we can respond to.  Like

6    a comment Your Honor made earlier, I feel like we're a very

7    moving target.  The 33 pages Mr. Slater provided go back to

8    2019 and start talking about discovery.

9            If there's going to be a hearing, which I would like

10   to sort through this, then I think it makes sense for there to

11   be a motion that sets forth exactly what it is that we're going

12   to be arguing.  Because right now I feel like it's a very big

13   moving target.

14           (Court reporter clarification.)

15           MR. BERNARDO:  Richard Bernardo for ZHP.

16           CHIEF JUDGE BUMB:  I don't know.  Okay.  So let me --

17   so on that issue, I'll have to give you a hearing date.

18           I'll see you folks on the 3rd.

19           Plaintiffs within five days will put in a

20   three-page submission as to what exactly it is that they are

21   asking for the certificates of analysis issue so I know what it

22   is that I'm holding a hearing on.  I think that's probably a

23   good idea.

24           Within five days both sides will submit a brief as to

25   why Dr. Siddiqui should not be precluded, which this Court is

```
 1    inclined to grant.

 2              I see no bases under Rule 702 to preclude Dr. Mahmud.

 3    And I have reserved for reasons I've articulated with the last

 4    witness, Dr. Thompson.

 5              The motions in limine, you folks have worked out,

 6    right?

 7              MR. SLATER:  The majority of them.

 8              CHIEF JUDGE BUMB:  What's the ones you haven't worked

 9    out?  I guess we can talk about them on the 3rd.

10              MS. ROSE:  Your Honor, do you mind if I clarify

11    something?  I'm so sorry to interrupt.

12              CHIEF JUDGE BUMB:  Yeah, one second.  So maybe I can

13    hold -- can I hold the hearing on the 3rd or at least start it?

14    Let's see, what is today?  Today's Tuesday.  Yeah.  So by

15    Friday, let them know what it is that you're complaining about

16    and what that hearing might look like by Friday.

17              MR. SLATER:  I mean, we have our brief.  I think our

18    brief was super detailed.

19              CHIEF JUDGE BUMB:  Can you just narrow it down?  Can

20    you just synthesize it, you know.  I don't know how else to say

21    this, but so much gets said and so much gets distorted.  And

22    it's so hard for me to keep a record of what exactly the issues

23    are.  So I think keeping the parties to really short

24    submissions is going to be very helpful.  So three pages.

25              Yes.
```

1          MS. ROSE:  Your Honor, just to clarify, would you --
2     will we be allowed to have a submission in response to
3     plaintiffs' submission?
4          CHIEF JUDGE BUMB:  File it by Monday, if I'm going to
5     hold the hearing on the 3rd.  Well, Monday is a holiday.
6          MS. ROSE:  Yes.
7          And, Your Honor, and I understand your schedule comes
8     first, Mr. Bernardo, who Mr. Slater specifically calls out as
9     making misrepresentations in his briefing, is unavailable on
10    the 3rd.  He did not make any misrepresentations, to be clear.
11    But he would very much like to be here to address the
12    spoliation issue.
13         MR. BERNARDO:  I can be there the next day.  I just
14    have a deposition in Boston on the 3rd, Your Honor.
15         MR. SLATER:  I don't know if this solves the issue or
16    makes it -- I don't know if this solves the issue, but I think,
17    Your Honor, did you determine that this trial is being pushed
18    by a few months?
19         CHIEF JUDGE BUMB:  No, I haven't determined that.
20    And I'd like not to.
21         MR. SLATER:  Okay.
22         CHIEF JUDGE BUMB:  The criticism of this Court has
23    been how long the proceedings have been ongoing.  I don't think
24    there's not one time one brief that I get from the plaintiffs
25    where I say -- where the plaintiffs say this has been going on

1    forever.

2              MR. SLATER:  Well, we're not criticizing the Court.

3    It's just that in terms of --

4              CHIEF JUDGE BUMB:  Well, who else would you be

5    criticizing?

6              MR. SLATER:  I don't think it's been as a criticism.

7    But what I'm saying is, the reality of it is we have enormous

8    amounts of time and money being spent.  We have commitments

9    that need to be made to hotels.  We need to have people have

10   plans to come in.  So I'm just asking in terms of everybody

11   being able to know what they're going to do with their lives,

12   if the Court is inclined to move the trial, we'd rather know it

13   now than next week when it's like go time and we have to sign

14   contracts and we have to make commitments of everybody's lives

15   around the country.

16             I don't know if everyone wants to say it, I would

17   think most people would want to know that because it's -- it's

18   a huge commitment of effort to be ready to try the case.  We're

19   ready to go if Your Honor says, look, come hell or high water,

20   we're going.  But if Your Honor is inclined to move the case,

21   we'd rather know it now so we can just, you know, structure our

22   lives.

23             CHIEF JUDGE BUMB:  Well, I guess it just depends upon

24   how many issues the parties keep asking me to address and how

25   many moving targets I have to deal with on a daily basis.

1          MR. SLATER:  Well, I fear that we have not one or two

2     issues.  There's a number of in limine motions that have to be

3     discussed, and I'm not going to try to sugarcoat it.  I mean,

4     there are definitely going to be disagreements that are going

5     to continue.  That's the nature of a litigation like this.  I

6     wish we could agree on everything, but I don't think we're

7     going to.

8          CHIEF JUDGE BUMB:  What are the motions in limine

9     that you didn't work out?

10         MR. SLATER:  I think we have --

11         CHIEF JUDGE BUMB:  Because some of them I just

12    thought were -- some of them I just thought were so frivolous.

13         The April 26 radiology report, did you work that out?

14         MR. SLATER:  No, we did not.

15         CHIEF JUDGE BUMB:  All right.  That's in.  That comes

16    in.

17         Did you --

18         MR. SLATER:  Just for the record, Your Honor, we

19    filed an extensive brief on that issue.

20         CHIEF JUDGE BUMB:  And I've read it.  It's in.

21         Exclude evidence of the past medical history.  All

22    the medical history comes in.

23         What else haven't you worked out?

24         MR. SLATER:  I don't have the list in front of me

25    because it was finalized last night.

```
 1              MS. ROSE:  I have it.

 2              CHIEF JUDGE BUMB:  All of the medical evidence comes

 3    in.  So if you can't work it out, it all comes in.  I'm looking

 4    here.

 5              MR. SLATER:  Do I need to say if we object to the

 6    ruling or not say anything?  I just want to make sure we make a

 7    clean record.  Because we obviously, you know, disagree with

 8    those rulings.

 9              CHIEF JUDGE BUMB:  Yeah.  I don't -- I don't -- I

10    don't understand the basis by which you could object.  You are

11    putting the plaintiffs' medical history in question.

12              MR. SLATER:  It's a 403 issue, Your Honor.

13              CHIEF JUDGE BUMB:  Right.

14              MR. SLATER:  And we're trying to keep the jury

15    focused on the parts of the medical history that are directly

16    relevant as opposed to having a wide-ranging presentation of

17    everything that ever happened in someone's life.

18              CHIEF JUDGE BUMB:  Well, obviously.  And that's one

19    of the difficulties with motions in limine because they're so

20    broad and then they ask for a broad ruling on the part of the

21    Court.  So obviously if the defendants are going to start

22    talking about how Mr. Roberts had, you know, an appendectomy

23    when he was ten, that's not relevant, okay.  So obviously I'll

24    exercise my gatekeeping function.  But what I don't do is I

25    just throw it all out and say none of it comes in.  And I trust
```

286

1    that the defendants understand that.

2              MS. ROSE:  Yes, Your Honor.  The medical conditions

3    that we have designated testimony about, we have demonstrated

4    through submissions to Judge Vanaskie the relevance to

5    Mr. Roberts' health as it applies to this case, his

6    cardiovascular health or his risk of HCC.

7              CHIEF JUDGE BUMB:  Right.

8              JUDGE VANASKIE:  I am prepared to give the rulings on

9    it today.

10             CHIEF JUDGE BUMB:  Great.  Okay.  What are the other

11   ones?  Preclude the defendants from seeking sympathy, did you

12   work out that one?

13             MS. ROSE:  I believe so.

14             CHIEF JUDGE BUMB:  Okay.  Exclude any comment,

15   evidence, testimony, inference that any award of damages will

16   adversely affect the ability of any member of the jury to

17   purchase drugs.

18             MR. SLATER:  I think those -- that might be the list

19   of stipulations.

20             (Counsel conferring.)

21             MS. ROSE:  No.  I think she's reading from the

22   August 11 letters that we submitted before we stipulated.

23             MR. SLATER:  Oh, all right.

24             CHIEF JUDGE BUMB:  All right.  Just tell me which

25   ones you haven't agreed on and which ones Judge Vanaskie is not

1    going to rule on.

2              MS. ROSE:  I can go through defendants, if that's

3    helpful.

4              CHIEF JUDGE BUMB:  All right.  Go ahead.

5              MS. ROSE:  We've been able to reach agreement on

6    almost all of defendants' motions in limine.  One we couldn't

7    reach agreement on was evidence or argument that defendants

8    committed fraud on the FDA or misled the FDA.  You had excluded

9    that previously in the TPP trial.

10             I believe the dispute between the plaintiffs, they

11   want to be able to say that ZHP misled the FDA.  But there's

12   clear case law saying that it's inappropriate in a personal

13   injury trial to be trying whether or not ZHP or a company

14   complied with its --

15             CHIEF JUDGE BUMB:  Yeah, okay.  What's the next one?

16             MS. ROSE:  Sorry.

17             MR. SLATER:  Do I need to comment on it, Your Honor?

18             CHIEF JUDGE BUMB:  I haven't ruled.  I just want to

19   hear which ones you haven't agreed on.

20             MS. ROSE:  And then would you like the next one, Your

21   Honor?

22             CHIEF JUDGE BUMB:  Yes.

23             MS. ROSE:  I believe we have stipulated to that one.

24             I think that is it for defendants.

25             CHIEF JUDGE BUMB:  Okay.  What about for the

1    plaintiffs?

2              MR. SLATER:  I'm trying to find the list, Your Honor.

3    I know that one of them is that we could not agree on certain

4    language for how adulteration will be tried during the case.

5    Your Honor discussed this at prior hearings.  And the issue

6    boils down to, we understand that the plaintiff expert and the

7    defense expert can talk about whether or not they believe the

8    statutory definition for adulteration was met or was not met.

9              CHIEF JUDGE BUMB:  Uh-huh.

10             MR. SLATER:  The sticking point is Your Honor ruled

11   very clearly that nobody can argue for the defense that the

12   drug could not have been adulterated before the FDA made that

13   determination.  Your Honor ruled and we have it on the record.

14   So we just wanted to make it clear that when the defense expert

15   says, well, it was not adulterated, and that's because they

16   cannot suggest that the timing of the FDA declaration is a part

17   of the reason why they would say it was not adulterated.

18   Either it was or it wasn't under the statutory definition.  I

19   understand their expert can argue about it, but can't anchor

20   their opinion to the date of the FDA determination in any way

21   or point to that date, and we could not agree to that.  They

22   would not agree.

23             MS. ROSE:  Your Honor, can I respond?

24             We see this motion as just a rearguing of the motion

25   to exclude Dr. Ali Afnan, which you heard September 18th, I

289

believe, of last year.  We had a full-day hearing on it in

which you said that Dr. Afnan who's an FDA expert, worked at

the FDA, could talk about whether or not valsartan was

adulterated prior to the recall.  He had said -- we had said

that there would not be an opinion that as a matter of law you

can't be adulterated before the FDA says you're adulterated.

But you specifically said, after hearing from him, long

cross-examination, that if the plaintiffs' witnesses are

testifying in their regulatory capacity that they, given their

regulatory experience, opined that these drugs were adulterated

before the FDA declared them adulterated, this witness,

Dr. Afnan, will be permitted, given his expertise, to counter

that.

So I'm not really sure what they wanted with this

motion because Your Honor has very clearly said that we can't

say as a matter of law you can't be adulterated but the FDA --

CHIEF JUDGE BUMB:  Yeah.

MS. ROSE:  But Dr. Afnan can say they were not

adulterated.

CHIEF JUDGE BUMB:  Yeah.  I mean, if you open the

door, then it comes in.

MR. SLATER:  The issue is the "it."  I understand

they're inserting the word as a matter of law in the middle of

a sentence, and they've been doing that now, we've been going

back and forth for two weeks.  Dr. Afnan, that's no concession

1    for him to say, well, I'm not going to say it as a matter of

2    law, but I'm going to say -- I just want to make clear, and

3    they will not agree to this, that he cannot point to the date

4    of the FDA finding of adulteration in the warning letter and

5    say:  And the FDA did not find that until November of 2018 and

6    that's part of the basis for my opinion that it wasn't

7    adulterated when it was sold.

8              Your Honor has ruled that the date of the finding is,

9    as a matter of law, not something they can argue to, and they

10   will not agree not to point to the date of the finding.  And

11   that -- Your Honor already ruled as a matter of law it would be

12   improper to suggest the drugs couldn't have been adulterated

13   before the finding, and they will not agree that their expert

14   won't say that.

15             MS. ROSE:  I guess what I'm confused by, again, I

16   feel like this is just a motion to reargue the motion to

17   exclude Dr. Afnan.  This was discussed at length, and I'm happy

18   to put in a submission to the Court with what the Court --

19   there were pages --

20             CHIEF JUDGE BUMB:  All right.  Do that.

21             MS. ROSE:  -- pages of testimony.

22             CHIEF JUDGE BUMB:  Do that, please.

23             MS. ROSE:  Okay.  What's the other --

24             MR. SLATER:  And I have the proposed MIL I can give

25   the Court.

291

1          CHIEF JUDGE BUMB:  What is it?

2          MR. SLATER:  I think it covers our other --

3          CHIEF JUDGE BUMB:  Just tell me what it is.

4          MR. SLATER:  Well, one is the one we just went

5    through, and I have the language right here, and I can give it

6    to counsel.

7          CHIEF JUDGE BUMB:  Okay.  And what's the other one?

8          MR. SLATER:  The other one is the one that Your Honor

9    wrote down, but we didn't argue yet, about the defense request

10   that the plaintiffs not be able to suggest the defendants

11   misled the FDA.

12         Your Honor ruled that we can absolutely tell the jury

13   what the defense -- what ZHP told the FDA.  That you've already

14   ruled we can tell them.

15         CHIEF JUDGE BUMB:  Why does that --

16         MR. SLATER:  So we're not arguing fraud on the FDA

17   affirmatively.  That evidence will be put in to answer the

18   defense that the FDA approved everything.

19         CHIEF JUDGE BUMB:  What cause of action does this go

20   to?

21         MR. SLATER:  It goes to their defense to all of the

22   claims where they say:  We didn't do anything wrong, the FDA

23   knew what we were doing.

24         So in response to that defense, we're going to show

25   the jury, well, let's look at what they told the FDA and didn't

1    tell them.  The FDA was not informed of what was going on, and

2    a lot of important information was held back.  So that

3    undercuts their defense.  It's not our affirmative claim.

4    We're not suing for misleading the FDA.  We don't have a claim

5    for that.  We don't have a fraud on the FDA claim.  The fraud

6    claim is directly on behalf of the plaintiff.  It's not based

7    on *Buckman*.  It's not a fraud on the FDA case.  It's

8    literally --

9              CHIEF JUDGE BUMB:  Okay.

10             MR. SLATER:  -- in response.

11             CHIEF JUDGE BUMB:  So the remaining motions in limine

12   for which there is a dispute, five pages each side.  I'd like

13   it by Friday.  And then we can pick up with them on Wednesday,

14   on the 3rd.  All right.  I'm just looking at my calendar here

15   because I want to --

16             MR. SLATER:  Your Honor, would you like me to hand

17   this to you and to counsel as well, this proposed MIL rulings

18   on those two issues?

19             CHIEF JUDGE BUMB:  No, because you're going to give

20   me a five-page submission.

21             MR. SLATER:  Okay.

22             MS. ROSE:  Your Honor, just for clarification, should

23   each party submit five pages?  I just want to be clear, because

24   we haven't received motions from them.  They haven't received

25   motions from us.  I think we only have one motion outstanding

293

1      that hasn't been ruled on.

2              THE COURT:  Well, I was just anticipating you know

3      their motion so tell me why it shouldn't come in.

4              MS. ROSE:  Okay.

5              CHIEF JUDGE BUMB:  Don't you folks -- haven't you

6      folks been having this conversation about disputes?

7              MR. SLATER:  Yes.

8              CHIEF JUDGE BUMB:  Yeah.  So yours will be an

9      opposition; his will be --

10             MS. ROSE:  Okay.

11             CHIEF JUDGE BUMB:  So I think what I'll do is I'll

12     hold a hearing, the hearing and any other -- so I'll see you

13     folks on the 3rd.  We'll pick up, we'll go through, try to

14     prune this case and get it ready for trial.  The 8th I'll have

15     you folks in.  I'll hold the hearing.  Are you free then,

16     counsel?

17             MR. BERNARDO:  On the 8th, yes, Your Honor.

18             CHIEF JUDGE BUMB:  So I'll do that then so I can be

19     prepared on that.

20             MR. BERNARDO:  Thank you.

21             CHIEF JUDGE BUMB:  And as it stands now, I'd like to

22     pick the jury on the 9th.  And we won't sit the following week.

23     I'll pick up on the 22nd, because the following week I'm only

24     available -- the problem is on the 22nd, then we have some

25     holidays on the 23rd and 24th.  But I'm not available the

1    17th through the 19th.

2              So we'll pick the jury.  We'll get the jury ready and

3    I'll tell them that we'll start on the 22nd.

4              MR. SLATER:  And, Your Honor, the 23rd I believe is

5    Rosh Hashanah.

6              CHIEF JUDGE BUMB:  Yes.  We have the holidays.

7              MR. SLATER:  I just wanted Your Honor to know if we

8    start Monday, we would be -- there's certain people who

9    probably have to be -- some of us would have to be out on

10   Tuesday.

11             CHIEF JUDGE BUMB:  Yeah.  Yeah.  But maybe we can do

12   like openings on the 22nd or something like that.  So schedule,

13   you know --

14             MR. SLATER:  Understood, Your Honor.

15             CHIEF JUDGE BUMB:  Okay.

16             MR. SLATER:  So can I repeat it back just to make

17   sure I got it?

18             CHIEF JUDGE BUMB:  Uh-huh.

19             MR. SLATER:  So we're going to pick the jury

20   hopefully on the 9th, tell them to come back on the 22nd for

21   openings.

22             CHIEF JUDGE BUMB:  How long is the trial going to

23   take, would you folks say?

24             MR. SLATER:  Let me get my notes.

25             MS. ROSE:  Your Honor, in the pretrial order we

1    proposed that we could -- we think the entire trial could be

2    done in 40 hours.

3            MR. SLATER:  Impossible.

4            MS. ROSE:  Twenty hours each side.

5            MR. SLATER:  That's impossible, especially if we get

6    through the *Daubert* rulings and we are allowed to proceed past

7    summary judgment, we're going to have to bring in a lot of

8    experts.

9            CHIEF JUDGE BUMB:  How long do you think the trial is

10   going to take?

11           MR. SLATER:  I'm going to look at my analysis.  If we

12   have to -- if two other experts come in, that would be

13   additional time, but I have it analyzed right now as -- you

14   have four-and-a-half-hour days, right, Your Honor?  It's five

15   hours minus two 15-minute breaks.

16           CHIEF JUDGE BUMB:  Usually.  Usually.

17           MR. SLATER:  So based on that, doing the math, right

18   now we're at probably 12 to 14 days to get our case in, because

19   I'm assuming we're going to have to call all of our experts on

20   causation at this point.

21           CHIEF JUDGE BUMB:  So that's two weeks.  So I'll

22   probably tell the jury three weeks, to be safe.  It usually

23   goes faster.  Anyone who's tried a case before me knows.  Okay.

24           MS. ROSE:  Your Honor, I apologize, before we

25   adjourn, I just wanted to clarify, because we're moving the

```
 1    hearing on spoliation to the 8th, in terms of filings and what

 2    the parties would put in, I believe you said that the

 3    plaintiffs would provide us something by this Friday.  Will we

 4    have an ability to respond to their fulsome 43-page motion for

 5    sanctions prior to the 8th?

 6                 CHIEF JUDGE BUMB:  No, because I am not -- if I

 7    find -- I can't -- you folks can inundate me with paper, but if

 8    I find that the defendants acted in good faith, if I find that

 9    the COAs would have been the same regardless, then I'm not

10    inclined to -- I'm not inclined to grant an adverse inference.

11    I'm not inclined to do that.  But what I will do is I will

12    probably impose attorney's fees for the hearing, et cetera, and

13    for having to bring this to the Court's attention.  I mean,

14    there's got to be some -- the defendants have already agreed

15    they destroyed the documents, right?  That's not in dispute.

16                 MS. ROSE:  No, Your Honor.

17                 CHIEF JUDGE BUMB:  Okay.  But they asked for the

18    Court's mercy because it was in good faith.  Okay.  Let's see.

19    But that doesn't mean that the plaintiffs shouldn't, you know,

20    that they should just, you know, take your word for it.  So

21    I'll hold a hearing.

22                 But I don't need briefing on it.  The issue for me

23    is, was it done in good faith, number one.  And number two, are

24    these certificates of analysis -- because there's thousands of

25    them, right, that the plaintiffs already have?
```

```
1              MR. SLATER:  No, not thousands.

2              CHIEF JUDGE BUMB:  How many do you have?  700?

3              MR. SLATER:  I think it's about 700 is what we were

4    told.  But that includes obviously some other products.  So

5    it's not just DMF.

6              CHIEF JUDGE BUMB:  Okay.  So the question is how many

7    more do you really need I guess is the question that they

8    raise?

9              MR. SLATER:  Well, we need the one.  We need the one

10   from when they were actually developing the process, and that's

11   gone.  And they don't even have a document to show when they

12   destroyed it.  I mean, that's the problem with this.  I have a

13   question on this.

14             If we're going to have a hearing, if the defendants

15   are going to call witnesses, because we don't have witnesses to

16   call on what the documents would have shown or not shown.  This

17   is -- and they've already testified they don't know, but I

18   don't know who they're going to call.  I think we need to have

19   notice of what witness they would actually bring in to say what

20   happened, why it happened, et cetera.  We would like notice of

21   who's going to testify.

22             CHIEF JUDGE BUMB:  Okay.

23             MS. ROSE:  Just to clarify, Mr. Slater said that

24   we've said that we don't know what was in the documents.  We

25   have laid out that the COAs prior to 2015 would have been
```

298

1    consistent with the Chinese national standard.  We know what

2    was in them.  We actually produced versions of them.

3              CHIEF JUDGE BUMB:  Right.  But I don't know what he

4    means by the "one document."

5              MS. ROSE:  What is the "one document"?

6              MR. SLATER:  Yeah.  What it means is remember, it's

7    not just the COAs.  Counsel keeps talking about the COAs, which

8    we also have the inspection documents where they actually

9    analyzed them and did chromatography on the batches, et cetera,

10   and recorded data.  And we don't have those either.  And those

11   were produced with the ones they have, and they destroyed the

12   ones from the development process risk assessment period of

13   time.

14             CHIEF JUDGE BUMB:  So you don't mean technically one

15   document, you mean accompanying documents.

16             MR. SLATER:  What I'm saying is, I need the document

17   that would show what they actually did with that when they were

18   doing this.  And I can't prove a negative.  I don't know who

19   they're going to have to bring to testify.

20             CHIEF JUDGE BUMB:  Do you know what --

21             MR. SLATER:  Their 30(b)(6) witness did not have

22   clarity on what was in there.  They don't know.

23             MR. BERNARDO:  Your Honor, I would not anticipate

24   bringing witnesses on this.  I think we can demonstrate both

25   through what the law says and what the law requires and what

299

1    has been done.  If we need a declaration, we can do that.

2            CHIEF JUDGE BUMB:  But how are you going to prove to

3    me good faith?

4            MR. BERNARDO:  We can show -- I think, Your Honor,

5    part of the good faith is going to come within the law and

6    within what these documents are and what the company is

7    obligated to do.  I don't want to get into full argument now,

8    but I think that's how we will do it.  But we don't have a

9    witness that we'll be bringing in from China who can

10   demonstrate in good faith.  We can demonstrate it through the

11   record retention policy.  We can demonstrate it through the

12   document destruction rulings that are all contemporaneous

13   business records that were generated --

14           CHIEF JUDGE BUMB:  And who's going to introduce all

15   of that?

16           MR. BERNARDO:  We can get an affidavit from the

17   company that --

18           CHIEF JUDGE BUMB:  I don't want an affidavit.  I just

19   want someone to tell me what happened.

20           MR. BERNARDO:  We'll need to consult with our client,

21   Your Honor, to see if we can get somebody from -- from China on

22   short notice to be able to do that.

23           Would Your Honor permit a Zoom for a witness to be

24   able to explain?

25           CHIEF JUDGE BUMB:  Perhaps.  Probably would meet the

                                                                    *300*

1    standard.

2              MR. SLATER:  Your Honor --

3              CHIEF JUDGE BUMB:  And I would consider it a 104

4    hearing anyway.  So hearsay would be, it seems to me,

5    admissible because I would consider it to be a preliminary

6    hearing.  I'm just trying to get to the bottom of it.

7              MR. BERNARDO:  Understood.  And we'd like to help you

8    get to the bottom of it.

9              CHIEF JUDGE BUMB:  Yeah.  Okay.

10             MR. SLATER:  Your Honor, I think that -- I'm sorry to

11   lengthen this.  When I gave you the time for the trial, that

12   was our time.  So, for example, for all those witnesses --

13             CHIEF JUDGE BUMB:  It will be done in three weeks,

14   Mr. Slater, I'm pretty confident of it.  And that's what I'll

15   tell the jury.  All of it, yeah.

16             MR. SLATER:  I'm just letting you know, Your Honor, I

17   don't think we can do it, but --

18             CHIEF JUDGE BUMB:  I think you can.

19             Okay.  Judge Vanaskie, you want to take over?

20             JUDGE VANASKIE:  I'll take over.

21             CHIEF JUDGE BUMB:  All right.  I'll see you folks

22   next week.  Okay.

23             THE COURTROOM DEPUTY:  All rise.

24             (Chief Judge Bumb left the bench.)

25             JUDGE VANASKIE:  It's not going to take very long.

301

```
 1   All right.  So we can -- I'll go sit over here.  And I'm just
 2   going to tell you how I rule on the deposition designations and
 3   then I have a question about the two motions that were referred
 4   to me and what you propose to do with those motions.
 5           All right.  I'm going to be working from the letters
 6   that you submitted on August 8th and August 15th.  Are you
 7   ready?
 8           MS. ROSE:  I believe so.
 9           JUDGE VANASKIE:  And specifically, I'm referring to
10   the plaintiffs' letter of August 15th, which went through
11   deposition designations identified by medical condition.  And
12   I've reviewed all the excerpts and the parties' contentions,
13   and I'm going to allow the testimony on obesity from Bullard,
14   Robichaux and Buckley.
15           I'm going to sustain the objections to the testimony
16   of Bullard, Buckley, Sanders and Robichaux dealing with
17   coronary artery disease and proximal atrial fibrillation.
18           I'm going to allow the testimony presented by Bullard
19   with respect to the GERD, G-E-R-D.  I'm going to allow the
20   testimony of Drs. Bullard and Buckley with respect to sleep
21   apnea.
22           I'm going to allow the testimony of Drs. Bullard and
23   Sanders with respect to NASH.  And the page numbers are
24   specified in your letter.  If you need, I can go through those
25   by page and line.
```

```
 1              I'm going to sustain the plaintiffs' objection to the
 2     testimony dealing with familial history.  That's in the Bullard
 3     deposition at pages 35 and 36.
 4              I'm going to sustain the objections of plaintiffs to
 5     isolated alcohol consumption as detailed in the section in the
 6     page -- there's no page numbers on this letter, but you'll find
 7     it.  And I can be specific about it.  It would be the Bullard
 8     deposition at pages 48 to 51, and 56 to 57.
 9              I'm going to sustain the objection to the testimony
10     of Drs. Bullard and Buckley dealing with remote smoking
11     history.  That's pages 36 to 37 of the Bullard deposition, and
12     page 30, lines 2 to 4 of the Buckley deposition.
13              I'm going to allow the testimony of Dr. Bullard with
14     respect to general health comments.  I don't think they place
15     blame on Mr. Roberts.  And to say his health condition could be
16     best described as fair I think is pretty accurate.  So I will
17     allow that testimony.
18              Now I'm going to switch gears and just go to the
19     defense letter of August 8th, 2025.  And consistent with the
20     ruling that I provided before, I'm going to allow the testimony
21     on obesity that is identified on page 3 of the defense letter,
22     which gives the specific page and line numbers that I'm
23     allowing.
24              I'm going to allow the testimony on obstructive sleep
25     apnea detailed on that page as well.
```

303

```
 1              I'm going to allow the testimony on NASH on page 69.

 2   And this all deals with the testimony of Dr. Bullard, as I

 3   recall.

 4              I'm going to, consistent with the ruling I made,

 5   disallow the testimony with respect to proximal atrial

 6   fibrillation and coronary artery disease that appears at

 7   page 33 to 34 and page 40 to 44 of Dr. Bullard's deposition.

 8              I think that covers the issues that were presented to

 9   me.

10              Now, I have a question, and that is there were two

11   motions in limine referred to me dealing with Dr. Chernyak and

12   Dr. Sawyer.  And I'm asking how you wanted to proceed with

13   respect to those motions.  Any thoughts?

14              I can rule on the papers.

15              MS. ROSE:  Your Honor, we'd be comfortable with Your

16   Honor ruling on the papers.  But we'd also, if Your Honor would

17   like to hear from the witnesses, we can make that happen as

18   well.

19              JUDGE VANASKIE:  Yeah.

20              MR. NIGH:  Your Honor, we agree as well.  We would be

21   comfortable with you ruling on the papers, but if you want to

22   hear from the witnesses, we are prepared to do that.

23              JUDGE VANASKIE:  I think I can rule on the papers.

24   I've gone through them, and I think there's enough there for

25   me.  And I don't have any questions of the witnesses myself.
```

1    So I will get a ruling to you hopefully out by Friday of this

2    week, but a written ruling.

3                Is there anything else to cover today?

4                (No response.)

5                JUDGE VANASKIE:  We used to ask that question and

6    we'd go forever.  Now we don't have --

7                MR. SLATER:  We just want to get to lunch.

8                JUDGE VANASKIE:  Yeah.  That would be nice.  All

9    right.  You can go to lunch.  Court is now adjourned.

10               MR. NIGH:  Thank you, Your Honor.

11               MS. ROSE:  Thank you, Your Honor.

12               (Proceedings concluded at 5:25 p.m.)

13          - - - - - - - - - - - - - - - - - - - - - -
           **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**
14          - - - - - - - - - - - - - - - - - - - - - -

15          I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18

19   /S/John J. Kurz, RDR-RMR-CRR-CRC                 August 29, 2025

20   Court Reporter/Transcriber

21

22

23

24

25