**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | MDL No. 2875 |
| | Honorable Renée Marie Bumb |
| | Chief District Court Judge |
| **This Document Relates to All Actions** | |

## TPP TRIAL DEFENDANTS' RESPONSE TO TPP PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 56.1(a), the undersigned Third-Party Payor ("TPP") Trial Defendants[1] submit this response to TPP Trial Plaintiffs' Statement of Material Facts in Opposition to TPP Trial Defendants' Motion for Summary Judgment (ECF 3146-2). Defendants object to the Supplemental Statement to the extent that Plaintiffs improperly submit "legal argument or extraneous detail outside the scope of the moving part[ies'] statement." Individual Rules & Procedures I.E.1; *see also Capps v. Dixon*, Nos. 19-12002, 20-01118, 2024 WL 340842, at *2 (D.N.J. Jan. 30, 2024) (Bumb, J.) ("Plaintiffs' Responsive Statements of Material Facts . . . plainly contain legal argument, case citations, and other impertinent information."); L. Civ. R. 56.1 ("Each statement of material facts . . . shall not contain legal argument or conclusions of law."). Moreover, as set forth in Defendants' Reply Memorandum of Law in Support of Summary Judgment, filed contemporaneously herewith, Defendants contend that the facts asserted below are immaterial and, thus, have no bearing on Defendants' Motion for Summary Judgment. Defendants nonetheless address the accuracy of these asserted facts for the sake of completeness.

---

[1] The "TPP Trial Defendants" (also referred to herein as "Defendants") are: (i) Zhejiang Huahai Pharmaceutical Co., Ltd. ("ZHP"), Huahai U.S., Inc., Prinston Pharmaceutical Inc., and Solco Healthcare U.S., LLC (collectively, "the ZHP Defendants"); (ii) Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries Ltd., Actavis LLC, and Actavis Pharma, Inc. (collectively, "the Teva Defendants" or "Teva"); and (iii) Torrent Pharmaceuticals Ltd. and Torrent Pharma, Inc. (collectively, "the Torrent Defendants" or "Torrent").

1.     Stephen S. Hecht, Ph.D., currently is a professor with the Department of Laboratory Medicine and Pathology, in the University of Minnesota Medical School. He received a B.S. in chemistry from Duke University in 1964, and his Ph.D. in organic chemistry from the Massachusetts Institute of Technology (MIT) in 1968. *See* Hecht Rpt. (Ex. 4). Judge Kugler denied Defendants' motion to preclude Dr. Hecht's general causation opinions (*see* ECF 1958), and also denied Defendants' subsequent motion to preclude Dr. Hecht's testimony at the TPP Bellwether Trial (*see* ECF 2581; ECF 2582).

**Response:** Admitted.

2.     Dr. Hecht opines, among other things, on the genotoxic and carcinogenic nature of NDMA and/or NDEA. *See* Hecht Rpt. (Ex. 4). He also opines on the failure by ZHP to conduct a reasonable risk assessment of chemical reactions and necessary testing with regard to the TEA with sodium nitrite quenching process, and the Zinc Chloride process. *See* Hecht Suppl. Rpt. (Ex. 5).

**Response:** Admitted with clarification. Defendants admit only that Dr. Hecht opined about the subjects as stated in this paragraph. Defendants deny any suggestion or implication that they knew about, or should have expected, the risk that NDEA or NDMA could form in the TEA with sodium nitrite quenching process, and the Zinc Chloride process.

3.      Dr. Stephen Lagana, M.D., a surgical pathologist, currently is an Associate Professor of Pathology and Cell Biology at Columbia University. He received a BA from Hofstra University in 2004, and an M.D. from the University of Pittsburgh School of Medicine in 2008. *See* Lagana Rpt. (Ex. 7). Judge Kugler denied Defendants' motion to preclude Dr. Lagana's general causation opinions (*see* ECF 1958).

**Response:** Admitted with clarification. Defendants admit the substance of this paragraph but note that the cited document in the second sentence does not show Dr. Lagana's credentials.

4.      Dr. Lagana opines, among other things, on how undisputed levels of NDMA and/or NDEA in Defendants' VCDs posed an unreasonably dangerous risk to those who ingested it. *See* Lagana Rpt. (Ex. 7) at 1, 33. He also will explain how the larger the amount of nitrosamines per pill or the longer used, the higher the increased risk of cancer. *Id.* at 4-5, 11-12, 16-17, 32-33.

**Response:** Admitted with clarification. Defendants admit only that Dr. Lagana opined about the subjects as stated in this paragraph. Defendants deny any suggestion or implication that Defendants' VCDs posed an unreasonably dangerous risk or that the larger the amount of nitrosamines per pill or the longer used, the higher the increased risk of cancer. In fact, the only three epidemiological studies that evaluated the potential relationship between NDMA and cancer found no

association with cancer overall and no dose-response relationship. (Defs.' Supp. SUMF ¶¶ 5-8, ECF 3101-1.)

5.    Mahyar Etminan Pharm.D., MSc, currently is a research scientist at the Center for Clinical Epidemiology and Evaluation at Vancouver Coastal Health Research Institute. He received a MSc in clinical epidemiology from the University of Toronto in 2003, and a Doctor of Pharmacy from Idaho State University in 2001. *See* Etminan Rpt. (Ex. 6). Judge Kugler denied Defendants' motion to preclude Dr. Etminan's general causation opinions (*see* ECF 1958).

**Response:** Denied in part. As the document cited by Plaintiffs shows, Judge Kugler denied in part and granted in part Defendants' motion to preclude Dr. Etminan's opinions. Specifically, Judge Kugler granted Defendants' motion to preclude Dr. Etminan's opinions "which concern NDEA and all other cancers" other than pancreatic cancer. (*See* ECF 1958.)

6.    Dr. Etminan, an epidemiologist, opines that epidemiological data showing a causal link between the levels of NDMA and/or NDEA present in Defendants' VCDs and certain cancers. *See* Etminan Rpt. (Ex. 6) at 3, 9, 27-31.

**Response:** Admitted with clarification. Defendants admit only that Dr. Etminan opined about the subjects as stated in this paragraph. Defendants deny any suggestion or implication that there is epidemiological data showing a causal link between exposure to VCDs containing NDMA and/or NDEA and an increased

overall risk of cancer. (*See* Defs.' Supp. SUMF ¶¶ 4-5, ECF 3101-1.) In fact, the only three epidemiological studies that evaluated the potential relationship between NDMA and cancer found no association with cancer overall and no dose-response relationship. (*Id.* ¶¶ 5-8, ECF 3101-1.)

7.      Dr. Etminan and Dr. Lagana address the Pottegard and Gomm studies cited in Defendants' instant motion. Dr. Etminan explains the limitations of both studies, as well as how Gomm found an increased risk of hepatic cancer and higher rates of cancer overall. *See* Etminan Rpt. (Ex. 6) at 24-26.

**Response:** Admitted with clarification. Defendants admit only that Dr. Etminan and Dr. Lagana opined about the subjects as stated in this paragraph. Defendants deny any suggestion or implication that there are limitations on the Pottegard and Gomm studies, or that Gomm found an increased risk of hepatic cancer and higher rates of cancer overall. To the contrary, Gomm found no association with cancer overall and only a small association for liver cancer, and the study authors emphasized that "[c]ausality cannot be inferred." (Defs.' Supp. SUMF ¶ 7, ECF 3101-1.)

8.      In addressing the Pottegard and Gomm studies, Dr. Lagana notes that these were something of a 'canary in a coal mine' about the dangerousness of NDMA and/or NDEA in VCDs. *See* Lagana Rpt. (Ex. 7) at 24-26. He also discusses another study that looked at adverse events reported to the FDA before and after the

valsartan recalls, and found a 70% higher risk of reporting a neoplasm for valsartan users compared to consumers of other medications before the recalls were announced publicly. *Id.* at 27.

**Response:** Admitted with clarification. Defendants admit only that Dr. Lagana offered the opinion that he viewed the Gomm study "as being something of a 'canary in a coal mine,'" and opined about the study described in the third sentence of this paragraph (Al Kindi 2019). (Lagana Rpt. (Ex. 7) at 26.) Defendants deny any suggestion or implication that the Pottegard and Gomm studies infer the dangerousness of NDMA and/or NDEA in VCDs. (Defs.' Supp. SUMF ¶¶ 6-7, ECF 3101-1.) Defendants further deny any suggestion of implication that Al Kindi 2019 suggests that NDMA and/or NDEA in VCDs was dangerous. The Al Kindi study authors themselves concluded that the increase in adverse events reported after the valsartan recall was "biologically implausible" and "[t]his observed phenomenon was likely associated with public alarm and fueled mainly by consumer and lay reporting." Al-Kindi SG et al., *Abrupt Increase in Reporting of Neoplasms Associated with Valsartan After Medication Recall. Circulation Cardiovascular quality and outcomes*, 2019;12(7):e005536.[2]

---

[2]    "[T]he Third Circuit and district courts therein have held that adverse event reporting system data are not a legitimate basis for causation opinions involving pharmaceutical products." *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 539 (W.D. Pa. 2003) (reiterating Third Circuit's "admonition against reliance on 'purely anecdotal' information" in *In re TMI Litigation*, 193 F.3d 613 (3d Cir. 1999)).

9.    Dipak Panigrahy, M.D., currently is a cancer researcher and is currently an assistant professor of pathology at Harvard Medical School. He received a BMedSci from Boston University in 1988. He received his M.D. from Boston University School of Medicine in 1994. *See* Panigrahy Rpt. (Ex. 8). Judge Kugler denied in relevant part Defendants' motion to preclude Dr. Panigrahy's general causation opinions (*see* ECF 1958).

**Response:** Denied in part. As the document cited by Plaintiffs shows, Judge Kugler denied in part and granted in part Defendants' motion to preclude Dr. Panigrahy's opinions. Specifically, Judge Kugler granted Defendants' motion to preclude Dr. Panigrahy's opinions "which concern NDEA and all other cancers" other than pancreatic cancer. (*See* ECF 1958.)

10.    Dr. Panigrahy, a cancer researcher and pathologist at Harvard Medical School, opines among other things that daily exposure to greater than 96 nanograms per day of NDMA (or greater than 26.5 nanograms per day of NDEA exposure) increases one's risk of developing numerous types of cancer. *See* Panigrahy Rpt. (Ex. 8) at 7, 10-12, 148-149. All of the NDMA levels in Defendants' VCDs exceeded 96 nanograms per day. *See infra*.

**Response:** Denied in part. Defendants admit only that Dr. Panigrahy opined about the subjects as stated in the second sentence of this paragraph. Defendants deny that the levels of NDMA in their VCDs significantly increased anyone's risk

of developing cancer. (Defs.' Supp. SUMF ¶¶ 5-8, ECF 3101-1 (none of the three epidemiological studies reported an association between NDMA in valsartan and cancer overall and all reported no dose-response relationship).)

11.    Dr. Panigrahy also opines that the latency period between NDMA (or NDEA) exposure and cancer induction including tumor dormancy escape can range from 6 months to 10+ years or more. *See* Panigrahy Rpt. (Ex. 8) at 7, 204, 212-214. Furthermore, Dr. Panigrahy opines that recent exposure to potent carcinogens such as NDMA or NDEA are more likely to be a significant factor in cancer causation than historical exposures. *Id.* at 7, 14.

**Response:** Admitted with clarification. Defendants admit only that Dr. Panigrahy opined about the subjects as stated in this paragraph.

12.    The Mansouri study was published after the parties' general causation experts submitted their reports. Nevertheless, Plaintiffs' experts such as Dr. Lagana or Dr. Panigrahy can address this study at trial and how the Mansouri study is supportive of their opinions.

**Response:** Denied in part. Defendants admit the first sentence of this paragraph. The second sentence of this paragraph is a legal argument/conclusion about future conduct, and to the extent it merits a response, Defendants deny that Dr. Lagana or Dr. Panigrahy will offer admissible testimony about the Mansouri study

or that the Mansouri study is supportive of their opinions. (Defs.' Supp. SUMF ¶ 8, ECF 3101-1.)

13.    Mansouri found statistically significant increased risk of liver cancer and melanoma. *See* Mansouri (Ex. 3). When excluding subjects who received both contaminated and uncontaminated valsartan, the statistically significant risk of liver cancer and melanoma further increased and a statistically significant increased risk of all cancer was also detected. *Id.*

**Response:** Denied. Mansouri found "no increased risk of overall cancer among exposed patients" and although it "found a slight increased risk" for liver cancer and melanoma, the study authors noted that increase may be explained by confounding factors. (Defs.' Supp. SUMF ¶ 8, ECF 3101-1; *see* Mansouri (Pls.' Ex. 3).) Although Mansouri excluded subjects who received both contaminated and uncontaminated valsartan as part of its sensitivity analyses, the study authors concluded that "[n]one of the sensitivity analyses produced meaningfully different results to those observed in the main analysis" and the "results remained overall consistent." *See* Mansouri (Pls.' Ex. 3). Mansouri further concluded that, excluding subjects who received both contaminated and uncontaminated valsartan, the risks for overall cancer were "in fact negligible." *Id.*

14.    Laura M. Plunkett, Ph.D. is a pharmacologist and toxicologist who received a B.S. degree in 1980 from the University of Georgia and a Ph.D. in

pharmacology from University of Georgia in 1984. She is a current adjunct professor at Baylor University. *See* Plunkett Rpt. (Ex. 9). Judge Kugler denied Defendants' motion to preclude Dr. Plunkett's general causation opinions (*see* ECF 1958), and largely denied Defendants' subsequent motion to preclude Dr. Plunkett's testimony at the TPP Bellwether Trial (*see* ECF 2581; ECF 2582).

**Response:** Denied in part. Defendants deny that Judge Kugler denied a motion to preclude Dr. Plunkett's opinions as part of the March 4, 2022 order (ECF 1958), especially given that her report in this case is dated October 31, 2022 (Pls.' Ex. 9). Defendants further deny that Judge Kugler largely denied Defendants' motion to preclude Dr. Plunkett's testimony in the January 5, 2025 order, which instead granted in part Defendants' motion to exclude large portions of Dr. Plunkett's testimony, including, *inter alia*, her claims about ZHP's risk assessments and the meaning of the FDA's warning letter. (*See* ECF 2581; ECF 2582.)

15. A pharmacologist and toxicologist and FDA regulatory expert, Dr. Plunket will opine from her disciplinary perspectives, among other things, that the nitrosamines in Defendants' VCDs were preventable, put patient health at risk, and resulted in the VCDs sold being adulterated. *See* Plunket Rpt. (Ex. 9).

**Response:** Admitted with clarification. Defendants admit only that Dr. Plunkett opined about the subjects as stated in this paragraph. As previously discussed, Judge Kugler precluded Dr. Plunkett from opining on ZHP's risk

assessments and the meaning of the FDA's warning letter, which Plaintiffs have relied upon in claiming that the VCDs were adulterated. (*See* ECF 2581 at 24-25.)

16.    Mr. Philip Russ is owner and president of Innovative Consultants GXP, which provides a range of regulatory compliance and quality assurance services to clients in the pharmaceutical, medical device and biologics industry. He holds a B.S. in chemistry from the University of Sciences. *See* Russ Rpt. (Ex. 10). Judge Kugler denied Defendants' motion to preclude Mr. Russ's opinions at the TPP Bellwether Trial (*see* ECF 2581; ECF, 2582).

**Response:** Admitted.

17.    Ms. Susan Bain is a former consumer safety officer/investigator with the FDA and current assistant professor with the department of regulatory and quality sciences at the University of Southern California. She received a BS in biology from California State Polytechnic University in 1978, an MS in regulatory science from University of Southern California in 2003, and a DRSc in regulatory science from University of Southern California in 2011. *See* Bain Rpt. (Ex. 11). Judge Kugler granted in part and denied in part Defendants' motion to preclude Ms. Bain's opinions (*see* ECF 2581; ECF 2582).

**Response:** Admitted. Defendants note that Judge Kugler specifically precluded Dr. Bain's opinion that the VCDs were "adulterated" and found that she

lacked "independent expertise to comment on ZHP's conduct in complying with certain regulations, i.e., cGMPs." (ECF 2581 at 19.)

18.    Dr. Ramin Najafi is founder and CEO of Emery Pharma, an FDA registered cGMP/GLP compliant contract research laboratory. He received a B.S. and M.S. in organic chemistry from the University of San Francisco in 1983. He received his Ph.D. in organic chemistry from the University of California, Davis in 1988. *See* Najafi Rpt. (Ex. 12). Judge Kugler granted in part and denied in part Defendants' motion to preclude Dr. Najafi's testimony at the TPP Bellwether Trial (*see* ECF 2581; ECF 2582).

**Response:** Denied in part. Defendants deny that Emery Pharma is cGMP/GLP compliant. (Najafi Dep. 109:14-112:12, Ex. 3, ECF 2292 (admitting that Emery Pharma received a Form 483 following an FDA inspection in 2021, which identified certain Emery Pharma practices that did not comply with regulations).) Defendants also note that Judge Kugler ruled that Dr. "Najafi's opinions that contaminated VCDs provided zero benefit to consumers or their TPPs are PRECLUDED. Najafi is no economic or medical expert qualified to opine on the benefit of contaminated VCDs to patients." (ECF 2581 at 22.)

19.    Dr. Plunkett, along with Mr. Russ, Ms. Bain, and Dr. Najafi, will collectively opine among other things on the nature of Defendants' non-compliance with current good manufacturing practices ("cGMPs"), and how Defendants'

avoidable deviations from cGMPs rendered their VCDs adulterated from a compliance or chemistry standpoint for the entirety of the class period. *See* Plunkett Rpt. (Ex. 9); Russ Rpt. (Ex. 10); Bain Rpt. (Ex. 11); Najafi Rpt. (Ex. 12).

**Response:** Admitted with clarification. Defendants admit only that Dr. Plunkett, Mr. Russ, Ms. Bain, and Dr. Najafi opined about the subjects as stated in this paragraph. Defendants deny any suggestion or implication that they failed to comply with cGMPs, or that they knew about, or should have expected, the risk that NDEA or NDMA could form in the manufacturing process. (*See* ZHP Defs.' Resp. to SUMF ¶ 143.5, ECF 2607; *see also* Torrent Resp. to SUMF ¶¶ 39,46, ECF 2597; Teva Resp. to SUMF ¶ 6, ECF 2619.)

20.    Dr. Plunkett also opines on how Defendants' generic equivalents of branded Diovan or Exforge should have, but did not have, the same purity, quality, and safety characteristics as the branded counterparts or other non-contaminated Orange Book-listed generic therapeutic equivalents. Plunket Rpt. (Ex. 9) at ¶¶ 16-17, 21-25, 28.

**Response:** Admitted with clarification. Defendants admit only that Dr. Plunkett opined about the subjects as stated in this paragraph. Defendants deny any suggestion or implication the VCDs were adulterated or misbranded at the time that they were sold. (Defs.' Orig. SUMF ¶¶ 68, 72-73, 94, 98-101, ECF 2571.)

13

21.     Kali Panagos, Pharm.D., RPH, is a registered pharmacist with two Bachelor of Science degrees from St. John's University in biology and pharmacy, and a doctorate in pharmacy from Shenandoah University. She has served as executive vice president of ARMSRx Pharmacy Benefit Consulting. *See* Panagos Rpt. (Ex. 13). Judge Kugler granted in part and denied in part Defendants' motion to preclude Dr. Panagos' testimony at the TPP Bellwether Trial (*see* ECF 2581; ECF 2582). Her opinions include an overview of TPP pharmacy benefits and drug formularies. Panagos Rpt. (Ex. 13) at 2-12. Dr. Panagos opined that TPPs could not have and would not have paid for Defendants' VCDs had they known of their contamination with NDMA and/or NDEA and adulteration. *Id.*

**Response:** Admitted with clarification. Defendants admit that Dr. Panagos opined about the subjects as stated in this paragraph. Defendants deny any suggestion or implication the VCDs were adulterated or misbranded at the time that they were sold. (*See* Defs.' Orig. SUMF ¶¶ 68, 72-73, 94, 98-101, ECF No. 2571.) Moreover, Emblem (one of Plaintiffs' assignors) did not notice any change to any Emblem formulary even after the valsartan recall. (*Id.* ¶ 124.)

22.     Defendants' VCDs did not possess the same purity, quality, and safety as Diovan or Exforge, *see, e.g.*, Plunkett Rpt. (Ex. 9) at ¶¶ 16-17, 21-25, 28, which they were required to have, *see, e.g.*, *id.*; Russ Rpt. (Ex. 10) at ¶¶ 15, 38; Najafi Rpt. (Ex. 12) at 39; ZHP Prior SUMF Resp. (ECF 2607) at ¶ 147 (ZHP admitting that

they "always represent to their customer that their valsartan products were the therapeutic equivalent of the brand name product"); *see also* Pls.' Prior SUMF re Torrent (ECF 2563) at ¶¶ 22-23; Pls.' Prior SUMF re Teva (ECF 2566) at ¶¶ 37-41.

**Response:** Denied. The VCDs containing NDMA provided the same therapeutic benefit as VCDs that did not contain NDMA impurities. (Defs.' Orig. SUMF ¶ 125, ECF 2571; *see also* Torrent Resp. to SUMF ¶ 23, ECF 2597; Teva Resp. to SUMF ¶ 41, ECF 2602.)

23. Defendants admit that NDMA and NDEA are probable human carcinogens; that nitrosamines at these undisputed levels presented an "unacceptable carcinogenic risk to the intended patient population"; and that it would have been "unethical" to knowingly sell the contaminated VCDs. ECF 2607 at 124-25, 126, 128-29, 138, 141.

**Response:** Denied. Defendants deny that their prior responses contained the admissions in this paragraph. In response to Plaintiffs' statement that NDMA and NDEA are probable human carcinogens, Defendants admitted with the clarification that: "As the FDA explained, NDMA and NDEA are also present 'in other ingested products,' such as 'charcoal grilled food items,' 'meats, dairy products,' 'vegetables' and even 'water.' Further, the trace NDMA impurity at the levels identified in recalled valsartan presented only a 'very small' risk to patients." (*See* ZHP Defs.' Resp. to SUMF ¶ 136, ECF 2607.) Defendants previously denied Plaintiffs'

15

statement that the level of NDMA in contaminated VCDs was "an unacceptable carcinogenic risk to the intended patient population." (*Id.* ¶ 143.) Defendants previously denied in part Plaintiffs' statement that it would be "unethical" to knowingly sell the contaminated VCDs. (*Id.* ¶ 163.1.)

24.    NDMA and/or NDEA are probable human carcinogens. *See* Pls' Prior SUMF re ZHP (ECF 2569-3) at ¶¶ 136-137; ZHP Prior SUMF Resp. (ECF 2607) at ¶¶ 136-137; Pls.' Prior SUMF re Teva (ECF 2566) at ¶¶ 96-100; Pls.' Prior SUMF re Torrent (ECF 2563) at ¶¶ 47, 49.

**Response:** Disputed. As defense expert Dr. Chodosh testified, "NDMA and NDEA are not known humans. There is no human cancer that has been demonstrated to result from exposure to NDMA or NDEA." (Teva Resp. to SUMF ¶ 100, ECF 2602.) Further, as the FDA explained, NDMA and NDEA are also present "in other ingested products," such as "charcoal grilled food items," "meats, dairy products," "vegetables" and even "water." (ZHP Defs.' Resp. to SUMF ¶ 136, ECF 2607; *see also* Torrent Resp. to SUMF ¶ 47, ECF 2597 (NDMA "occurs naturally in certain foods, drinking water, air pollution, and industrial processes . . . .").) In short, the trace NDMA impurity at the levels identified in recalled valsartan presented only a "very small" risk to patients. (ZHP Defs.' Resp. to SUMF ¶ 136, ECF 2607.)

25.    NDMA and/or NDEA was detected in Defendants' VCDs' by every test for nitrosamines by ZHP, Teva, or Torrent themselves, or the FDA. *See* Pls.'

Prior SUMF re ZHP (ECF 2569-3) at ¶¶ 26-34; Pls.' Prior SUMF re Teva (ECF 2566) at ¶¶ 96-100; Pls.' Prior SUMF re Torrent (ECF 2563) at ¶¶ 23-25.

**Response:** Denied. Defendants deny that NDMA and/or NDEA was detected in Defendants' VCDs by every test. (*See* ZHP Defs.' Resp. to SUMF ¶ 32, ECF 2607; *see also* Teva Resp. to SUMF ¶¶ 8-16, ECF 2619, Torrent Resp. to SUMF ¶¶ 23-25, ECF 2597.)

26.     Every test by ZHP, Teva, Torrent, or the FDA showed nitrosamines at levels well above the eventual limit adopted by the FDA, ranging up to 627 times the limit. *See* Pls.' Prior SUMF re ZHP (ECF 2569-3) at ¶¶ 31; Pls.' Prior SUMF re Teva (ECF 2566) at ¶¶ 8-16, 18-19; Pls.' Prior SUMF re Torrent (ECF 2563) at ¶¶ 23-25.

**Response:** Denied. Defendants deny that every test showed nitrosamine levels above the eventual limit adopted by the FDA. (*See* ZHP Defs.' Resp. to SUMF ¶ 32, ECF 2607; *see also* Teva Resp. to SUMF ¶¶ 8-16, 18-19, ECF 2619; Torrent Resp. to SUMF ¶¶ 23-25, ECF 2597.) Defendants further deny Plaintiffs' characterization that tests showed levels "well above" the eventual limited adopted by the FDA. (*Id.*)

27.     ZHP stated that the levels of nitrosamines in valsartan API used in Defendants' VCDs posed "an unacceptable carcinogenic risk to the intended patient

population." *See* Pls.' Prior SUMF re ZHP (ECF 2569-3) at ¶¶ 143, 155, 158-159, 163.1; *see also* Pls.' Prior SUMF re Torrent (ECF 2563) at ¶¶ 55.

**Response:** Denied in part. As explained by Mr. Hai Wang, the statement quoted by Plaintiffs was a "mandate[] of the FDA," which Defendants do "not necessarily agree with." (ZHP Defs.' Resp. to SUMF ¶ 155, ECF 2607; *see also* Torrent Resp. to SUMF ¶ 55, ECF 2597.)

28.    ZHP witness(es) testified that "NDMA is highly likely to be carcinogenic to humans" and that it would be "'unethical to sell valsartan with those levels of NDMA contamination [documented by ZHP],' if that was knowingly done". *See* Pls.' Prior SUMF re ZHP (ECF 2569-3) at ¶¶ 139, 163.1.

**Response:** Denied in part. While the quoted language in Paragraph 28 appears in the deposition testimony of Dr. Min Li, Dr. Li did not testify that "ZHP stopped selling the contaminated valsartan because it was deemed 'highly likely to be carcinogenic in humans.'" ZHP voluntarily recalled valsartan due to the detection of a trace amount of an unexpected impurity, N-nitrosodimethylamine (NDMA)." (SOLCO00000173 (Defs.' Orig. SUMF, ECF 2571, Ex. 2).) The FDA "estimated that if 8,000 people took the highest valsartan dose (320 mg) from NDMA-affected medicines daily for four years (the amount of time we believed the affected products had been on the U.S. market), there may be one additional case of cancer over the lifetimes of these 8,000 people beyond the average cancer rate among Americans.

This estimate represented the highest possible level of NDMA exposure. It was a measure of the risk under the most extreme circumstances. Most patients who were exposed to the impurity through the use of valsartan received less exposure than this worst-case scenario." (Defs.' Orig. SUMF Ex. 64 at3) Similarly, the FDA stated that it "estimate[s] that if 18,000 people took valsartan at the highest dose (320 mg) containing NDEA from recalled batches daily for four years, there may be one additional case of cancer over the lifetime of these 18,000 people." (Defs.' Orig. SUMF Ex. 71.) (*See* ZHP Defs.' Resp. to SUMF ¶ 163.1, ECF 2607.)

29.    Retailer Defendants' corporate representatives testified that they would not have sold Defendants' VCDs had they known of the NDMA and/or NDEA contamination. *See* Pls.' Prior SUMF re ZHP (ECF 2569-3) at ¶ 144.

**Response:** Admitted with clarification. There has been no finding that ZHP's API or the VCDs were adulterated or misbranded at the time that they were sold, and the FDA's Warning Letter does not suggest otherwise. (*See* ZHP Defs.' Resp. to SUMF ¶¶ 47, 144, ECF 2607.)

30.    Named TPP Plaintiff's assignors do not reimburse for drugs that are not FDA approved and that are adulterated, contaminated, misbranded, or otherwise unsaleable. *See* Mrakovich Decl. (Ex. 15) at ¶ 12; Colby Decl. (Ex. 15) at ¶ 14. They would not have reimbursed for Defendants' VCDs had they known about the

nitrosamine contamination and Defendants' cGMP violations relating to their VCDs. Mrakovich Decl. (Ex. 15) at ¶ 13; Colby Decl. (Ex. 15) at 15.

**Response:** Admitted with clarification. There has been no finding that ZHP's API or the VCDs were adulterated or misbranded at the time that they were sold, and the FDA's Warning Letter does not suggest otherwise. (*See* ZHP Defs.' Resp. to SUMF ¶¶ 47, 144, ECF 2607.) Moreover, Emblem (one of Plaintiffs' assignors) did not notice any change to any Emblem formulary even after the valsartan recall. (Defs.' Orig. SUMF ¶ 124, ECF 2571.)

31.    The FDA's July 13, 2018 press release stated "NDMA is classified as a probable human carcinogen (a substance that could cause cancer) based on results from laboratory tests." *See* Ex. 16. It also stated: "When we identify lapses in the quality of drugs and problems with their manufacturing that have the potential to create risks to patients, we're committed to taking swift action to alert the public and help facilitate the removal of the products from the market. As we seek the removal of certain drug products today, our drug shortages team is also working hard to ensure patients' therapeutic needs are met in the United States with an adequate supply of unaffected medications." *Id.*

**Response:** Admitted.

32.    Defendants' own treating physician expert, Dr. John Flack, testified that he "swiftly and seamlessly" transitioned all of his own patients to non-

contaminated alternatives "as soon as we could," he "would be awfully dumb" if he hadn't, and he did not keep a single one of his patients on contaminated VCDs post-recall. *See* Flack 9/28/21 Tr. (Ex. 14) at 182:14 – 183:8.

**Response:** Admitted with clarification. Defendants admit the substance of this paragraph but deny any implicit suggestion that Dr. Flack testified that he transitioned all of his own patients to alternatives because of any risks associated with the contaminated VCDs. To the contrary, Dr. Flack testified that he transitioned his patients onto alternatives "once we found out there was a problem between us and the pharmacies," and that the transition was seamless because there were "five or so other ARBs to choose from. There is zero problem with substitute." (Flack Dep. 178:11-16 (Ex. 1 to Decl. of Nina Rose).)

33.    The FDA issued a letter to Mr. Du of ZHP on September 28, 2018 informing him that ZHP had been placed on the Import Alert list (Import Alert 66-40) and that future shipments were subject to refusal of admission to the United States until ZHP could demonstrate their products were in cGMP compliance. Pls.' Prior SUMF re ZHP (ECF 2569-3) at ¶ 46; *see also id.* at ¶ 53.

**Response:** Admitted with clarification. The document cited by Plaintiffs states that "all future shipments of drugs that originate from your facility ***may*** be refused admission into the United States (U.S.) until your firm can demonstrate the

21

drugs manufactured at this site, and intended for the U.S. market, are in compliance with CGMP." (*See* ZHP Defs.' Resp. to SUMF ¶ 46, ECF 2607.)

34.    On November 29, 2018, the FDA issued a Warning Letter (320-19-04) to ZHP notifying ZHP of significant deviations from cGMPs for their API manufacturing operations, and stating that the API was consequently adulterated within the meaning of section 501(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and 21 U.S.C. 351(a)(2)(B). Pls.' Prior SUMF re ZHP (ECF 2569-3) at ¶ 47; *see also id.* at ¶ 54.

**Response:** Denied in part. Defendants deny any suggestion that the warning letter constituted a final regulatory determination that ZHP's API was adulterated. (*See* ZHP Defs.' Resp. to SUMF ¶ 47, ECF 2607 ("A Warning Letter is informal and advisory. It communicates the agency's position on a matter, but it does not commit FDA to taking enforcement action. For these reasons, FDA does not consider Warning Letters to be final agency action on which it can be sued.") (citing FDA, Regulatory Procedures Manual § 4-1-1, at 4 (June 2022)).)

35.    The FDA Warning Letter catalogued a number of cGMP violations directly tied to the manufacture of the contaminated ZHP valsartan. Pls.' Prior SUMF re ZHP (ECF 2569-3) at ¶ 48.

**Response:** Admitted with clarification. Defendants deny any suggestion that the warning letter constituted a final regulatory determination that ZHP's API was adulterated. (*See* ZHP Defs.' Resp. to SUMF ¶ 47, ECF 2607.)

Dated: September 12, 2025

Respectfully submitted,

*/s/ Jessica Davidson*

**KIRKLAND & ELLIS LLP**
Jessica Davidson, P.C. (*pro hac vice*)
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4723
jessica.davidson@kirkland.com

Allison M. Brown, P.C.
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel: (215) 268-5000
alli.brown@kirkland.com

Nina R. Rose, P.C. (*pro hac vice*)
Jordan M. Schwartz (*pro hac vice*)
1301 Pennsylvania Avenue
Washington, D.C. 20004
Tel: (202) 389-3394
nina.rose@kirkland.com
jordan.schwartz@kirkland.com

*Attorneys for Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Huahai U.S., Inc., Prinston Pharmaceutical Inc., and Solco Healthcare U.S., LLC*

**GREENBERG TRAURIG, LLP**
Steven M. Harkins
Lori G. Cohen, Esq.
Victoria Davis Lockard

23

Terminus 200
3333 Piedmont Rd., NE, Suite 2500
Atlanta, Georgia 30305
Tel: (678) 553-2385
harkinss@gtlaw.com
cohenl@gtlaw.com
lockardv@gtlaw.com

Gregory E. Ostfeld
Tiffany M. Andras
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Tel: (312) 456-8400
ostfeldg@gtlaw.com
andrast@gtlaw.com

*Attorneys for Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries Ltd., Actavis LLC, and Actavis Pharma, Inc.*

**KIRKLAND & ELLIS LLP**
Devora W. Allon, P.C.
Alexia R. Brancato, P.C.
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-5967
devora.allon@kirkland.com
alexia.brancato@kirkland.com

*Attorneys for Torrent Pharmaceuticals Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 12, 2025, a true and correct copy of the foregoing document was served upon counsel of record via operation of the Court's electronic filing system.

Dated: September 12, 2025

Respectfully submitted,

*/s/ Jessica Davidson*

Jessica Davidson, P.C. (*pro hac vice*)
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4723
jessica.davidson@kirkland.com