IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br>*All Actions* | MDL No. 19-2875 |

SPECIAL MASTER ORDER NO. __

THIS MATTER having been brought before the Court by way of the Motion to Seal Pursuant to Local Civil Rule 5.3 (the "Motion to Seal") filed by Defendants Zhejiang Huahai Pharmaceutical Co., Ltd., Prinston Pharmaceutical Inc., Huahai U.S. Inc., and Solco Healthcare US, LLC (collectively, "the ZHP Parties" or "ZHP") on notice to liaison counsel for Plaintiffs; and the Court having considered the Parties' submissions and proposed sealed information, and the factors contained in Local Civil Rule 5.3(c)(2); and the Court having further found that the standards set forth therein have not been met, the Court makes the following Findings of Fact and Conclusions of Law:

1. "In *Pansy v. Stroudsburg*, 23 F. 3d 772 (3rd Cir. 1994), the court expounded on the burden to justify confidentiality." *In re Valsartan N-Nitrosodimethylamine (NDMA), Losartan, & Irbesartan Prods. Liab. Litig.*, 512 F.

Supp. 3d 546, 550 (D.N.J. 2021). There, the Third Circuit set forth seven factors to consider when deciding a motion to seal:

1. whether disclosure will violate any privacy interests;

2. whether the information is being sought for a legitimate purpose or for an improper purpose;

3. whether disclosure of the information will cause a party embarrassment;

4. **whether confidentiality is being sought over information important to public health and safety**;

5. **whether the sharing of information among litigants will promote fairness and efficiency;**

6. whether a party benefitting from the order of confidentiality is a public entity or official; and

7. **whether the case involves issues important to the public**.

*In re Avandia Mktg., Sales, and Prods. Liab. Litig.*, 924 F.3d 662, 671 (3d Cir. 2019) (emphasis added) (quoting *Glenmede Tr. Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995) (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787-97 (3d Cir. 1994))). All of these factors cut against ZHP, which has the heavy burden on this motion.

2.      **"[T]he more rigorous common law right of access [applies] when discovery materials are filed as court documents. In addition to recognizing fewer reasons to justify the sealing of court records, the public right of access—**

**unlike a Rule 26 inquiry—begins with a presumption in favor of public access."** *Avandia*, 924 F.3d at 670 (emphasis added) (citing *Goldstein v. Forbes (In re Cendant Corp.)*, 260 F.3d 183, 192–93 (3d Cir. 2001)).

> The common law right of access "antedates the Constitution." *Bank of Am. Nat'l Tr. & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d [339,] 343 [(3d Cir. 1986)]. The right of access "promotes public confidence in the judicial system by enhancing testimonial trustworthiness and the quality of justice dispensed by the court." *Littlejohn v. BIC Corp.*, 851 F.2d 673, 678 (3d Cir. 1988). Public observation facilitated by the right of access "diminishes possibilities for injustice, incompetence, perjury, and fraud." *Id.* Moreover, "the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness." *Id.*

*Avandia*, 924 F.3d at 672. Thus, **once a document "has been filed with the court ... or otherwise somehow incorporated or integrated into a district court's adjudicatory proceedings," "a presumption of access attaches."** *Id.* (emphasis added) (quoting *In re Cendant Corp.*, 260 F.3d at 192).

3. "To overcome that strong presumption, the District Court must articulate 'the compelling, countervailing interests to be protected,' make 'specific findings on the record concerning the effects of disclosure'...." *Avandia*, 924 F.3d at 672-73 (quoting *In re Cendant Corp.*, 260 F.3d at 194). "In delineating the injury to be prevented, specificity is essential," so **"[b]road allegations of harm, bereft of specific examples or articulated reasoning, are insufficient."** *Avandia*, 924

F.3d at 673 (quoting *In re Cendant Corp.*, 260 F.3d at 194) (emphasis added). In sum, **"[c]areful factfinding and balancing of competing interests is required before the strong presumption of openness can be overcome by the secrecy interests of private litigants."** *Avandia*, 924 F.3d at 673 (emphasis added) (quoting *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 167 (3d Cir. 1993)).

4. Moreover, although some of the seven *Pansy* factors are relevant to a court's analysis under the common law standard, two are explicitly not considered. *Id.* at 677. First, the Third Circuit has "repeatedly said that **concern about a company's public image, embarrassment, or reputational injury, without more, is insufficient to rebut the presumption of public access**." *Id.* (emphasis added) (collecting cases). Second, "a person's motive for inspecting or copying judicial records is irrelevant under the common law right of access." *Id.* at 677.

5. The Third Circuit has put its "thumb on the scale in favor of openness—the strong presumption of public access" in exactly this situation:

> **[T]he public's right of access must be the starting point, not just one of multiple factors.** The scale is tipped at the outset in favor of access. And the right of access is not a mere formality—it "promotes public confidence in the judicial system"; "diminishes possibilities for injustice, incompetence, perjury, and fraud"; and "provide[s] the public with a more complete understanding of the judicial system and a better perception of its fairness." *Littlejohn*, 851 F.2d at 678. **These interests are particularly important in a case**

4

> **such as this one, which implicates the public's trust in a well-known and (formerly) widely-used drug.**

*Avandia*, 924 F. 3d at 677 (emphasis added). Moreover, "[s]ealing must be based on *current evidence* to show how public dissemination of the pertinent materials *now* would cause the competitive harm." *Id.* at 678 (quoting *In re Cendant Corp.*, 260 F.3d at 196) (emphasis added).

### A. ZHP Admits Most of the September 16, 2025 Letter is Not Privileged.

6. Local Rule 5.3(c)(2)(iv)(d) requires ZHP to prove "why a less restrictive alternative to the relief sought is not available." Here, after ZHP filed its letter and failed to provide Plaintiffs any access to its contents, the Court ordered ZHP to "provide a reacted version of the letter to opposing counsel." (ECF 3181). ZHP consequently provided Plaintiffs with a copy of the letter containing only redactions on page 2 and the footnote on page 3. ZHP also provided Exhibits 1 and 2 after Plaintiffs requested all non-privileged exhibits. Thus, ZHP has admitted the redacted letter and two exhibits provided to Plaintiffs are not privileged and not subject to any sealing by the Court. Perhaps recognizing this fact, nearly all of the cases ZHP cites concern motions to seal only part of the filings at issue, many of which are also uncontested. At most, the Court would seal the redacted information not already provided to Plaintiffs. However, for the reasons stated below, the Court declines to seal even the redacted information.

5

### B. ZHP Has Not Shown the Rest of the Letter Is Privileged.

7. The Party claiming privilege must provide the opposing party with: "a privilege log … sufficiently complete to 'enable the Court to determine such issues as whether the documents were prepared in anticipation of litigation, whether the information was intended to be confidential and whether there has been a waiver of the privileges.' 'Such information is also necessary for the party seeking discovery to have a full and fair opportunity to oppose the assertion of privilege.'" (ECF 990, p. 3-4 (quoting *Wei v. Bodner*, 127 F.R.D. 91, 96 (D.N.J. 1989)). This requires the provision of "the date of the document, the name of its author, the name of its recipient, the names of all people given copies of the document, the subject of the document, and the privilege or privileges asserted," *Torres v. Kuzniasz*, 936 F. Supp. 1201, 1208 (D.N.J. 1996) (citing Wei *v. Bodner*, 127 F.R.D. 91, 96 (D.N.J.1989)), as well as "the name, title, department, and email address of each person listed on a privilege log." (ECF 990, p. 4). ZHP did not provide this information to Plaintiffs when it produced the redacted letter, and it has not provided this information in its motion to seal. If it did not deny its motion for the reasons explained below, the Court would have denied the motion until ZHP produced this information, and Plaintiffs were able to respond accordingly.

8. Nevertheless, given the general context of the letter, Plaintiffs are able to challenge ZHP's general claim to the attorney-client and work-product privileges

6

here. Preliminarily, "[t]he party asserting privilege bears the burden of demonstrating that it applies." *United States v. Halliburton Co.*, 74 F. Supp. 3d 183, 187 (D.D.C. 2014). Because privileges are a "derogation of the truth-seeking process," courts construe them strictly and narrowly. *Id.* The attorney-client privilege shelters only "confidential communications between an attorney and client, including their agents, made with a primary purpose of seeking or providing legal advice." *Id.* As a result, this Court has held that **it is: "well-settled … that 'not all communications between a client and lawyer are privileged. The attorney client privilege only insulates communications that assist the attorney to formulate and render *legal advice*.**'" (ECF 990, p. 3 (emphasis added) (quoting *Peterson v. Bernardi*, 262 F.R.D. 424, 428 (D.N.J. 2009)).

9. Litigation hold notices and related communications contain instructions required by law to be disseminated, and not legal advice. Courts have recognized that **"the predominant purpose of [a litigation hold and related documents are] to give recipients forceful instructions about what they must do,** *rather than advice about what they might do***."** *Bagley v. Yale Univ.*, 318 F.R.D. 234, 240 (D. Conn. 2016) (emphasis added). The same applies to the work-product privilege in this context. *Id.* ("As for the work product doctrine, it "is not actually a privilege, but rather a qualified immunity from discovery," codified in Fed. R. Civ. P. Rule 26(b)(3), whose purpose 'is to protect an attorney's mental

7

processes so that the attorney can analyze and prepare for the client's case without interference from an opponent.' 6 *Moore's Federal Practice*, § 26.70[1] (Matthew Bender 3d ed.) That purpose is not implicated by the present exercise."). Preventing their disclosure, especially when they are widely disseminated, as they should be, does not further the purposes of the attorney-client privilege and only results in the degradation of the law's truth-seeking function. *Id.*; *Halliburton*, 74 F. Supp. 3d at 190-91.

10. The work-product privilege does not protect litigation holds or related documents either. *Halliburton*, 74 F. Supp. 3d at 191. Litigation holds and related documents are "simply not the type of preparation that is intended to be protected by the privilege, especially given today's liberal standards for conducting discovery where companies have a duty to preserve electronic documents." *Id.* at 192. "An attorney cannot complain that his preparations for trial have been unfairly affected by his opponent receiving information about document retention practices to which he is entitled." *Id.*

11. Litigation holds and related documents have been produced in other MDL litigation as well. For example, in *In re Ethicon, Inc. Pelvic Repair Systems Product Liability Litigation*, 299 F.R.D. 502 (S.D.W.V. 2014), the pelvic mesh MDL Court discussed the timing and contents of the litigation holds produced by Johnson & Johnson/Ethicon in ruling on plaintiffs' motion for spoliation sanctions,

which was granted in part.

12. In fact, this Court has indicated that the disclosure of litigation holds and related documents should occur in the setting of allegations of spoliation, which is exactly the situation presented here. *Major Tours, Inc. v. Colorel*, Civil No. 05–3091, 2009 WL 2413631 (D.N.J. Aug. 4, 2009). "[P]laintiffs are entitled to know which categories of electronic storage information employees were instructed to preserve and collect, and what specific actions they were instructed to undertake to that end." *Major Tours*, 2009 WL 2413631, at *2. To this end, other courts have also ordered production of the key fundamental information. *See, e.g.*, *Colonial BancGroup Inc. v. PriceWaterhouseCoopers LLP*, Case No. 2:11-cv-746, 2016 WL 9687001, at *4-5 (M.D. Ala. Jan. 22, 2016) (ordering the disclosure of the dates and recipients of the holds, the types of documents and files subject to the holds, the actions undertaken pursuant to the holds, efforts to enforce the holds, and "any additional, non-duplicative, information concerning its collection, retention and production methods in this case"). As stated by another Court:

> **[P]laintiffs seek answers concerning what has actually happened in this case, i.e., when and to whom the litigation hold letter was given, what kinds and categories of ESI were included in defendants' litigation hold letter, and what specific actions defendants' employees were instructed to take to that end. Although the letters themselves may be privileged, the basic details surrounding the litigation hold are not.** These requests are reasonable and may ultimately benefit defendants if questions ever arise concerning

defendants['] efforts to preserve relevant ESI.

*Cannata v. Wyndham Worldwide Corp.*, No. 2:10–cv–00068, 2011 WL 3495987, at *3 (D. Nev. Aug. 10, 2011). Here, the Court ordered ZHP to preserve and produce the certificates of analysis (COAs) for dimethylformamide (DMF) and related inspection reports, and it failed to do so and then destroyed the documents in violation of those orders. (ECF 5, p. 6; ECF 328, p. 8 of Ex. A; ECF 629; *see also* ECF 3147, p. 3-16; 12/11/2019 Hearing Tr. 57:11-58:1 (ZHP's counsel recognizing that the document requests required the production of COAs for "catalysts and solvents used in the tetrazole ring formation process," which includes the use of the solvent DMF). Thus, there is no legal "advice about what they might do" at issue in Plaintiffs' motion for sanctions. *Bagley*, 318 F.R.D. at 240. The Court consequently rejects ZHP's privilege claims regarding any documents relevant to its destruction of its DMF COAs and inspection reports in violation of the Court's orders.

**C. ZHP Waived the Privilege of the Rest of the Letter.**

13.     Even if some of the letter is privileged, ZHP has waived that privilege by putting its counsel's "advice" at issue in explaining or justifying its failure to preserve and produce the DMF COAs and inspection reports and then destroying them. "Once a party places attorney-client communications at issue, that party waives the privilege with regard to all communications on the same subject matter." *In re G-I Holdings Inc.*, 218 F.R.D. 428, 432 (D.N.J. 2003). "The client's offer of

10

his own or the attorney's testimony as to a specific communication to the attorney is a waiver as to all other communications to the attorney on the same matter." *Id.* (quoting 8 J. Wigmore, *Evidence* § 2328 at 638 (McNaughton rev.ed.1961)). "When a party waives the attorney-client privilege by placing the advice of counsel at issue, the waiver applies not only to otherwise privileged communications between the attorney and client, but also to any of the attorney's documents which reflect the substance of such advice, even if such documents would otherwise be immune from discovery under the work-product doctrine." *Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, 707 F. Supp. 2d 463, 472 (D. Del. 2010).

14. During the September 9, 2025 hearing on ZHP's failure to preserve and produce its DMF COAs and inspection reports as Ordered by the Court and then its destruction of those documents, ZHP's witnesses repeatedly put the "advice" of its counsel at issue:

- "But, again, that was our first experiences, first taste of discovery in a U.S. court. And then I worked with the -- my U.S. counsel trying to understand the actual requirements. And there are also areas where, you know, **I raised it to my counsel**; and my counsel back then discussed with the plaintiffs' counsel. And once they got agreed, **they give us specific instructions, then we carried out the discovery.**" (9/9/2025 Tr. 20:12-19 (emphasis added)).

- "So what happened was that if there is any question from my team or we are not certain what was the true requirement, **we brought this to our counsel. And our counsel would then give us instructions what to do.**" (*Id.* at 21:1-5 (emphasis added)).

11

- "We produced all the documents that was required. I mean, Mr. Bernardo, with that said, there are times, you know, we might have -- we expressed, you know, the overburden pressure on us. And in cases like that, **we discussed with our counsel**." (*Id.* at 21:12-17 (emphasis added)).

- "I was personally involved. **So back then we got the request from my U.S. counsel. They provided us a legal hold memo in English. I did review and discuss with my attorney to understand exactly what it meant.**" (*Id.* at 55:23-56:1 (emphasis added)).

- "So there are occasions where, you know, my colleague would bring their inquiries to me, discuss, you know, what would be the approach. And as I said, **I would then approach my attorney**. But in the meanwhile, I would also reinforce the importance of keep all those documents until there was a specific instruction from our attorney." (*Id.* at 56:19-24 (emphasis added)).

- "So my China counsel, the Chinese counsel needs to make sure that we comply with laws and regulations when we export the documents from China to the U.S. And the **U.S. counsel give us instructions of what documents needs to be produced**, and they talk to each other." (*Id.* at 67:21-25 (emphasis added)).

- "[T]his was dated 2020, and back then **I did recall the discussion with my U.S. attorney with regards to the certificate of analysis of the API. Now, with that said, I didn't recall we went through the specifics about, you know, the -- the -- what do you call it? The certificate of analysis for what was described in Item No. 26, which was shown on the screen**." (*Id.* at 70:22-71:3 (emphasis added)).

- "**I do have very constant discussions or communications with my counsel. Now, speaking of Item No. 26, as I mentioned, I do recall we discussed the certificate of analysis of API. With that said, I could not recall if that discussion was by email or was by teleconference.**" (*Id.* at 74:13-17 (emphasis added)).

- "**I do recall the discussion with my U.S. counsel, Duane Morris, about certificate of analysis of valsartan API. With that said, I don't**

12

- recall how it was discussed, whether that by email or teleconference." (*Id.* at 74:25-75:4 (emphasis added)).

- "After we received that request and we discussed internally, **we discussed with the -- our attorney**. But I apologize. I really don't recall exact month." (*Id.* at 81:22-25 (emphasis added)).

- "**[O]ur U.S. counsel basically provide very specific instructions to us, how to be, you know, how to conduct the discovery to be in compliance.**" (*Id.* at 83:10-12 (emphasis added)).

- "**In my recollection, I didn't recall there was discussions with my U.S. counsel about the catalysts and the solvents.**" (*Id.* at 87:18-20 (emphasis added)).

- "**Your Honor, when we got the order, the order from the Court, my U.S. counsel did share with me the orders, not just this one, but all the others. And we typically would review in parallel, and then we would have discussed, and we would then conclude what needs to be done. Typically, if I have any question, I would consult them. Now, with this one, I do apologize that I -- I really have no recollection, you know, why we didn't discuss very specifically about the certificate of analysis for catalysts and the solvents.**" (*Id.* at 89:6-15 (emphasis added)).

- "**As I shared earlier, the discovery work was specifically led -- or under the instruction of our U.S. counsel. So <u>I wouldn't say that it was my role to interpret what should be in and what should be out</u>.**" (*Id.* at 97:17-20 (emphasis added)).

- "**Mr. Slater, so when we are talking about what type of documents that needs to be collected, this was more about an instruction or advice from our U.S. counsel.**" (*Id.* at 98:3-5).

- "Now, my colleagues who are, you know, could be technology experts, quality experts, RA experts, when they collected those documents, **it was done under the instruction of our U.S. counsel.**" (*Id.* at 98:17-20 (emphasis added)).

13

- "In the beginning, **we did receive the instruction regarding the legal hold of the litigation involving valsartan**. However, for the list of documents to be destroyed, each and every time we did not go to our counsel specifically for verification." (*Id.* at 123:15-18 (emphasis added)).

In response to this testimony, the Court observed that ZHP seemed to be blaming its counsel for its failure to preserve and produce the DMF COAs and inspection reports as Ordered:

- "She's not a lawyer. She is not schooled. This is how -- she's now looked at the order, and she says, "I understand it." But **she had her marching orders from counsel.** And where that miscommunication happened, I don't know. How I address it, I don't know." (*Id.* at 101:22-102:1 (emphasis added)).

- "I'm going to be interested to see what you have to say about it, Mr. Slater. But **it seems pretty clear to me that counsel was not telling ZHP exactly what to save and what not to save**. …[T]he order of Judge Schneider was not really communicated to them. So that's what it seems -- appears to me." (*Id.* at 130:14-120 (emphasis added)).

- **"Counsel failed to communicate it to them."** (*Id.* at 141:5 (emphasis added)).

- "For whatever reason -- and I don't know what that reason is – the defendants did not communicate that to ZHP. Whether or not counsel for the defendant, for ZHP, believed that the COAs for DMF weren't included seems to me *that's what they thought erroneously, wrongly*." (*Id.* at 145:3-8 (emphasis added)).

As acknowledged by the Court above, Plaintiffs have a right to discovery to assess the veracity of ZHP's excuses for not preserving and producing the DMF COAs and inspection reports as Ordered, and then destroying them. Put differently, ZHP

14

cannot use its counsel as a shield to Plaintiffs' request for sanctions without providing Plaintiffs will a full record to assess the merits of that defense. *G-I Holdings*, 218 F.R.D. at 432; *Brigham & Women's Hosp.*, 707 F. Supp. 2d at 472. The Court consequently rejects ZHP's privilege claims and denies its motion to seal.

### D. The Rest of the Letter Is Subject to the Crime/Fraud Exception to Any Privilege.

15.  The crime-fraud exception to the attorney-client and work-product privileges includes "communications and work product used in furtherance of the spoliation of evidence." *Wachtel v. Guardian Life Ins. Co.*, 239 F.R.D. 376, 380 (D.N.J. 2006) ("The crime-fraud exception is not limited to evidence that supports a finding of common-law fraud. Rather, under federal law, the exception can encompass communications and attorney work product 'in furtherance of an intentional tort that undermines the adversary system itself.'"). As explained above, ZHP has invoked its communications with counsel in defending its undisputed failure to preserve and produce the DMF COAs and inspection reports and then destroying them in violation of multiple Court Orders. (ECF 5, p. 6; ECF 328, p. 8 of Ex. A; ECF 629; s*ee also* ECF 3147, p. 3-16; 12/11/2019 Hearing Tr. 57:11-58:1 (ZHP's counsel recognizing that the document requests required the production of COAs for "catalysts and solvents used in the tetrazole ring formation process," which includes the use of the solvent DMF). Under the crime-fraud exception, such

15

communications are not privileged and not subject to seal.

Pursuant to the foregoing Findings of Fact and Conclusions of Law:

It is hereby ORDERED this ___ day of _____, 2025 that ZHP's motion to seal its September 16, 2025 letter is DENIED.

/s/ _____
Hon. Thomas I. Vanaskie (Ret.)
Special Master