# Exhibit D



Victoria Davis Lockard
Tel 678.553.2103
Fax 678.553.2212
lockardv@gtlaw.com

February 27, 2026

*VIA EMAIL*
Special Master the Honorable Thomas Vanaskie
Stevens & Lee
1500 Market Street, East Tower
18th Floor
Philadelphia, PA 19103

   **Re:** ***In re Valsartan, Losartan, and Irbesartan Products Liability Litigation;***
     **Case No. 1:19-md-02875-RMB-SAK (D.N.J.)**

Dear Special Master Vanaskie:

   Pursuant to the Court's request, Defendants respectfully submit this response to Plaintiffs' February 17, 2026 letter proposal for the selection and management of the Wave Three bellwether trial pool cases.

   At this time, the parties appear to agree on the following parameters for the selection process: (1) a new Wave Three bellwether pool should be chosen, starting from the full inventory of filed personal injury cases in the MDL proceeding in which Plaintiff Fact Sheets have been submitted; (2) the bellwether pool should exclude cases involving Mylan product[1]; (3) neither party's potential *Lexecon* objections should prevent a case from being included in the pool; and (4) *Lexecon* rights will not be waived by the selection of a case as a bellwether candidate.

   Aside from these narrow areas of agreement, it appears that areas of disagreement remain. The following Table sets forth the parties' respective positions with respect to those issues:

| Issue | Defs.' Position | Pls.' Position |
| --- | --- | --- |

---

[1] While Plaintiffs suggest that a Wave Four Bellwether proceeding may include cases that involve Mylan usage, Defendants submit that it is premature to determine that issue now. Defendants are willing to meet and confer with respect to that proposal at the appropriate time.

Special Master the Honorable Thomas Vanaskie
Page 2

| Issue | Defs.' Position | Pls.' Position |
|---|---|---|
| **Composition of Wave Three Pool** | | |
| Cancer Type | Colorectal cases only | Equal number of colorectal and liver cases |
| Exposure at Issue | Valsartan only | Suggests cases involving losartan/irbesartan claims are included |
| Eligible Defendants | All but Mylan and Hetero | All but Mylan |
| **Bellwether Candidate Selection** | | |
| Certification Process | Plaintiffs in the pool to certify that they are willing to move forward and have identified a doctor willing to attest to specific causation prior to bellwether selection; bellwether Plaintiffs to provide periodic certifications (e.g., after fact discovery, after depositions of Plaintiffs' experts) that they remain willing to proceed with their claims | Plaintiffs to certify that they are willing to proceed with their claims only *after* bellwether selection; no need to certify that there is good-faith basis for specific causation until *after* fact discovery; no additional certifications or check-ins throughout the process to ensure claims are on track |
| Candidate Selection Process | Random selection of five colorectal candidates to be worked up and five alternates that could be elevated to the pool at random as necessary. | Each side picks three colorectal cases and three liver cases for a total of 12 cases to be worked up |
| **Bellwether Discovery** | | |
| Timing of Expert Disclosure and Depositions | Plaintiffs to provide specific causation reports and disclose names of general causation experts at end of fact discovery; Defendants to depose Plaintiffs' specific causation experts prior to providing rebuttal reports | Plaintiffs to provide specific causation reports at the end of fact discovery and Defendants to provide rebuttal reports before any Plaintiffs' expert is deposed.<br><br>Silent as to identification of general causation experts |

Special Master the Honorable Thomas Vanaskie
Page 3

| Issue | Defs.' Position | Pls.' Position |
|---|---|---|
| Rule 702 Motions | Following expert discovery, parties permitted to file Rule 702 motions as to general and specific causation experts, as well as motions for summary judgment | Silent as to Rule 702 motions with respect to general causation experts; silent as to motions for summary judgment |
| **Trial Issues** | | |
| Trial Selection Process | Defendants to pick first trial case; Plaintiffs to pick second trial | Silent as to selection of trial case |
| *Lexecon* Timing | Court to address *Lexecon* issues after Rule 702 and summary judgment motions are decided and a case is picked for trial | Silent as to timing for addressing *Lexecon* issues |
| **Costs/Fees** | | |
| | Plaintiffs required to pay Defendants' costs in any bellwether case dismissed after the start of fact discovery; Plaintiffs to pay Defendants' costs and expert fees in any bellwether case dismissed after the completion of Plaintiffs' experts' depositions | Silent on imposition of costs and/or fees if selected bellwether candidate is dismissed |

As set forth below, and in Defendants' February 17, 2026 Letter ("Defendants' February 17 Letter"), Defendants' proposal should be adopted because it is designed to avoid and discourage the inefficiencies and waste of resources caused by Plaintiffs' dismissal of all of the Wave Two bellwether cases and will also aid the Court in answering the key question of whether "plaintiffs can come up with specific-causation experts" in a manner that does not unnecessarily "wear down on this Court's limited resources." (2/6/26 CMC Tr. 8:9-15.)

Special Master the Honorable Thomas Vanaskie
Page 4

**I.  Defendants' Positions on Areas of Disagreement as to the Wave Three Bellwether Process**

    1.  The Wave Three Pool Should Be Limited to Colorectal Cases Only.

As stated in Defendants' February 17 Letter, limiting the pool to only colorectal cases, the most common cancer alleged in the MDL, is the logical next step given the substantial time and resources the parties expended for 18 months advancing the *Lee*, *Suits*, and *Garcia* matters before they were dismissed by Plaintiffs. Doing so would mitigate at least some measure of the costs already expended by Defendants in identifying and preparing experts to testify as to colorectal cancer. Critically, the Court has already taken a liver case handpicked by Plaintiffs, *Roberts*, through expert discovery and the Rule 56 phase, resulting in summary judgment for ZHP. As noted in Defendants' February 17 Letter, Plaintiffs filed an appeal in the *Roberts* case. In the time since, Plaintiffs have asked the ZHP Defendants to stipulate to the dismissal of that appeal, apparently now recognizing that their appeal was unlikely to succeed. While Plaintiffs nonetheless continue to believe that liver cancer cases will be stronger for them than colon cancer cases, that is not a legitimate ground to pivot back to liver cancer cases, unless Plaintiffs are now prepared to dismiss the remaining colorectal cases in the MDL.

Plaintiffs also complain that exclusion of liver cancer and Mylan cases from the pool will "drastically" limit the number of available cases, but Defendants have identified approximately 180 non-Mylan, active colorectal cases, which is more than sufficient to create an adequate pool of cases (following certification as discussed below) to allow for a random selection of five cases to be worked up through fact and expert discovery.[2] Considering the large number of available colorectal cases, and the fact that the parties have already litigated a prior liver cancer case through final judgment, there is no reason to include liver cancer cases in the initial Wave Three bellwether pool.

    2.  The Pool Should Exclude Cases Involving Losartan and/or Irbesartan Claims.

During the parties' meet-and-confer communications, Plaintiffs' counsel indicated that they believe claims involving ingestion of both valsartan and losartan/irbesartan should not be excluded from the Wave Three pool. While Plaintiffs do not specifically mention losartan/irbesartan claims in their February 17 letter, they state that Wave Three cases should be selected "from the overall pool of filed cases," suggesting that claims related to losartan or irbesartan would be eligible.

The Court should reject any Wave Three proposal that includes losartan/irbesartan claims in the bellwether pool. The parties have not completed material fact discovery as to losartan or irbesartan to date, as the MDL has been primarily focused on valsartan claims.

---

[2] Alternate cases would only be worked up as necessary.

Special Master the Honorable Thomas Vanaskie
Page 5

Similarly, the parties have never disclosed any general or specific causation experts as to losartan and irbesartan. For these reasons, losartan/irbesartan claims were not considered for inclusion in Waves One or Two, and there is no reason for a different approach in Wave Three. Including such claims in the Wave Three pool would unnecessarily complicate the specific and general causation questions the Court needs to decide without any real benefit. In addition, it would be wildly inefficient given the need for new rounds of fact and expert discovery not required for valsartan-only claims.

      3.   The Pool Should Exclude Cases Involving Hetero.

While Plaintiffs agree that cases involving Mylan should be excluded from the Wave Three pool, their proposal does not exclude cases involving Hetero, which has also reached a settlement. But there is simply no reason to include cases involving Hetero products in the Wave Three pool, and doing so may unnecessarily complicate the Wave Three process given the pending settlement.

      4.   A Meaningful Certification Process Is Needed Before Wave 3 Selection.

Consistent with the Court's direction at the February 6 CMC, Defendants propose an initial certification process applicable to the entire Wave Three pool of colorectal cancer cases, followed by a periodic checkpoint process after the random selection of the Wave Three bellwether cases, to determine whether each Plaintiff intends to continue to proceed with his/her claims.

Specifically, within 60 days of the adoption of a Wave Three bellwether process, the Plaintiff in each case within the eligible pool identified above should be required to provide a certification that includes: (a) identification of the diagnosed primary cancer type of the party who consumed valsartan; (b) the date of diagnosis; and (c) a form declaration from a healthcare provider stating, to a reasonable degree of medical certainty, that consumption of affected valsartan products caused the cancer at issue. There is ample precedent for such case management orders. *See, e.g.*, *In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 2016 WL 3281032 (N.D. Ill. June 10, 2016) (order requiring each plaintiff in bellwether trial track in medical device MDL to identify particular injury claims and provide a signed expert declaration regarding causation in the form attached to the order). And, as Judge Bumb has stated, determination of whether "plaintiffs can come up with specific causation" needs to be the "focus" of this litigation going forward. (2/6/2026 CMC Tr. 8:9-15.)

Given that there are approximately 180 cases within the initial pool of eligible colorectal cancer matters as defined above, 60 days is adequate time for Plaintiffs' counsel and their clients to confirm they are willing to proceed with their claims and identify a healthcare provider willing to attest to specific causation. This is particularly true given that each Plaintiff included in the eligible pool has already submitted a Court-approved

Special Master the Honorable Thomas Vanaskie
Page 6

Plaintiff Fact Sheet, which requires collection and production of medical records and authorizations that identify product use, length and duration of exposure, cancer diagnosis and timing, potential comorbidities and alternative risk factors, and countless other meaningful details. Based on the information already available to Plaintiffs, certification of claims for inclusion in the Wave Three pool could easily be accomplished within 60 days.

Consistent with the Court's statements at the February 6 CMC, Defendants also propose that Plaintiffs' counsel provide periodic recertifications that their clients intend to proceed with their claims, including: (1) after the conclusion of fact discovery; (2) following completion of the depositions of Plaintiffs' specific-causation experts; and (3) following completion of expert discovery on specific causation.

By contrast, Plaintiffs' proposal offers no meaningful certification process designed to prevent the problems that plagued the Wave Two bellwether process. First, Plaintiffs' proposal would have bellwether cases selected *before* Plaintiffs' counsel even bother to ask their clients if they want to proceed with their claims. This leaves open the risk that the parties and the Court go through the Wave Three selection process only to find out that very few or possibly none of the Wave Three Plaintiffs want or are able to proceed.

Second, Plaintiffs' proposal requires the parties to complete fact discovery before Plaintiffs make any effort to determine whether any doctor is willing to attest to specific causation. But this was the exact process used in Wave Two, which led to the dismissal of half of the bellwether cases *after* Defendants had been forced to spend significant time and resources deposing many fact witnesses in those actions. And Plaintiffs' proposal would require the parties to simultaneously undertake fact discovery for *twelve* cases, more than double the previous bellwether pool.

Third, contrary to the Court's direction at the February 6 CMC, Plaintiffs' proposal does not provide for any ongoing check-ins after the disclosure of expert reports to ensure that the bellwether cases are "on track" to proceed to Rule 702 and summary judgment motions. (*See* 2/6/26 CMC Tr. 15:2-17.) Once again, this is no different than the process used in Wave Two, which led to the late dismissals in *Garcia* and *Suits* *after* Defendants provided expert reports and deposed many of Plaintiffs' experts. Accordingly, Plaintiffs' proposal offers no assurances of the type demanded by Judge Bumb.

In sum, to "cut down on unnecessary expenditure of resources," (2/6/26 CMC Tr. 8:9-10), Plaintiffs' counsel must be required to certify that they intend to, and can, proceed with each eligible case prior to the random selection of the bellwether candidates, and at various inflection points thereafter. Plaintiffs' proposal does not provide for such certifications and therefore invites the same kind of bellwether manipulation and waste of resources that occurred in Wave Two.

Special Master the Honorable Thomas Vanaskie
Page 7

5.    Wave 3 Bellwethers Should Be Randomly Selected from the Eligible Pool.

Defendants' position is that, regardless of the Court's eventual decision on the make-up of the eligible cases for the Wave Three pool, the Court should again use random selection to identify the cases that will be worked up through fact and expert discovery. This is consistent with the Court's past practices. Plaintiffs, by contrast, propose that each party select six cases to be worked up for discovery. Random selection, however, best ensures that the cases selected for workup will fairly represent the MDL colorectal case inventory, not merely the outlier cases deemed most advantageous by any one party. Moreover, random selection is the quickest and most cost-efficient way to generate the bellwether list, as it occurs instantaneously and avoids the burden associated with having the parties assess scores of cases and identify their "picks." *See, e.g.*, Pretrial Order No. 69, ECF No. 4683, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, No. 20-MD-2924 at 6 (S.D. Fla. Nov. 19, 2021) (Ex. A) ("[P]arties shall use the Microsoft Randomizer to randomly select eight percent (8%) of the Bellwether Pool for each cancer type …. The selected Plaintiffs and Claimants shall constitute the 'Initial Discovery Pool.'"). There is no reason to deviate from the random selection process used in Wave Two and, given recent experiences, it is imperative to avoid any manipulation of the bellwether pool (i.e., by Plaintiffs dismissing Defendants' picks and leaving only their own picks as trial candidates).

6.    Plaintiffs' Specific Causation Experts Should Be Deposed Before Defendants' Specific Causation Experts Are Disclosed.

As in Wave Two, Plaintiffs insist that Defendants should be required to submit rebuttal reports on the issue of specific causation before Plaintiffs' specific causation experts are deposed. But this invites the same waste of resources that occurred in *Garcia* and *Suits*. If the outcome of the Wave Two bellwether process proved anything, it is that Plaintiffs' counsel must be required—after their experts' opinions are disclosed and their experts have defended those opinions at deposition—to confirm that the Plaintiffs still intend to proceed with their cases. Only at that point should Defendants be required to undertake the substantial cost of providing rebuttal expert opinions on the issue of specific causation.

7. Consistent with the Wave Two Process, General and Specific Causation Experts Should Be Disclosed, and Subject to Rule 702 Motions, at the Same Time.

Plaintiffs' letter does not mention the disclosure of general causation experts, or Rule 702 motion practice challenging the opinions of those experts. Just as in Wave Two, however, Plaintiffs should be required to disclose which general causation experts they intend to rely on in each Wave Three case at the same time they disclose their specific causation experts—and Defendants should be permitted to challenge those experts'

Special Master the Honorable Thomas Vanaskie
Page 8

opinions under Rule 702 at the same time they file such motions with respect to the specific causation experts. (*See* 9/3/25 CMC Tr. 105:13-17 ("So my ruling is, is that the plaintiffs have to identify the general causation experts. If the defendants in good faith want to bring a *Daubert* challenge because they believe that in the context of that case there are *Daubert* concerns, they can do it.") (ECF 3170); *see also* Order Establishing Amended Case Management Schedule for Wave Two Bellwether Cases (Oct. 31, 2025) (ECF 3201).)

Requiring Plaintiffs to identify the general causation experts that they intend to present at trial in each of the Wave Three bellwether cases, as was ordered in Wave Two, imposes no significant burden on Plaintiffs. Indeed, Plaintiffs already did this in *Suits* and *Garcia*, identifying two particular experts whose opinions on colorectal cancer they intended to rely upon in both cases. There is no reason they cannot do the same in Wave Three. Moreover, the Court's resolution of general causation motions will inform its rulings on specific causation, as any differential etiology analysis must address the foundational question of whether, and at what threshold level, an alleged exposure to nitrosamines in valsartan can be "ruled in" as a potential cause of an individual Plaintiff's cancer diagnosis. It is impossible for Plaintiffs' specific causation experts to "rule in" a specific Plaintiff's valsartan use as a cause of his or her cancer without having admissible evidence of general causation; as such, the admissibility of both general and specific causation opinions should be evaluated simultaneously.[3]

8. Defendants Should Select the First Trial Case.

Plaintiffs' letter does not address the issue of how the Wave Three bellwether trial cases will be selected. Defendants' position is that, following work-up of the Wave Three bellwether cases, Defendants should select the first Wave Three bellwether trial. This is the only fair outcome because Plaintiffs selected the *Roberts* case to serve as the initial bellwether candidate and were then able to avoid taking any case to trial in Wave Two through dismissals. Defendants propose that Plaintiffs select the second Wave Three bellwether trial.

9. *Lexecon* Issues Should Be Addressed Following Rule 702 and Summary Judgment Rulings.

---

[3] Further, dropping the requirement that Plaintiffs identify the general causation experts they intend to use in each bellwether case (so that Defendants can test the admissibility of those opinions with respect to the specific cancer at issue in each Plaintiff's case) would only reward Plaintiffs for dismissing all of the Wave Two cases late in the game by lowering their burden in Wave Three.

Special Master the Honorable Thomas Vanaskie
Page 9

The parties agree that cases implicating *Lexecon* rights and issues should be eligible for the Wave Three pool, and that *Lexecon* rights are not waived for any party by a case's inclusion in the pool. During the parties' meet-and-confer communications, however, Plaintiffs suggested that the MDL Court may not be able to decide dispositive and/or Rule 702 motions in cases subject to *Lexecon*. This is incorrect. There is ample precedent, including from the Third Circuit, making clear that MDL courts can rule on all pretrial motions prior to remanding cases in which parties have asserted *Lexecon* objections. Indeed, MDL courts routinely recognize that doing so promotes the efficiency goal of the MDL process. *See, e.g.*, *Hooper v. Ethicon, Inc.*, 2020 U.S. Dist. LEXIS 250391, at *4-5 (E.D. Tenn. Sept. 4, 2020) ("Generally, the [MDL] court, rather than the transferor court, is in the better position to resolve motions for summary judgment because of the familiarity it has developed with the case before it"); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practice & Prods. Liab. Litig.*, 226 F. Supp. 3d 557, 583 (D.S.C. 2017) ("[*Lexecon*] does not limit the ability of an MDL court to conduct pretrial proceedings, including ruling on dispositive motions, before suggesting remand"); *In re Patenaude*, 210 F.3d 135, 144 (3d Cir. 2000) ("Congress intended transferee courts to have broad pretrial authority…[u]nder the Federal rules the transferee district court would have authority to render summary judgment[.]"). Accordingly, the Wave Three case management order should provide that the MDL court will decide Rule 702 motions as to specific and general causation experts, as well as summary judgment motions—and that *Lexecon* remand issues will be addressed once a case is ready to be set for trial.

10. Costs and Fees

Despite the Court's statements at the February 6 CMC that it would "impose fees and costs" if Plaintiffs once again dismissed a bellwether case late in the process, Plaintiffs' proposal is silent as to the parameters for granting such relief. As the Court noted, the parties should "come up with a plan" for identifying "road signs" throughout the Wave Three bellwether process so that "at the end of the day, after fees and expenses have been, you know, expended and says, well, we're going to dismiss, then I have a map to follow." (2/6/26 CMC Tr. 16:8-17.) Defendants' proposal provides such a map by making it clear to all parties that: (1) if a bellwether case is voluntarily dismissed during or after fact discovery, Plaintiffs will pay Defendants' costs in taking that discovery; and (2) if a bellwether case is voluntarily dismissed after Defendants have to spend resources developing rebuttal expert testimony on specific causation (i.e., after Plaintiffs' experts are deposed), Plaintiffs will have to pay both Defendants' costs and expert fees.

\* \* \*

For all of these reasons, and those set forth in Defendants' February 17 Letter, the Court should adopt Defendants' Wave Three bellwether proposal.

Special Master the Honorable Thomas Vanaskie
Page 10

## II.  Plaintiffs' Submission Regarding Broader Case Management Proposals

Defendants respectfully submit that the Court should disregard the portion of Plaintiffs' letter that relates to proposed case management orders addressing cases outside the proposed Wave Three pool.

At the February 6 CMC, the Court suggested that the parties consider implementation of processes to ensure that pending personal injury cases are viable and should remain active. (*See, e.g.*, 2/6/26 CMC Tr. 15:23-24; 16:8-17 (ECF No. 3251).) Consistent with such statements, the Wholesaler/Retailer Defendants attempted to meet and confer with Plaintiffs regarding the potential adoption of a CMO proposal—separate and apart from the Wave Three bellwether process—that would require certification of certain information as to the entire docket of personal injury cases in order to begin winnowing nonviable cases out of the MDL more generally.

During a meet and confer on February 12, Plaintiffs' counsel indicated an openness to discussing what such an order might look like, and both sides agreed to continue to meet and confer on these issues. Plaintiffs' counsel then not only refused to meet and confer but also specifically advised Defendants by email on February 17 that discussion of any broader case management proposal "need not be included in tomorrow's position statement" regarding the Wave Three bellwether proposal. (2/17/26 Email from D. Nigh to S. Harkins (attached as Exhibit B).) Despite these representations, Plaintiffs' counsel proceeded to brief the issue in their letter, criticizing even the *idea* of adopting any case management order that would require Plaintiffs to provide certifications or conduct additional case vetting outside the Wave Three bellwether setting.

Defendants will attempt to further meet and confer with Plaintiffs' counsel with respect to a broader case management proposal, as originally agreed, and will be prepared to address the issue in their agenda submission for the March 6 CMC.

Sincerely,

Victoria Davis Lockard

cc:    Counsel of Record (via ECF)

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE:  ZANTAC (RANITIDINE)                           **MDL NO. 2924**
PRODUCTS LIABILITY                                    **20-MD-2924**
LITIGATION

                          **JUDGE ROBIN L. ROSENBERG**
                 **MAGISTRATE JUDGE BRUCE E. REINHART**

_____/

**PRETRIAL ORDER # 69**
**Bellwether Selection**

This Order sets forth initial procedures to prepare for the selection of the cases that will proceed to personal injury bellwether trials in this multi-district litigation ("MDL").  This Order provides the steps that shall take place prior to the Court issuing rulings on *Daubert* motions on general causation.  Following those rulings the Court expects that it will, with the parties' input, issue a second Order providing additional procedures and deadlines leading to the beginning of the first bellwether trial.

The parties have negotiated bellwether selection procedures and have submitted two versions of an agreed-upon proposal on this subject to the Court.[1]  The Court adopts much of the parties' second bellwether proposal in this Order.  The Court does not adopt the parties' proposal in its entirety, however.  This Order reflects the Court's determination as to the initial bellwether selection procedures that will best serve this MDL.

**I.  BACKGROUND**

As of the date of this Order, in excess of 1,800 cases have been consolidated into this MDL in which individuals assert personal injury claims related to the ingestion of ranitidine.  The Court

---

[1] The Court has dismissed from the master complaints all claims against Defendants other than those alleged to have manufactured brand-name ranitidine products. *See* DE 3716; DE 3750.  The word "parties" as used in this Order includes those Defendants named in the Second Amended Master Personal Injury Complaint. DE 3887.

refers to the individuals with filed personal injury cases as "Plaintiffs." In addition, in Pretrial Order # 15, the Court created a process whereby individuals who have not yet filed lawsuits may register their personal injury claims related to the ingestion of ranitidine. *See* DE 547. The Court refers to these individuals as "Claimants." As of the date of this Order, in excess of 150,000 Claimants have registered their claims. Through the use of Census Plus Forms ("CPF"), both Plaintiffs and Claimants have entered information about themselves and their claims into a database maintained by Litigation Management, Inc. ("LMI"). The Court refers to this database as the "Registry."

On October 5, 2021, the parties submitted to the Court an agreed-upon proposal for the selection of personal injury cases to proceed to bellwether trials. *See* DE 4506 at 2-12. The Court held a hearing on the proposal in an open proceeding through Zoom teleconference on October 25. During the hearing, the parties explained each step of their proposal and answered the Court's various questions. The parties stated that they were continuing to negotiate certain provisions of the proposal and that they would submit a second proposal following those negotiations. The parties submitted their second bellwether proposal to the Court on November 4. A copy of that second proposal is attached to this Order.

Under both bellwether proposals, the pool of cases eligible for bellwether selection would be comprised only of Plaintiffs and Claimants residing in the state of Florida. The parties explain in their proposals that they agree on this provision for two reasons. First, trying cases venued in Florida avoids the need for *Lexecon* waivers. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34-40 (1998) (holding that a federal district court presiding over an MDL has no authority to invoke the change-of-venue statute to assign a transferred case to itself for trial).

Second, the Court has subpoena power over witnesses with case-specific information about Florida Plaintiffs and Claimants.

The Court has reviewed multiple authorities on the administration of MDLs that stress the desirability of selecting cases for bellwether trials that are representative of the cases in the MDL as a whole. For example, the Federal Judicial Center's Manual for Complex Litigation states: "If individual trials, sometimes referred to as bellwether trials or test cases, are to produce reliable information about other mass tort cases, the specific plaintiffs and their claims should be representative of the range of cases." Manual for Complex Litigation § 22.315 (4th ed. 2004). Other authorities caution courts against assuming that the cases of residents from one state will be representative of a nationwide pool of cases. *E.g.,* Loren H. Brown *et al.*, *Bellwether Trial Selection in Multi-District Litigation: Empirical Evidence in Favor of Random Selection*, 47 Akron L. Rev. 663, 683 (2014). Thus, during the October 25 hearing, the Court inquired about the parties' choice to include only Florida Plaintiffs and Claimants in the bellwether pool and about whether such a pool will be representative of all of the individuals and claims in this MDL.

The parties provided additional reasons, beyond the issues with *Lexecon* waivers and the Court's subpoena power, for selecting Florida for the bellwether pool. The parties explained that both sides independently reviewed reports from LMI about the information in the Registry, and the parties are satisfied that, in terms of demographics and product usage, Florida Plaintiffs and Claimants are representative of Plaintiffs and Claimants nationwide. T. at 11-13.[2] As examples, the distributions of ages, cancer types, durations of product use, and types of products used are substantially similar when comparing Florida Plaintiffs and Claimants to Plaintiffs and Claimants nationwide. *Id.* at 13. The parties believe that the large Florida population will provide an adequate

---

[2] "T." refers to the transcript of the October 25 hearing.

3

pool of cases for bellwether selection. *Id.* at 9.  The parties also compared Florida state law with the law of other states and believe that Florida "is kind of in the middle from the standpoint of substantive law that would be of assistance from the standpoint of formulating settlement values and the like." *Id.* at 15.

Following the hearing, the Court received and reviewed the same types of LMI reports that the parties relied upon to reach their mutual conclusion that Florida will provide a representative pool of Plaintiffs and Claimants for the selection of bellwether trials.  Based on its own independent review and after considering the parties' justifications, the Court is satisfied that, at this time and with the current composition of Plaintiffs and Claimants who have entered the Registry, Florida Plaintiffs and Claimants are representative of Plaintiffs and Claimants nationwide.  Thus, at this time the Court intends to draw from Florida Plaintiffs and Claimants for the purpose of bellwether selection.  Should the composition of the Registry change, the Court may modify the procedures contained in this Order.

## II.  BELLWETHER POOL

A.  On January 8, 2021, Plaintiffs' Leadership Counsel disclosed the ten (10) types of cancer that, as of that date, they intended to litigate in this MDL.  Those types of cancer were bladder, breast, colorectal/intestinal, esophageal, gastric, kidney, liver, lung, pancreatic, and prostate. DE 2533.

B.  On November 17, 2021, Plaintiffs' Leadership Counsel disclosed that they no longer intend to litigate breast and kidney cancer in this MDL. DE 4676.  Thus, as of the date of this Order, the types of cancer that continue to be litigated in this MDL are bladder, colorectal/intestinal, esophageal, gastric, liver, lung, pancreatic, and prostate.

4

C.  Under Second Amended Pretrial Order # 65, Plaintiffs' Leadership Counsel will provide expert reports on general causation by January 24, 2022, thereby identifying the types of cancer that they intend to continue to litigate through the *Daubert* stage of this MDL. DE 4660.[3]  Each deadline in this Order applies only with respect to the types of cancer that continue to be litigated in this MDL as of the deadline.

D.  According to reports that the Court has received from LMI, as of early November 2021 there were in excess of 4,000 Florida Plaintiffs and Claimants entered in the Registry (1) who have non-deficient CPFs; (2) who allege at least one of the cancer types that continue to be litigated in this MDL; (3) who make claims based at least in part on ingestion of brand-name ranitidine; and (4) whose Registry data does not reveal a potential Defendant who would destroy federal subject matter jurisdiction based on diversity of citizenship.[4]

E.  By **December 9, 2021**, 75% or more of the Florida Plaintiffs and Claimants who entered into the Registry on or before November 11, 2021 and who meet each of the four criteria in the preceding paragraph shall provide to Plaintiffs' Leadership Counsel the certification, either individually or through counsel, attached hereto as Exhibit A.[5]  The Florida Plaintiffs and Claimants who so certify by December 9, 2021, shall constitute the "Bellwether Pool."

---

[3] Plaintiff's Leadership Counsel has thus far provided prompt notice when they determine that they will no longer be pursuing one of the previously identified cancers.  It is the Court's expectation that this practice will continue through January 24, as the Court is mindful of the costs associated with the discovery set forth in this Order.

[4] "Non-deficient" refers to those CPFs that do not include a deficiency that, under Pretrial Order #'s 38 and 56, could lead to a Plaintiff's or Claimant's removal from the Registry and the dismissal of a Plaintiff's case. *See* DE 1479; DE 2325.  Plaintiffs and Claimants making claims based solely on ingestion of generic ranitidine are excluded because the Court has dismissed from the master complaints all claims against the manufacturers of generic ranitidine products. *See* DE 3750.

[5] Should less than 75% of the eligible Florida Plaintiffs and Claimants provide the certification, the Court may conduct an inquiry as to why this 75% requirement was not reached and may modify the procedures contained in this Order.

### III.  INITIAL DISCOVERY POOL

A.  In their second bellwether proposal, the parties set a date of November 8, 2021, to agree upon the form of signed medical authorizations and other required authorizations.  Special Master Dodge has informed the Court that the parties have reached agreement on the form of all authorizations.

B.  On **December 10, 2021**, the parties shall use the Microsoft Randomizer to randomly select eight percent (8%) of the Bellwether Pool for each cancer type, or a total of twenty-five (25) Plaintiffs and Claimants per cancer type for any cancer type in which eight percent (8%) of the Bellwether Pool does not exceed twenty-five (25).  The selected Plaintiffs and Claimants shall constitute the "Initial Discovery Pool."

C.   If at any time the Initial Discovery Pool for any cancer type drops below twenty-five (25), and there is otherwise no procedure for replacement under the terms of this Order, the parties shall use the Microsoft Randomizer to select replacement Plaintiffs and Claimants from the Bellwether Pool to replenish the Initial Discovery Pool to twenty-five (25) per cancer type.

D.  All Plaintiffs and Claimants selected for the Initial Discovery Pool on December 10 shall by **December 16, 2021**, file a Short Form Complaint using the process in Amended Pretrial Order # 31, if he or she has not already done so. *See* DE 1496.  Any Plaintiff or Claimant added to the Initial Discovery Pool at any time shall within six (6) days of selection file a Short Form Complaint using the process in Amended Pretrial Order # 31, if he or she has not already done so.

E.  The Answers to the Second Amended Master Personal Injury Complaint [DE 4101, 4102, 4103, 4105, and 4205] shall constitute answers that preclude a Plaintiff in the Initial Discovery Pool from unilaterally dismissing his or her case under Federal Rule of Civil Procedure 41(a)(1)(A)(i).  Any Plaintiff in the Initial Discovery Pool who wishes to voluntarily dismiss his

or her case shall comply with Federal Rule of Civil Procedure 41(a)(1)(A)(ii) or (a)(2). For each Plaintiff in the Initial Discovery Pool who voluntarily dismisses his or her case, the Defendants may at their option, within three (3) days of execution of a stipulation of dismissal or of the Court's order of dismissal, select a substitute Plaintiff or Claimant from the Bellwether Pool alleging the same type of cancer to be included in the Initial Discovery Pool. For each Plaintiff substituted into the Initial Discovery Pool who voluntarily dismisses his or her case, the Defendants may at their option, within three (3) days of execution of a stipulation of dismissal or of the Court's order of dismissal, cause the Microsoft Randomizer to select a substitute Plaintiff or Claimant from the Bellwether Pool alleging the same type of cancer to be included in the Initial Discovery Pool.

## IV.   INITIAL DISCOVERY POOL AUTHORIZATIONS AND PROVIDERS

As to each Plaintiff in the Initial Discovery Pool:

A.  Starting on **December 15, 2021** and continuing on a rolling basis until **January 14, 2022**, each Plaintiff shall serve electronically via LMI signed authorizations and a complete list of the following medical providers: (1) primary healthcare physician(s); (2) gastroenterologist(s); (3) ranitidine-prescribing physician(s), if applicable; (4) physician(s) diagnosing the alleged cancer; and (5) treating oncologist(s). Any Plaintiffs or Claimants added to the Initial Discovery Pool at any time shall serve the authorizations and list of medical providers required under this paragraph within two (2) weeks of their selection.

B. If there are deficiencies in any signed authorization or list of medical providers, the Defendants shall notify Plaintiffs' Leadership Counsel and the Plaintiff's individual retained counsel within five (5) days of receiving the deficient authorization and/or list. The Plaintiff shall correct the deficiencies within two (2) weeks.[6]

---

[6]  Adam Pulaski and Andrew Bayman shall meet and confer with Special Master Dodge in advance of the deadlines in Sections IV and V in this Order to determine what shall be deemed "deficiencies."

C.  The Defendants may move to dismiss the case of any Plaintiff who has not timely served non-deficient signed authorizations and a non-deficient list of medical providers and who has not timely corrected deficiencies identified by the Defendants.  Any dismissal for failure to comply with the terms of this Order may be with prejudice.  For each Plaintiff whose case is dismissed under this paragraph, the Defendants may at their option, within three (3) days of the date of the dismissal, select a substitute Plaintiff or Claimant from the Bellwether Pool alleging the same type of cancer to be included in the Initial Discovery Pool.

D.  Any disputes over the completeness or sufficiency of signed authorizations or lists of medical providers shall be presented to and decided by Special Master Dodge.

## V.  INITIAL DISCOVERY POOL DISCOVERY AND VETTING

### A.  CPF Bellwether Supplements

1.  By **December 3, 2021**, the parties shall agree upon the form of a CPF Bellwether Supplement.

2.  Starting on **February 1, 2022** and continuing on a rolling basis until **April 30, 2022**, each Plaintiff in the Initial Discovery Pool shall serve electronically via LMI a complete CPF Bellwether Supplement executed under oath by the Plaintiff.

3.  If there are deficiencies in any served CPF Bellwether Supplement, the Defendants shall notify Plaintiffs' Leadership Counsel and the Plaintiff's individual retained counsel within five (5) days of receiving the deficient CPF Bellwether Supplement.  The Plaintiff shall correct the deficiencies within two (2) weeks.

4.  The Defendants may move to dismiss the case of any Plaintiff who has not timely served a non-deficient CPF Bellwether Supplement and who has not timely corrected deficiencies identified by the Defendants.  Any dismissal for failure to comply with the terms of this Order may

be with prejudice. For each Plaintiff whose case is dismissed under this paragraph, the Defendants may at their option, within three (3) days of the date of the dismissal, select a substitute Plaintiff or Claimant from the Bellwether Pool alleging the same type of cancer to be included in the Initial Discovery Pool. Any Plaintiffs or Claimants added to the Initial Discovery Pool shall serve complete CPF Bellwether Supplements within six (6) weeks of their selection.

5. Any disputes over the completeness or sufficiency of CPF Bellwether Supplements shall be presented to and decided by Special Master Dodge.

## B. Vetting for Eligibility Criteria

1. The parties shall use medical authorizations and CPF Bellwether Supplements to begin the process of records collection and to vet the Initial Discovery Pool for compliance with eligibility criteria. The parties shall agree upon the eligibility criteria by **March 1, 2022**. During the October 25 hearing, the parties explained that they anticipate the eligibility criteria will relate to issues such that the parties agree a case should not proceed in the bellwether selection process, such as when a Plaintiff asserts that he or she took ranitidine but pharmacy records indicate that the Plaintiff took a different drug, or when a Plaintiff asserts that he or she took brand-name ranitidine but pharmacy records indicate that the Plaintiff took only generic ranitidine. T. at 46-47.

2. By **August 1, 2022**, the parties shall submit to the Court a list of the Plaintiffs in the Initial Discovery Pool whose claims do not satisfy the eligibility criteria. If the parties cannot agree on a joint list following a meet and conferral, they shall submit competing lists on August 1. If competing lists are submitted, the parties shall highlight the Plaintiffs in dispute for the Court. The Court anticipates that it will then issue a list of any Plaintiffs whose claims do not satisfy the eligibility criteria and thus are removed from the Initial Discovery Pool.

9

3. The Plaintiffs in the Initial Discovery Pool whose claims satisfy the eligibility criteria and who have served non-deficient authorizations, lists of medical providers, and CPF Bellwether Supplements by the required deadlines shall constitute the "Final Discovery Pool."

4. The Defendants and counsel for each Plaintiff in the Initial Discovery Pool shall evenly split the cost of procuring certain agreed upon medical records obtained via the signed authorizations provided by the Plaintiffs.[7] Each side shall promptly make available to the other side via LMI all medical records obtained. Any time that Plaintiffs' Leadership Counsel reduces the number of cancer types being litigated in this MDL, Plaintiffs' Leadership Counsel shall immediately inform LMI and terminate the records collection process for Plaintiffs not alleging a cancer type that continues to be litigated in the MDL. Costs for records collection incurred thereafter for such Plaintiffs shall be borne by Plaintiffs, rather than split among the parties.

5. Notwithstanding the procedures contained in this Order, the Court retains the ultimate authority over the selection of which cases proceed to bellwether trials.

## VI. POST-*DAUBERT* PROCEDURES

The parties' two proposals on bellwether selection procedures included procedures and deadlines whereby, following the Court's rulings on *Daubert* motions on general causation, the parties would further reduce the number of Plaintiffs at issue and would undertake case-specific discovery and the briefing of case-specific motions. The Court declines to adopt a post-*Daubert* process or schedule as this stage of the litigation. Plaintiffs' Leadership Counsel has not yet finalized the number and types of cancer that they will litigate in this MDL. The Court has not yet had the benefit of the parties' Science Day presentations and *Daubert* briefing. The Court recognizes the importance of the bellwether trials for all parties and believes that various factors

---

[7] The parties have agreed to this cost-splitting arrangement.

may help to inform the Court as to the manner in which cases should be prepared for bellwether trials. The Court anticipates setting a hearing immediately after issuing its last *Daubert* ruling to discuss with the parties the additional procedures and the schedule that will lead to the beginning of the first personal injury bellwether trial in this MDL. The parties have represented that they will be ready to commence the first bellwether trial in the summer of 2023, if not sooner, and the Court is prepared to preside over this trial at the earliest appropriate date.

      **DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 19th day of November, 2021.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Case 9:20-md-02875-RMB-SAK Document 2258-5 Filed 03/04/2021 Page 24 of 41
Case 1:19-md-02875-RMB-SAK Document 680 Entered 04/16/2021 Page 24 of 24
PageID: 129822

## EXHIBIT A – BELLWETHER ORDER CERTIFICATION

I hereby certify that, if selected to be in the Initial Discovery Pool (as defined in the Court's Pretrial Order No. 69 (Bellwether Selection)), I will not bring claims against non-diverse defendants and thus will file my complaint in the MDL by the deadline set forth in that Order. I understand that as a Plaintiff, I will be bound by the MDL Court's orders.

PLAINTIFF or CLAIMANT NAME:   _____

PLAINTIFF or CLAIMANT LMI ID#:   _____

SIGNED BY (electronic signature permitted):

_____
Plaintiff or Claimant

**OR**

_____
Counsel for Plaintiff or Claimant, on behalf
of         Plaintiff or Claimant

Case 1:20-md-02875-RMB-SAK Document 3258-5 Filed 03/11/21 Page 25 of 43
Case 9:20-md-02875-RMB-SAK Document 4683 Entered 04/26/2021 Page 1 of 24
PageID: 129823

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

IN RE:  ZANTAC (RANITIDINE)                          MDL NO. 2924
PRODUCTS LIABILITY                                   20-MD-2924
LITIGATION

                                    JUDGE ROBIN L. ROSENBERG
                          MAGISTRATE JUDGE BRUCE E. REINHART

_____/

### PRETRIAL ORDER
**(Bellwether Selection)**

This Order shall govern the process and plan for selecting personal injury bellwether

Plaintiffs from those cases currently filed in or transferred to this MDL 2924 and unfiled Claimants

in the Registry as of September 30, 2021.

## I.  BELLWETHER POOL

A. Pursuant to PTO 15, and applicable orders entered thereafter, the Court ordered and the

parties have maintained a database of cases filed in or transferred to this MDL and a

Census Registry of unfiled Claimants, containing information about the Plaintiffs and

Claimants and their claims and documents submitted and/or collected through a Census

Plus Form ("CPF") process.

B. On January 8, 2021, Plaintiffs' Leadership Counsel ("PLC") disclosed to the Court ten

(10) types of cancers that, as of that date, they intended to pursue in this MDL: Bladder

Cancer;  Breast  Cancer;  Colorectal  Cancer;  Esophageal  Cancer;  Gastric

(Stomach/Intestinal) Cancer; Kidney Cancer; Liver Cancer; Lung Cancer; Pancreatic

Cancer; and Prostate Cancer.

C. The Court intends to use Plaintiffs and Claimants residing in the state of Florida as

bellwether Plaintiffs in this MDL for two reasons: first, no Lexecon waivers are needed

Case 9:20-md-02875-RMB-SAK Document 2258-5 Filed 03/14/22 Page 26 of 44
Case 1:19-cv-04875-RMB-SAK Document 4683 Entered 03/14/22 Page 26 of 24
PageID: 129824

for any trials of these Plaintiffs' and Claimants' actions; and second, this Court has subpoena power over witnesses with case-specific information regarding these Plaintiffs and Claimants.

D.  As of November 2, 2021, the numbers of non-deficient Florida Plaintiffs and Claimants (excluding generic use only cases and claims, and those where the Census Registry data revealed a potential in-state defendant) alleging the ten (10) cancers disclosed by the PLC, are as follows:

| Type of Cancer Alleged | # of Florida Plaintiffs and Claimants |
| --- | --- |
| Bladder | 737 |
| Breast | 1,299 |
| Colorectal | 915 |
| Esophageal | 331 |
| Gastric (Stomach/Intestinal) | 388 |
| Kidney | 681 |
| Liver | 271 |
| Lung | 311 |
| Pancreatic Cancer | 290 |
| Prostate | 1,443 |

E.  75% or more of the above-referenced Florida Plaintiffs and Claimants will certify – either individually or through their counsel, in the form attached hereto as Exhibit A – before December 9, 2021, that if selected to be in the Initial Discovery Pool, they will not bring claims against non-diverse defendants and thus will file their complaints in the MDL and also be bound by the MDL Court's orders.  The Florida Plaintiffs and Claimants who so certify by December 9, 2021 are deemed the "Bellwether Pool."

F.  On December 20, 2021, pursuant to PTO 65, PLC will provide Plaintiffs' expert reports on general causation which will identify the cancers they intend to continue pursuing in the MDL.

Case 9:20-md-02875-RMB-SAK Document 2258-5 Filed 03/04/22 Page 27 of 45
Case 1:19-md-02875-RMB-SAK Document 683 Entered 2258-5 LSD Docket 04/26/2021 Page 3 of 24
PageID: 129825

## II.   INITIAL DISCOVERY POOL

A. By November 8, 2021, the parties shall agree upon the form of signed medical authorizations and other required authorizations.

B. On December 10, 2021, the parties will use the Microsoft Randomizer to randomly select a combined eight percent (8%) of the Bellwether Pool in each cancer category, or 25 combined Plaintiffs and Claimants per category in any alleged cancer category in which 8% of the combined Bellwether Pool does not exceed 25.

C. The Plaintiffs and Claimants selected under this paragraph will form the initial discovery pool (hereinafter, "Initial Discovery Pool"). If at any time the Initial Discovery Pool for any of the cancer categories drops below twenty-five (25), the Court will use the Microsoft Randomizer to select replacement cases from the Bellwether Pool to replenish the bellwether discovery pool to twenty-five (25) cases per cancer category. All Plaintiffs and Claimants who are selected for the Initial Discovery Pool will within six days (6) of selection file an individual Complaint, if not already done, using the Short Form Complaint process in Pretrial Order No. 31.

D. By December 17, 2021, any Plaintiff selected for the Initial Discovery Pool who does not intend to proceed with his or her case and be subject to the discovery and deadlines set forth in this Order will voluntarily dismiss his or her case with prejudice, with each party to bear its own costs.[1] For each Plaintiff in the Initial Discovery Pool who voluntarily dismisses his or her case, Defendants may at their option substitute another

---

1. For purposes of the dismissal with prejudice provisions of Sections II.D, III.C, IV.A.3, and V.B.2, if a Plaintiff does not respond after documented diligent efforts to contact him/her, or cannot respond fully because of a reasonable medical or other hardship, the parties can agree to extend the deadline for that Plaintiff. If there is no agreement to extend, or if any extended deadline passes, then Defendants may at their option substitute another Plaintiff or Claimant from the Bellwether Pool asserting the same cancer. The substituted Plaintiff's Short Form Complaint will be dismissed with prejudice ten (10) days thereafter unless that Plaintiff can show good cause for his/her failure to respond.

Plaintiff or Claimant from the Bellwether Pool asserting the same cancer to be included in the Initial Discovery Pool, by December 20, 2021 by 10:00 AM EST. Any Plaintiffs or Claimants added to the Initial Discovery Pool as replacements will within four (4) days of selection file an individual Complaint, if not already done, using the Short Form Complaint process in Pretrial Order No. 31.[2] By January 7, 2022, any Plaintiff who does not intend to proceed with his or her case and be subject to the discovery deadlines set forth in this order will voluntarily dismiss his or her case with prejudice, with each party to bear their own costs, and Defendants may at their option, by January 14, 2022, cause the Microsoft Randomizer to select a substitute another Plaintiff or Claimant from the Bellwether Pool asserting the same cancer category to be included in the Initial Discovery Pool.

### III. INITIAL DISCOVERY POOL AUTHORIZATIONS AND PROVIDERS

As to each of the Plaintiffs in the Initial Discovery Pool:

A. Starting December 15, 2021, 5 days after the first selection of the Initial Discovery Pool described in II(B) and continuing on a rolling basis until January 14, 2022, Plaintiffs will serve electronically via LMI signed authorizations and complete a list of the following medical providers for each Plaintiff (1) Primary Healthcare Physician(s); (2) gastroenterologist(s); (3) Ranitidine-prescribing physician(s), if applicable; (4) physician diagnosing the alleged cancer; and (5) treating oncologist(s). Plaintiffs who are added to the Initial Discovery Pool as replacements must provide the authorizations and list of medical records providers required by this paragraph by January 20, 2022.

---

2. The parties agree that any discrepancies between information or allegations contained in Short Form Complaints filed by Plaintiffs or Claimants selected for the Initial Discovery Pool (either initially or as replacements) and the subsequent Census Plus Form Bellwether Supplements required by Section IV or Amended Short Form Complaints filed under Section V(B)(2) will not be discoverable nor admissible.

B. If there are deficiencies in any signed authorizations or list of medical providers served under this paragraph, Defendants will endeavor to notify PLC and Plaintiffs' counsel (as identified in the signed medical authorizations) within five (5) days of receiving them. Plaintiffs will correct the deficiencies within two weeks.[3]

C. Any Plaintiff who has not timely served substantially complete, non-deficient signed authorizations and a complete list of medical providers or who has not timely corrected deficiencies identified by Defendants will be dismissed with prejudice with each party to bear its own costs, and Defendants may at their option substitute another Plaintiff or Claimant from the Bellwether Pool asserting the same alleged cancer to be included in the Initial Discovery Pool.

D. To the extent there are disputes over the completeness or sufficiency of the signed authorizations or list of medical providers, such disputes will be presented to and decided by the Special Master.

## IV.  **<u>BELLWETHER DISCOVERY POOL</u>**

### A. **Census Plus Form ("CPF") Bellwether Supplements**

1. By December 3, 2021, the parties shall agree upon the form of a CPF Bellwether Supplement.

2. Between February 1, 2022 and April 30, 2022, and on a rolling basis between therein to the extent possible, Plaintiffs in the Initial Discovery Pool will serve electronically via LMI a completed CPF Bellwether Supplement executed under oath by the Plaintiff. If there are deficiencies in any CPF Bellwether Supplement served under this paragraph, Defendants will notify PLC and Plaintiffs' counsel (as

---

3. Adam Pulaski and Andrew Bayman will meet and confer with the Special Master in advance of the deadlines in Sections III, IV, and V in this Order to determine what shall be deemed deficiencies.

identified in the CPF Bellwether Supplement) and Plaintiffs will correct the deficiencies within 14 days.

3. Any Plaintiff who has not timely served a substantially complete, non-deficient CPF Bellwether Supplement or timely corrected deficiencies identified by Defendants will be dismissed with prejudice with each party to bear its own costs, and Defendants may at their option substitute a replacement Plaintiff or Claimant from the Bellwether Pool asserting the same cancer type to be included in the Initial Discovery Pool by May 16, 2022.[4] In addition to serving authorizations and a list of providers pursuant to Section III, any such replacement Plaintiff shall serve a CPF Bellwether Supplement by June 3, 2022.

4. To the extent there are disputes over the completeness or sufficiency of a CPF Bellwether Supplement, such disputes will be presented to and decided by the Special Master.

**B. Vetting for Eligibility Criteria**

1. The parties will use medical records and CPF Bellwether Supplements to begin the process of records collection and to vet the Initial Discovery Pool for compliance with eligibility criteria to be agreed by the parties by March 1, 2022.

2. By August 1, 2022, the parties will provide to the Court a list of Plaintiffs in the Initial Discovery Pool whose claims do not satisfy the eligibility criteria. The parties shall meet and confer and attempt to submit a joint list, but will submit competing lists on August 1, 2022 if they cannot. If competing lists are submitted,

---

4. Any unfiled Claimant from the Bellwether Pool not selected for the Initial Discovery Pool (either initially or as a replacement) may remain in the Registry as an unfiled Claimant, subject to compliance with the Court's orders relating to the Registry.

the parties will highlight the disputed Plaintiffs for the Court, and by August 15, 2022 the Court will issue a list of any Plaintiffs whose claims do not satisfy the eligibility criteria and thus are removed from the Initial Discovery Pool.

3. Plaintiffs in the Initial Discovery Pool whose claims satisfy the eligibility criteria and who have served non-deficient authorizations, provider lists, and CPF Bellwether Supplements by the required deadlines, shall constitute the "Final Discovery Pool."

4. The Defendants and Counsel for each Plaintiff in the Initial Discovery Pool shall evenly split the cost of procuring medical records obtained via the signed authorizations provided by Plaintiffs, and such records shall promptly make available to the other side via LMI all such records obtained. Plaintiffs will inform LMI of the cancers they are pursuing on the day of disclosure and terminate the records collection process in cases involving Plaintiffs not alleging those cancers. Costs for records collection incurred after the day of disclosure in such cases involving Plaintiffs alleging non-disclosed cancers will be borne by Plaintiffs, not split evenly among the parties.

## V.   SELECTION OF BELLWETHER TRIAL POOL

The Court anticipates ruling on the parties' general causation *Daubert* motions in the fall of 2022.

### A. Sequencing

1. On the first Monday following the date of the last of the Court's general causation *Daubert* decisions, the parties will use the Microsoft Randomizer to set the order of the cancers supported by opinions of experts that survive *Daubert*, for purposes of

proceeding into bellwether discovery, subject to the Court's approval. The first two cancers as selected by the Microsoft Randomizer will be "Phase One Cancers" [Cancers 1 and 2, respectively] and the second two cancers selected by the Microsoft Randomizer will be "Phase Two" cancers" [Cancers 3 and 4, respectively]. On the same day, the parties will use the Microsoft Randomizer to select from the Final Discovery Pool eight (8) bellwether cases per cancer for each of the Phase One Cancers, forming the "Initial Bellwether Trial Pool."

## B. Phase One Cancers

1. Two days after the Initial Bellwether Trial Pool is selected, each side may strike one (1) Plaintiff from each of the Phase One Cancers, creating a "Bellwether Trial Pool" that includes six (6) Plaintiffs per cancer for each Phase One Cancer. Case-specific written discovery for the Plaintiffs in the Bellwether Trial Pool will open on the same date, and all other case-specific discovery will open the following Monday. For any Plaintiff in the Bellwether Trial Pool who voluntarily dismisses his or her case or claim on or after the date on which case-specific discovery opens, Defendants may strike an additional case in the same cancer category from the Bellwether Trial Pool.

2. Each of the twelve (12) Plaintiffs selected for the Bellwether Trial Pool will have 14 days from selection to file an amended Short Form Complaint, if necessary, to correct any information or allegations in Short Form Complaints filed under requirement of section II(C). The allegations in such Bellwether Trial Pool Plaintiffs' individual operative Complaints shall not differ from the information provided in the CPF Bellwether Supplement produced pursuant to IV(A). Any Plaintiff in the Bellwether Trial Pool who does not timely file the operative individual Complaint required by this

paragraph, or who files a Complaint containing allegations inconsistent with the information in his or her verified CPF Bellwether Supplement, or amendment thereto, will be dismissed with prejudice with each party to bear its own costs. Any amendment to the CPF Bellwether Supplement must be filed prior to or on the date of filing an amended Short Form Complaint and based upon later-discovered receipts, purchase records, medical records, or other similar documentation. Defendants may at their option substitute another Plaintiff from the Final Discovery Pool of the same alleged cancer type to be included in the Bellwether Trial Pool. Defendants will have three weeks to respond to any Complaints filed by the 12 Bellwether Trial Pool Plaintiffs that Defendants have not yet answered.

3. Within 70 days of case-specific discovery opening in the Bellwether Trial Pool, each party may strike one (1) case per cancer for each of the Phase One Cancers, leaving four remaining Plaintiffs per Phase One Cancer, and Defendants may strike any additional cases permitted pursuant to V(B)(1). The remaining cases in each of the Phase One Cancers will constitute the "Final Bellwether Trial Pool."

4. 95 days after the case-specific discovery opens on the date set by V(B)(1), case-specific discovery will close in the Final Bellwether Trial Pool. Only for good cause shown may the parties take a deposition after the close of case-specific discovery.

C. **Phase Two Cancers**

1. Five days after case-specific discovery closes for the Phase One Cancers on the date determined in V(B)(4), the parties will submit joint or competing proposals regarding a schedule for selecting and conducting discovery in Phase Two bellwether cases and setting them for trial.

2.   The Parties' proposals will provide for selection of Phase Two cases within 14 days of

the close of Phase One case-specific discovery.

## VI.   PRETRIAL SCHEDULE

### A.  Pretrial Motions Practice

As to the cases in the Final Bellwether Trial Pool established in V(B)(3), the Court orders

as follows:

| Deadline | Event |
|---|---|
| 10 days after close of case specific discovery | Plaintiffs' expert disclosures served and two non-consecutive deposition dates per expert provided |
| 30 days after Plaintiffs' expert disclosures served | Defendants' expert disclosures served and two non-consecutive deposition dates per expert provided |
| 30 days after Plaintiffs' expert disclosures served | Omnibus motions for summary judgment, cross-cutting dispositive motions, |
| 25 days after Defendants' expert disclosures served | Completion of depositions of Plaintiffs' experts |
| 25 days after completion of depositions of Plaintiffs' experts | Completion of depositions of Defendants' experts |
| 21 days after the completion of depositions of Defendants' experts | Case-specific dispositive and *Daubert* motions |
| 14 days after case-specific dispositive and *Daubert* motions filed | Oppositions to case-specific dispositive and *Daubert* motions |
| 7 days after oppositions to case-specific dispositive and *Daubert* motions are filed | Replies on case-specific dispositive and *Daubert* motions |

### B.  Selection of Bellwether Trial Cases

1.  Assuming the Court rules on the parties' case-specific dispositive and *Daubert* motions

by May 19, 2023, on May 21, 2023, the parties will nominate to the Court and rank in

order of preference the four cases in the first Phase One cancer category to be tried as

the first bellwether trial, and the four cases in the second Phase One cancer category to

be tried as the second bellwether trial, with the order of the Phase One cancer categories

set as described in V(A).  If, however, the Court has not ruled on the parties' case-

Case 9:20-md-02875-RMB-SAK Document 2258-5 Filed 03/04/22 Page 35 of 43
Case 1:19-cv-02875-RMB-SAK Document 2258-5 Filed 04/16/2021 Page 5 of 24
PageID: 129833

specific dispositive and *Daubert* motions by May 19, 2023, the parties will meet and confer on proposed modifications to this Order.

2. On May 23, 2023, the Court will decide which Plaintiff(s) in the first Phase One cancer category shall be tried in the first bellwether trial, and which Plaintiff(s) in the second Phase One cancer category shall be tried in the second bellwether trial.5

3. By May 30, 2023, the parties will meet and confer and submit a proposed schedule for pretrial evidentiary motions and procedural filings in the first trial case.

4. The first bellwether trial is hereby set for July 17, 2023, unless subsequently modified by order of this Court.

**C. Pretrial Hearing on Motions in Limine and Other Pretrial Motions**

By May 21, 2023, the Court intends to enter a subsequent order setting a Pretrial Hearing with respect to its first bellwether trial.

**VII.   SUBSEQUENT BELLWETHER TRIAL CASE SETTINGS**

The Court intends to issue subsequent Orders setting a date for the second through fourth bellwether trials, and addressing bellwether selection with respect to any cancers remaining.

**SO ORDERED,** on this _____ day of November, 2021.

_____
ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

---

5. The parties have informed the Court that Plaintiffs will ask for multi-plaintiff bellwether trials and that the Defendants will oppose the same.  That issue is hereby deferred for another day after motion practice thereon.

## EXHIBIT A – BELLWETHER ORDER CERTIFICATION

I hereby certify that, if selected to be in the Initial Discovery Pool (as defined in the Court's Pretrial Order No.__(Bellwether Selection)), I will not bring claims against non-diverse defendants and thus will file my complaint in the MDL by the deadline set forth in that Order.  I understand that as a Plaintiff, I will be bound by the MDL Court's orders.


PLAINTIFF or CLAIMANT NAME:          _____

PLAINTIFF or CLAIMANT LMI ID#:          _____


SIGNED BY (electronic signature permitted):



                                                           _____
                                                           Plaintiff or Claimant


                                                           **OR**



of
                                              _____
                                         Counsel for Plaintiff or Claimant, on behalf
                                                     Plaintiff or Claimant

# EXHIBIT B

| | |
|---|---|
| **From:** | Daniel Nigh |
| **To:** | Harkins, Steven M. (Shld-ATL-LT) |
| **Cc:** | valpec@kirtlandpackard.com; decvalsartan@btlaw.com |
| **Subject:** | Re: Valsartan - Items for Discussion in 2/17 Position Statements |
| **Date:** | Tuesday, February 17, 2026 2:20:39 PM |

**\*EXTERNAL TO GT\***

Counsel:

   I am writing in response to your email.

1. We do not believe that Lexecon should be a factor in the selection of cases.  We also do not agree to your characterization of what decisions the Court will make in each case subject to Lexecon, since the transferee court often evaluates case specific issues, for example, specific causation experts and dispositive motions, as well as motions in limine, and deposition designations, in particular related to case specific issues.

2. Losartan/Irbesartan Cases – Plaintiffs do not agree that the Wave 3 pool should exclude cases involving use of losartan and/or irbesartan products.

3. Liver Cancer – Plaintiffs believe that the Wave 3 bellwether pool should include both liver and colorectal cancer cases.

4. Mylan/Hetero Cases – Plaintiffs propose a two-pool approach for Wave 3. The primary Wave 3 pool will exclude cases with Mylan given the settlement posture – which should not be referenced in the submissions to the Court, at least as to Mylan. Plaintiffs propose that the next wave include cases involving Mylan products.  Once the settlement process concludes and it is determined which cases will have those defendants dismissed, Wave 4 cases can be selected from this next pool that includes Mylan use.  Cases with Hetero use do not need to be excluded from Wave 3, since nearly all of those cases have been resolved or nearly resolved.

5. Case Management Proposals – Plaintiffs agree that the case management proposals need not be included in tomorrow's position statement.

6. Plaintiffs do not believe broader certification requirements for all plaintiffs not included in the bellwether process or a show cause process for non-designated cancers are appropriate at this time. The parties should focus their resources on the bellwether cases. Accordingly, a meet and confer on Friday does not seem productive.

We believe we should send these position papers simultaneously to Judge Vanaskie via email and agree that submission by 5PM ET makes sense. Please let us know your thoughts.

Best regards,

Daniel

## Daniel Nigh

Founding Partner



NGRV Logo

Nigh Goldenberg Raso & Vaughn, PLLC
14 Ridge Square NW | Third Floor | Washington, D.C. | 20016

D  -  (850) 600-8090

T  -  (202)-792-7927-102

F  -  (612)-792-7927

nighgoldenberg.com

☐   ☐   ☐   ☐   ☐

On Mon, Feb 16, 2026 at 2:14 PM <harkinss@gtlaw.com> wrote:
Counsel,

We are following up on Thursday's meet and confer ahead of filing our letters with the Court tomorrow to clarify the parties' respective positions on certain items which may or may not need to be addressed with the Court.

1. *Lexecon* – Defendants understand that Plaintiffs are in agreement *Lexecon* issues should not prevent a case from being included in the "Wave 3" bellwether pool and will not prevent workup of any case selected for inclusion through completion of Rule 702 and summary judgment motions. All parties reserve their respective *Lexecon* rights which can be addressed following completion of motion practice. Please confirm this is accurate.

2. **Losartan/Irbesartan Cases** – Please confirm if Plaintiffs agree the Wave 3 pool should exclude cases involving use of losartan and/or irbesartan products.

3. **Liver Cancer** – Please confirm if Plaintiffs still intend to propose the Wave 3 bellwether pool include both liver and colorectal cancer. As previewed on our meet and confer, Defendants believe liver cancer should not be included while the appeal of the Court's Rule 702 and summary judgment decisions in *Roberts* is pending. We would prefer the parties jointly propose a Wave 3 pool of colorectal cancer cases and avoid the need to argue over the inclusion of liver cancer cases in tomorrow's submissions, if possible.

4. **Mylan/Hetero Cases –** Please confirm if Plaintiffs still intend to argue that personal injury cases involving use of Mylan and/or Hetero products should be included. As previewed on our meet and confer we believe that the inclusion of these cases is prejudicial to Mylan and Hetero in light of the announced settlements of their inventories of personal-injury cases and presents additional, unnecessary complications to the workup of the Wave 3 cases. Moreover, the potential Wave 3 pool is more than sufficient without inclusion of these cases.

5. **Case Management Proposals:** As raised by counsel for the downstream defendants, we would like to propose implementing (1) a show cause process for resolving cases involving non-designated cancers; and (2) broader certification requirements for plaintiffs not included in the bellwether process to certify certain facts and information with respect to their matters. Defendants propose that the parties meet and confer further on these certifications and not include discussion of any such proposal in tomorrow's position statement. Please let us know if Plaintiffs are available on this Friday at 10:00 a.m., 12:00 p.m., or 2:00 p.m. EST to meet and confer on these processes and certifications prior to any submission to the Court.

Best,

**Steven M. Harkins**

**Shareholder**

Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE | Suite 2500 | Atlanta, GA 30305
T +1 678.553.2312  |  F +1 678.553.2441
harkinss@gtlaw.com  |  www.gtlaw.com  |  View GT Biography

---

If you are not an intended recipient of confidential and privileged information in this email, please delete it, notify us immediately at postmaster@gtlaw.com, and do not use or disseminate the information.