[Docket No. 3130]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

|  |  |
|---|---|
| **IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION** | MDL No. 19-2875 (RMB/SAK) <br><br><br> **MEMORANDUM ORDER** |

**APPEARANCES:**

Adam Slater
Mazie Slater Katz & Freeman
103 Eisenhower Parkway, Suite 207
Roseland, NJ 07068

   *Attorney for Plaintiffs*

Jessica Davidson
Nina R. Rose
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

   *Attorneys for ZHP Defendants[1]*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter comes before the Court upon Plaintiffs' request for leave to file a motion for sanctions against ZHP for failing to preserve pre-2015 dimethylformamide certificates of analysis ("DMF COAs") and related inspection reports. In the motion, Plaintiffs would seek the entry of a default judgment against ZHP, a harsh remedy to be sure. [Docket No. 3147,

---

[1] For purposes of this matter, the ZHP Defendants ("ZHP") are Zhejiang Huahai Pharm. Co.; Solco Healthcare U.S., LLC; and Prinston Pharm. Inc.

at 30–31 (filed under seal).]   Alternatively, Plaintiffs would seek a factual determination adverse to ZHP, namely, that ZHP failed to turn over such documents because it was aware that DMF could contain the impurity dimethylamine.  [*Id.* at 31.]  Plaintiffs' secondary alternative argument would have the Court instruct the jury that it may infer that the discarded pre-2015 DMF COAs would have harmed ZHP's defense.  [*Id.* at 32.]  Finally, Plaintiffs request permission to move for monetary sanctions proportionate to costs and attorney's fees incurred during a discovery process allegedly conducted "under false pretenses."  [*Id.* at 35.] For the reasons discussed below, the Court **DENIES** Plaintiffs' request for leave to file a motion for sanctions against ZHP.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This ongoing litigation involves the contamination of the blood-pressure medication valsartan with N-Nitrosodimethylamine—known as "NDMA."   Agency for Toxic Substances & Disease Registry, Toxicological Profile for N-Nitrosodimethylamine (NDMA), 1, https://www.atsdr.cdc.gov/toxprofiles/tp141.pdf (Apr. 2023).   The present dispute is rooted in ZHP's destruction of pre-2015 DMF COAs in the ordinary course of business.[2]  On December 23, 2019, the Special Master ordered ZHP to "[p]roduce all certificates of analysis or similar documents concerning analysis of the purity or contents of valsartan, *including the catalysts and solvents used in the tetrazole ring process . . . .*"  [Docket No. 328, at 11, ¶ 26 (emphasis added).]  ZHP was to produce such documents on a rolling basis until June 30, 2020, and that deadline was subsequently extended to November 30, 2020.  [*See* Docket No. 318, at 2 ¶ 7; Docket No. 629, at 1, ¶ 1.]  But for reasons that remain unclear to this Court, Plaintiffs' May

---

[2] Specifically, "pre-2015" refers to DMF COAs produced prior to April 2015.  [*See* Docket No. 3140, at 3.]

7, 2020, letter—coming roughly six months after the Special Master's December 2019 discovery ███████████████████████████████████ ██████████████████████████████ [Docket No. 3176-1, at 2–3 (emphasis added) (filed under seal).]  As the Court noted at oral argument, a fair-minded recipient of Plaintiffs' May 7 letter could not be faulted for reading it as narrowing the broad language of RFPD No. 26.[3]  Accordingly, ZHP responded by producing COAs for valsartan API.  [*See, e.g.*, ZHP00075303–ZHP00075784;  ZHP00158981–ZHP00164474;  ZHP00201585–ZHP00236301.]  Notably, at no time before 2023 did Plaintiffs allege that ZHP's document production was deficient in this respect.  [Docket No. 3140, at 5.]

On February 3, 2023, during the deposition of ZHP's proposed chemistry expert Dr. Fengtian Xue, Plaintiffs made their first reference to third-party supplier COAs—noting that DMF COAs had not been produced.  [*See id.*;  *see also* Docket No. 3140–2, at 145:17–147:24.] Although Plaintiffs were aware of the non-production of the DMF COAs, Plaintiffs did not formally request production of those documents *until almost twenty months later*, in October 2024.  [*See* Docket No. 3140-3, at 2.]  On December 10, 2024, ZHP's counsel responded to Plaintiffs' request by producing a sample of DMF COAs and related documents dated from 2016 through 2018.  [*See* Docket No. 3140-4, at 2.]  On December 17, 2024, after further investigation, ZHP's counsel notified Plaintiffs that DMF COAs and related documents dated

---

[3] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

prior to 2015 had likely been destroyed in the ordinary course of business.  [Docket No. 3140-5, at 2, ¶ 3.]  ZHP's counsel had apprised Plaintiffs of the Company's document retention policies, which explained that auxiliary documents like COAs could be destroyed more than five years after receipt.  [*See, e.g.*, Docket No. 3140-4, at 3–4;  Docket No. 3140-6, at 2;  Docket No. 3140-7, at 7–9.]

On February 27, 2025, Plaintiffs formally requested leave to file a motion for sanctions related to the non-production of the pre-2015 DMF COAs.  [*See* Docket No. 2985, at 3–4.] On March 3, 2025, at the Case Management Conference, Plaintiffs' counsel expressed concern about the discarding of pre-2015 DMF COAs and related documents.  [*See* Docket No. 2992, at 30:23–31:6.]    After the Case Management Conference, ZHP produced approximately 229 DMF COAs received from various suppliers of substances used to manufacture valsartan along with the latest version of the Chemical Industry Standard of the People's Republic of China for dimethylamine (the "Chinese National Standard").[4]  [*See* Docket No. 3140, at 7.]  ZHP also agreed to produce a representative to provide deposition testimony related to the "contents and interpretation of the documents, and the use and distribution of the documents."  [Docket No. 3085, at 3.]

In connection with this issue, between July 10 and July 11, 2025, Plaintiffs' counsel deposed Ms. Jucai Ge—ZHP's former Head of Quality Assurance at a location where manufacturing of valsartan API took place.  [*See* Docket No. 3140, at 8.]  Ms. Ge explained that all DMF specifications conform to the Chinese National Standard, which has remained the same since 2009.  [*See* Docket No. 3140-10, at 145:6–20.]  As such, she suggested that the

---

[4] This standard has governed the substance of DMF COAs in China since 2009.  [*See, e.g.*, Docket No. 3140-8, at 2;  Docket No. 3140-9, at 1–13.]

pre-2015 DMF COAs contain the same information as the post-2015 DMF COAs that ZHP had already produced, although, as noted, ZHP did not produce them all. [*See id.*] Ms. Ge also testified that ZHP retained pre-2015 DMF COAs in accordance with the document retention policies disclosed to Plaintiffs. [*See* Docket No. 3140-11, at 80:22–83:4.] Plaintiffs requested the documentation of record destruction, which ZHP identified and produced on July 23, 2025. [*See* Docket No. 3140, at 9.] These documents indicated that at least some of the pre-2015 DMF COAs had been discarded pursuant to these policies. [*See id.*]

Unpersuaded by Ms. Ge's testimony, Plaintiffs renewed their request for leave to file a motion for sanctions. [*See* Docket No. 3130 (filed under seal).] After the August 1, 2025, Case Management Conference, ZHP requested sample DMF COAs from two different distributors of DMF purchased before 2016. [*See* Docket No. 3140-12, at 3, ¶¶ 1–3.] One distributor provided DMF COAs manufactured by Zhejiang Jiangshan Chemical Co., which included language identical to that contained in hundreds of COAs already produced by ZHP. [*Id.* at 3, ¶ 2; *see also id.* at 6, App'x A.] The second distributor, which sold ZHP DMF manufactured by Shandong Hualu Hengsheng Chemical Co., informed ZHP that it no longer possessed DMF COAs dated before 2016, but noted—just as Ms. Ge had explained—that those COAs adhered to the Chinese National Standard.[5] [Docket No. 3140-12, at 2, ¶ 3; *see also id.* at 11, App'x B.]

On August 8, 2025, ZHP filed a Memorandum in Opposition to Plaintiffs' Request for Leave to File a Motion for Sanctions. [*See* Docket No. 3140.] Plaintiffs responded with a

---

[5] Afterwards, pursuant to the Court's request that counsel determine whether this sanctions dispute could be resolved by stipulation, [Docket No. 3133, at 55:24–25], ZHP proposed a stipulation relating to the pre-DMF COAs. [Docket No. 3140-13, at 2.] The parties could not agree on that stipulation.

Memorandum in Support on August 15, 2025.  [*See* Docket No. 3147 (filed under seal).]  On August 18, 2025, ZHP's counsel filed a letter with the Court asking for a briefing schedule in the event the Court wished for a reply to Plaintiffs' Memorandum in Support.  [*See* Docket No. 3149.]  On August 27, 2025, the Court ordered Plaintiff to file a supplemental submission regarding the application for sanctions, not to exceed three pages.  [*See* Docket No. 3155.]  On September 9, 2025, pursuant to its previous order, the Court held oral argument on Plaintiffs' request for leave to move for the imposition of sanctions.  [Docket No. 3172.]

## II.    LEGAL STANDARD

Plaintiffs allege a spoliation injury.  [*See generally* Docket No. 3147 (filed under seal).]  Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Manning v. Safelite Fulfillment, Inc.*, 2021 WL 3542808, at *1 (D.N.J. Aug. 11, 2021) (citing *Mosaid Techs., Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004)).  Federal Rule of Civil Procedure 37(e) governs the spoliation of Electronically Stored Information ("ESI").  *See id.*  However, determining whether the spoliation of *physical evidence* has occurred requires the court to find the following elements: (1) the evidence was in the party's control;  (2) the evidence is relevant to the claims or defenses in the case;  (3) the evidence has actually been suppressed or withheld;  and (4) the duty to preserve the evidence was reasonably foreseeable to the party.  *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012).[6]

---

[6] *Bull* involved physical documents, demonstrating that the Third Circuit has extended the *Schmid* factors to cover all physical evidence, not just non-documentary physical evidence in products liability actions.  *See id.*  ("Here, though Bull failed to produce the [original documents], she did provide UPS with facsimiles and photocopies of the documents.").

Relatedly, for spoliation of physical documents to be sanctionable, the moving party must show bad faith. *Id.* at 79 ("In *Brewer* we discussed the connection between a finding of sanctionable spoliation and a ruling on bad faith . . . ."). An unfavorable inference of intent to spoliate physical documents does not arise automatically where a document "has been lost or accidentally destroyed, *or where the failure to produce it is otherwise properly accounted for.*" *See id.* (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995)) (emphasis added). Bad faith requires the court to find that a party "intended to impair the ability of [the other party] to [make its case]." *Magnetar Techs. Corp. v. Six Flags Theme Park, Inc.*, 886 F. Supp. 2d 466, 481 (D. Del. 2012) ("*Magnetar*"). In sum, because "a finding of bad faith is pivotal to a [sanctionable] spoliation determination . . . conduct that is 'no worse than negligent' is not spoliation *where non-electronic evidence is concerned.*" *Bistrian v. Levi*, 448 F. Supp. 3d 454, 466 (E.D. Pa. 2020) (emphasis added).

If the court finds that physical evidence has been spoliated, the following factors must be considered before deciding to impose sanctions: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994); *see also, inter alia*, *Bull*, 665 F.3d at 73 *n.*5; *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 519 (D.N.J. 2008); *Ogin v. Ahmed*, 563 F. Supp. 2d 539, 545 (M.D. Pa. 2008); *Parkinson v. Guidant Corp.*, 315 F. Supp. 2d 760, 762 (W.D. Pa. 2004).

A finding of prejudice requires a showing that the spoliation materially affected the substantial rights of the non-spoliating party by harming that party's ability to present its

case. *Magnetar*, 886 F. Supp. 2d at 481;  *see also Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1328 (Fed. Cir. 2011).  When a party moving for spoliation sanctions cannot offer "plausible, concrete suggestions as to what [the lost] evidence might have been," the Court is unable to find prejudice.  *Schmid*, 13 F.3d at 80, 81;  *see also GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 83 (3d Cir. 2019).

### III.  DISCUSSION

For the reasons enumerated herein, the Court **DENIES** Plaintiffs' request for leave to file a motion to impose sanctions for ZHP's failure to preserve the pre-2015 DMF COAs and related documents.

### A.  Spoliation

Plaintiffs have failed to satisfy the elements of physical spoliation that would entitle them to sanctions.  As a preliminary matter, though, it is important to recognize that three of the four elements have been satisfied based on the record evidence.  This is because: (1) ZHP had control of the pre-2015 DMF COAs before discarding them;  (2) the presence of dimethylamine in valsartan manufactured by third-party suppliers is somewhat relevant to Plaintiffs' case;  and (3) ZHP's preservation duty was at least reasonably foreseeable in light of the breadth of the Special Master's discovery order.  *See generally Bull*, 665 F.3d at 73.  But the last element, intentional withholding, has not been established for at least two reasons: (1) the pre-2015 DMF COAs were discarded pursuant to an established document retention policies permitting disposal of documents after at least a five-year period;  and (2) there is no evidence to contradict the conclusion that the parties were content, at least initially, with the production of COAs for valsartan API, but not for catalysts and solvents used in the tetrazole ring process.  Additionally, Plaintiffs delayed significantly before expressing their

concerns to Defendants regarding the absence of pre-2015 DMF COAs—making bad faith on ZHP's part a virtual impossibility under the circumstances. Of course, without a demonstrable showing of bad faith, the intentional-withholding element cannot be satisfied. *Id.* at 74 (considering whether Bull *intentionally* withheld the original notes from Dr. Farber's office). Because there is no evidence of bad faith here, Plaintiffs have not cleared their burden at the threshold.

Plaintiffs rely extensively on *Orion Drilling Co., LLC v. EQT Production Co.*, 826 F. App'x 204, 216 (3d Cir. 2020) ("*Orion Drilling*") and *Indem. Ins. Co. of N. Am. v. Electrolux Home Prods., Inc.*, 520 F. App'x 107, 111 (3d Cir. 2013) for the related conclusion that a finding of prejudice is not necessary to prove spoliation of physical evidence. Respectfully, Plaintiffs misrely on those cases. While Plaintiffs are correct that prejudice is not an element of spoliation to the extent physical documents—as opposed to ESI—are concerned, they err in suggesting that prejudice is not required as a prerequisite to the imposition of *sanctions* for such spoliation. *See Orion Drilling*, 826 F. App'x at 218 (citing *Schmid*, 13 F.3d at 79 (stating the three factors a court must consider when evaluating the propriety of proposed spoliation sanctions, *one of which is prejudice to the moving party*)) (emphasis added). Accordingly, this Court must heed the admonition of the *Bull* Court not to "merge[] its deliberation on spoliation with its analysis of spoliation sanctions" because "[t]hough there is some overlap between the two [inquiries], there are distinctive elements of each." *Bull*, 665 F.3d at 73 *n.*5 (emphasis omitted).

## B. Sanctions

Even if the spoliation elements were clearly satisfied, the Court must separately consider the *Schmid* factors before deciding to impose sanctions. *See Schmid*, 13 F.3d at 79.

9

Applied in this case, the Court must consider (1) whether, and if so to what extent, ZHP was at fault;  (2) whether ZHP's discarding of the pre-2015 DMF COAs prejudiced Plaintiffs;  and (3) whether a sanction more lenient than entry of default judgment remains available.  *Id.*

Here, while ZHP destroyed the pre-2015 DMF COAs in the sense that its decision to discard those documents rendered them undiscoverable, Plaintiffs have not provided the necessary evidence of bad faith on ZHP's part because they have not demonstrated that ZHP "intended to impair [Plaintiffs'] ability of to make [their] case" by disposing of the pre-2015 DMF COAs.  Rather, the available evidence suggests that ZHP discarded the pre-2015 DMF COAs during the litigation based—in its understanding of what Plaintiffs sought—on its document retention policies.  In other words, ZHP's failure to preserve the pre-2015 DMF COAs appears to have been the product of either a misunderstanding or a lack of communication between counsel.  *See Bistrian*, 448 F. Supp. 3d at 466.  Plaintiffs' May 7, 2020, letter is one such example.  [*See* Docket No. 3176-1, at 2–3 (filed under seal).]

Here, even if it could be said that ZHP intentionally failed to preserve the pre-2015 DMF COAs, Plaintiffs' attempt to prove sanctionable spoliation would still fall short because they have not proved that that failure prejudiced them.  Indeed, ZHP produced hundreds of post-2015 DMF COAs for Plaintiffs' examination.  [*See generally* Docket No. 3140-12, at 3, ¶ 2;  *id.* at 5, App'x A.]  The Chinese National Standard, unchanged since its adoption in 2009, governed both the pre-2015 and post-2015 DMF COAs, meaning that both sets of documents had the *same* substantive content.  [*Id.*]  Specifically, the Chinese National Standard defined the technical requirements applicable to DMF sold in China.  [*See* Docket No. 3140, at 7–8.]  Relevant here, the Chinese National Standard requires

10

measurement of DMF's alkalinity.  [*Id.*]  While test results differ numerically between individual DMF COAs, whether they were produced pre-2015 or post-2015, all of them reference an identical set of measurement standards—with the alkalinity measurement labeled either "alkalinity" or "Alkalinity (calculated as Dimethylamine)."[7]  [*See* Docket No. 3140, at 7–8.]  Because Plaintiffs have not demonstrated that the pre-2015 DMF COAs likely contained materially different information from the post-2015 DMF COAs, Plaintiffs have not established prejudice.[8]

There is, however, another factual consideration that counsels against finding prejudice here: Plaintiffs' failure to promptly object to ZHP's discarding of the pre-2015 DMF COAs.  In response to Plaintiffs' October 2024 discovery request pertaining to DMF and other substances used to manufacture valsartan, ZHP's counsel transparently stated that "COAs for DMF issued prior to 2015 had likely been destroyed in the ordinary course of business."  [Docket No. 3140-5, ¶ 3.]  In December 2024, ZHP's counsel again notified Plaintiffs of the possibility of destruction by adverting to its document retention policies— translated and provided to the Court—which expressly stated that COAs could be discarded after a five-year period.  [*See* Docket No. 3140-4;  *see also* Docket No. 3140-7.]  Despite

---

[7] At her deposition, Ms. Ge testified that "COA[s] issued by manufacturers" before April 2015 adhered to the same Chinese National Standard as COAs already produced.  [Docket No. 3140-10, at 144:18–145:20.]  Additionally, Ms. Ge testified that ZHP's internal pre-2015 DMF inspection reports did not differ from its post-2015 reports.  [*Id.*]

[8] ZHP also procured exemplary DMF COAs from the companies that supplied it with DMF before 2015.  [*See generally* Docket No. 3140-12 & Apps.]  These, too, are almost identical to the post-2015 DMF COAs already produced by ZHP.  For example, the DMF COAs created by Jiangshan in April and July 2012, like the post-2015 DMF COAs, label the alkalinity measurement "Alkalinity (calculated as Dimethylamine)."  [*Id.* at 3, ¶ 2;  *id.* at 5– 9, App'x A.]  Similarly, Shandong Hualu, which coincidentally produced the DMF COA that Plaintiffs discovered on the internet, confirmed that the DMF COAs it created between 2009 and 2015 met the Chinese National Standard.  [*Id.* at 3, ¶ 3;  *id.* at 10–12.]

possessing this information since at least 2024, Plaintiffs waited to object to the failure to preserve until 2025—diminishing Plaintiffs' position that these documents were central to Plaintiffs' case.[9]  Accordingly, Plaintiffs have not demonstrated prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' request for leave to file a motion to impose sanctions for ZHP's failure to preserve and produce the pre-2015 DMF COAs.

**/s/ Renée Marie Bumb**
RENÉE MARIE BUMB
Chief United States District Judge

DATED: July 2, 2026

---

[9] Specifically, Plaintiffs argue that ZHP's failure to preserve and produce the pre-2015 DMF COAs and related inspection reports prejudiced them because they could have used those documents to better understand the case; could have referenced them during the depositions of corporate witnesses; and could have employed them as evidence of the presence of dimethylamine as an impurity in DMF.  [*See* Docket No. 3147, at 23 (filed under seal).] However, the mere fact that the documents could have been used for these purposes, as well as to undercut ZHP's defenses, does not explain why Plaintiffs waited so long before raising the issue.  [*Id.*]