[Docket No. 3285]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| IN RE: VALSARTAN, LOSARTAN, AND IRBESARTAN PRODUCTS LIABILITY LITIGATION | MDL No. 19-2875 (RMB/SAK) |
| | |
| | **OPINION** |

**APPEARANCES:**

Adam Slater
Mazie Slater Katz & Freeman
103 Eisenhower Parkway, Suite 207
Roseland, NJ 07068

    *Attorney for Plaintiffs*

Richard T. Bernardo
Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West, Suite 42-128
New York, New York 10001

    *Attorney for ZHP Defendants[1]*

**RENÉE MARIE BUMB, Chief United States District Judge:**

This matter is before the Court on Plaintiff's Motion to Reverse the Order dated April 8, 2026, issued by Special Master Thomas I. Vanaskie (the "Order"). The Order sealed certain redacted portions of the September 16, 2025, letter from Richard T. Bernardo, Esq., to the Court (the "Letter"). Plaintiffs challenge the Order on three grounds, namely: (1) that ZHP has not shown that the redacted information is privileged; (2) that ZHP waived privilege in

---

[1] For purposes of this matter, the ZHP Defendants ("ZHP") are Zhejiang Huahai Pharm. Co.; Huahai U.S., Inc.; Prinston Pharm. Inc.; and Solco Healthcare U.S., LLC.

any case;  and (3) that the redacted portions of the Letter are subject to the crime-fraud exception to attorney-client privilege.  For the reasons discussed below, the Court **AFFIRMS** the Special Master's decision in full and accordingly **DENIES** Plaintiffs' motion.

## I.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This ongoing litigation involves the contamination of the blood-pressure medication valsartan with N-Nitrosodimethylamine—also known as "NDMA."  Agency for Toxic Substances & Disease Registry, Toxicological Profile for N-Nitrosodimethylamine (NDMA), 1, https://www.atsdr.cdc.gov/toxprofiles/tp141.pdf (Apr. 2023).  The discovery dispute that led to the filing of the Letter originates from two orders: the Case Management Order issued on February 25, 2019, which directed the parties to take reasonable measures to preserve potentially relevant documents, and the Special Master's discovery order issued on December 23, 2019, which set forth the documents to be produced.  [Docket No. 5, at 6, ¶ 12;  Docket No. 328, at 11, ¶ 26.]  Plaintiffs contend that they have been prejudiced by ZHP's failure to preserve and produce pre-2015 certificates of analysis ("COAs") for dimethylformamide ("DMF") pursuant to these Orders.[2]  [Docket No. 3195, at 5.]

Relevant here, on December 23, 2019, the Special Master ordered ZHP to "[p]roduce all certificates of analysis or similar documents concerning analysis of the purity or contents of valsartan, *including the catalysts and solvents used in the tetrazole ring process . . . .*"  [Docket No. 328, at 11, ¶ 26 (emphasis added).]  ZHP was to produce these documents on a rolling basis until June 30, 2020, and that deadline was subsequently extended to November 30, 2020.  [*See* Docket No. 318, at 2, ¶ 7;  Docket No. 629, at 1, ¶ 1.]  But for reasons that remain unclear to

---

[2] A COA is a document that shows the results of scientific tests on a particular drug.  It lists the chemicals the drug contains as well as the quantities of them.  DMF is a solvent used to produce valsartan.  [Docket No. 3267, at 3.]

this Court, Plaintiffs' May 7, 2020, letter—coming roughly six months after the Special

Master's December 2019 discovery ████████████████████████████████

████████████████████████████████████████████ [Docket No.

3176-1, at 2–3 (emphasis added) (filed under seal).] As the Court noted at oral argument, a

fair-minded recipient of Plaintiffs' May 7 letter could not be faulted for reading it as narrowing

the broad language of RFPD No. 26.[3] Seemingly consistent with this letter, ZHP produced

COAs for the active ingredient in finished valsartan, but not the catalysts and solvents used

in the tetrazole ring process. [See, e.g., ZHP00075303–ZHP00075784; ZHP00158981–

ZHP00164474; ZHP00201585–ZHP00236301.]

Plaintiffs did not raise ZHP's failure to produce all of the requested COAs, including

COAs for the catalysts and solvents used in the tetrazole ring process, until the 2023

deposition of defense expert witness Dr. Fengtian Xue—during which the distinction between

COAs for the active ingredient in finished valsartan and COAs for the catalysts and solvents

used in the tetrazole ring process crystallized. [Docket No. 3140-2, at 4–5.] Despite this

awareness, Plaintiffs did not renew their request for production of these COAs until October

2024, as the parties prepared for the inaugural bellwether trial. [Docket No. 3140-3, at 2–3.]

Specifically, Plaintiffs' counsel requested that ZHP "identify [in the document production

already made] the suppliers' certificates of analysis and material safety data sheets [for DMF]

---

[3] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

for the entire relevant time period . . . or produce them immediately." [*Id.* at 3.] On December 10, 2024, ZHP's counsel emailed a link to sample DMF COAs for a period stretching from 2016 through 2018. [Docket No. 3140-4, at 2.] On December 17, 2024, ZHP's counsel opined that the equivalent COAs for the period prior to 2015, which Plaintiffs sought to discover, had probably been destroyed in the ordinary course of business. [Docket No. 3140-5, at 2, ¶ 3.]

Plaintiffs sought to obtain these COAs, as opposed to the COAs for the active ingredient in the finished valsartan, on the theory that the documents would demonstrate that solvents used to manufacture valsartan—like DMF—contained the impurities dimethylamine and diethylamine, both of which could combine with already-present nitrous acid to create NDMA. [Docket No. 2985, at 2.] In response to the parties' dispute, on March 12, 2025, the Special Master ordered ZHP to produce COAs and related materials pertaining to the production of Valsartan by March 17, 2025, and to file a status report about its document retention policies and production of COAs by March 18, 2025. [Docket No. 3267, at 6.] In a status report filed on March 19, 2025, Plaintiffs expressed serious concern about the Defendants' failure to produce all COAs predating 2015. [Docket No. 2995, at 2.] ZHP responded the next day, reasserting that it could not find DMF COAs dated before 2015. [Docket No. 2996, at 1.] Pursuant to a March 21, 2025, Special Master Order, the parties participated in a conference call on March 28, 2025, which addressed ZHP's production of DMF COAs, ZHP's document retention policies, and Chinese "standard policies" for COAs. [Docket No. 3267, at 7.] During the call, Plaintiffs claimed prejudice because they had had to proceed with discovery and motions preparation without access to all of the requested COAs. [Docket No. 3002, at 10–13.]

4

Plaintiffs then requested leave to file a motion for sanctions to recover fees and costs for discovery conducted without the requested documents. [Docket No. 3034, at 2–3.] ZHP responded that Plaintiffs should not be given leave to request sanctions and that, in any event, Plaintiffs could not have been prejudiced by ZHP's failure to preserve and produce DMF COAs dated prior to December 2015, as there was no evidence that those COAs would materially differ from the ones created after 2015 and already made available for Plaintiffs' review. [Docket No. 3035, at 10.] During the August 1, 2025, Case Management Conference, Chief Judge Bumb directed the parties to present evidence pertaining to (1) the destruction of pre-2015 COAs as well as (2) whether the pre-2015 COAs were substantively identical to those created later in time. [Docket No. 3133, at 42.]

Two of ZHP's witnesses, Ms. Xiaofang "Maggie" Kong and Ms. Xiaxia Kuang, presented the requested testimony at the September 9, 2025, hearing. [Docket No. 3172, at 12–107 (Ms. Kong), 112–119 (Ms. Kuang).] On September 16, 2025, in accordance with the Court's direction, ZHP filed the Letter under seal. [Docket No. 3176 (filed under seal).] The Court subsequently ordered ZHP to provide opposing counsel with a redacted version of the Letter. [Docket No. 3181; *see also* Docket No. 3186-1, at 6.] ZHP supported its request to seal on the basis that the Letter contained information protected by attorney-client privilege and the work-product doctrine. [Docket No. 3186-2, at 2–3.] Plaintiffs opposed the motion to seal, setting up the dispute for resolution by the Special Master. [Docket No. 3195, at 5.] On April 8, 2026, the Special Master granted ZHP's motion to seal with respect to the redacted sections of the Letter but required publication of the redacted second footnote on

5

page three.  [Docket No. 3267, at 10.]  Plaintiffs now object and ask the Court to reverse the Special Master's order granting ZHP's motion.[4]  [Docket No. 3285, at 5–6.]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 53(f) sets out the requirements for judicial review of an order issued by a special master.  Rule 53(f)(3) provides that "[t]he court must decide de novo all objections to findings of fact made or recommended by the master, unless the parties, with the court's approval, stipulate that: (A) the findings will be reviewed for clear error; or (B) the findings of a master appointed under Rule 53(a)(1)(A) or (C) will be final."  Fed. R. Civ. P.  53(f)(3)(A)–(B).    Relatedly,  Rule 53(f)(4) provides that the court must review objections to the special master's legal conclusions de novo.  Finally, Rule 53(f)(5) provides that when reviewing a special master's determinations with respect to procedural matters, unless the appointing order calls for a different standard of review, the court may only set aside a ruling for abuse of discretion.

Here, the parties neither stipulated to a more deferential standard of factual review, nor to the proposition that the Special Master's decisions on such questions would be final. Accordingly, the Court must review de novo the Special Master's adjudication of the legal and factual considerations underlying the Order.

---

[4] ZHP filed its final investigative report regarding the production of DMF COAs on January 23, 2026.  [Docket No. 3236 (filed under seal).]  On January 26, 2026, ZHP filed a redacted version of its letter report.  [Docket No. 3237.]  On February 3, 2026, the Special Master issued an order granting ZHP leave to defer filing a motion to seal the January 23, 2026, letter report and accompanying exhibits until fourteen days after the issuance of the Special Master's disposition of ZHP's motion to seal the September 16, 2025, letter.  [Docket No. 3244.]  Pursuant to the Court's directive at the June 30, 2026, hearing, Judge Vanaskie shall decide whether to grant any putative motions to seal involving the January 23 letter or its accompanying exhibits in light of the analysis set forth in this Court's opinion.

### III.    DISCUSSION

For the reasons examined below, the Court **AFFIRMS** the Special Master's Order in full and accordingly **DENIES** Plaintiffs' motion.    First, ZHP *has* demonstrated that the redacted portions of the Letter are privileged.    This Court's in camera inspection of the unredacted version of the Letter confirms that the sections at issue contain textbook examples of attorney work product, to wit: (1) outside counsel's characterization of communications between ZHP and its former counsel regarding former counsel's mental impressions of document requests and (2) outside counsel's characterization of a preliminary draft of a spreadsheet prepared by ZHP's former counsel elucidating former counsel's mental impressions respecting collection strategy for manufacturing-adjacent document requests. [Docket No. 3295, at 9;  *see also, e.g.*, Docket Nos. 3176 (filed under seal), 3226.]

ZHP's production of a privilege log further supports the conclusion that the redacted portions of the Letter are privileged.    [Docket No. 3295, at 6.]    The privilege log specified, *inter alia*, the author of the spreadsheet, the individual who sent it as an email attachment, the recipient of the email to which it was affixed, and the date on which the email was sent. [Docket No. 3295-1, at 2–5;  *see also* Docket No. 3295, at 10.]    The foregoing considerations support the assertion of attorney work product, which the law recognizes a strong public policy interest in protecting.  *See, e.g.*, *Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981) (noting that "[t]he 'strong public policy' underlying the work–product doctrine" had recently been reaffirmed by the Supreme Court and "ha[d] been substantially incorporated" into the Federal Rules of Civil Procedure);  *see also Winston & Strawn LLP v. Janssen Prods., L.P.*, 2022 WL 3588106, at *3 (D.N.J. Aug. 22, 2022).    Plaintiffs' argument that ZHP's privilege log is defective because it does not provide enough detail to determine the nature of the Letter's

7

redactions is fruitless in light of the limited nature of ZHP's request to seal, which—in light of the Order—encompasses only two redactions, both of which have been clearly described. [Docket Nos. 3226, 3272, at 2–3; *see also* Docket No. 3295, at 11.] Far from acting in a disingenuous manner, ZHP attached documents to the privilege log that it considered helpful to Plaintiffs' evaluation of its privilege claims regarding the redacted sections of the Letter. [*See* Docket No. 3295 at 10–11.]

Second, the case law that Plaintiffs cite for the proposition that legal preservation orders do not enjoy privilege is unavailing. ZHP already complied with the Order to un-redact footnote two on page three of the redacted letter, which contained a general description of document preservation instructions—although the underlying document referenced remains privileged. [*See* Docket Nos. 3226, 3272, at 3.] The remaining redacted sections do not mention litigation holds. *See Boyington v. Percheron Field Servs.*, LLC, 2016 WL 6068813, at *12 (W.D. Pa. Oct. 14, 2016) (granting a motion to compel production to the extent it sought facts surrounding the defendant's preservation efforts but clarifying that the defendant did not need to produce actual hold notices or disclose communications between attorneys and employees). Either way, Plaintiffs have access to the key facts underlying ZHP's preservation efforts, including an example of a previous legal hold notice connected with the valsartan litigation and a list of employees who received hold notices. [*See* Docket Nos. 3147-2 (filed under seal), 3295.]

Third, the witnesses' testimony at the September 9 hearing did not waive attorney-client privilege with respect to the Letter's redacted sections. To waive attorney-client privilege with respect to communications with counsel, a client's testimony must put specific legal advice "at issue" for the purpose of satisfying a critical element of a claim or defense.

*Compare Brigham & Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, 707 F. Supp. 2d 463, 463, 471 (D. Del. 2010) ("*Brigham*") (finding waiver where the client proffered counsel's advice to support an affirmative defense before the United States Patent and Trademark Office), *and In re Valeant Pharms., Inc.*, 2021 WL 2163463, at *6 (D.N.J. Apr. 26, 2021) (finding waiver where the court inferred that an "advice of counsel" defense would imminently be raised); *with Rhone-Poulenc Rorer Inc. v. Home Indem. Co.,* 32 F.3d 851, 863–64 (3d Cir. 1994) ("*Rhone*") (declining to find waiver where plaintiffs had not disclosed or described an attorney client communication to prove a claim or defense), *and Jorjani v. N.J. Inst. of Tech.*, 2023 WL 2986694, at *11 (D.N.J. Apr. 18, 2023) (declining to find waiver where the defendant did not raise counsel's advice as an affirmative defense and where the relevant testimony pertained exclusively to the witnesses' states of mind), *aff'd*, 2023 WL 7895856 (D.N.J. Nov. 9, 2023).

In the Third Circuit, "[a]dvice is not in issue merely because it is relevant, and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner." *Rhone*, 32 F.3d at 863.  Instead, "[t]he advice of counsel is placed in issue where the client asserts a claim or defense, and *attempts to prove that claim or defense by disclosing or describing an attorney client communication*." *Id.*  (emphasis added).  It is generally not sufficient for a witness merely to testify that he consulted with counsel in deciding to follow a certain course of action. *See, e.g.*, *AstraZeneca L.P. v. Breath Ltd.*, 2010 WL 11428457, at *6 (D.N.J. Aug. 26, 2010) (declining to find waiver where the client merely consulted counsel about a matter at the heart of the case but never attempted to justify its challenged conduct by asserting reliance on counsel's advice).  In *Jorjani*, for instance, the plaintiff sued his former employer alleging First Amendment violations. *Jorjani*, 2023 WL 2986694, at *2.  The plaintiff moved to compel production of withheld documents on the

ground that university officials "testified that they consulted counsel on general topics as well as the issues regarding [the plaintiff]" himself. *Id.* at \*8. The court declined to find waiver, relying on *Rhone's* conclusion that "[d]efendants . . . do not waive the privilege when the clients' 'state of mind is put in issue in the action.'" *Id.* at \*11. In other words, because the witnesses' testimony did not plead advice of counsel to make out an affirmative defense, waiver did not occur. *Id.*

Here, the facts fit neatly with *Jorjani*. The mere fact that Ms. Kong and Ms. Kuang offered general testimony that they communicated with ZHP's former counsel during discovery did not place legal advice at issue in order to state a claim or defense. Ms. Kong merely testified as to her belief that ZHP complied with its discovery obligations, and Ms. Kuang similarly stated that she did not confer with counsel every time documents came due for destruction.[5] [*See id.* at 61:2–4 ("I – we did – provided all our best efforts, even though, now looking back, there are areas to improve."); *id.* at 87:18–20 ("In my recollection, I didn't recall there was discussions with my U.S. counsel about the catalysts and the solvents."); *id.* at 97:17–20 ("As I shared earlier, the discovery work was specifically led -- or under the instruction of our U.S. counsel. So I wouldn't say that it was my role to interpret what should be in and what should be out.").] Neither witness claimed that she failed to produce the DMF COAs and related documents *because of* counsel's advice. Thus, the sum total of Ms. Kong's statements at the September 9 hearing, [*see* Docket No. 3267, at 11–14], does not alter this

---

[5] In fact, Ms. Kong credibly testified that she could not explain why ZHP had focused on the COAs for valsartan API and not for DMF. [Docket No. 3172, at 89:20–90:3.]

Court's conclusion. Rather, it only offers insight into ZHP's state of mind during discovery––which does not rise to the level of placement "at issue" in the Third Circuit.[6]

Fourth, Plaintiffs' argument that any unwaived privilege is barred by the crime-fraud exception falters because Plaintiffs have not provided evidence to satisfy that exception's elements. To invoke the crime-fraud exception, the discovery-seeking party must demonstrate "that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud." *United States ex rel. Silbersher v. Janssen Biotech, Inc.*, 2025 WL 2693954, at *3 (D.N.J. Sept. 22, 2025) (citation omitted). Prima facie evidence is that "which, if believed by the factfinder, would be sufficient to support a finding that the elements of the crime-fraud exception were met." *Id.* The mere assertion of unsupported allegations of intentional wrongdoing does not suffice to "demonstrate that Defendants or their attorneys were engaged in or intending to commit a fraud or crime, or that attorney-client communications were being misused in furtherance of a fraud or crime." *Id.* at *4. Here, the Court finds no evidence that ZHP intentionally spoliated the DMF COAs and related documents or engaged in any other form

---

[6] *Brigham* does not require a different conclusion. In *Brigham*, the defendants asserted that the "plaintiffs [had] intentionally withheld information regarding [a certain patent application] in order to extend unlawfully [their] patent terms." *Brigham*, 707 F. Supp. 2d at 465. The plaintiffs responded that they must have disclosed all relevant materials because they had relied on counsel to do so. *Id.* at 471. The court ruled that "a litigant who asserts reliance on the advice of counsel as a defense waives the attorney-client privilege with regard to all communications pertaining to that advice." *Id.* at 470. But here, ZHP never asserted reliance on counsel's advice as an affirmative defense in litigation, let alone as a defense to Plaintiffs' spoliation accusations. Rather, ZHP provided witness testimony for the sole purpose of complying with this Court's order that someone from the Company provide testimony relating to its good-faith efforts to comply with document preservation requirements during discovery. [Docket No. 3168, at 275.]

of fraud or criminality. Accordingly, Plaintiffs cannot invoke the crime-fraud exception to attorney-client privilege.

## IV.    CONCLUSION

The Court **AFFIRMS** the Special Master's Order in full. Accordingly, Plaintiffs' motion is **DENIED**.


<u>**/s/ Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge

DATED: <u>July 2, 2026</u>

12